# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated,<br><br>                       Plaintiffs,<br><br>               v.<br><br>CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE,<br><br>                      Defendants. | Case No. _____ |

# CLASS ACTION COMPLAINT

Plaintiffs Alayna D'Amico, Max Miller, Bella Robinson, and Bram Silbert, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Defendants Consortium on Financing Higher Education, the Common Application Inc., Scoir Inc., Amherst College, Barnard College, Bowdoin College, Brown University, Bryn Mawr College, Carleton College, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, Haverford College, Johns Hopkins University, Macalester College, Middlebury College, Mount Holyoke College, Northwestern University, Oberlin College, Pomona College, Rice University, Smith College, Swarthmore College, Trinity College, University of Chicago, University of Pennsylvania, University of Rochester, Vanderbilt University, Vassar College, Washington University in St. Louis, Wellesley College, Wesleyan University, and Williams College (collectively, "Defendants").

## I.     Introduction

1.      The above-listed prestigious national colleges and universities ("Defendant Schools") have long been in the top tier of widely recognized rankings of colleges, such as the annual *U.S. News & World Report* rankings. These elite institutions occupy an undeniable place of privilege and influence in American society. And despite their critical role in the American higher education landscape, these schools have openly participated and are participating in practices that entrench patterns of inequality of access while inflating the price of attendance. Among these is the central practice challenged in this case: a horizontal agreement to reduce or eliminate competition through use of the early decision process ("Early Decision" or "ED"). Defendants the Common Application Inc. (the "Common App") and Scoir Inc., through its "Coalition App" (together, the "Application Platforms" or "Defendant Application Platforms"), provide common application products that facilitate and enforce the anticompetitive restraints of the conspiracy. Each Defendant School either is or has been a member of Defendant the Consortium on Financing Higher Education ("COFHE"), whose stated purpose is to facilitate information sharing among these institutions, which in turn facilitates the horizontal restraints challenged in this case.

2.      Each Defendant School, in addition to a traditional admissions process through which it competes with other schools for students, employs Early Decision to accept a substantial portion of its incoming class each year. A student applying Early Decision indicates that they will accept an offer of admission and withdraw all applications made to any other schools if offered admission through the Early Decision process. They must also state that they agree to pay whatever tuition and fees the school demands of them, provided the family can afford the price of attendance after factoring in the school's offered financial aid package if one is provided.

3.      It is well known and understood that schools offering Early Decision have much higher rates of admission for Early Decision applicants than for Regular Decision applicants. Thus, especially for the defendant colleges and universities that are known to have extremely competitive admissions processes, students are strongly incentivized to participate in Early Decision, even if they might otherwise prefer to see what other colleges and universities would admit them and compare costs of attendance among schools to which they have been offered admission.

4.      While the Early Decision agreement is presented in a form that resembles a contract, an applicant's commitment is not actually legally binding. Admissions experts and school officials widely acknowledge that Early Decision is not based on any enforceable contractual obligation, and instead describe it as an "honor-bound agreement" that imposes an "ethical" obligation, but "doesn't have any legal standing." The participating colleges and universities benefit from the fact that Early Decision is not legally binding. This allows the schools to retain the right to withdraw their offers of acceptance if the student does not finish high school with grades consistent with their interim transcript or if the student engages in behavior antithetical to the school's standards. Furthermore, because admitted students do not have enforceable contractual rights vis-à-vis participating colleges and universities, those schools retain the right to change their programs of study, available amenities and other terms of service without facing legal recourse from admitted students. Without binding contracts, participating colleges are also not contractually bound to any price terms vis-à-vis admitted students and can charge the tuition they deem appropriate, or offer any student financial aid packages they deem appropriate without facing

legal claims that implied financial terms were violated. Even if participating schools wished to bind students admitted through Early Decision, many students are admitted at the age of 17, which does not permit them to enter into legally binding contracts.

5.    Notwithstanding the absence of a contractual obligation, through the anticompetitive behavior described in this complaint (the "Early Decision Conspiracy"), Defendant colleges and universities essentially force Early Decision admittees to be bound to the school that offered early admission by preventing students from receiving and comparing offers from other schools.

6.    Early Decision is a classic *per se* violation of the antitrust laws. Ultimately, Early Decision is enforced by mutual agreement between would-be competitors not to compete for students offered admission through Early Decision at other schools. A school has no legal, moral, academic, or self-interest-based reason not to compete for students offered admission at other schools through Early Decision, any more than it does to refrain from competing for students offered admission by other schools through the regular admissions process. Yet the Defendant Schools have mutually agreed not to compete for students accepted through Early Decision, which both raises prices for tuition and other services and entrenches a system widely acknowledged to be unfair and harmful. Specifically, Early Decision is widely acknowledged to disadvantage price-sensitive students and those who lack the awareness and/or resources to participate in the Early Decision process, even as it drives up prices for the wealthier, less price-sensitive students who have the resources to play the game. As James Fallows wrote in *The Atlantic* in 2001, "Everyone involved with the early-decision process admits that it rewards the richest students from the most exclusive high schools and penalizes nearly everyone else."

7.    As in other cases involving the protection of portions of the market from competition, the effect on price is clear. The schools lose their incentive to compete on price for students admitted through Early Decision, driving up overall "top line" tuition levels and reducing both need-based and merit-based aid for Early Decision admittees. The result is that both Early

Decision and non-Early Decision students pay higher prices than they would have paid absent the conspiracy at the center of the Early Decision scheme.

