# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, THE TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, WILLIAM MARSH RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE,<br><br>　　　　　　　Defendants. | Case No. 1:25-cv-12221-AK |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

## <u>TABLE OF CONTENTS</u>

Introduction .................................................................................................................1

Background ..................................................................................................................3

    A.  Colleges And Universities Fiercely Compete For Students By Offering
         Several Admissions Options, Including Early Admissions. ..........................................3

    B.  Plaintiffs Allege A Sprawling, Multi-Decade Conspiracy To Limit
         Competition For Students After They Are Admitted Early Decision............................6

    C.  Plaintiffs Cannot Plead A Horizontal Conspiracy Based On Lawful Vertical
         Agreements. ..........................................................9

Argument ....................................................................................................................10

    I.  Plaintiffs Do Not Plausibly Allege A Horizontal Agreement Among Defendants. ..........11

        A.  The Complaint Alleges No Direct Evidence Of A Conspiracy. ...................................13

        B.  The Complaint Alleges No Indirect Evidence Of Agreement. ....................................14

    II.  Plaintiffs Do Not Plausibly Allege An Unreasonable Restraint Of Trade........................21

        A.  The Rule of Reason Applies. ..............................................22

        B.  Plaintiffs Do Not Plausibly Allege A Rule Of Reason Claim. ...................................24

    III.  Plaintiffs Do Not Plausibly Allege They Have Antitrust Standing. ...................................29

        A.  Plaintiffs Do Not Allege Any Causal Connection Between Their Harms And
            The Challenged Conduct.................................................30

        B.  Plaintiffs Do Not Plausibly Allege That The Challenged Conduct Increased
            Their Tuition. ..............................................................31

        C.  Plaintiffs Do Not Plausibly Allege That The Challenged Conduct Reduced
            Their Need- Or Merit-Based Aid..........................................32

    IV.  The Statute of Limitations Bars Claims By Plaintiffs D'Amico and Silbert. ...................33

Conclusion ..................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
  1 F.4th 102 (2d Cir. 2021) ...............................................................................24, 25

*Advanced Tech. Corp. v. Instron, Inc.,*
  925 F. Supp. 2d 170 (D. Mass. 2013) ..............................................................16, 19

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.,*
  367 F.3d 212 (4th Cir. 2004) .................................................................................13

*American Sales Co., LLC v. AstraZeneca LP (In re Nexium (Esomeprazole)*
  *Antitrust Litig.),* 842 F.3d 34 (1st Cir. 2016) ................................................ *passim*

*American Steel Erectors v. Local Union No. 7, International Ass'n of Bridge,*
  *Structural, Ornamental & Reinforcing Iron Workers,*
  815 F.3d 43 (1st Cir. 2016) .........................................................................9, 22, 23

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................11, 31

*Associated General Contractors of California, Inc. v. California State Council of*
  *Carpenters,*
  459 U.S. 519 (1983) ................................................................................29, 31, 33

*Avangrid, Inc. v. NextEra Energy Inc.,*
  No. 24-CV-30141, slip op. (D. Mass. Sept. 22, 2025), ECF No. 109 ...................26

*Beddall v. State Street Bank & Trust Co.,*
  137 F.3d 12 (1st Cir. 1998) ....................................................................................27

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... *passim*

*Berkson v. Del Monte Corp.,*
  743 F.2d 53 (1st Cir. 1984) ....................................................................................34

*Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.,*
  483 F. Supp. 3d 38 (D. Mass. 2020) ......................................................................29

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ...............................................................................25

*Bryan v. Ascend Learning, LLC*,
2025 WL 2239250 (D. Mass. Aug. 6, 2025), *appeal docketed*, No. 25-1858
(1st Cir. Sept. 12, 2025) ...........................................................................................27

*Bunker Ramo Corp. v. United Business Forms, Inc.*,
713 F.2d 1272 (7th Cir. 1983) .................................................................................23

*CCBN.com, Inc. v. Thomson Financial, Inc.*,
270 F. Supp. 2d 146 (D. Mass. 2003) ................................................................23, 29

*Cement Manufacturers Protective Ass'n v. United States*,
268 U.S. 588 (1925)...................................................................................................21

*Chapman v. New York State Division for Youth*,
546 F.3d 230 (2d Cir. 2008)......................................................................................27

*Choh v. Brown University*,
753 F. Supp. 3d 117 (D. Conn. 2024), *appeal docketed*, No. 24-2826 (2d Cir.
Oct. 25, 2024) ..................................................................................................... *passim*

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities
Corp.*,
92 F.4th 381 (2d Cir. 2024) .................................................................................13, 15

*Coronavirus Reporter v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .....................................................................................26

*Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc.*,
357 F.3d 1 (1st Cir. 2004)..............................................................................24, 26, 28

*Evergreen Partnering Group., Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013)...........................................................................11, 13, 16

*Flaa v. Hollywood Foreign Press Ass'n*,
55 F.4th 680 (9th Cir. 2022) .....................................................................................25

*Flovac, Inc. v. Airvac, Inc.*,
817 F.3d 849 (1st Cir. 2016)......................................................................................26

*Geffner v. Coca-Cola Co.*,
343 F. Supp. 3d 246 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 198 (2d Cir. 2019) ............31

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) .................................................................................10

*Government of Puerto Rico v. Carpenter Co.*,
442 F. Supp. 3d 464 (D.P.R. 2020)...........................................................................34

*Hansen v. Northwestern University,*
  2025 WL 2731378 (N.D. Ill. Sept. 24, 2025) .......................................................2, 14, 16, 19

*Harry v. Countrywide Home Loans Inc.,*
  219 F. Supp. 3d 228 (D. Mass. 2016), *aff'd*, 902 F.3d 16 (1st Cir. 2018) ..............................34

*Hicks v. PGA Tour, Inc.,*
  897 F.3d 1109 (9th Cir. 2018) ...............................................................................................28

*Integrated Systems & Power, Inc. v. Honeywell International, Inc.,*
  713 F. Supp. 2d 286 (S.D.N.Y. 2010).....................................................................................28

*Leegin Creative Leather Products., Inc. v. PSKS, Inc.,*
  551 U.S. 877 (2007).................................................................................................................22

*Marion Healthcare, LLC v. Becton Dickinson & Co.,*
  952 F.3d 832 (7th Cir. 2020) ..................................................................................................19

*NCAA v. Alston,*
  594 U.S. 69 (2021)...................................................................................................................23

*New England Carpenters Health Benefits Fund v. McKesson Corp.,*
  573 F. Supp. 2d 431 (D. Mass. 2008) .....................................................................................24

*Ohio v. American Express Co.,*
  585 U.S. 529 (2018).................................................................................................24, 25, 26, 28

*OV Loop, Inc. v. Mastercard Inc.,*
  2025 WL 1333546 (D. Mass. May 7, 2025) ............................................................................26

*Ramsey v. National Ass'n of Music Merchants, Inc. (In re Musical Instruments &
  Equip. Antitrust Litig.),*
  798 F.3d 1186 (9th Cir. 2015) ...........................................................................................9, 15

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II),*
  709 F. Supp. 3d 478 (M.D. Tenn. 2023)..................................................................................25

*RSA Media, Inc. v. AK Media Grp., Inc.,*
  260 F.3d 10 (1st Cir. 2001).................................................................................................29, 30

*SAS of Puerto Rico, Inc. v. Puerto Rico. Tel. Co.,*
  48 F.3d 39 (1st Cir. 1995)...................................................................................................11, 30

*SD3, LLC v. Black & Decker (U.S.), Inc.,*
  801 F.3d 412 (4th Cir. 2015) .......................................................................................11, 14, 16, 20

*Serpa Corp. v. McWane, Inc.,*
  199 F.3d 6 (1st Cir. 1999)........................................................................................................29

iv

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)..................................................................................................21

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
    373 F.3d 57 (1st Cir. 2004)............................................................................10, 22

*Sullivan v. Tagliabue*,
    25 F.3d 43 (1st Cir. 1994)....................................................................................32

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) (Frankfurter, J., concurring) ...............................................10

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)..................................................................................................22

*Toys R Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...............................................................................18

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993)..............................................................................9, 22

*United States v. Brown University*,
    5 F.3d 658 (3d Cir. 1993).........................................................................10, 22, 23

*Untracht v. Fikri*,
    454 F. Supp. 2d 289 (W.D. Pa. 2006), *aff'd*, 249 F. App'x 268 (3d Cir. 2007) .....................33

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011)................................................................................11

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)..............................................................................................33

**Statutes**

15 U.S.C. § 15b.............................................................................................. *passim*

**Other Authorities**

Competitive Impact Statement, *United States v. NACAC*, No. 1:19-cv-3706
    (D.D.C. Dec. 20, 2019), ECF No. 5 ......................................................................19

*National Universities Rankings*, U.S. News & World Report,
    https://www.usnews.com/best-colleges/rankings#national-universities (last
    accessed: Oct. 15, 2025) ......................................................................................27

## **INTRODUCTION**

Colleges and universities compete fiercely to admit and enroll exceptional students. And students compete fiercely to obtain admission to their preferred institution. Against this backdrop, schools offer multiple application options to compete for applicants with a broad range of preferences. One option is Early Decision, which allows students to apply to their top choice school and receive an answer early in the admissions cycle in exchange for a commitment to attend that school if they are accepted and receive a financial aid package that makes attendance feasible. Available for decades, Early Decision enables students to communicate that a school is their first choice and allows schools to compete for applicants most interested in attending.

Plaintiffs are four current and former college students who had the benefit of choosing whether to participate in Early Decision. Three applied and were admitted through Early Decision, and the fourth was admitted through Regular Decision. They filed this antitrust case against 32 colleges and universities (Defendant Schools), two college application platform companies, and one trade association. Although their allegations focus on Early Decision, they do not challenge the lawfulness of Early Decision itself. Nor could they. Hundreds of schools use Early Decision to compete for the strongest applicants. That competition is vigorous and undisputed. Plaintiffs instead claim that Defendants have conspired not to compete for applicants *after* they are accepted Early Decision, with the purported goal of suppressing financial aid awards and raising tuition.

To plead a Section 1 Sherman Act claim, Plaintiffs must allege an agreement among Defendants that unreasonably restrains competition and injures Plaintiffs. But Plaintiffs' allegations of an illegal conspiracy among Defendants are as conclusory as they are implausible. This Court should dismiss the case with prejudice for multiple independent reasons.