8.    Both the existence of this restraint on trade and its effect on price have long been acknowledged, including by university insiders. For example, Defendant Vanderbilt University's current general counsel, Ruby Shellaway, argued in the *Yale Law Journal* in 2006 that Early Decision reflected an unlawful conspiracy that violated the antitrust laws:

> In essence, the competitor schools, who—under E[arly] A[ction] or regular decision—might have lured the student away with a better financial aid package, promise not to compete with the school to which the student has been admitted. The colleges have, through their agreement, created monopolies on certain customers' business for themselves—an illegal customer allocation and horizontal restraint of trade. Just as it is illegal to act in combination with competitors to set different prices for different customers, it is also illegal for competitors to grant each other exclusive access to certain customers. Each school, by sending out a list that its competitors will enforce, is guaranteed a listed student's attendance, and a student can only negotiate financial aid with the school that admitted him. In the remaining negotiations, the student has given up his leverage: He cannot make a credible threat to go elsewhere, because his name has already been removed from other schools' applicant pools.

9.    This argument is not merely academic. Charles Deacon, the current and long-time director of admissions at Georgetown University—which does not use Early Decision—was quoted in a 2001 article in *The Atlantic* describing a particular example of how the presence of competition affected price:

> "A cynical view is that early decision is a programmatic way of rationing your financial aid. First, the ED pool is more affluent, so you spend less money"—that is, give less need-based aid—"enrolling your class. And then there is absolutely no need to compete on financial packages. I am dealing with a very attractive candidate right now, admitted in our nonbinding program, who is comparing our aid package with"—and here he named a famous East Coast school that has a binding early-decision plan. That school, he said, had just come up with an offer that was all grant, no loan. "If she had applied there early decision, they wouldn't have had to do that."

10.     The then-dean of admission at Amherst College, Tom Parker, acknowledged in 2001 that "[t]he whole early-decision thing is so preposterous, transparent, and demeaning to the profession that it is bound to go bust."

11.     Though Dean Parker was right about Early Decision's merits, he was wrong about its staying power. Despite its "preposterous" lack of justification, Amherst, like the other users of Early Decision, has continued to participate in the Early Decision Conspiracy, because it has benefited the participating colleges and universities at the expense of students and applicants.

12.     The conspiracy is also self-reinforcing. As one commentator noted, "Given the benefits that early decision programs provide for universities and the fear of being put at a competitive disadvantage, it is unlikely that many institutions will voluntarily discontinue offering ED while their peers continue to offer it." Schools that choose not to use Early Decision may lose out on applications from desirable students who wish to use Early Decision at a competing school, and the schools cannot earn the supra-competitive levels of revenue that result from being protected from competition by the Early Decision Conspiracy. Unwilling to subject themselves to these disadvantages, few schools have abandoned Early Decision programs after using them, notwithstanding the broad consensus that they are harmful and unfair.

13.     Defendants have engaged in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. That conspiracy is likely to continue unless the relief sought herein is granted.

14.     The conspiracy challenged in this lawsuit consists of an agreement, understanding, and concerted action among Defendants, the substantial terms of which are to restrain competition for an agreed-upon group of students, in order to increase overall tuition levels and to decrease financial aid, thereby increasing the net price of attending these institutions.

15.     The Early Decision Conspiracy has caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to compensate Class Members for the financial harms of Defendants' conspiratorial conduct and to prevent future injuries from the ongoing conspiracy.

16.    Plaintiffs seek to represent themselves and a proposed Class of all persons who have (a) enrolled in one or more of Defendant Schools' full-time undergraduate programs and (b) directly purchased education from one or more of Defendant Schools not fully covered by grant-only financial aid and (c) were either (i) admitted through the Early Decision process and received financial aid in the form of school-provided grants for any semester in which they attended the school or (ii) admitted through any decision process and did not receive financial aid in the form of school-provided grants for any semester in which they have attended the school (d) during the period beginning four years prior to the filing of this Complaint until the effects of Defendants' continuing conduct cease.

## II.    The Parties

### A.    Plaintiffs

17.    Alayna D'Amico, from Cambridge, Massachusetts, attended Defendant Wesleyan University for four years as a full-time undergraduate student and graduated in May 2023. She applied to Wesleyan in the fall of 2018 through its Early Decision program, received an offer of admission that was presented as binding, and enrolled in the fall of 2019. She paid the full cost of attendance in each academic semester in which she was enrolled at Wesleyan.

18.    Max Miller, from San Francisco, California, is currently a full-time undergraduate student at Washington University in St. Louis. He received an offer of admission through the school's Regular Decision process with no financial aid provided and enrolled in the fall of 2022. He is expected to graduate in the spring of 2026 and has paid the full cost of attendance in each academic semester in which he was enrolled at Washington University in St. Louis (and will continue to do so through graduation).

19.    Bella "Jude" Robinson, from Philadelphia, Pennsylvania, is currently attending Defendant Vassar College as a full-time undergraduate student. They applied to Vassar in the fall of 2021 through its Early Decision program, received an offer of admission that was presented as binding, and enrolled in the fall of 2022. They have paid part of the full cost of attendance in each of the academic semesters since then, having received financial aid in each of those semesters

consisting in part of grants. The aid offers received from Vassar have also included both loans and work-study provisions.

20.     Bram Silbert, from Philadelphia, Pennsylvania, attended Defendant Wesleyan University for four years as a full-time undergraduate student and graduated in May 2023. He applied to Wesleyan in the fall of 2018 through its Early Decision program, received an offer of admission that was presented as binding, and enrolled in the fall of 2019. He paid the full cost of attendance in each academic semester in which he was enrolled at Wesleyan.

**B.     Defendants**

21.     Defendant Schools are national colleges and universities that use the Common App and/or Scoir/the Coalition App to coordinate anticompetitive conduct through the Early Decision college application process. Defendants also include those Application Platforms.

22.     Each Defendant School either is or has been a member of Defendant COFHE, the Consortium on Financing Higher Education, which describes itself as an "organization of highly selective, private liberal arts colleges and universities," and whose stated purpose is to facilitate information sharing among ostensibly competing elite education institutions "as they relate to undergraduate education, admissions, financial aid, and the financing of higher education."