*First*, Plaintiffs do not plausibly allege any horizontal agreement among the 32 Defendant Schools to restrict competition for students admitted through Early Decision. A horizontal

1

agreement requires concerted action among actual or potential competitors—here, the Defendant Schools. Another district court recently dismissed a similar antitrust class action for failing to adequately plead an agreement among 40 schools to consider non-custodial parent assets when making financial aid determinations. *Hansen v. Northwestern Univ.*, 2025 WL 2731378, at *7-11 (N.D. Ill. Sept. 24, 2025). As in *Hansen*, Plaintiffs do not allege direct evidence of any horizontal agreement—i.e., a "smoking gun." Nor do Plaintiffs allege indirect evidence—there are no factual allegations about Defendants acting in parallel to stop competing for Early Decision admits or any other factors suggesting an unlawful agreement. Indeed, the Complaint alleges that non-Defendant schools without Early Decision, such as Harvard, Yale, and MIT, also decline to recruit students admitted elsewhere through Early Decision. As *Twombly* makes clear, such independent rational conduct is not evidence of conspiracy.

*Second*, Plaintiffs do not plausibly allege any unreasonable restraint of trade. To determine whether a restraint is unreasonable, courts presumptively apply the "rule of reason" approach—a multi-step analysis that requires the plaintiff to plausibly allege that a restraint has anticompetitive effects that cannot be offset by procompetitive benefits. Courts reserve the "*per se* rule"—which condemns the restraint without factual analysis—for a rare category of restraints that are obviously anticompetitive. The rule of reason applies here because Plaintiffs have not alleged conduct that obviously harms competition. Any alleged agreement not to encourage students to violate their Early Decision commitments would have facially apparent procompetitive virtues, including promoting competition for Early Decision applicants and protecting the integrity of each college's admissions process. And Plaintiffs have not stated a rule of reason claim because they do not plausibly allege a relevant market or anticompetitive effects.

*Third*, Plaintiffs do not plausibly allege they have antitrust standing. Plaintiffs must, but do

not, trace their purported injuries—increased tuition and decreased financial aid—to the alleged conspiracy. No Plaintiff offers factual allegations showing they would have paid less tuition or received more financial aid absent any alleged agreement. Plaintiffs' theories of harm simply layer implausible speculation on top of implausible speculation and thus fail to establish standing to sue.

*Finally*, Plaintiffs D'Amico's and Silbert's claims are time-barred. Their alleged injuries occurred more than four years before filing this lawsuit.

*    *    *

Plaintiffs seek to transform the widely-adopted college admissions practice of Early Decision, which increases student choice, into an antitrust violation. In so doing, they rely solely on a smattering of decades-old statements arguing that Early Decision is bad policy. But that policy debate is irrelevant here. What matters is whether Plaintiffs have plausibly alleged an antitrust conspiracy among a diverse array of schools and several non-schools not to compete for students *after* they are admitted to their preferred schools through a competitive Early Decision process. They have not. Plaintiffs' Complaint offers none of the factual allegations—or indeed, common sense rationale—required to support their far-fetched conspiracy theory. This Court should dismiss the case with prejudice.

## BACKGROUND

### A.    Colleges And Universities Fiercely Compete For Students By Offering Several Admissions Options, Including Early Admissions.

For decades, schools have competed for the strongest applicants through several admissions options. Doc. No. 1, Compl. ¶¶ 2, 12, 69, 79, 90, 129. Schools decide which options to offer and students decide how and where to apply. *Id.* ¶¶ 12, 79, 137. These options are part of vigorous competition in admissions, with schools seeking out the strongest applicants and applicants choosing the option and the school that best fits their preferences. *Id.* ¶¶ 3, 12, 135.

3

Most colleges and universities admit some students through a process known as Regular Decision, with applications typically due in January and decisions communicated in March or April. *Id.* ¶¶ 69-71. Financial aid packages are typically communicated to admitted students around the same time as admissions decisions. *Id.* ¶ 72. Students applying through Regular Decision make no commitment to attend if admitted; they can accept or reject any offer they wish. *Id.* ¶¶ 75-76.

Many schools also offer early admissions options. *Id.* ¶¶ 2, 79, 90. Through these options—commonly known as Early Action and Early Decision—students choose to submit their applications months before the Regular Decision deadline, typically in early November, and receive a decision before most Regular Decision applications are due. *Id.* ¶¶ 70, 78-79, 84. In Early Action, students are not obligated to accept any offer and may apply to multiple schools. *Id.* ¶ 90. The same is true of Restricted Early Action, except that students may apply early to only one school. *Id.* In Early Decision, students apply to their first-choice school and commit to attend if admitted, as long as they receive sufficient financial aid. *See id.* ¶¶ 2, 92-94. Generally, for each early admissions option, an applicant may be admitted, denied, or deferred to Regular Decision. *Id.* ¶¶ 84-86. Some schools have two rounds of Early Decision. *Id.* ¶ 79 n.1.

Schools decide which admissions options to offer depending on their unique circumstances and priorities. *Id.* ¶¶ 12, 79, 90. Many offer early admissions "[g]iven the benefits that [E]arly [D]ecision programs provide for universities," *id.* ¶ 12, including the prospect of attracting a stronger pool of applicants most interested in attending. Early Decision also gives schools the benefit of assessing applications from a set of students who have indicated they plan to attend, *id.* ¶ 81, enabling schools to review applications more efficiently and build a class consistent with their goals and academic offerings. Some schools may offer Early Decision to avoid "los[ing] out on applications from desirable students who wish to use Early Decision." *Id.* ¶ 12. Others choose

a different form of early admissions, such as Early Action. *Id.* ¶ 9 (Georgetown), *id.* ¶ 116 (Harvard and Yale), *id.* ¶ 117 (MIT). Either way, early admissions is one way schools compete for applicants in the college admissions process. *Id.* ¶¶ 12, 79, 90.

Students decide whether to apply Early Decision and, if so, where. *Id.* ¶¶ 79, 137. Students may elect to apply Early Decision for many reasons. For one, as the name implies, Early Decision occurs earlier in the application process than Regular Decision—giving applicants the opportunity to secure admission to their preferred school by December. *Id.* ¶¶ 71, 84. For another, students may prefer to apply against a smaller pool, which in turn may result in a higher chance of admission. *See id.* ¶¶ 3, 78, 137, 144. Ultimately, Early Decision is an opportunity for candidates "who have chosen to apply via the binding [E]arly [D]ecision [P]lan to their *first-choice institution*." Doc. No. 1-1, Compl. Ex. A (emphasis added); *see also* Doc. No. 1-2, Compl. Ex. B (similar). Applicants thus apply early when it suits their needs based on their chances of admission, preferred school, preferred timing, and other applicant-specific criteria. Doc. No. 1 ¶¶ 137-138.

To ease the burden of applying to multiple schools, colleges and universities often accept applications through one or more widely used application platforms. *Id.* ¶¶ 1, 60, 61. Two such platforms are the Common Application (the Common App), owned by the Common Application, Inc., and the Coalition Application (Coalition App) (the latter of which Plaintiffs incorrectly allege is owned by Defendant Scoir, Inc. (Scoir)). *Id.* The Common App and Coalition App permit applicants to participate in Early Decision processes. *See* Doc. No. 1-1 (directing applicants to "consult the instructions for [E]arly [D]ecision applicants on the college's website" and hyperlinking to "[G]uiding [P]rinciples" that indicate, among other things, that institutions using the Common App set their admission requirements); Doc. No. 1-2 (endorsing Early Decision as a "specific polic[y]" of the "institution" and directing applicants to the "[institution's] Early

Decision agreement").

In both Regular Decision and Early Decision, admitted students can evaluate a financial aid package before making a final decision about where to enroll. *Id.* ¶¶ 75, 87, 92-94. For example, a student may apply Early Decision to their top choice school and also submit applications via Regular Decision. *Id.* ¶¶ 69, 90. Upon admission through Early Decision, a student need not withdraw their applications from other schools until they have received and assessed their financial aid offer. *Id.* ¶¶ 92, 94. A student is not obligated to accept an Early Decision offer if attendance would present financial hardship. *Id.* Early Decision applications typically must be reviewed and signed by a parent and/or guidance counselor. *Id.* ¶ 82.

**B.      Plaintiffs Allege A Sprawling, Multi-Decade Conspiracy To Limit Competition For Students After They Are Admitted Early Decision.**

Plaintiffs are four current or former college students who attended three of the 32 Defendant Schools. *Id.* ¶¶ 17-20. Plaintiffs allege an anticompetitive conspiracy in connection with Early Decision among Defendant Schools, the Consortium on Financing Higher Education (COFHE, a trade association of several dozen schools, including non-Defendants), Common App, and Scoir. *Id.* ¶¶ 1-6. They state without elaboration that "Early Decision is a classic *per se* violation of the antitrust laws," *id.* ¶ 6, but they do not challenge Early Decision itself or allege that Defendant Schools conspired to adopt Early Decision, *id.* ¶¶ 145-147, 171-175. Nor do Plaintiffs allege that Defendant Schools have agreed not to compete for students when they are choosing where to apply or whether to make an Early Decision commitment. Instead, Plaintiffs allege only that Defendant Schools have agreed not to compete for applicants *after* they are admitted to another Defendant School via Early Decision. *Id.* ¶¶ 6, 14, 145-147, 171-175. Plaintiffs do not identify when Defendants reached such agreement, whether the agreement has been memorialized (or by whom), or what its terms might be. Plaintiffs also allege that other non-

Defendant schools offer Early Decision and that other schools *without* Early Decision, such as Harvard, Yale, and MIT, do not compete for applicants admitted Early Decision by other schools. *Id.* ¶¶ 90, 114-117.

Without factual allegations of an agreement among Defendant Schools, Plaintiffs focus on so-called "enforce[ment]" of the purported agreement. *Id.* ¶ 6. They allege that the Common App and Coalition App aid the conspiracy through various pre-admission actions, including limiting applicants' ability to apply Early Decision to multiple schools and requiring applicants to agree to withdraw their applications once admitted Early Decision (unless the student seeks financial aid). *Id.* ¶¶ 92-94, 108. Plaintiffs allege that certain Defendant Schools may "share information" through COFHE and the (non-Defendant) National Association for College Admission Counseling (NACAC) to "facilitate the scheme." *Id.* ¶¶ 118-121. They claim that just four of the Defendant Schools have "codified their participation in the [alleged] conspiracy" through the Ivy League's statement that it will respect commitments made by students accepted Early Decision at other Ivy League schools. *Id.* ¶ 116. Plaintiffs allege that several admissions officers at non-Defendant and a few Defendant Schools long ago stated that some colleges shared "lists of students admitted through early decision" with other unspecified schools. *Id.* ¶¶ 109-112. Plaintiffs also vaguely allege that unspecified schools "routinely remove" students admitted Early Decision "from their own application processes." *Id.* ¶ 113.