23.     All Defendants are jointly and severally liable for the acts of all members of the Early Decision Conspiracy.

24.     Under the rule of joint and several liability, each Defendant is liable for all acts undertaken and all damages caused in furtherance of the conspiracy alleged herein, even those committed before the Defendant joined the Early Decision Conspiracy. Accordingly, each Defendant is jointly and severally liable for the conspirators' conduct throughout the course of the conspiracy.

25.     The Consortium on Financing Higher Education is an unincorporated organization of colleges and universities with its principal place of business in Cambridge, Massachusetts.

26.     The Common Application, Inc., is a private, non-profit institution with its principal place of business in Arlington, Virginia.

27.     Scoir Inc., the owner of the Coalition App, is a private, for-profit corporation with its principal place of business in West Chester, Pennsylvania.

28.     Amherst College is a private, non-profit institution with its principal place of business in Amherst, Massachusetts.

29.     Barnard College is a private, non-profit institution with its principal place of business in New York, New York.

30.     Bowdoin College is a private, non-profit institution with its principal place of business in Brunswick, Maine.

31.     Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

32.     Bryn Mawr College is a private, non-profit institution with its principal place of business in Bryn Mawr, Pennsylvania.

33.     Carleton College is a private, non-profit institution with its principal place of business in Northfield, Minnesota.

34.     Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

35.     Cornell University is a private, non-profit institution with its principal place of business in Ithaca, New York.

36.     Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

37.     Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

38.     Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

39.     Haverford College is a private, non-profit institution with its principal place of business in Haverford, Pennsylvania.

40.     The Johns Hopkins University is a private, non-profit institution with its principal place of business in Baltimore, Maryland.

41.     Macalester College is a private, non-profit institution with its principal place of business in Saint Paul, Minnesota.

42.     Middlebury College is a private, non-profit institution with its principal place of business in Middlebury, Vermont.

43.     Mount Holyoke College is a private, non-profit institution with its principal place of business in South Hadley, Massachusetts.

44.     Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois.

45.     Oberlin College is a private, non-profit institution with its principal place of business in Oberlin, Ohio.

46.     Pomona College is a private, non-profit institution with its principal place of business in Claremont, California.

47.     Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

48.     Smith College is a private, non-profit institution with its principal place of business in Northampton, Massachusetts.

49.     Swarthmore College is a private, non-profit institution with its principal place of business in Swarthmore, Pennsylvania.

50.     Trinity College is a private, non-profit institution with its principal place of business in Hartford, Connecticut.

51.     The University of Chicago is a private, non-profit institution with its principal place of business in Chicago, Illinois.

52.     The University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

53.    The University of Rochester is a private, non-profit institution with its principal place of business in Rochester, New York.

54.    Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

55.    Vassar College is a private, non-profit institution with its principal place of business in Poughkeepsie, New York.

56.    Washington University in St. Louis is a private, non-profit institution with its principal place of business in St. Louis, Missouri.

57.    Wellesley College is a private, non-profit institution with its principal place of business in Wellesley, Massachusetts.

58.    Wesleyan University is a private, non-profit institution with its principal place of business in Middletown, Connecticut.

59.    Williams College is a private, non-profit institution with its principal place of business in Williamstown, Massachusetts.

60.    Defendants Brown University, Cornell University, Dartmouth College, Macalester College, and Trinity College exclusively use the Common App for accepting Early Decision applications.

61.    Defendants Amherst College, Barnard College, Bowdoin College, Bryn Mawr College, Carleton College, Columbia University, Duke University, Emory University, Haverford College, Johns Hopkins University, Middlebury College, Mount Holyoke College, Northwestern University, Oberlin College, Pomona College, Rice University, Smith College, Swarthmore College, University of Chicago, University of Pennsylvania, University of Rochester, Vanderbilt University, Vassar College, Washington University in St. Louis, Wellesley College, Wesleyan University, and Williams College accept applications from both the Common App and from the Coalition App.

62.    The Defendant Schools are competitors in enrolling highly selective undergraduate student bodies and providing an elite undergraduate education. People throughout the United States apply for admission to the Defendant Schools' undergraduate programs.

63.    Each Defendant School annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant School's undergraduate population.

64.    Each Defendant School annually receives millions of dollars in tuition and fee payments that flow across state lines. Each Defendant School markets its undergraduate programs to the public across state lines.

## III.    Jurisdiction and Venue

65.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

66.    This Court has personal jurisdiction over each Defendant under Massachusetts law and through the jurisdiction conferred by 15 U.S.C. § 22. Each Defendant has (1) transacted business in the United States and in this District, including by recruiting and advertising for students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District.

67.    Defendant COFHE has its principal place of business in this District, and each Defendant School is or has been a member of COFHE during the Class Period. In addition, Defendants Amherst College, Mount Holyoke College, Smith College, Wellesley College, and Williams College reside in this District.

68.    Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and under 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents,

and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## IV.    Allegations

### A.    The Regular Decision Application Mechanism

69.    Each Defendant School uses a regular application mechanism in addition to Early Decision. Under the regular admissions process ("Regular Decision" or "RD"), the overwhelming majority of student applicants apply to more than one school for admission. According to the 2025 edition of Princeton Review's annual survey of applicants and their parents, 80% of applicants planned to apply to five or more schools, with 41% of applicants planning to apply to nine or more schools.

70.    Regular Decision applications are typically due in early January for matriculation in the fall semester.

71.    Schools normally communicate their acceptance or rejection of student applicants by late March or early April.

72.    At or about the same time that schools communicate acceptances, they also communicate offers of financial aid to prospective students.

73.    The financial aid packages can include merit-based and/or need-based aid, both constituting discounts from the published full tuition and fees of the school when they are provided in the form of grants.

74.    Schools have discretion in calculating the amount of both merit-based and need-based financial aid that they offer students.