Plaintiffs claim that this alleged conspiracy amounts to an unlawful "[c]ustomer allocation" or "group boycott" that is a "*per se* violation[] of Section One of the Sherman Act." *Id.* ¶ 145. As a fallback, Plaintiffs allege the agreement also violates the rule of reason because it harms competition in a "market for undergraduate education from selective private national universities and liberal arts colleges in the United States." *Id.* ¶ 151. They do not define the contours of this

market, but instead aver that it includes schools that are "consistently among the highest-rated schools on national rankings such as those published by *U.S. News & World Report*." *Id.*

Plaintiffs claim that the conspiracy increases tuition by allowing schools to fill substantial portions of their classes with "price-insensitive" students. *Id.* ¶ 126. Plaintiffs do not, however, offer any price comparison between Defendant Schools and others outside the alleged conspiracy. They assert instead that Early Decision became more common in the 1990s, tuition rose faster than inflation in the 1990s and 2000s, and, on average, schools with Early Decision charge higher tuition than non-Early Decision schools. *Id.* ¶¶ 127, 129. Plaintiffs also claim that the alleged conspiracy decreases financial aid awarded to Early Decision students. *Id.* ¶¶ 130-132.

Plaintiffs do not trace these alleged harms to the circumstances of the named Plaintiffs. Plaintiffs are two graduates of Wesleyan University (Alayna D'Amico and Bram Silbert), a current Washington University in St. Louis student (Max Miller), and a current Vassar College student (Bella "Jude" Robinson). *Id.* ¶¶ 17-20. D'Amico, Robinson, and Silbert were admitted through Early Decision. *Id.* They do not allege that they applied Early Decision to a school other than their top choice, *id.* ¶¶ 135-138; that they tried to or wanted to back out of their Early Decision commitment, *id.* ¶ 134; or that they were misled about how Early Decision works, *id.* ¶¶ 91-104. D'Amico, Silbert, and Miller do not allege they were eligible for need-based financial aid. *Id.* ¶¶ 17-20. None of the Plaintiffs allege that they tried to negotiate an increase in their aid, *id.* ¶ 132; D'Amico, Miller, and Silbert do not allege they applied for aid, *id.* ¶¶ 17–18, 20; and Plaintiffs do not allege why they would have received more aid but for the challenged agreement, *id.* ¶¶ 17-20. Miller was admitted Regular Decision and does not allege that he applied anywhere Early Decision. *Id.* ¶ 18.

### C. Plaintiffs Cannot Plead A Horizontal Conspiracy Based On Lawful Vertical Agreements.

Plaintiffs challenge an alleged conspiracy not to compete for students admitted through Early Decision by another school. *Id.* ¶¶ 6, 14, 145-147, 171-175. That is a horizontal conspiracy claim. Plaintiffs therefore cannot satisfy their pleading burden for that claim based on vertical agreements—i.e., agreements made up and down the supply chain—including Defendant Schools' individual agreements with students through Early Decision or Defendant Schools' individual agreements with college application platforms. Vertical agreements are generally deemed procompetitive and thus are not *per se* illegal. *Ramsey v. Nat'l Ass'n of Music Merchants, Inc. (In re Musical Instruments & Equip. Antitrust Litig.)*, 798 F.3d 1186, 1191-92 (9th Cir. 2015). A Section 1 claim therefore requires "careful delineation of the parties' horizontal and vertical relationships" to ensure the correct standard of review is applied. *Am. Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 61-62 (1st Cir. 2016); *accord U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993).

Early Decision is a vertical agreement between non-competitors (e.g., student and school). It resembles an optional exclusive offer in which the student seeks early resolution of their admissions process and the prospect of a higher admission rate in exchange for a commitment to attend if admitted, so long as the financial aid package makes attendance possible. This process fully preserves—and indeed, promotes—competition among schools. Students decide for themselves whether to apply early and, if so, where, weighing the resulting potential costs and benefits. Doc. No. 1 ¶¶ 79, 137. Defendant Schools in turn compete for Early Decision applicants. Early Decision itself does not require any agreement between or among Defendant Schools. And

Plaintiffs do not (and cannot) challenge these vertical Early Decision agreements.[1]

Similarly, Defendants' individual agreements with Common App or Scoir to use their application software constitute vertical vendor agreements. As the First Circuit has made clear, allegations that "various defendants [have] enter[ed] into separate agreements with a common defendant" do not plead a single horizontal conspiracy; instead, they suggest multiple vertical agreements "between the common defendant and each of the other defendants*." Am. Sales Co. v. AstraZeneca LP (In re Nexium (Esomeprazole) Antitrust Litig.)*, 842 F.3d 34, 56 (1st Cir. 2016). The Common App and Coalition App provide common services to individual Defendant Schools—arrangements that promote competition and efficiency by simplifying the application process for students. Hundreds of other schools, most of which are not defendants here, likewise use these same application platforms to facilitate the process for students to apply to their institution. As the Ninth Circuit recently held in *Gibson v. Cendyn Group., LLC*, 148 F.4th 1069, 1082-88 (9th Cir. 2025), vendor agreements do not unreasonably restrain trade. Plaintiffs do not (and cannot) challenge Defendant Schools' vendor agreements with application platforms.

## ARGUMENT

Plaintiffs fail to state a plausible antitrust claim. To state a claim under Section 1 of the Sherman Act, Plaintiffs must, at a minimum, plausibly allege that (1) Defendants reached "an actual agreement" to restrain trade, *Nexium*, 842 F.3d at 56 (quotation marks omitted); and (2) the agreement is "unreasonable" because it harms competition, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004). Plaintiffs also must have antitrust

---

[1] Plaintiffs do not (and could not) challenge the schools' use of Early Decision. In addition to being unilateral conduct, a university's unilateral admissions decisions about "who may be admitted to study" are not part of the trade and commerce that the antitrust laws reach. *See, e.g.*, *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (observing admissions decisions are one of a university's "essential freedoms."); *United States v. Brown University*, 5 F.3d 658, 666 (3d Cir. 1993) ("the Sherman Act does not apply to 'the noncommercial aspects of the liberal arts.'").

standing, which requires more than Article III standing. *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 45-46 (1st Cir. 1995). As to all three, Plaintiffs must provide sufficient factual allegations, "accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the plausibility of a Sherman Act claim, courts do not accept "legal conclusion[s]." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Rather, Plaintiffs must offer nonconclusory factual allegations that "raise a right to relief above the speculative level." *Id.*

## I.    Plaintiffs Do Not Plausibly Allege A Horizontal Agreement Among Defendants.

Plaintiffs' claim fails at the outset because they do not plausibly allege any agreement among Defendants. "An antitrust conspiracy claim … requires evidence of an actual agreement." *Nexium*, 842 F.3d at 56. The Sherman Act does not reach "independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011). The critical question in a Section 1 case is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Twombly*, 550 U.S. at 553 (citation omitted). A plaintiff fails to plausibly allege an agreement if the defendants' conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. To survive a motion to dismiss, "an antitrust plaintiff may present either direct or circumstantial evidence of defendants' conscious commitment to a common scheme designed to achieve an unlawful objective." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (internal quotation marks omitted). Moreover, the plaintiff must allege facts showing that *each* defendant consciously committed to the challenged scheme. *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 424 (4th Cir. 2015).

Here, Plaintiffs attempt to plead a conspiracy among Defendant Schools not to compete for

students admitted Early Decision at another school.[2] But much of their Complaint relies on procompetitive agreements between a Defendant School and a student or an application platform that do not advance their case. *See supra* Background Section C. Plaintiffs have no plausible allegations of any *horizontal* agreement—i.e., an agreement among the Defendant Schools.

Plaintiffs' sole claim is premised on their assertion of a horizontal conspiracy: the implausible theory that Defendant Schools agreed "not to compete for students offered admission through Early Decision at other schools." Doc. No. 1 ¶ 6. Plaintiffs do not allege that Defendant Schools colluded to adopt Early Decision policies in the first place; after all, hundreds of other schools have identical policies. *See id.* ¶¶ 90, 129; *supra* Background Section C. They also do not allege that Defendant Schools have agreed to restrict competition to convince students to apply Early Decision; there is no question that Defendant Schools use early admissions to compete, both with each other and with schools not alleged to be part of any conspiracy. *See* Doc. No. 1 ¶ 12; *supra* Background Section C. Instead, Plaintiffs claim that (1) *after* a school has won the fierce competition for the Early Decision applicant, (2) *after* the applicant has expressed a clear preference for that school, and (3) *after* that school has admitted the applicant based on their qualifications, fit, and the student's commitment to attend, Defendant Schools have agreed that they will not participate in any effort by the applicant to renege on their commitment to attend the admitting school.

That far-fetched conspiracy has none of the plausible factual allegations required to survive a motion to dismiss—no direct or indirect evidence that each individual Defendant made a "conscious commitment to a common scheme designed to achieve an unlawful objective."

---

[2] Plaintiffs' group boycott theory is substantively identical to their customer allocation theory. Both claims are premised on Defendant Schools supposedly agreeing not to compete for students admitted Early Decision at another school.

*Evergreen Partnering Grp., Inc.*, 720 F.3d at 43 (quotation marks omitted). Instead, Plaintiffs' allegations make clear that Defendant Schools would have compelling independent and common-sense reasons not to waste resources seeking out or considering students who might renege on their Early Decision commitments.

###### A.    The Complaint Alleges No Direct Evidence Of A Conspiracy.

Plaintiffs do not allege direct evidence of any conspiracy not to compete for students admitted Early Decision. "Direct evidence of a conspiracy is 'explicit' and can show one exists without any inferences"—for example, "a recorded phone call in which two competitors agreed to fix prices." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024) (internal quotation marks omitted). This is "extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004).