75.    Applicants can negotiate with schools over the amount and composition of their financial aid package, including by leveraging the financial aid packages they have been offered by competitor schools. Because school administrators understand that each aid-seeking student is likely to receive financial aid offers from competing schools, schools are incentivized to offer more generous packages in their initial offers and to negotiate improved packages when an accepted

student requests additional aid before committing to a school, as reflected in the example described above at ¶ 9.

76.     Students generally have until May 1 to accept the offer from one school, including the financial aid package included in that offer.

77.     Students make their decisions based on, inter alia, the net cost of attendance, including any discount provided by the financial aid packages offered.

**B.     The Early Decision Application Process**

78.     Early Decision is marketed to potential student applicants as an opportunity to increase their likelihood of acceptance at prestigious schools with low acceptance rates.

79.     Each early applicant is allowed to make only one Early Decision application, which is due at the beginning or middle of November.[1]

80.     Early Decision applicants typically must use either the Common App or the Coalition App to apply to the Defendant Schools.

81.     Both Application Platforms require a student applying Early Decision to sign a document designed to resemble a contract obligating that applicant to accept an offer of admission received through Early Decision, to withdraw any other pending applications, and to make no further applications to other schools. Both Application Platforms prevent simultaneous Early Decision applications to two or more schools. Use of an Application Platform by a school requires it to agree to comply with the rules of that Application Platform, including any rules governing Early Decision applications.

82.     The supposedly binding Early Decision documents often require the signature of a parent and/or a high school counselor.

---

[1] Some, but not all, Defendants also offer a later round of ED, known as "Early Decision II" or "ED II," which also is limited to a single application.

83.     The Common App's "Early decision agreement" also expressly states that the student acknowledges that the Early Decision admitting school "may share my name and my early commitment with other institutions."

84.     The school has about a month to process the Early Decision application and typically responds by mid-December.

85.     If the school does not admit the student early, it may deny the application or transfer the application to the Regular Decision process. The student then normally has a relatively short period of time—often about two weeks—to send out additional applications to other schools through the Regular Decision process.

86.     Applicants admitted via Early Decision are informed that they must accept the admission, withdraw any pending applications to other schools, and cease applying to any other colleges.

87.     Thereafter, accepted students are presented with a financial package over which they have little ability to negotiate because they have been notified that they must accept the offer of admission and withdraw others, with few exceptions.

88.     Nor can accepted students compare aid packages from multiple schools or leverage other offers of admission in negotiating with the school that accepted them ED.

89.     According to the 2025 edition of Princeton Review's annual survey of college applicants and their parents, two-thirds of students list financial aid as among their most important considerations in selecting a college; potential debt is the single largest concern about college for prospective students and their parents; and nearly 70% of those who apply for financial aid consider receiving aid either "extremely" or "very" necessary to attending college.

90.     Early Decision is one of two common early application processes used by elite colleges and universities. The other, known as Early Action ("EA"), similarly allows students to apply to and receive an early response from a school. Early Action may be unrestricted or restricted—the latter prohibiting a student from submitting certain other early applications. Unlike Early Decision, however, Early Action does not purport to be binding. Under either form of EA,

students admitted through Early Action are free to apply to other schools in the Regular Decision process and to compare offers before making a final decision.

### C.    Defendants Falsely Portray Early Decision as Legally Binding

91.    The Early Decision system is built on a core misrepresentation that all Defendant Schools and Application Defendants make in their application materials: that an agreement to apply Early Decision to a school is a binding agreement by which the student is prevented from considering competing offers from other colleges.

92.    For example, the Common App's "Early decision agreement," which is for "the binding early decision plan" of an applicant's chosen college, requires the student to enter his or her "Legal name"—"exactly as it appears on official documents." It further states: "If the student is accepted under an early decision plan, the student *must* promptly withdraw the applications submitted to other colleges and universities and make no additional applications to any other university in any country." (Emphasis added). The only limitation is that, "[i]f the student is an early decision candidate and is seeking financial aid, the student need not withdraw other applications until the student has received notification about financial aid from the admitting early decision institution." The student is required to sign under an acknowledgment that states, "I have read and understand my rights and responsibilities under the early decision process." The Common App website states, "Students admitted under the Early Decision option may be released from this binding commitment only in cases of documented financial hardship."

93.    The document that applicants must sign to apply for Early Decision through the Common App is attached as Exhibit A to this Complaint.

94.    The Coalition App uses nearly identical language, but it adds the following clarifying language regarding financial aid: "Should a student who applies for financial aid not be offered an award that makes attendance *possible*, the student may decline the offer of admission and be released from the Early Decision commitment." (Emphasis added).

95.    The agreement that applicants must sign to apply for Early Decision through the Coalition App is attached as Exhibit B to this Complaint.

96.    Defendant Schools also falsely present the submission of an Early Decision application as a binding arrangement. For example, Northwestern's website states regarding its Early Decision plan, "As with all traditional ED plans, you agree to withdraw all applications at other colleges and enroll at Northwestern if admitted."

97.    Defendants have each independently and in collaboration with one another intentionally created the false impression among applicants and potential applicants that a student accepted under Early Decision is legally required to attend the accepting school, unless it would be financially impossible or in cases of documented financial hardship.

98.    These same schools claim to offer sufficient need-based financial aid to make attendance "possible" to all their early admittees.

99.    Defendants intentionally create the impression that the agreement is legally binding. It is widely known and accepted among the Defendants themselves, though, that the Early Decision agreements are not legally enforceable.

100.    In 2002, for example, Martin Wilder, the vice president for admission, counseling, and enrollment practices at the leading industry organization for college admissions, the National Association for College Admission Counseling ("NACAC"), stated that an Early Decision agreement is an "honor-bound agreement" that "doesn't have any legal standing."

101.    The Common App itself uses scare quotes in its "Application dictionary" in defining Early Decision, which it states is "A 'binding' application process by which you commit to enrolling in a certain college if you're admitted." The Common App does not define "binding."