Nothing of the sort appears in the Complaint. Plaintiffs repeatedly refer to "the Early Decision Conspiracy," *see, e.g.*, Doc. No. 1 ¶¶ 5, 11, 12, 24, 105, 106, but labeling it a conspiracy does not plead one under *Twombly*, 550 U.S. at 564. Equally conclusory is the claim that the conspiracy is "enforced by mutual agreement between would-be competitors not to compete for students offered admission through Early Decision at other schools." Doc. No. 1 ¶ 6. The rest of the Complaint is more of the same. *See, e.g.*, *id.* ¶ 109 (alleging that schools "coordinate their allocation of [admitted] applicants"); *id.* ¶ 172 ("Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain, or stabilize the prices of attendance paid by Class Members"). These are "merely legal conclusions"—not allegations of direct evidence establishing, without any inferences, a conspiracy. *Twombly*, 550 U.S. at 564.

Certain Defendant Schools' alleged affiliation with other groups is not direct evidence of

the purported agreement either. Plaintiffs note, for example, an Ivy League statement that "[a]ll Ivy League institutions will honor any required commitment to matriculate that has been made to another college under [Early Decision]." Doc. No. 1 ¶ 116. But that cannot be direct evidence of the alleged conspiracy when some members of the Ivy League do not have Early Decision programs, and most Defendant Schools are not members of the Ivy League. Thus, there is a complete mismatch between the allegations and the purported conspiracy. Plaintiffs offer no plausible reason why institutions without Early Decision would join a conspiracy when, if Plaintiffs' theory were right, they would have a strong independent incentive to compete for those students. And Plaintiffs do not explain how the Ivy League statement could be evidence of a conspiracy that supposedly reaches far beyond the Ivy League. *See SD3*, 801 F.3d at 422-23 (dismissing where plaintiffs improperly group all Defendants together with "indeterminate assertions" "without sufficient detail" and without "separately identify[ing] each defendant's involvement in the conspiracy") (internal quotation marks omitted). Plaintiffs' allegations as to COFHE and non-Defendant NACAC are even vaguer, and those organizations likewise include schools without Early Decision.

In sum, the Complaint fails to plead any direct admissions, smoking guns, or other facts to establish a conspiracy. *See Hansen*, 2025 WL 2731378, at *7.

**B.    The Complaint Alleges No Indirect Evidence Of Agreement.**

Plaintiffs also fail to plead indirect evidence of an agreement. To plead an agreement indirectly, Plaintiffs must plausibly allege "parallel [conduct]" and "something more." *Twombly*, 550 U.S. at 560. Both components are critical. Even "conscious parallelism … is not in itself unlawful." *Nexium*, 842 F.3d at 56 (quotation marks omitted). Many plaintiffs seek to meet their burden by pleading "plus factors"—indicia that the alleged parallel conduct resulted from conspiracy rather than independent action. *Id.* at 58. Foremost among these are actions against

one's "own individual best interest." *Id.* at 56 (quotation marks omitted). Here, Plaintiffs have alleged neither parallel conduct nor "something more."

### 1.    Parallel Conduct

Plaintiffs do not allege parallel conduct. Parallel conduct arises when "competitors adopt[] similar policies around the same time in response to similar market conditions." *Musical Instruments*, 798 F.3d at 1193; *see Twombly*, 550 U.S. at 564-65. Plaintiffs do not allege that Defendant Schools have acted in parallel to stop competing for other schools' Early Decision admits. There are no allegations that Defendants even adopted their Early Decision programs in parallel—i.e., "around the same time." *Musical Instruments*, 798 F.3d at 1193. The Complaint merely suggests that colleges across the country—of which Defendant Schools are a small subset—began adopting "Early Decision in the early 1990s." Doc. No. 1 ¶ 129.

Those deficiencies make this case even weaker than *Twombly*. There, certain telephone companies allegedly responded to a 1996 federal communications law by taking parallel steps to impede new market entrants. *Twombly*, 550 U.S. at 566. Here, Plaintiffs simply allege that, at unspecified times over a period spanning three decades, each Defendant School and hundreds of others across the country began offering some form of Early Decision. Such generic allegations lend no plausibility to Plaintiffs' sweeping conspiracy theory. *See City of Pontiac*, 92 F.4th at 401 (statistical allegations that did not distinguish between defendants and non-defendants did not allege parallel conduct by the defendants in particular).

### 2.    Something More

Even assuming Plaintiffs alleged parallel conduct unique to Defendants (which they have not), they fail to plead the "something more" required to plausibly allege a conspiracy. The critical factor is whether engaging in the parallel conduct would have been "against each [Defendant's] interest unless all of them did so." *Nexium*, 842 F.3d at 57. Conspiracy is implausible where there

15

is a "natural explanation for the noncompetition alleged," *Twombly*, 550 U.S. at 568, or Defendants "had [their] own economic incentive" to undertake the conduct at issue absent agreement, *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 179 (D. Mass. 2013). Accordingly, circumstantial allegations of agreement are insufficient when the complaint discloses an "obvious alternative explanation" for the alleged conduct. *Twombly*, 550 U.S. at 567.

Here, the Complaint fails to allege the necessary context to make any alleged agreement plausible. At the outset, Plaintiffs do not allege "the general contours of when an agreement was made." *Evergreen Partnering Grp., Inc.*, 720 F.3d at 46 (requiring such allegations). This failure resembles the insufficient allegations in *Hansen*, where the court explained that "the lack of details surrounding when each University Defendant" began the alleged parallel conduct and "the potential that the period of time lasted almost twenty years calls into question" the plausibility of "coordinated action among all Defendants." 2025 WL 2731378, at *9. Again, the most Plaintiffs allege is "widespread adoption of Early Decision in the early 1990s." Doc. No. 1 ¶ 129. That allegation speaks to Early Decision in general and is not addressed to Defendant Schools; it also does not speak to when, if ever, Defendant Schools supposedly agreed not to compete for students admitted Early Decision by other schools. It also is not a factual allegation as to when or how *each* of the 32 Defendant Schools consciously agreed to any unlawful scheme. *See SD3*, 801 F.3d at 422 (dismissing complaint for failing to "allege particular facts against a particular defendant," including "how these defendants [were] involved in the alleged conspiracy" (alteration in original) (internal quotation marks omitted)).

Moreover, the Complaint admits an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for the allegedly parallel conduct—the significant downsides and lack of benefits to competing for students admitted Early Decision elsewhere. Actively seeking to recruit or consider

16

students committed to attending another institution through Early Decision would ignore students'
commitments to other schools. It would be hypocritical for schools to disregard the very
commitments they ask of their own applicants. And schools may wish to avoid admitting students
who renege on their commitments—conduct even Plaintiffs describe as unethical. Doc. No. 1 ¶ 4.
The ultimate harm would be to Early Decision itself, a process with acknowledged "benefits" for
schools and students. *See e.g.*, *id.* ¶¶ 3, 12. None of these interests is contingent on an agreement;
each is independent.

Meanwhile, there are few benefits to soliciting or considering students already admitted
Early Decision elsewhere—i.e., students who have decided on their first-choice school and made
a commitment to attend that school if admitted. It would be remarkably wasteful to devote scarce
resources to recruiting students who have already committed to attend their first-choice school—
especially when schools could use those same resources to recruit the many other students who
would not be reneging on their own commitments and would be more open to considering and
potentially accepting such offers.[3] *See, e.g.*, *id.* ¶ 158 (alleging "extremely strong brand
preferences among consumers").

These "natural explanation[s]," *Twombly*, 550 U.S. at 568, for the conduct alleged are not
theoretical; they come directly from the Complaint. Plaintiffs allege that even schools *without*
Early Decision—such as Harvard, Yale, and MIT—refrain from recruiting students admitted Early
Decision elsewhere. Doc. No. 1 ¶¶ 115-117. That is flatly contrary to Plaintiffs' theory that an
alleged failure to recruit students admitted Early Decision at other schools could be explained only
by agreement. Harvard, Yale, and MIT also allegedly do not try to entice Early Decision admits to

---

[3] Plaintiffs' suggestion that Defendants misrepresent whether Early Decision is a legally enforceable
contract, Doc. No. 1 ¶¶ 4, 91-104, is a red herring and wrong. Regardless of whether Early Decision
agreements are legally enforceable, applicants who apply Early Decision (and their parents and counselors)
do so with knowledge that they have committed to abide by the terms of the early admission option.

break their commitments to other schools. This is not because of any conspiracy, but because they presumably are not interested in admitting students who do not "respect [the] rules," *id.* ¶ 117, or who disregard their own "commitment[s]," *id.* ¶ 115, which Plaintiffs acknowledge are "honor-bound agreement[s]," *id*. ¶ 4. These allegations confirm that schools have independent reasons to undertake the conduct alleged (i.e., not competing for students admitted Early Decision elsewhere). Plaintiffs try to avoid the impact of these allegations by claiming, inexplicably, that Harvard, Yale and MIT are non-Defendant members of the "Early Decision Conspiracy." *Id.* ¶¶ 114-117. That assertion is facially implausible. But even expanding the alleged conspiracy to include potentially every school in the country—including those that, under Plaintiffs' theory, would have every incentive to recruit students admitted Early Decision—only confirms Plaintiffs have no basis for their claims.

Given the obvious, common-sense, and independent reasons for Defendant Schools' alleged conduct, this case is on all fours with *Twombly* and *Nexium*. In *Twombly*, the Court held that the parallel conduct did not create an inference of conspiracy because the "allegedly conspiratorial actions could equally have been prompted by lawful, independent goals." 550 U.S. at 566-67 (citation omitted). It was "natural," the Court explained, for the telephone companies to decline to compete in new markets because, as the "complaint itself" suggested, they would "expect[] their neighbors to do the same thing" and so it would serve their "best interest in keeping to their old turf." *Id.* at 568. So too in *Nexium*, where two generic manufacturers acted in parallel to settle with the brand manufacturer to delay launching their generic products. The court explained that "self-interest could explain equally well" why each generic would agree to a "contingent launch" provision—to "ensure that no other generic preceded its entry into the market." 842 F.3d at 56 (internal quotation marks omitted). In so holding, the court distinguished *Toys R Us, Inc. v.*

*FTC*, 221 F.3d 928 (7th Cir. 2000), on the ground that "entering into parallel agreements" in that case "was *against* each toy manufacturer's interest unless all of them did so." 842 F.3d at 57. Here, given that schools without Early Decision engage in the same conduct at issue, it cannot possibly be "*against* [Defendants'] interest unless all of them [do] so." *Id.*; *see also Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020) (plaintiff must allege that competitors "would not have attempted to inflate prices without assurance that each distributor was abiding by the agreement and behaving in the same way").