102.    NACAC's "Guide to Ethical Practice in College Admission" describes Early Decision as "binding," but instead of referencing legal consequences, it advises its members to "educate students and families of their *ethical* responsibilities in the admission process" (emphasis added). The guide lists "[having] more than one pending Early Decision application"— immediately after plagiarism—as an example of an "ethical" violation.

103.    In a 2016 article in *U.S. News & World Report*, in which the author noted that "[t]he early decision agreement is not legally binding and that school wouldn't go after the student for

tuition," the director of admissions at Williams College, Richard Nesbitt, stated that if a student backed out without a good reason, "[i]t would be a big ethical issue."

104.    Sources who are former employees of defendants and other universities recently confirmed that the agreements are "not legally enforceable," with one longtime former administrator at multiple institutions that used Early Decision stating: "We all knew that the ED agreement was not a legal contract." As a result, as one industry insider put it, "[i]t's on the student to follow the agreement." And students honor the agreement because the possible "punishment" of not doing so is "so great."

**D.    Enforcement of the Early Decision Conspiracy**

105.    Notwithstanding the lack of legal obligation, the consequences for students who seek competitive offers from other schools are very real. Instead of employing legal, contractual mechanisms, the Early Decision Conspiracy is enforced by anticompetitive agreements not to compete that allocate applicants to a single school.

106.    The Early Decision Conspiracy coordinates enforcement through shared application platforms including the Common App and the Coalition App, as well as through information sharing among the Defendant Schools themselves.

107.    Nearly all applications to the Defendant Schools are submitted through one of the Defendant Application Platforms.

108.    The Application Platforms do not permit more than one Early Decision application at a time on each platform.

109.    In accordance with the provision in the Common App Early Decision document, colleges and universities, including the Defendant Schools, regularly share lists of students admitted under Early Decision in order to coordinate their allocation of applicants. Sources who previously worked in admissions offices at schools using Early Decision confirm that sharing occurred when they worked in those offices. When asked whether schools that offer Early Decision collude by sharing Early Decision admission information, one vice provost at a non-defendant institution stated: "I am certain that it happens … I'm as sure as I can be." Another source—a

former administrator at multiple institutions, including some that used Early Decision—confirmed direct knowledge of the sharing of Early Decision admit lists among COFHE-member schools and other liberal arts schools.

110.    Vanderbilt University's current General Counsel, Ruby Shellaway, acknowledged in The Yale Law Journal in 2006: "Once a school admits a student under ED, it notifies the student, and also sends a list of the students it has admitted ED to all of its competitor schools. Those schools then check the list and take two steps. First, they may terminate any EA or Regular Decision application that an ED-admitted student has submitted. Second, if they discover that the student has applied ED to more than one school, they notify the first school—and all involved typically revoke the student's admission."

111.    *The New York Times* confirmed the continuation of the practice when it reported in 2018, "In 2016, Amherst's dean of admissions told U.S. News that the college and about 30 others shared lists of students admitted through early decision, and that she would also be open to sharing the names of students who chose not to attend and for what reasons."

112.    A former director of admissions at Dartmouth College similarly admitted, "When Dartmouth finishes its final decisions for the early-decision applicants, it mails a list to the Ivies and several other highly selective colleges."

113.    When participating schools receive such lists, they routinely remove those students from their own application processes.

114.    The Early Decision Conspiracy even includes schools that do not use Early Decision in their own application processes, notwithstanding that some have been openly critical of the harms caused by Early Decision.

115.    For instance, in 2002, Harvard University, which does not use Early Decision, considered plans to continue competing for students admitted through other schools' Early Decision programs. One member of Harvard's Standing Committee on Admissions and Financial Aid asked, "[Why] would we honor a system that stinks?" Yale's Dean of Undergraduate Admissions and Financial Aid, Richard Shaw, said in response that it was important that Harvard

act collaboratively on Early Decision. As this Yale administrator expounded, "Harvard has always respected and acknowledged the binding commitment of early decision programs .... I assume they will continue to do so .... This is an important year for discussion about early programs and *it is also important to reach respectful consensus rather than take unilateral action*." (Emphasis added).

116.    In the end, Harvard did not go through with its plans to deviate from the no-competition consensus. Today, Harvard and Yale have both codified their participation in the conspiracy with respect to other Ivy League schools through a "Joint Statement for Candidates on Common Ivy Admission Procedure," which requires that each member school—including those without an Early Decision option, like Harvard and Yale—agree not to compete for students accepted through other Ivy League schools' Early Decision programs: "All Ivy League institutions will honor any required commitment to matriculate that has been made to another college under this plan."

117.    COFHE-member MIT similarly enforces other schools' Early Decision agreements despite not using Early Decision in its own application process, explaining on its admissions website: "Our Early Action isn't single-choice, binding, or anything like that. If you choose to apply to MIT during Early Action, we do not place any limits on where else you may apply, nor do we require you to attend if admitted (though we sure hope you do!). However, if you apply to another school during Early Action that does have a restriction, **MIT requires that you respect those rules**. So for example, if you apply to another school that is 'single choice'—meaning that you can only apply there during the early period—you may not simultaneously apply to MIT, and if you're admitted somewhere 'binding,' then even if we admit you, you *must* go there instead. So choose wisely!" (Emphases in original).

118.    The Defendant Schools use various mechanisms to share information to facilitate the scheme. All Defendant Schools, for example, are or have been members of COFHE, an "unincorporated, voluntary, institutionally-supported organization of highly selective, private

liberal arts colleges and universities" formed in the mid-1970s to share information among elite schools regarding financial aid and other matters related to financing attendance at these schools.