Nor does Defendant Schools' membership in trade organizations or individual relationships with the same application platforms suggest a conspiracy. *See* Memorandum of Law in Support of Non-School Defendants' Motion to Dismiss at Section II.A.2.b (to be filed in this Docket on Oct. 15, 2025). As the court explained in *Hansen*: "Trade organizations are ubiquitous and serve numerous legitimate and pro-competitive purposes." 2025 WL 2731378, at *9 (alteration and quotation marks omitted). Here, there is no factual allegation that Defendant Schools' involvement in COFHE (or NACAC, which is not a defendant) facilitated any unlawful agreement. Plaintiffs' Complaint is devoid of allegations about which school was a member of which organization at which time and how such membership bears on an agreement.[4]

The Complaint also "leaves unexplained" how those organizations could facilitate such an agreement when Defendant Schools are only a "particular subset of institutions," and numerous members do not have Early Decision programs in the first place. *Hansen*, 2025 WL 2731378, at

---

[4] Plaintiffs misleadingly cite a settlement between the DOJ Antitrust Division and NACAC that addressed a different component of early admissions—NACAC's prior bar on "incentives exclusive to students applying or admitted under an Early Decision application plan." Competitive Impact Statement 4, *United States v. NACAC*, No. 1:19-cv-3706 (D.D.C. Dec. 20, 2019), ECF No. 5. Far from treating an Early Decision agreement between a school and a prospective student as evidence of an antitrust violation, the settlement accepted Early Decision as a permissible and desirable option for admission and sought to *encourage* schools to attract more Early Decision applications. *Id.*

*10; *see Advanced Tech.*, 925 F. Supp. 2d at 181 (failing to allege "conspiratorial meeting" among defendants as to "plausibly suggest a meeting of the minds" absent any alleged meeting among *all* defendants). The same is true of Defendants Common App and Coalition App, which, as alleged, merely offer students an online application that reflects each school's admission options and are not alleged to have any involvement in the schools' consideration of students' applications or their financial aid offerings. Indeed, numerous Defendant Schools allegedly do not use the Coalition App, Doc. No. 1 ¶ 60, so it is unclear how that platform facilitated any conspiracy. Likewise, the allegations that the platforms' respective boards include employees from a few Defendant Schools, *id.* ¶¶ 122-124, cannot support any plausible inference of a conspiracy among all Defendant Schools. In short, there are no factual allegations that support any horizontal agreement through those entities. Without a "rim to the wheel in the form of an agreement among" Defendant Schools, Plaintiffs have no claim. *In re Nexium*, 842 F.3d at 56 (quotation marks omitted).

Finally, Plaintiffs' allegations of information sharing do not make an agreement any more plausible. *See* Doc. No. 1 ¶¶ 109-118. These allegations are stale, misleading, conclusory, or attributed to admissions directors associated with non-Defendant schools. *Id.*[5] Moreover, most of Plaintiffs' allegations do not specify any particular school. Plaintiffs cannot impute these allegations to all Defendant Schools to levy "indeterminate assertions" against them all "lumped … together." *SD3*, 801 F.3d at 422-23 (quotation marks omitted).

More importantly, an allegation that one or more schools may have shared information (at an unspecified time) about students admitted Early Decision does not plausibly suggest that all Defendant Schools did so, let alone that they agreed not to compete for those students. Schools

---

[5]  For example, Plaintiffs offer as their "university insider[]" 19-year-old quotes from a student law review note written by a then-law clerk who only years later became Vanderbilt University's general counsel. Doc. No. 1 ¶¶ 8, 110. Plaintiffs also allege information-sharing practices based on a quote from a Dartmouth College former director of admissions in a book published in 1997. *Id.* ¶ 112.

that allegedly shared lists of admitted students had unilateral self-interested reasons to do so—namely, to protect the integrity of their own admission processes and minimize the risk of wasting limited and highly valued Early Decision admissions on applicants who may violate their commitments. *See Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 595-97 (1925) (discussing analogous self-interested reasons for one competitor to share with other competitors that it had won a supply contract). Likewise, any removal of an Early Decision admit from another school's Regular Decision process is entirely in that school's unilateral self-interest—i.e., not to waste an admission spot on someone committed to attend their first-choice school. Thus, any alleged sharing of Early Decision admitted student lists (or actions in response to those lists) does not support any inference of a conspiracy because that conduct is wholly consistent with unilateral self-interest.

*    *    *

Plaintiffs allege no direct or indirect evidence of any agreement among Defendant Schools. Instead, they claim that Defendant Schools engage in the same practices as other non-Defendant schools across the country in offering Early Decision programs and declining to waste resources to pursue students who have already committed to attend their first-choice school. Accordingly, their Complaint falls short even of the allegations of conscious parallelism deemed deficient in *Twombly*. This failure to plausibly allege a horizontal conspiracy is fatal to Plaintiffs' claim.

## II. Plaintiffs Do Not Plausibly Allege An Unreasonable Restraint Of Trade.

Plaintiffs' Complaint independently fails because they do not plausibly allege that any agreement is "unreasonable" under the Sherman Act. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Defendants' alleged conduct is subject to the rule of reason, not *per se* condemnation, because the effects on competition are anything but clear given facially obvious, legitimate, procompetitive

ends. And Plaintiffs have not adequately pleaded a rule of reason case because they do not plausibly allege either direct or indirect evidence of anticompetitive effects.

### A.    The Rule of Reason Applies.

The Complaint incorrectly asserts that the Court should condemn the supposed agreement not to compete for students admitted Early Decision under the *per se* rule. *See* Doc. No. 1 ¶¶ 6, 145, 150, 177. "Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss." *Stop & Shop*, 373 F.3d at 61. Here, if the Court finds that Plaintiffs have adequately alleged an agreement to restrain trade or commerce, any such agreement would be subject to the rule of reason.

The *per se* rule governs only a small universe of "manifestly anticompetitive" restraints that "always or almost always tend to restrict competition and decrease output" and "lack any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (quotation marks omitted). The restraints within this "ever narrowing" category, *U.S. Healthcare*, 986 F.2d at 593, are typically limited to "naked horizontal price-fixing, market allocation, and output restrictions," *Stop & Shop*, 373 F.3d at 61. Courts thus "presumptively appl[y] rule of reason analysis" and are "reluctan[t] to adopt *per se* rules where the economic impact of certain practices is not immediately obvious." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Courts are particularly wary of applying *per se* treatment in cases involving non-profit colleges and universities, as their educational mission and economic incentives depart sharply from traditional for-profit industries. *See United States v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir. 1993); *Choh v. Brown Univ.*, 753 F. Supp. 3d 117, 126-30 (D. Conn. 2024), *appeal docketed*, No. 24-2826 (2d Cir. Oct. 25, 2024).

These principles all point to the conclusion that the *per se* rule does not apply to the allegations in the Complaint. Whatever label is placed on it, Doc. No. 1 ¶¶ 145-146, any supposed agreement among Defendant Schools not to compete once a student is admitted Early Decision

would not be "manifestly anticompetitive" or devoid of "any redeeming virtue." *Am. Steel*, 815 F.3d at 61 (quoting *Leegin*, 551 U.S. at 886). As the Complaint reveals, students receive obvious procompetitive benefits from Early Decision—e.g., potentially higher chances of admission to their top choice school and early resolution of the application process. *See* Doc. No. 1 ¶¶ 3, 84, 137, 144. These benefits require consideration under a full rule of reason analysis, but they would be ignored entirely under the *per se* approach.

Rule of reason review also is required given that no court has considered or condemned the alleged practices at issue. Defendants are aware of no decisions involving an even arguably similar arrangement among educational institutions purporting to restrict competition for customers or labor that is already subject to an exclusive arrangement. *See Brown Univ.*, 5 F.3d at 672; *Choh*, 753 F. Supp. 3d at 126-30. Because the courts have not "amassed 'considerable experience with the type of restraint at issue,'" *NCAA v. Alston*, 594 U.S. 69, 89 (2021) (citation omitted), *per se* condemnation is inappropriate.[6]

Finally, Plaintiffs cannot manufacture *per se* treatment through their repeated but unsubstantiated invocation of the *per se* label or through their use of the terms "customer allocation" or "group boycott." *See* Doc. No. 1 ¶¶ 6, 145-146. As courts in this District and elsewhere recognize, plaintiffs may not simply demand *per se* treatment—they must offer factual allegations that plausibly give rise to a *per se* claim. *See, e.g., CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 154-55 (D. Mass. 2003) (rejecting "conclusory" allegations of *per se* illegality and dismissing Sherman Act Section 1 claims); *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284-85 (7th Cir. 1983) (similar).

---

[6] Nor does the intermediate review known as "quick look" apply; it is reserved for those restraints that are obviously anticompetitive to "an observer with even a mere rudimentary understanding of economics." *Am. Steel*, 815 F.3d at 61 (quotation marks omitted).

### B.    Plaintiffs Do Not Plausibly Allege A Rule Of Reason Claim.

Plaintiffs do not plead a rule of reason claim either. The rule of reason requires that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("*Amex*"); *see E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 3-6 (1st Cir. 2004) (dismissing complaint on this ground). A plaintiff can meet this requirement with either direct or indirect evidence of anticompetitive harm. *Amex*, 585 U.S. at 542. Plaintiffs here fail to plead such harm either way.

### 1.    Plaintiffs Do Not Allege Direct Evidence Of Anticompetitive Effects.

Plaintiffs do not plausibly plead "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* at 542 (internal quotation marks omitted). When a plaintiff "advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021); *accord Choh*, 753 F. Supp. 3d at 131 (applying this rule on motion to dismiss). Plaintiffs only offer conclusory allegations that the purported agreement decreased financial aid and raised tuition. Doc. No. 1 ¶¶ 126-132.