119.    Although its existence is public, COFHE's activities are highly secretive. The COFHE website highlights that "productive in-person meetings and information-sharing" are central to its mission, justifying COFHE's relatively small size. "Other than the information available on this site," the site emphasizes, "there are no other materials that are available to non-members." And even among member schools, "Access to the [non-public] COFHE site is limited to certain senior level administrators at each of our member institutions." A person who once worked in the provost's office at one of the member schools noted that COFHE had a history of being "twitchy about being subject to antitrust investigations." He added, "As the COFHE website suggests, this is an organization that doesn't really like to advertise its existence."

120.    All Defendant Schools are also members of NACAC, a national organization of colleges, universities, high schools, individuals who work for those schools, and others who work as college counselors. NACAC imposes what it now describes as a "Guide to Ethical Practice in College Admission." As NACAC notes:

> Since its inception, compliance with the *Statement of Principles of Good Practice* and, later, the *Code of Ethics and Professional Practices* was a condition of NACAC membership, and all members were expected to comply with the statements in the document. In 2017 the United States Department of Justice identified elements of the statement that they considered to be anti-competitive and in violation of the Sherman Antitrust Act. As a result, the 2020 Assembly approved the new Guide to Ethical Practice in College Admission as a statement of recommendations that the Assembly believes best promotes ethical and best practices in college admission.

121.    NACAC's ethical rules include the recognition of Early Decision as a "[b]inding" agreement and state that violations of the arrangement, such as through applying to more than one school for Early Decision, are "unethical."

122.    A number of administrators of the Defendant Schools and even COFHE are also on the boards of directors of the Defendant Application Platforms, the Coalition App and the Common App.

123.    For example, Whitney Soule, Vice Provost & Dean of Admissions at University of Pennsylvania, is on the Common App's board of directors. Former Common App directors include Art Rodriguez, Vice President and Dean of Admissions and Financial Aid at Carleton College, and Logan Powell, Dean of Admissions at Brown University.

124.    Among the members of the Coalition App's board of directors is Peter Wilson, Associate Vice President & Dean of Admissions at the University of Chicago. Its Directors Emeriti include Adam Sapp, Director of Admissions at Pomona College; Jessica Marinaccio, Dean of Undergraduate Admissions and Financial Aid at Columbia University; Seth Allen of Pomona College; James Nondorf of the University of Chicago; John Latting of Emory University; Audrey Smith of Smith College; Whitney Soule of Bowdoin College; Paul Thiboutot of Carleton College; and Kristine Dillon of COFHE.

### E.    Harm to Students

125.    The Early Decision Conspiracy affects the net prices that students pay in several ways.

126.    First, Early Decision permits colleges and universities to raise the full cost of attending the school by focusing on non-price-sensitive students who are able to pay full tuition and have indicated that they will not accept competing offers from other schools if they are admitted. By identifying and isolating a group of price-insensitive applicants to fill a substantial portion of their classes, schools are able to increase their power to raise prices. These students are willing to accept artificially inflated tuition in the absence of competition in exchange for the apparent possibility of an increased likelihood of acceptance to a single school, which allows the school to set a higher price for full tuition and fees.

127.    As a result, the elite colleges and universities with standard Early Decision programs impose full tuition rates that are, on average, thousands of dollars higher than those charged by comparable schools without such Early Decision programs. But for their participation in the Early Decision Conspiracy described herein, full tuition rates at the defendant colleges and universities would be lower.

128.    Use of Early Decision also leads to increased upward pressure on college tuition more broadly. When schools using Early Decision raise their prices in conjunction with identifying price-insensitive students as described above, comparable schools without Early Decision can also increase prices under this umbrella—albeit less aggressively than schools able to specifically target price-insensitive students through Early Decision—and remain competitive.

129.    The data bear this out, as the widespread adoption of Early Decision in the early 1990s correlates with skyrocketing tuition prices. In recent decades, tuition inflation has significantly outstripped both overall inflation as measured by the Consumer Price Index (CPI) and inflation as measured by the Higher Education Price Index (HEPI), which tracks costs incurred by colleges and universities. For instance, for fifteen straight years from 2002-2016, tuition price inflation grew faster each year than both overall inflation and HEPI inflation. The remarkable increase in tuition price is demonstrated by this graph:



130.    Second, schools offer less in need-based financial aid to applicants admitted under Early Decision because they know that no other school can compete by offering a more generous need-based aid package, eliminating the incentive to offer a competitive aid package.

131.    Third, schools similarly offer less in merit-based aid, which is a direct financial method of competing with other schools for attractive applicants.

132.    Finally, an Early Decision admit who tries to negotiate an increase to merit-based or need-based aid will have little bargaining power because of the absence of competing offers. School administrators know that very few applicants decline an Early Decision offer based on cost, especially after having been falsely told that they may do so only if the offer is inadequate to make it "possible" to attend the school. As one non-defendant administrator recently explained, because "[u]nder ED there is no financial negotiation going on," the "willingness to offer financial aid is eliminated."

133.    The financial harms that Early Decision causes applicants—and the concomitant financial benefits Defendant Schools accrue—are well known. Indeed, some college and university administrators openly admit that the ability to impose overcharges is a key benefit of Early Decision. For example, Dean of Admissions at Georgetown Charles Deacon has characterized ED as "a programmatic way of rationing your financial aid. First, the ED pool is more affluent, so you spend less money … enrolling your class. And then there is absolutely no need to compete on financial packages."

134.    Nor does the caveat that schools will release students from binding commitments on the basis of insufficient financial aid meaningfully reduce the harm to consumers that results from Early Decision's limitation on competition. This supposed qualification applies only in cases of "financial hardship" or when the cost makes attendance "not possible"—vague and subjective standards that imply it would be invoked only rarely. And schools typically send financial aid offers after the acceptance, so that the applicant is made to understand that they are bound by the acceptance before even seeing the price of attendance. Few students are willing to risk the potential consequences of not attending a school after Early Decision admittance, partly because they typically lack legal sophistication and may accept the Defendants' false representations that the agreement is binding. But even beyond that, students face the risk of boycott by other schools' collusive enforcement of the Early Decision agreement, the immediate loss of the acceptance in hand, and the lower probability of admission in the remaining Regular Decision application

process, as seats at other selective institutions have been meaningfully filled by other early applicants.