Their need- and merit-based aid allegations lack any supporting facts. Plaintiffs claim that "schools offer less in need-based financial aid to applicants admitted under Early Decision because they know that no other school can compete by offering a more generous need-based aid package." *Id.* ¶ 130; *see id.* ¶¶ 131-132 (similarly conclusory allegations about merit-based aid and loss of leverage). But Plaintiffs allege no facts indicating that schools offer less aid to Early Decision admits, much less facts showing a plausible connection between the alleged conspiracy and Defendant Schools' supposedly inflated tuition rates. In fact, schools must offer sufficient financial aid to Early Decision admits, otherwise they would go elsewhere. *See id.* ¶¶ 2, 92-94; *accord New*

*England Carpenters Health Benefits Fund v. McKesson Corp.*, 573 F. Supp. 2d 431, 435-36 (D. Mass. 2008) (rejecting similarly conclusory allegations about price increases on motion to dismiss); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (plaintiffs "must, at a minimum, sketch the outline of the injury to competition with allegations of supporting factual detail"). There are also no allegations "of increased prices … after the restraint was implemented." *1-800 Contacts*, 1 F.4th at 118.

The allegations underlying Plaintiffs' tuition-increase theory are just as weak. Plaintiffs claim the alleged conspiracy has resulted in Defendant Schools charging "full tuition rates that are, on average, thousands of dollars higher than those charged by comparable schools without … Early Decision programs." Doc. No. 1 ¶ 127. To support this theory, they allege only that "widespread adoption of Early Decision in the early 1990s correlates with skyrocketing tuition prices," and they include a chart purporting to show that price increases for college tuition at all institutions nationwide grew faster than inflation "from 2002-2016." *Id.* ¶ 129. Correlation is not causation, even at the pleading stage, and the chart fails to isolate Defendant Schools and focuses on Early Decision as a whole (rather than any agreement not to compete for Early Decision applicants). *See, e.g.*, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 525 (M.D. Tenn. 2023) (rejecting "graphs [that] fail to show a supracompetitive [price] increase" attributable to the challenged conduct).

### 2. Plaintiffs Do Not Allege Indirect Evidence Of Anticompetitive Effects.

To indirectly plead anticompetitive effects, Plaintiffs must allege "market power" in a properly defined antitrust market "plus some evidence that the [purported Early Decision conspiracy] harms competition." *Amex*, 585 U.S. at 542; *see Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 693 (9th Cir. 2022). Plaintiffs fail these requirements too.

(a)    **Relevant Market**

Plaintiffs have not pleaded a properly defined product market. This is a critical omission because the relevant market is the starting point for analyzing Defendants' "ability to lessen or destroy competition." *Amex*, 585 U.S. at 543 (quotation marks omitted). For this reason, "virtually all courts applying the rule of reason require the plaintiff to define the product and geographic market in which competition is allegedly restrained." *E. Food Servs.*, 357 F.3d at 5-6 (quotation marks omitted). Failure to plausibly allege a relevant product market requires dismissal. *See, e.g.*, *Avangrid, Inc. v. NextEra Energy Inc.*, No. 24-CV-30141, slip op. (D. Mass. Sept. 22, 2025), ECF No. 109; *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023).

An antitrust market is the zone of effective competition for a product or service. "Determining the scope of a product market begins with examining the universe of products that are considered 'reasonably interchangeable by consumers for the same purposes.'" *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016) (citation omitted). Consequently, "'[a]t the pleading stage, a plaintiff plausibly must allege that the products in the defined market are not reasonably interchangeable for products outside the defined market, and that consumers are not likely to substitute other products if the given product becomes more expensive.'" *OV Loop, Inc. v. Mastercard Inc.*, 2025 WL 1333546, at *3 (D. Mass. May 7, 2025) (quotation marks omitted). Plaintiffs have failed to do so here for at least two reasons.

*First*, Plaintiffs have not defined the contours of the market based on objectively identifiable characteristics. They claim Defendants have restrained competition in a "Market for Undergraduate Education from Elite Private Colleges and Universities," which they define to include "selective private national universities and liberal arts colleges in the United States" that are "consistently among the highest-rated schools on national rankings such as those published by *U.S. News & World Report*." Doc. No. 1 ¶ 151. But Plaintiffs do not allege facts sufficient to

determine whether a school is or is not included in such a market. For example, the Complaint lacks any allegations regarding how "selective" or "high[ly] rated" a school must be to fall within the market. *Id.* The Complaint does not identify any other "national rankings" upon which Plaintiffs rely to define the market. *Id.*

These pleading deficiencies are fatal because they prevent the court from assessing whether "the parameters of the relevant market [are] in accordance with the principles of reasonable interchangeability and cross-elasticity of demand." *Bryan v. Ascend Learning, LLC*, 2025 WL 2239250, at *4 (D. Mass. Aug. 6, 2025) (dismissing claim where "it remains unclear to the Court which products Plaintiffs contend fall within their market definition"), *appeal docketed*, No. 25-1858 (1st Cir. Sept. 12, 2025). It is impossible to determine which schools compete in Plaintiffs' alleged market and which do not. This is the same deficiency that led the court in *Choh* to reject a product market of Ivy League schools plus "a few other schools, including Stanford, Notre Dame, Duke and Rice." 753 F. Supp. 3d at 132-33.

*Second*, Plaintiffs' alleged product market fails because it is underinclusive on its face. *See, e.g.*, *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008). Plaintiffs inexplicably *exclude* public universities from their market even though several public universities are "consistently among the highest-rated schools on national rankings such as those published by *U.S. News & World Report*."[7] Doc. No. 1 ¶ 151; *see, e.g.*, *Choh*, 753 F. Supp. 3d at 132 (alleged student-athlete market limited to Ivy League schools was "legally insufficient" because it excluded

---

[7] No *U.S. News & World Report* college ranking system conforms with Plaintiffs' alleged product market as it ranks "national universities," which includes both public and private universities, separate from "liberal arts colleges." *U.S. News & World Report* does not issue a ranking of "private national universities," Doc. No. 1 ¶ 151, as Plaintiffs' allegations might suggest. *See National Universities Rankings*, U.S. News & World Rep., https://www.usnews.com/best-colleges/rankings#national-universities (last accessed Oct. 15, 2025). Because they are relied upon throughout the Complaint, the *U.S. News & World Report* rankings are incorporated by reference. *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

non-Ivy League schools that compete for student-athletes). Plaintiffs offer no factual allegations to explain why highly ranked public universities are not reasonably interchangeable with Defendant Schools. *See, e.g.*, *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010) ("Cases in which dismissal on the pleadings is appropriate frequently involve … [a] failure even to attempt a plausible explanation as to why a market should be limited in a particular way."). Plaintiffs' exclusion of reasonable substitutes is fatal.

Plaintiffs' alleged market is also arbitrarily broad. It includes everything from all-women's liberal arts schools to research universities such as Washington University in St. Louis to Ivy League schools such as the University of Pennsylvania. These and other Defendant Schools have markedly different offerings, and they naturally attract different pools of applicants. Plaintiffs allege no factual basis for including such diverse schools in the same market, much less allege facts plausibly suggesting that such a broad market reflects "commercial realities." *Amex*, 585 U.S. at 544. It is well settled that antitrust plaintiffs cannot rest their complaints on proposed markets that are "artificial" and "contorted to meet their litigation needs." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018).

Plaintiffs must allege a plausible and coherent relevant market to survive a motion to dismiss—one with contours objectively defined based on reasonable interchangeability and cross-elasticity of demand. And they must allege sufficient facts to establish that schools within the alleged market are interchangeable. Their failure to do so is fatal to their Complaint.

### (b)    Market Power

Plaintiffs do not plausibly allege that Defendant Schools possess market power within any market. *See E. Food Servs.*, 357 F.3d at 5 ("identification of market power is ordinarily the first step in any rule of reason claim"). Market power means the "power to raise price over cost without losing so many customers as to defeat the effort," and it requires allegations of high "market

shares." *Id.* at 6. Here, Plaintiffs offer *no* factual allegations as to either. The only allegations in the Complaint regarding market power are bare-bone assertions that "Defendants and their conspirators have considerable market power" in the supposed "Market for Undergraduate Education from Elite Colleges and Universities," and "would similarly have dominant market power" in "submarkets that may exist" for "Undergraduate Education from Elite Private Colleges" and "Undergraduate Education from Elite Private Universities[.]" Doc. No. 1 ¶¶ 156-157, 159. These are legal conclusions, not factual allegations, and they cannot satisfy Plaintiffs' burden. *See, e.g.*, *CCBN.com*, 270 F. Supp. 2d at 155-56 (plaintiff must offer more "than the mere assertion that such power exists"); *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 59 (D. Mass. 2020) ("Claiming that prices are supracompetitive is a legal conclusion rather than a fact . . . and must be supported by specific factual allegations.").

## III.    Plaintiffs Do Not Plausibly Allege They Have Antitrust Standing.

Antitrust standing is more stringent than Article III standing, and "ensure[s] that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) (quotation marks omitted). The Supreme Court has identified six factors to assess antitrust standing: (1) the causal connection between the alleged violation and harm; (2) improper motive; (3) whether the injury was of a type Congress sought to redress ("antitrust injury"); (4) the directness of the causal link between the restraint and injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537-45 (1983) ("*AGC*"). Foremost among these is an "antitrust injury," meaning an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"—which must be shown in every private antitrust damages case. *RSA Media, Inc. v. AK*

*Media Grp., Inc.*, 260 F.3d 10, 14 (1st Cir. 2001) (quotation marks omitted). Antitrust standing also requires a direct causal link between the violation and harm. *Id.* Many antitrust cases are dismissed on these grounds. *See, e.g.*, *id.* at 15; *SAS of P.R.*, 48 F.3d at 46.

Plaintiffs offer two main theories of injury. First, Plaintiffs claim to be injured because the alleged agreement inflated tuition prices at all Defendant Schools. Second, Plaintiffs claim they might have received more financial aid absent any agreement. Both theories fail to show any cognizable antitrust injury or causation.