135.    Beyond these financial harms, Early Decision also harms students by distorting the incentives that would otherwise increase the chances that students were matched to their most preferred school. While Defendants have claimed that Early Decision improves matching by identifying the applicant's most preferred school, the overall effect is to undermine efficient matching.

136.    Students who apply to a school Early Decision but are not accepted are effectively penalized for having used their one Early Decision application at the wrong school, since their chance of gaining admission to any remaining schools is lower than it would have been if they had applied Early Decision to those schools.

137.    Because of this, applicants are incentivized to use Early Decision strategically, applying to a school for which they believe Early Decision will most likely make a difference in their chances of admission, which often means not applying to more preferred schools. If they are accepted, they lose the chance to apply to those more preferred schools, and if they are not accepted, they can apply, but with a lower probability of acceptance that comes with the standard application process.

138.    The result is that many students do not apply Early Decision to their most preferred schools; many students are forced to attend schools they would not otherwise have chosen to attend; and many students are not admitted to schools that they would have been accepted to absent the market distortions caused by the Early Decision system.

139.    Early Decision also works to undermine what Defendant Schools have described as an important aspect of their institutions—the inclusion of students from lower-income families. As one commentator put it, "[i]t's really a form of affirmative action for well-off students."

140.    Studies have consistently shown that Early Decision disfavors price-sensitive and disadvantaged students. For example, Defendant the Common App recently studied data from

applicants using its application platform, reporting in 2023 that Early Decision disfavors students from families with lower incomes and educational attainment:

> Use of early admission deadlines has increased in recent years. As applicants aim to optimize admissions chances at their target institutions, it is important to understand who is and is not using these deadlines in their application strategies. Our results indicate that trends vary meaningfully across ED and EA deadlines, such that ED applying is substantially less common than EA applying. This is likely the result of the binding language surrounding ED admission plans and the lack of such a commitment when students apply EA. Nonetheless, we find significant differences in both ED and EA applying across demographic subgroups. Our results indicate that these differences are not the result of variation in where students choose to apply or differences in academic characteristics (either GPA or SAT). *Instead, we see that applicants are far more likely to apply ED or EA when they live in more advantaged communities (whether this is measured by educational attainment or median household income)*. We also see that, on average, underrepresented students submitted their first application later in the season than their peers applying to the same institutions. *In other words, while early deadlines are increasingly popular overall and may confer admissions advantages for students, we observe that applicants historically underrepresented in higher education are less likely to use them*. (Emphases added).

141.    In *The Early Admissions Game: Joining the Elite*, Avery, Fairbanks, and Zeckhauser reached similar conclusions.

142.    And Ruby Shellaway, Vanderbilt University's current general counsel, acknowledged in The Yale Law Journal in 2006 that "the Avery study shows that students who apply ED 'are disproportionately non minorities from advantaged backgrounds. …. Similarly, financial aid applicants were less likely than others to apply early.'"

143.    In 2019, the Center for American Progress called for abolishing Early Decision because it disadvantages low-income students, noting, "The accumulated result of these unearned privileges and early admissions policies is nothing short of a crisis of representation on America's most prestigious college campuses."

144.    Because applying Early Decision increases the likelihood of acceptance at each of the Defendant Schools, the Early Decision Conspiracy works to reduce access to education at the Defendant Schools for the less wealthy and well-connected at a time when the tools universities

have for promoting broader access are increasingly limited, thereby further cementing institutional advantage for advantaged populations, all while raising the costs of higher education and distorting the efficient matching of students with schools that would result from a competitive market.

145.    Customer allocation and group boycotts to protect a single provider of products and services from competition are *per se* violations of Section One of the Sherman Act.

146.    Information sharing, when applied to effectuate a market-division scheme, price-fixing scheme, or group boycott scheme, also violates Section One of the Sherman Act.

147.    In combination, the practices of information sharing, customer allocation, and group boycotts serve to enforce compliance with Early Decision agreements, by allocating particular applicants to a single school without competition from other institutions. Those policies and practices serve to create and maintain a conspiracy between competing schools, the terms of which prospective students are forced to abide, in order to unlawfully reduce price competition.

148.    Colluding to allocate individual applicants to single institutions in the absence of competition is not reasonably necessary to achieve any legitimate procompetitive aim. The Early Decision system distorts, rather than improves, the matching of students to schools.

149.    Although each of the Defendant Schools is non-profit, they typically generate revenue substantially in excess of the cost of providing education, as evidenced by the fact that the endowments at elite schools have generally grown substantially over the last several decades. The Defendant Schools' endowments—nearly all of which are measured in the billions of dollars—could be used to reduce the price of attendance for undergraduates while maintaining a level of revenue that exceeds operating expenses.

F.    **The Relevant Market**

150.    Defendants' conduct is *per se* anticompetitive, obviating any need for market definition, including based on the direct evidence of anticompetitive effects. Defendants' conduct is also, and in the alternative, illegal under the rule of reason and "quick look" modes of analysis.

151.    Plaintiffs thus, in an abundance of caution, further allege a relevant market for undergraduate education from selective private national universities and liberal arts colleges in the

United States. These schools are consistently among the highest-rated schools on national rankings such as those published by *U.S. News & World Report*. This is the Market for Undergraduate Education from Elite Private Colleges and Universities. Each of the Defendant Schools is a participant in this market.

152.    Each of the Defendant Schools has consistently been among the highest-ranked schools in national rankings such as the *U.S. News & World Report* rankings for private national universities or private liberal arts colleges throughout the class period.

153.    The Market for Undergraduate Education from Elite Private Colleges and Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the schools in the market. That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of students admitted to two or more of these schools would respond to a small but significant increase in the net price by one of them by choosing to attend a lower-priced school in the same market that would make the price increase unremunerative.