### A.    Plaintiffs Do Not Allege Any Causal Connection Between Their Harms And The Challenged Conduct.

Plaintiffs' theories all fail for the same overarching reason: they do not allege that *the restraint* at issue, as opposed to Early Decision itself, caused their supposed harms. *RSA Media*, 260 F.3d at 14. Plaintiffs allege an "agreement between would-be competitors not to compete for students offered admission through Early Decision at other schools." Doc. No. 1 ¶ 6. But they trace every alleged harm—the purported increase in full tuition rates and reduction in financial aid—to Early Decision itself, rather than to an agreement not to compete for students after they are admitted Early Decision. *See id.* ¶ 126 ("*Early Decision* permits colleges and universities to raise the full cost of attending the school by focusing on non-price-sensitive students who are able to pay full tuition and have indicated that they will not accept competing offers from other schools if they are admitted" (emphasis added)); *id.* ¶ 130 ("schools offer less in need-based financial aid to applicants admitted *under Early Decision*" (emphasis added)); *id.* ¶ 133 ("financial harms that *Early Decision* causes applicants … are well known (emphasis added)).[8]

---

[8] Plaintiffs also allege that "an Early Decision admit who tries to negotiate an increase to merit-based or need-based aid will have little bargaining power because of the absence of competing offers." Doc. No. 1 ¶ 132. But in the next breath, they assert that the reason for this is that "[s]chool administrators know that very few applicants decline an Early Decision offer based on cost"—making clear that the leverage issue they allege arises from Early Decision generally, not an agreement not to compete. *Id.*

Plaintiffs' allegations therefore do not establish antitrust injury that "*flows from that which makes the defendants' acts unlawful*," *RSA Media*, 260 F.3d at 14 (quotation marks omitted), and they certainly do not establish a "direct" causal link between the two, *see AGC*, 459 U.S. at 540-41. After all, hundreds of schools offer Early Decision policies, and the harms identified above would flow equally from those policies. This disconnect requires dismissal.

### B. Plaintiffs Do Not Plausibly Allege That The Challenged Conduct Increased Their Tuition.

Plaintiffs' lead theory of injury independently fails because it rests on the implausible and unsupported assertion that the alleged agreement inflated the tuition at every single Defendant School for the last 35 years. They claim that Early Decision helps schools "identify[] and isolat[e] a group of price-insensitive applicants to fill a substantial portion of their classes," thereby enabling them to "raise prices." Doc. No. 1 ¶ 126. In the sparse four paragraphs spent on this idea, Plaintiffs offer no factual allegations suggesting Early Decision (much less the alleged agreement) increased tuition at any school over the alleged 35-year conspiracy, much less the specific schools they attend. Indeed, three of the four supporting paragraphs, *see id.* ¶¶ 125-128, consist merely of high-level descriptions that prices are higher, which do not suffice. *See Iqbal*, 556 U.S. at 678 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not to be taken as true at the pleading stage).

Plaintiffs' only factual allegation—a chart purporting to show college tuition relative to inflation since the 1990s, Doc. No. 1 ¶ 129—undercuts their theory for reasons discussed above. *Supra* Section II.B.1. While Plaintiffs allege "widespread adoption of Early Decision in the early 1990s," they do not allege that the chart shows any appreciable impact of adoption at that time. *Id.* Moreover, because the chart does not specify the schools to which it refers, it undermines Plaintiffs' claim by suggesting that tuition increases are instead due to industry-wide factors such

as increases in demand and to the schools' costs. *Geffner v. Coca-Cola Co.*, 343 F. Supp. 3d 246, 254 (S.D.N.Y. 2018) (correlational studies are insufficient), *aff'd*, 928 F.3d 198 (2d Cir. 2019). Here, the chart does not even support a *correlation* between Early Decision *practices* and tuition prices, much less a *causal* connection between the alleged *agreement* and the tuition Plaintiffs paid. Nor could they—Plaintiffs do not even allege when any specific Defendant School adopted Early Decision as compared to changes in its tuition.

### C.   Plaintiffs Do Not Plausibly Allege That The Challenged Conduct Reduced Their Need- Or Merit-Based Aid.

Plaintiffs' second theory—that the challenged conduct reduced their financial aid—does not pass muster either. That is true for a host of reasons as to the named Plaintiffs.

**Miller.** Plaintiff Miller's claims fail because he allegedly applied Regular Decision, rather than Early Decision. Doc. No. 1 ¶ 18. The Complaint does not plausibly allege any effects on financial aid for individuals admitted Regular Decision.

**D'Amico, Miller, Silbert.** These Plaintiffs do not allege that they applied for financial aid or would have been eligible for it in a but-for-the-challenged-conduct world. Antitrust standing requires plausible allegations that Plaintiffs would have been better off without the alleged anticompetitive agreement. *See, e.g.*, *Sullivan v. Tagliabue*, 25 F.3d 43, 52 (1st Cir. 1994). Nothing in the Complaint supports that theory as to any of these three Plaintiffs.

**Robinson.** While Robinson obtained financial aid, they do not plausibly allege they would have received more aid but for the alleged conspiracy. To show antitrust injury based on reduced financial aid, Robinson would need to plausibly allege either that *all* financial aid offered at the Early Decision stage (including at their school, Vassar College) is lower because of the alleged conspiracy, or that, but for the conduct at issue, Robinson would have applied to a hypothetical different school Regular Decision, been accepted, received a hypothetical more generous financial

aid package, and used it to "negotiate an increase" in financial aid at Vassar. Doc. No. 1 ¶ 132. They allege none of the necessary factual predicates for their claims. The allegation that *all* financial aid is lower due to the alleged conspiracy is conclusory. *See supra* Section III.A. And Robinson alleges no details about their merit, financial aid needs, or interest in applying to other schools despite committing early to Vassar.

**D'Amico, Silbert, Robinson**. The Early Decision Plaintiffs' theory fails for an additional reason: all three voluntarily decided to apply for Early Decision knowing full well that their commitment would be binding absent financial hardship. But "voluntary foreclosure of one's own opportunities for competition is not the type of antitrust injury for which the antitrust laws were designed to provide redress." *Untracht v. Fikri*, 454 F. Supp. 2d 289, 310 (W.D. Pa. 2006), *aff'd*, 249 F. App'x 268 (3d Cir. 2007). Giving students multiple choices that are each the product of robust competition and holding them to their choice does not injure competition. It is competition.[9]

## IV.    The Statute of Limitations Bars Claims By Plaintiffs D'Amico and Silbert.

Plaintiffs D'Amico and Silbert assert untimely claims that should be dismissed. A federal antitrust claim must be brought within four years "after the cause of action accrued," 15 U.S.C. § 15b, which occurs when "a defendant commits an act that injures a plaintiff[]," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Here, D'Amico and Silbert allege that they were injured "by paying more for attendance at [Wesleyan] than they would have paid but for the [existing] combination and conspiracy." Doc. No. 1 ¶ 176. Each of their asserted injuries first arose when they enrolled and paid tuition at Wesleyan for the first time in Fall 2019. *Id.* ¶¶ 17, 20. The four-year limitations period thus expired in Fall 2023, long before this case.

---

[9] Plaintiffs also suggest that Early Decision distorts "the efficient matching of students with schools," Doc. No. 1 ¶ 144, but they do not trace any harms to the alleged restraint itself, *see supra* Section III.A, or connect such harms to named Plaintiffs. Nor could damages be calculated to redress such speculative, non-financial harms. *AGC*, 459 U.S. at 543.

The continuing violation theory does not save these untimely claims because there has been no "overt act" alleged that (1) is "new and independent" ("not merely a reaffirmation of a previous act") and (2) "inflict[s] new and accumulating injury on the plaintiff." *Gov't of P.R. v. Carpenter Co.*, 442 F. Supp. 3d 464, 475 (D.P.R. 2020); *see Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984) (requiring "subsequent overt act in furtherance of the alleged conspiracy"). D'Amico and Silbert contend that they suffered injury by paying higher tuition caused by the alleged conspiracy surrounding Early Decision programs. They do not allege they applied for or were eligible for financial aid at any point, Doc. No. 1 ¶¶ 17-20, and even if they had, any subsequent financial aid determinations in future years would be the "unabated inertial consequence[s]" of Defendants' alleged unlawful agreement from outside the time period and would not restart the limitations clock. *Berkson*, 743 F.2d at 55. This is just like *Choh*, where the plaintiffs argued that the annual decision to decline awarding tuition constituted a new overt act that reset the limitations period. 753 F. Supp. 3d at 135. The court disagreed because the plaintiff's injury occurred when Brown University initially declined to award a scholarship; the "failure of Brown to award [the plaintiff] an athletic scholarship … during the remainder of his time at Brown was simply a manifestation of the [initial] overt act." *Id*. at 136.

Nor can Plaintiffs benefit from tolling based on fraudulent concealment, which requires "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Berkson*, 743 F.2d at 55 (quotation marks omitted). The Complaint relies on publicly available sources reaching back decades, *e.g.*, Doc. No. 1 ¶¶ 6, 9, 110-112, confirming that each Plaintiff could have discovered their alleged injuries in 2019 had they exercised reasonable "diligence." *Harry v. Countrywide Home Loans Inc.*, 219 F.

Supp. 3d 228, 236-37 (D. Mass. 2016), *aff'd*, 902 F.3d 16 (1st Cir. 2018).

## **CONCLUSION**

Early Decision gives applicants more options for admission, and it helps schools build a class of students most interested in attending. Hundreds of institutions besides Defendant Schools have similar programs. None of this is unlawful, and Plaintiffs do not argue otherwise.

What Plaintiffs do argue is more far-fetched: that a random subset of schools conspired to undermine applicants' ability to consider other options after they have been admitted Early Decision. Plaintiffs' agreement allegations are conclusory and fall far short of what is required to adequately plead an antitrust violation under Section 1. If any doubt remained about that, the Complaint also fails to allege anticompetitive effects in a well-defined market or antitrust standing. These are not problems that can be solved through amendment. Therefore, this Court should dismiss the Complaint with prejudice.