154.    The Defendant Schools have recognized the scope of the market through their membership in COFHE, whose membership closely corresponds to the top-rated private universities and liberal arts colleges. COFHE has long understood itself to be a consortium "that includes most of the institutions widely identified as the 'elite' colleges and universities in the United States, including the Ivy League universities and selective coeducational and women[']s colleges."

155.    Economists and other academics studying higher education markets have used membership in COFHE as a means of identifying the market for elite undergraduate education in the United States.

156.    Defendants and their coconspirators have considerable market power, which they have exercised to increase the net price of attendance and to injure Plaintiffs and the other Class Members through the conduct alleged herein.

157.    Defendants have conspired with non-defendant schools as well to enforce the Early Decision Conspiracy. In fact, all schools in the Market for Undergraduate Education from Elite Private Colleges and Universities have agreed, through membership in NACAC, through participation in one or both of the Application Platforms, or through other means, to abide by the unlawful market-allocating agreements used to enforce Early Decision decisions.

158.    Competition in the Market for Undergraduate Education from Elite Private Colleges and Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry. Competition is further constrained by the fact that such institutions limit the supply of available seats, which has the effect of generating scarcity and enhancing their prestige.

159.    Relevant submarkets may exist. In addition, if Undergraduate Education from Elite Private Colleges were properly viewed as a separate market than Undergraduate Education from Elite Private Universities, for example, the respective defendants and their coconspirators would similarly have dominant market power in each of those separate markets.

### G.    Class Allegations

160.    The proposed Class is composed of all persons who have (a) enrolled in one or more of Defendant Schools' full-time undergraduate programs and (b) directly purchased from one or more of Defendant Schools education not fully covered by grant-only financial aid and (c) were either (i) admitted through the Early Decision process and received financial aid in the form of school-provided grants for any semester in which they attended the school or (ii) admitted through any decision process and did not receive financial aid in the form of school-provided grants for any semester in which they attended the school (d) during the period beginning four years prior to the filing of this Complaint until the effects of Defendants' continuing conduct cease.

161.    The Class excludes Defendants and their officers, directors, management, subsidiaries, or affiliates; the Judge presiding over this action, his or her law clerks, and their spouses; and any person living in the household of such a person.

162.    The Class consists of at least tens of thousands of members.

163.    The Class is so numerous that joinder of all members is impracticable.

164.    There are questions of law and fact common to the Class, including:

      a.    Whether the Defendants engaged in a contract, combination, or conspiracy to reduce competition and fix, raise, maintain, or stabilize the price of attendance at Elite Private Colleges and Universities in the United States.

      b.    The effect of Defendants' use and enforcement of the Early Decision system on the net cost of attendance at Defendant Schools during the class period.

      c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

      d.    Whether Defendants' conduct caused injury to the Plaintiffs and the other members of the Class.

      e.    The appropriate measure of class-wide damages.

165.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

166.    Given the cost of establishing that Defendants' conduct violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for any Plaintiff to enforce his or her statutory rights.

167.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

168.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and class-wide damages.

169.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily ascertainable and is one for which records exist. Prosecution as a class action will eliminate the possibility of duplicative litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their

common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

170.    Defendants have acted and continue to act on grounds that apply generally to the Class, so that, in addition to damages, final injunctive relief is appropriate respecting the Class as a whole.

## V.    Claims for Relief

### FIRST CAUSE OF ACTION

### Sherman Act, 15 U.S.C. § 1

171.    Plaintiffs incorporate the preceding paragraphs.

172.    At a time currently unknown to Plaintiffs, but long before the beginning of the class period and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain, or stabilize the prices of attendance paid by Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

173.    In formulating and carrying out their conspiracy, Defendants have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: unlawfully agreeing to allocate particular customers to particular Defendant Schools with the purpose and effect of eliminating competition and increasing net prices paid by students at the Defendant Schools.

174.    Defendants have monitored and enforced their conspiracy in several ways, including (but not limited to) through the Application Platforms, sharing of information with competitors, and engaging in group boycotts of applicants who attempt to act outside of the unlawful rules of the Early Decision Conspiracy.

175.    This conspiracy has, among other effects, fixed, increased, maintained, and stabilized the net price of attendance at artificially high, non-competitive levels for all Class Members.

176.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendant Schools than they would have paid but for the combination and conspiracy.

177.    Defendants' conspiracy is a *per se* violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the rule of reason, including under a "quick look" analysis.

178.    Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid and will pay to Defendant Schools flows directly from Defendants' restraints on competition and is the type of injury that the antitrust laws were designed to prevent.

179.    Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## VI.    Requested Relief

Plaintiffs request the following relief:

a)    That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class Members;

b)    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

c)    That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and award Plaintiffs and the other Class Members actual damages and/or restitution in an amount to be determined at trial, such amount to be trebled as permitted by law;

d)    That the Court award Plaintiffs and the other Class Members pre- and post-judgment interest on any recovery;

e)      That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

f)      That the Court award Plaintiffs a permanent injunction, under Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from continuing to conspire regarding their early application policies and practices; and

g)      That the Court award such other relief as the Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiffs request a jury trial on all matters so triable.

Dated: August 8, 2025

Respectfully Submitted:

By:____/s/ *Daniel H. Silverman*_____

Edward Diver
Peter Leckman
Kevin Trainer
**LANGER GROGAN & DIVER P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
ndiver@langergrogan.com
pleckman@langergrogan.com
ktrainer@langergrogan.com

*Pro Hac Vice forthcoming*

Daniel H. Silverman
Massachusetts Bar ID: 704387
**COHEN MILSTEIN SELLERS & TOLL PLLC**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
Alex Bodaken
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, DC 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dmccuaig@cohenmilstein.com
abodaken@cohenmilstein.com

*Pro Hac Vice forthcoming*