Dated: October 15, 2025                          Respectfully submitted,

                                                 */s/  Douglas E. Litvack*
                                                 Douglas E. Litvack (admitted *pro hac vice*)
                                                 Ishan K. Bhabha (admitted *pro hac vice*)
                                                 Peter E. Davis (admitted *pro hac vice*)
                                                 JENNER & BLOCK LLP
                                                 1099 New York Avenue, NW, Suite 900
                                                 Washington, DC 20001-4412
                                                 (202) 639-6300
                                                 dlitvack@jenner.com
                                                 ibhabha@jenner.com
                                                 pdavis@jenner.com

                                                 Shoba Pillay (MA Bar No. 659739)
                                                 Casey Carlson (admitted *pro hac vice*)
                                                 JENNER & BLOCK LLP
                                                 353 N. Clark Street
                                                 Chicago, IL 60654-3456
                                                 (312) 222-9350
                                                 spillay@jenner.com
                                                 ccarlson@jenner.com

                                                 *Counsel for Defendants The Trustees of Dartmouth
                                                 College and William Marsh Rice University*

                                                 */s/  Michael T. Gass*
                                                 Michael T. Gass (BBO No. 546874)
                                                 Samuel N. Rudman (BBO No. 698018)
                                                 John C. Calhoun (BBO No. 694479)
                                                 Katherine Quezada (BBO No. 711550)
                                                 CHOATE, HALL & STEWART LLP
                                                 Two International Place
                                                 100-150 Oliver Street
                                                 Boston, MA 02110
                                                 (617) 248-5000
                                                 mgass@choate.com
                                                 srudman@choate.com
                                                 jcalhoun@choate.com
                                                 kquezada@choate.com

                                                 *Counsel for Defendant Consortium On
                                                 Financing Higher Education*

                                                 */s/  Alexander M. Wolf*

Alexander M. Wolf (BBO # 685374)
awolf@steptoe.com
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, Texas 77002
(713) 221-2300

Eric S. Berman (admitted *pro hac vice*)
Lee F. Berger (admitted *pro hac vice*)
Patrick F. Linehan (admitted *pro hac vice*)
Weisiyu Jiang (admitted *pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
eberman@steptoe.com
lberger@steptoe.com
plinehan@steptoe.com
wjiang@steptoe.com

*Counsel for Defendant The Common Application, Inc.*

/s/ Sarah F. Kirkpatrick
Sarah F. Kirkpatrick (BBO No. 667300)
Cole T. Wintheiser (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
(202) 434-5000
skirkpatrick@wc.com
cwintheiser@wc.com

*Counsel for Defendant Scoir, Inc.*

/s/ Juan A. Arteaga
Juan A. Arteaga (*pro hac vice*)
Rosa M. Morales (*pro hac vice*)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 223-4000
JArteaga@crowell.com
RMorales@crowell.com

37

Jordan Ludwig (*pro hac vice*)
CROWELL & MORING LLP
515 South Flower Street
Los Angeles, CA  90071
(213) 622-4750
JLudwig@crowell.com

Daniel H. Leff (BBO #689302)
CROWELL & MORING LLP
1 International Place
Boston, MA  02110
(781) 795-4700
DLeff@crowell.com

*Counsel for Defendants Amherst College, Bowdoin College, Wellesley College, and Williams College*

/s/  Jacob R. Sorensen
Jacob R. Sorensen (*pro hac vice*)
Laura C. Hurtado (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
(415) 983-1000
jake.sorensen@pillsburylaw.com
laura.hurtado@pillsburylaw.com

Jeffrey Metzler (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
(212) 858-1153
jeffrey.metzler@pillsburylaw.com

*Counsel for Defendants Barnard College, Oberlin College, Pomona College, Trinity College, and Vassar College*

/s/  Noah J. Kaufman
Noah J. Kaufman
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 341-7590

38

noah.kaufman@morganlewis.com

*Counsel for Defendant Brown University*

/s/  Daryl J. Lapp
Daryl J. Lapp (BBO #554980)
TROUTMAN PEPPER LOCKE LLP
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
(617) 239-0100
daryl.lapp@troutman.com

Daniel Boland (*pro hac vice*)
Barbara Sicalides (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 981-4000
daniel.boland@troutman.com
barbara.sicalides@troutman.com

Julie Webb (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive
Suite 4100
Chicago, IL 60606
(312) 443-0700
julie.webb@troutman.com

*Counsel for Defendants Bryn Mawr College and Swarthmore College*

/s/  Jacob A. Kramer
Lawrence G. Scarborough (BBO No. 681285)
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
(212) 248-3140
lawrence.scarborough@faegredrinker.com

Jacob A. Kramer (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW Washington, D.C. 20005
(202) 230-5289
jake.kramer@faegredrinker.com

Emily E. Chow (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
90 S. Seventh Street Minneapolis, MN 55402
(612) 766-8012
emily.chow@faegredrinker.com

Joshua P. Mahoney (*pro hac* vice)
FAEGRE DRINKER BIDDLE & REATH LLP
320 South Canal Street Chicago, IL 60606-5707
(312) 212-6520
josh.mahoney@faegredrinker.com

*Counsel for Defendants Carleton College,*
*Macalester College, and Wesleyan University*

*/s/ Alisha Q. Nanda*
Alisha Q. Nanda (BBO #657266)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
alisha.nanda@skadden.com

Karen Hoffman Lent (*pro hac vice*)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3000
karen.lent@skadden.com

Amy L. Van Gelder (*pro hac vice*)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
320 S. Canal St., 47th Floor
Chicago, IL 60606
(312) 407-0700
amy.vangelder@skadden.com

*Counsel for Defendant Columbia University*

*/s/  Melissa H. Maxman*
Melissa H. Maxman (*pro hac vice*)
Ronald F. Wick (*pro hac vice*)

40

Derek Jackson (*pro hac vice*)
COHEN & GRESSER LLP
2001 Pennsylvania Avenue NW, Suite 300
Washington, D.C. 20006
(202) 851-2070
mmaxman@cohengresser.com
rwick@cohengresser.com
djackson@cohengresser.com

Alicia L. Downey (BBO # 564265)
DOWNEY LAW LLC
155 Federal Street, Suite 300
Boston, MA 02110
(617) 444-9811
alicia@downeylawllc.com

*Counsel for Defendant Cornell University*

/s/  Kelsey M. Westrich
Kelsey M .Westrich, BBO No. 705615
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA  02116
(617) 723-3300
kelsey.westrich@saul.com

Kayleigh T. Keilty (*pro hac vice*)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8919
kayleigh.keilty@saul.com

Christopher D. Dusseault (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7855
cdusseault@gibsondunn.com

Rachel S. Brass (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(413) 393-8293
rbrass@gibsondunn.com

*Counsel for Defendant Duke University*

/s/  Tina M. Tabacchi
Tina M. Tabacchi (*pro hac vice*)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
(312) 782-3939
tmtabacchi@jonesday.com

Peter W. Schwingler (*pro hac vice*)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8800
pschwingler@jonesday.com

Yvonne W. Chan (BBO# 669223)
JONES DAY
100 High Street, 22nd Floor
Boston, Massachusetts  02110
 (617) 960-3939
ychan@jonesday.com

*Counsel for Defendant Emory University*

/s/  Austin Evers
Austin Evers  (#676985)
Eric Mahr (*pro hac vice*)
Heather P. Lamberg (*pro hac vice*)
Jan Rybnicek (*pro hac vice*)
FRESHFIELDS LLP
700 13th Street NW - 10th Floor
Washington, D.C. 20005
(202) 777-4545
eric.mahr@freshfields.com
heather.lamberg@freshfields.com
jan.rybnicek@freshfields.com

*Counsel for Defendants Haverford College,*
*Mount Holyoke College, Middlebury College,*
*Smith College*

/s/  John P. Bueker
John P. Bueker (BBO #636435)

42

ROPES & GRAY LLP
Prudential Tower 800 Boylston Street
Boston, Massachusetts 02119
(617) 951-7000
John.Bueker@ropesgray.com

Samer M. Musallam *(pro hac vice)*
Elizabeth T. McInerney *(pro hac vice)*
Logan D. Hovie *(pro hac vice)*
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 508-4600
Samer.Musallam@ropesgray.com
Elizabeth.McInerney@ropesgray.com
Logan.Hovie@ropesgray.com

*Counsel for Defendant Johns Hopkins University*

/s/  Jack W Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
jpirozzolo@sidley.com
(617) 223-0304

Scott D. Stein (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
sstein@sidley.com
(312) 853-7000

*Counsel for Defendant Northwestern University*

/s/  James L. Cooper
James L. Cooper (*pro hac vice*)
Michael A. Rubin (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
james.cooper@arnoldporter.com
michael.rubin@arnoldporter.com

43

Esther Ha Yoon Sohn (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
esther.sohn@arnoldporter.com

H. Tiffany Jang, BBO No. 691380
ARNOLD & PORTER KAYE SCHOLER LLP
500 Boylston Street, 20th Floor
Boston, MA 02116
(617) 351-8050
tiffany.jang@arnoldporter.com

*Counsel for Defendant University of Chicago*

/s/  Andrew S. Dulberg
Andrew S. Dulberg (BBO No. 675405)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
Andrew.Dulberg@wilmerhale.com

David Z. Gringer (*admitted pro hac vice*)
7 World Trade Center
250 Greenwich St.
New York, NY  10007
(212) 230-8800
David.Gringer@wilmerhale.com

*Counsel for Defendant the Trustees of the
University of Pennsylvania*

/s/ John F. Baughman
John F. Baughman (*pro hac vice*)
BAUGHMAN KROUP BOSSE PLLC
One Liberty Plaza – 46th Floor
New York, NY 10006
(212) 548-3212
jbaughman@bkbfirm.com

*Counsel for Defendant the University of Rochester*

/s/ J. Mark Gidley

44

J. Mark Gidley (*pro hac vice*)
WHITE & CASE LLP
701 13th Street N.W.
Washington, DC 20005
(202) 626-3600
mgidley@whitecase.com

C. Kelly Newman
Dan Medici
WHITE & CASE LLP
75 State Street
Boston, MA 02109
(617) 979-9300
kelly.newman@whitecase.com
dan.medici@whitecase.com

Jack E. Pace III (*pro hac vice*)
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8200
jpace@whitecase.com

*Counsel for Defendant Vanderbilt University*


/s/  Michael Ryan Meuth
Michael Ryan Meuth (BBO #714093)
PAUL HASTINGS LLP
200 Clarendon Street
Boston, MA 02116
(617) 912-1652
ryanmeuth@paulhastings.com

Ryan P. Phair (*pro hac vice*)
Christopher C. Brewer (*pro hac vice*)
Jill Rogowski (*pro hac vice*)
Samuel J. Thomas (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700
ryanphair@paulhastings.com
chrisbrewer@paulhastings.com
jillianrogowski@paulhastings.com
samthomas@paulhastings.com

45

Stephen McIntyre (*pro hac vice*)
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
(213) 683-6000
stephenmcintyre@paulhastings.com

*Counsel for Defendant Washington
University in St. Louis*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Memorandum of Law in Support of Defendants' Joint Motion to Dismiss for Failure to State a Claim has been served on all counsel of record via the Court's ECF system on October 15, 2025.

/s/  *Douglas E. Litvack*
Douglas E. Litvack