UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, THE TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, WILLIAM MARSH RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE, <br><br> Defendants. | Case No. 1:25-cv-12221-AK |

## NON-SCHOOL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................ 1

I.  Factual Background ..................................................................................... 1

    A.  Common App ........................................................................................ 1

    B.  Scoir ...................................................................................................... 3

    C.  COFHE .................................................................................................. 4

    D.  Plaintiffs' Allegations Against Non-School Defendants ....................... 4

Argument ................................................................................................................ 7

I.  Legal Standard ............................................................................................. 7

II.  The Complaint Fails To Allege a Plausible Section 1 Claim Against Non-School Defendants. ................................................................................ 8

    A.  Plaintiffs' Purported Customer Allocation and Group Boycott Allegations Fail Against Non-School Defendants ................................. 8

        1.  The Complaint Alleges No Direct Evidence of An Agreement Among Competitors Involving Non-School Defendants ....................... 9

        2.  Plaintiffs Fail To Allege Parallel Conduct and Plus Factors Sufficient To Establish An Illegal Agreement Involving Non-School Defendants ..................... 9

            a.  The Complaint Fails to Sufficiently Allege Any Parallel Conduct Involving Non-School Defendants ................................... 10

            b.  Plaintiffs Do Not Allege That Non-School Defendants Are "Hubs" of any Purported Early Decision Conspiracy ....................... 11

            c.  The Complaint Fails To Allege Any "Plus Factors" Applicable to Non-School Defendants ................................... 14

        3.  Plaintiffs' Group Pleading Allegations Are Particularly Impermissible As to Non-School Defendants ................................... 16

    B.  Plaintiffs' Conclusory Allegations of Information-Sharing Are Not Circumstantial Evidence of an Unlawful Agreement. ........................... 18

Conclusion ............................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Tech. Corp., Inc. v. Instron, Inc.*,
  925 F. Supp. 2d 170 (D. Mass. 2013) ..............................................................10, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................1, 7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................ *passim*

*DM Rsch. v. Coll. of Am. Pathologists*,
  170 F.3d 53 (1st Cir. 1999)...........................................................................................7

*Euromodas, Inc. v. Zanella, Ltd.*,
  368 F.3d 11 (1st Cir. 2004)...........................................................................................8

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013)................................................................................. *passim*

*García-Catalán v. U.S.*,
  734 F.3d 100 (1st Cir. 2013).........................................................................................7

*Gibson v. Cendyn Group., LLC, et al.*,
  2024 WL 2060260 (D. Nev. May 8, 2024), *aff'd*, 148 F.4th 1069 (9th Cir.
  2025) .............................................................................................................................13

*Hansen v. Northwestern University*,
  2025 WL 2731378 (N.D. Ill. Sept. 24, 2025) .................................................11, 15

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019)........................................................................17

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ....................................................................................16

*In re Processed Egg Products Antitrust Litigation*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................12, 15

*In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
  709 F. Supp. 3d 478 (M.D. Tenn. 2023)....................................................................13

*Jones v. Micron Tech., Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ............................................................................16, 18

*Maple Flooring Mfrs. Ass'n v. U.S.*,
    268 U.S. 563 (1925)..........................................................................................................18

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)........................................................................................................8, 9

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
    567 F.3d 8 (1st Cir. 2009)..................................................................................................7

*Sarvis v. Polyvore, Inc.*,
    2013 WL 4056208 (D. Mass. Aug. 9, 2013) ......................................................................2

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
    311 F. Supp. 3d 468 (D.R.I. 2018)....................................................................................14

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ...........................................................................................11

*United States v. Apple Inc.*,
    791 F.3d 290 (2d Cir. 2015)..............................................................................11, 13, 14

*Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd.*,
    2015 WL 4467064 (D. Mass. July 20, 2015)......................................................................7

*Zond, Inc. v. Fujitsu Semiconductor Ltd.*,
    990 F. Supp. 2d 50 (D. Mass. 2014) .................................................................................17

**Other Authorities**

Fed. R. Civ. P. 8(a) ..................................................................................................................17

Fed. R. Civ. P. Rule 9(b)............................................................................................................7

Fed. R. Civ. P. 12(b)(6).........................................................................................................1, 7

## INTRODUCTION

Defendants The Common Application, Inc. ("Common App"), Scoir, Inc. ("Scoir"), and the Consortium on Financing Higher Education ("COFHE") (collectively, "Non-School Defendants") join with the schools also named as Defendants (collectively, "School Defendants"; together with Non-School Defendants, "Defendants") in Defendants' Joint Motion to Dismiss (Doc. No. 219). Non-School Defendants submit this separate motion and supporting memorandum to highlight additional insufficiencies that are unique to each of them.

While the Complaint's allegation of a vast horizontal conspiracy among 32 colleges and universities is facially deficient as to all Defendants, it is non-existent as to Non-School Defendants. Plaintiffs fail to allege that Non-School Defendants entered into *any* agreement at all, let alone the restraints alleged. Plaintiffs instead spatter the Complaint with sparse and conclusory allegations that Non-School Defendants "facilitated" School Defendants' agreement or that the alleged agreement was "coordinated" through them (Doc. No 1 ¶¶ 1, 106, 118). These allegations fail to state a claim under Federal Rule of Civil Procedure 12(b)(6) and fall far short of the pleading standard required under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). They must be dismissed with prejudice.

## I.    FACTUAL BACKGROUND

### A.    Common App

Common App is a nonprofit organization based in Arlington, Virginia. (Doc. No. 1 ¶ 26.) It was founded in 1975 with a membership of 15 colleges to streamline the admission process for

students.[1] Common App's membership has since grown to approximately 1,100 colleges and universities, with a purpose "to increase access, equity, and integrity in the college admissions process."[2]

Plaintiffs claim that Common App helps School Defendants "entrench patterns of inequality of access" to higher education (Doc. No. 1 ¶ 1), but Common App actually **broadens** student access to post-secondary education by processing ever-increasing numbers of first-year applications from more students to more schools. In the 2024-25 application cycle, nearly 1.5 million first-year applicants used the Common App to submit more than 10 million applications to Common App's 1,100 members, including over 570,000 first-generation applicants.[3] While Plaintiffs malign Early Decision as a program that "disadvantages low-income students" (Doc. No. 1 ¶ 143), applications from Common App users in below-median income zip codes grew **114 percent** over the past decade and 10 percent in the last year.[4] And though Plaintiffs portray the alleged conspiracy as the work of a few dozen "elite institutions" that "occupy an undeniable place of privilege and influence" (Doc. No. 1 ¶ 1), Common App's membership is diverse and expanding—recently welcoming its first cohort of community colleges to increase access for low- and middle-income students.[5]

---

[1] *See First-Year Application Trends End of Season Report* (2024-25), available at https://www.commonapp.org/files/DAR/deadline-updates/Common-App-End-of-Season-Report_24-25.pdf (hereafter "2024-25 App Trends") (last visited on Oct. 7, 2025). "[F]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Sarvis v. Polyvore, Inc.*, No. 12-12233-NMG, 2013 WL 4056208, at 3 (D. Mass. Aug. 9, 2013) (quoting *Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 193 n.8 (S.D.N.Y. 2006)) (additional quotations omitted).

[2] 2024-25 App Trends at 1.

[3] *See id.* at 2, 15.

[4] *See id.* at 4, 16.

[5] *See* "Common App Welcomes its First Cohort of Community Colleges to the Platform," available at https://www.commonapp.org/blog/common-app-welcomes-its-first-cohort-community-colleges-platform (last visited Oct. 7, 2025).

**B.**    **Scoir**

Scoir is a private, for-profit corporation (Doc. No. 1 ¶ 27) based in Chesterbrook, Pennsylvania.  Founded in 2013, Scoir is a software service platform that provides students, parents, high school counselors, and colleges a suite of tools to accomplish its three goals: (1) simplifying the college application process, (2) expanding collegiate access, and (3) improving student outcomes.[6]  These tools include such things as questionnaires and search features to help students identify colleges that fit their needs; cost calculators; a messaging portal to connect students, admissions officers, and counselors; and document storage.[7]

In 2022, Scoir expanded its suite of services when it launched a software integration with Technolutions' Slate™—a CRM software product used by a majority of U.S. college admissions offices—and the Coalition for College—the owner of the Coalition App.[8]  This new integration allowed students to complete the Coalition App directly through their Scoir portals and deliver the application directly to a college's CRM software, streamlining the process by pre-filling duplicative information across different colleges' individual applications.[9]  But, Plaintiffs' flatly incorrect allegations to the contrary notwithstanding (Doc. No. 1 ¶ 27), Scoir's software integration did not result in the acquisition of ownership, management, or control over the Coalition App itself.

---

[6] *See* What We Believe, available at https://www.scoir.com/about-us (last visited Oct. 2, 2025); Career Exploration, Plus College Search, Planning, and Applications Made Better, available at https://www.scoir.com/students-families (last visited October 2, 2025).

[7] *See* Career Exploration, Plus College Search, Planning, and Applications Made Better, available at https://www.scoir.com/students-families (last visited Oct. 2, 2025).

[8] *See* Our Story, available at https://www.scoir.com/about-us (last visited Oct. 2, 2025).

[9] *See* Scoir's New Product Integration Explained, available at https://www.scoir.com/whats-new-in-scoir/scoir-new-product-integration (last visited Oct. 2, 2025); Apply Coalition with Scoir, available at https://www.scoir.com/students/apply-with-scoir (last visited October 2, 2025).

### C.    COFHE

COFHE is an unincorporated association of selective colleges and universities headquartered in Cambridge, Massachusetts.  (Doc. No. 1 ¶ 25.)  Since its inception in the early 1970's, COFHE's mission has been to assist its member institutions to better understand the financial challenges facing students in order to increase access for talented students with limited financial resources.[10]  COFHE has advanced this mission through research and analysis of historical, anonymized data from its members.

### D.    Plaintiffs' Allegations Against Non-School Defendants

Plaintiffs do not allege that Non-School Defendants committed the "central practice challenged in this case," a purported agreement between 32 colleges and universities to reduce competition amongst themselves for students after they are admitted through their Early Decision programs.  (Doc. No. 1 ¶ 1.)  The putative conspiracy's aim is "to increase overall tuition levels and to decrease financial aid."  (Doc. No. 1 ¶ 14.)  Plaintiffs do not allege that Non-School Defendants participated in this conspiracy or, for that matter, engaged in any concerted action amongst themselves or with the 32 schools named as Defendants.  They also do not, and cannot, allege that any Non-School Defendants make admissions decisions for any of the School Defendants, set their tuition prices, determine their financial aid awards, or otherwise compete in the alleged market for undergraduate education.

Instead, Plaintiffs seek to hold Non-School Defendants jointly and severally liable for a conspiracy they are not alleged to have joined (Doc. No. 1 ¶¶ 23, 24) by lodging a conclusory (and illogical) assertion that they somehow "facilitated" it.  (Doc. No. 1 ¶ 1 (alleging that Common App and Scoir "provide common application products that facilitate and enforce the anticompetitive

---

[10] *See, e.g.*, https://web.mit.edu/cofhe/ (last visited Oct. 8, 2025).

restraints of the conspiracy," while COFHE's alleged "purpose is to facilitate information sharing among these institutions, which in turn facilitates the horizontal restraints challenged in this case").)

As part of this alleged "facilitation," Plaintiffs claim that each of Common App and Scoir, through the Coalition App, requires students using its platform for Early Decision to "sign a document . . . obligating that applicant to accept an offer of admission received through Early Decision, to withdraw any other pending applications, and to make no further applications to other schools." (Doc. No. 1 ¶ 81.) Plaintiffs also allege that schools using Common App or Coalition App as a platform for their Early Decision applications must comply with the platform's "rules governing Early Decision applications" (Doc. No. 1 ¶ 81), but fail to identify what those rules are or explain how they relate to the alleged conspiracy.

The Complaint also alleges that when Common App presents its member schools' application form to Early Decision applicants, it discloses that the ***school receiving the application*** "may share [the applicant's] name and [the applicant's] early commitment with other institutions." (Doc. No. 1 ¶ 83 (emphasis added).)[11] Plaintiffs do not, however, allege that Common App itself shares any student's Early Decision information with any school other than the one to which the student applied Early Decision, nor do they allege that either platform encourages, assists, or participates in any communications or agreement between School Defendants regarding students' early commitments. Indeed, the Complaint does not allege any involvement on the part of Common App or Scoir in any college's admissions or financial aid process after the applicant clicks the "submit" button.

Plaintiffs also allege that "Early Decision applicants typically must use either the Common App or the Coalition App to apply to School Defendants." (Doc. No. 1 ¶ 80.) But none of the

---

[11] There is no similar information-sharing allegation relating to the Coalition App or Scoir.

Plaintiffs alleges that they used either Common App or the Coalition App (or Scoir) to apply to the institutions that they attend or attended, or that the school to which they applied used either the Common App or the Coalition App as the exclusive means of receiving applications at the time Plaintiffs submitted theirs.  (Doc. No. 1 ¶¶ 17–20.)[12]

Plaintiffs do not, and cannot, allege that COFHE promulgated any Early Decision policy, adopted any Early Decision rule, or enforced any Early Decision agreement among schools. Plaintiffs do not identify any COFHE meeting at which Early Decision was discussed or adopted, any COFHE vote or directive concerning Early Decision, or any COFHE program or working group addressing schools' Early Decision practices.  The Complaint contains no allegations that COFHE distributed Early Decision admission lists, discussed Early Decision admission forms or materials of any kind, or coordinated Early Decision policies among schools.  Plaintiffs make no attempt to describe the information with which they claim COFHE facilitated the alleged conspiracy, how it did so, or that it had anything to do with schools' Early Decision practices. They merely allege generalized assertions that COFHE "facilitate[s] information sharing" and holds "productive in-person meetings" that are "highly secretive."  (Doc. No. 1 ¶¶ 1, 22, 118–19.)

Finally, Plaintiffs allege that the boards of directors of both Common App and the Coalition App (but not Scoir) are comprised of some Defendant School administrators and COFHE members. (Doc. No. 1 ¶¶ 122–24.)  But there is no allegation that any of these board members ever took any action, entered into any agreement, or shared any School Defendant's Early Decision admission information with other School Defendants at any time.

---

[12] And the Complaint affirmatively alleges that some of the School Defendants do not even use the Coalition Application.  *See* Doc. No. 1 ¶ 60 (alleging that Brown University, Cornell University, Dartmouth College, Macalester College, and Trinity College do not use the Coalition App for accepting Early Decision applications).

## **ARGUMENT**

I.    **Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  A plaintiff's "claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'"  *García-Catalán v. U.S.*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  In determining whether a complaint has cleared the plausibility threshold, the court must determine "whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*. at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).  And in a Sherman Act Section 1 case, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Twombly*, 550 U.S. at 557.  Allegations that are "merely consistent with" liability "stop[] short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In the antitrust context, the First Circuit requires that "the factual allegations must be specific enough to justify 'drag[ging] a defendant past the pleading threshold.'"  *DM Rsch. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999).[13]  And "the complaint must allege a plausible claim against ***each*** defendant."  *Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd.*, Civ. No. 14-cv-12047-ADB, 2015 WL 4467064 at *53 (D. Mass. July 20, 2015) (emphasis added) (citing *Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53 (D. Mass. 2014)).

---

[13] To the extent Plaintiffs' allegations that the Early Decision system is "built on a core misrepresentation" (Doc. No. 1 ¶ 91) are intended to sound in fraud, those allegations would be subject to Rule 9(b)'s heightened pleading standard.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009).  Plaintiffs plead no particularized facts about "who, what, when, where, and how" any alleged misrepresentation was made by any Non-School Defendant and thus fall far short of Rule 9(b). The Court could dismiss the Complaint on this basis, too.

## II.    The Complaint Fails To Allege a Plausible Section 1 Claim Against Non-School Defendants.

Plaintiffs' only claim asserts that School Defendants conspired to eliminate competition after admitting students Early Decision ("Early Decision Conspiracy"), in order to "artificially raise the prices of attendance paid by Class Members, in violation of Section 1 of the Sherman Act."  (Doc. No. 1¶¶ 1, 172.)   In doing so, however, they fail to allege that any Non-School Defendant either (1) participated in any agreement to limit post-Early Decision competition, or (2) engaged in any sharing of competitively sensitive information.

### A.    Plaintiffs' Purported Customer Allocation and Group Boycott Allegations Fail Against Non-School Defendants.

To establish a Section 1 claim, Plaintiffs must plausibly allege (1) the existence of an agreement or "concerted action" and (2) that the agreement involves either restrictions that are *per se* illegal or restraints of trade that fail scrutiny under the rule of reason.  *See Euromodas, Inc. v. Zanella, Ltd*., 368 F.3d 11, 16 (1st Cir. 2004); *see also Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 761 (1984).  They fail to meet the first criterion entirely: Plaintiffs nowhere allege that any of the Non-School Defendants agreed to enter the alleged Early Decision Conspiracy or engaged in any concerted action whatsoever.[14]

Such an "agreement" can be established through either direct evidence or circumstantial evidence of defendants' "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (quoting *Monsanto*, 465 U.S. at 764).  Direct evidence, such as communication between

---

[14] Because Plaintiffs fail to allege any agreement by Non-School Defendants, they necessarily also fail to allege that any such (non-pleaded) agreement constitutes either a *per se* or rule of reason antitrust violation. Defendants' Joint Motion to Dismiss ably explains why: (1) the alleged Early Decision Conspiracy does not fall within the narrow *per se* category; and (2) Plaintiffs fail to allege a rule of reason claim.  *See* Doc. No. 220 at 21-29.  Non-School Defendants incorporate those arguments by reference.

conspirators expressly stating they agreed to fix prices, allocate customers, or share markets, can constitute sufficiently specific allegations regarding an unlawful agreement. *See Monsanto*, 465 U.S. at 752 (1984). In the absence of direct evidence (such as here), a plaintiff can establish concerted action through allegations of parallel conduct with "plus factors" that suggest a preceding agreement among defendants. *Twombly*, 550 U.S. at 557.

The Complaint alleges neither direct nor circumstantial evidence of an agreement involving Non-School Defendants violative of Section 1.

1. **The Complaint Alleges No Direct Evidence of An Agreement Among Competitors Involving Non-School Defendants**

The Complaint fails to allege any direct evidence that Non-School Defendants reached an agreement with School Defendants to allocate students or engage in a group boycott. Nor does the Complaint contain any allegations explaining how the Non-School Defendants plausibly ***could*** enter such an agreement, given that they have no role in or authority over admissions policies or decisions. Although each of Common App and Scoir maintains agreements with individual schools permitting those schools to use their respective application platforms, Plaintiffs do not allege that any such contract contains terms regarding Early Decision, let alone provisions amounting to an agreement to allocate students or boycott applicants, or to facilitate such allocation. Plaintiffs allege no direct evidence against COFHE either: not a single claim that COFHE promulgated any Early Decision policy, conducted any Early Decision vote, maintained any Early Decision enforcement mechanism, or facilitated any Early Decision-specific information exchange.

2. **Plaintiffs Fail To Allege Parallel Conduct and Plus Factors Sufficient To Establish An Illegal Agreement Involving Non-School Defendants**

The Complaint also fails to allege any parallel conduct and plus factors that could reasonably support an inference of tacit agreement involving any of the Non-School Defendants. While School Defendants are alleged, albeit in conclusory fashion, to have adopted and enforced

9

the Early Decision Conspiracy (Doc. No. 1 ¶ 1), the Complaint is utterly devoid of any allegation that Non-School Defendants had any involvement in discussions with School Defendants regarding admissions or financial aid, or any involvement in other parallel conduct by School Defendants. Moreover, there are no "plus factors" alleged that would otherwise sustain a Section 1 claim against Non-School Defendants.

> **a.** **The Complaint Fails to Sufficiently Allege Any Parallel Conduct Involving Non-School Defendants**

Parallel conduct refers to behavior among competitors that is similar or uniform, which may suggest collusion when accompanied by additional circumstances indicating an agreement. *See, e.g., Evergreen Partnering Grp.,* 720 F.3d at 46; *Advanced Tech. Corp., Inc. v. Instron, Inc.,* 925 F. Supp. 2d 170, 178 (D. Mass. 2013). Plaintiffs' allegations fail at the threshold, as Non-School Defendants are not competitors with School Defendants in the alleged "Market for Undergraduate Education from Elite Private Colleges and Universities." (Doc. No. 1 ¶ 153.) Non-School Defendants do not admit students, set tuition, or determine financial aid, and thus could not engage in parallel behavior with School Defendants on those matters. Nor are Non-School Defendants even competitors with each other, as each of the three named entities engages in different aspects of the higher education enrollment process.

Plaintiffs do not assert *any* allegations of parallelism against COFHE specifically. And as to Common App and Scoir, they allege, at most, that the Common App and Coalition App (through Scoir) provided standardized Early Decision forms used by their member schools to applicants. (Doc. No. 1 ¶¶ 83, 92–95.) But Plaintiffs do not allege that these forms were used only by the 32 School Defendants, as opposed to being available to Common App's more than 1,100 members and used by hundreds of them, or Coalition App's more than 150 members and used by many of them. Nor do Plaintiffs explain why the adoption of a widely available, optional administrative

tool demonstrates conspiratorial parallelism among just those 32 School Defendants, but not among the hundreds of other institutions that also use them. This doomed the similar Section 1 complaint against the College Board and 40 universities in *Hansen v. Northwestern University*, 2025 WL 2731378 (N.D. Ill. Sept. 24, 2025), where "some" schools adopted the optional financial aid pricing strategy at issue but "many other College Board members" did not. The court dismissed that case, because "this does not suggest a conspiracy." *Id.* at *10.[15] Even if School Defendants' adoption of similar Early Decision forms could be characterized as "parallel conduct" (which it cannot be, *see* Doc. No. 220 at 20), any such parallelism would be attributable to School Defendants' own unilateral choices, and not to Common App or Coalition App (or Scoir). The fact that a relatively small subset of institutions using Common App or Coalition App decided to use the same sample language through their application vendors does not come close to establishing that Common App or Coalition App (or Scoir) engaged in parallel conduct in a market with those schools.

> **b.    Plaintiffs Do Not Allege That Non-School Defendants Are "Hubs" of any Purported Early Decision Conspiracy**

The Complaint does not allege a hub-and-spoke conspiracy in which Non-School Defendants are a central "hub" that coordinates agreement among competing schools–the "spokes." *See, e.g., Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008). A valid hub-and-spoke conspiracy would require allegations that Common App, the Coalition App (or Scoir), or COFHE actively directed or orchestrated the alleged market allocation or group boycott scheme. *See, e.g., United States v. Apple Inc.*, 791 F.3d 290 (2d Cir. 2015). This Complaint alleges nothing of the sort. As Defendants' Joint Motion to Dismiss

---

[15] The Complaint here is even weaker. The *Hansen* plaintiffs alleged that the College Board "urge[d]" colleges to collect certain financial information. 2025 WL 2731378, at *10. But there is no allegation that Common App or Scoir urged their members to do ***anything*** relating to Early Decision.

explains, the Complaint largely focuses on lawful vertical relationships between higher education institutions and students applying for admission to them. *See* Doc. No. 220 at 9-10. Plaintiffs point only to the fact that Common App's and Coalition App's Early Decision forms require students committing to an admitting school to acknowledge that they will withdraw other pending applications if admitted. (Doc. No. 1 ¶¶ 92–94.) But the allegation that the schools use the same or similar Early Decision agreements through the Common App and Coalition App (via Scoir) platforms does not provide a plausible basis to conclude that Common App or Scoir actively facilitated coordination between the schools. And Plaintiffs utterly fail to allege any reason why Common App or Coalition App (or Scoir) would engage in such facilitation. And as to COFHE, Plaintiffs do not identify any COFHE rulemaking, vote, directive, agenda, minutes, working group, or program through which COFHE allegedly set schools' Early Decision policies, coordinated admit lists, or enforced compliance.

At most, Plaintiffs' allegations against Non-School Defendants reduce to the claim that they function as neutral service providers by offering application forms, transmitting applications, or, as to COFHE, facilitating member communications. But courts have consistently refused to treat such entities as "hubs" absent allegations of <u>active orchestration</u>. For instance, in *In re Processed Egg Products Antitrust Litigation*, plaintiffs alleged that egg producers and their trade association had engaged in a conspiracy to manipulate the supply of (and thereby fix prices for) eggs. 821 F. Supp. 2d 709, 713-714 (E.D. Pa. 2011). The court dismissed a Section 1 price-fixing conspiracy against the trade association, finding that the complaint failed to allege that the trade association itself undertook any collusive actions with members of the association beyond providing a forum for member communications. *Id.* at 751–55. Like the trade association in *Processed Eggs*, Non-School Defendants are alleged merely to provide an administrative function,

not to have actively orchestrated or induced a customer allocation conspiracy among their school members. In fact, Plaintiffs' allegations themselves describe School Defendants' independent use of a neutral tool, which is equally consistent with lawful conduct and therefore cannot support an inference of concerted action under *Twombly*. *See Gibson v. Cendyn Group., LLC, et al.*, 2024 WL 2060260 (D. Nev. May 8, 2024), *aff'd*, 148 F.4th 1069 (9th Cir. 2025).

This case thus stands in stark contrast to the "facilitator" cases where a non-competitor acted as the "hub" for collusion among horizontal rivals. For instance, in *In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, plaintiffs alleged that RealPage, a pricing algorithm software provider, served as a key intermediary between competing landlords by pooling and analyzing landlords' competitively sensitive data and distributing pricing recommendations back to them, thereby functioning as a coordinating mechanism of the conspiracy among landlords. 709 F. Supp. 3d 478, 493–97 (M.D. Tenn. 2023). Similarly, in *Apple*, defendant Apple was found liable for engaging in a price-fixing conspiracy under Section 1 because it actively structured its contracts with e-book publishers to include most-favored-nation clauses, engaged in repeated communications with the publishers, and affirmatively induced all publishers to act collectively against Apple's competitor Amazon. 791 F.3d at 316–20. The court emphasized that Apple went "well beyond" ordinary business conduct to orchestrate such a scheme. *Id*. at 319. Here, Plaintiffs made no similar allegation that Non-School Defendants actively orchestrate School Defendants' Early Decision practices. Unlike RealPage or Apple, which served as the brain of the collusive price-fixing schemes, Non-School Defendants are alleged only to have provided a service or membership platform. Nor are Non-School Defendants alleged, as Apple was, to have aimed a conspiracy somehow against their competitor.

**c.    The Complaint Fails To Allege Any "Plus Factors" Applicable to Non-School Defendants**

The Complaint also fails to allege any "plus factors" as to any of Non-School Defendants that would elevate any sufficiently pleaded parallel conduct allegations to a cognizable Section 1 claim.  Commonly cited plus factors include: "(1) evidence that the defendant had a motive to enter into a[n antitrust] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."  *Advanced Tech.*, 925 F. Supp. 2d at 178 (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011)).  "The third factor, evidence implying a traditional conspiracy, consists of non-economic evidence [suggesting] that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468, 494 (D.R.I. 2018) (internal quotations omitted).

Plaintiffs allege none of these plus factors as to Non-School Defendants.  First, they do not allege that Non-School Defendants had any motive to conspire with School Defendants to raise tuition or reduce financial aid.  Unlike Apple, who conspired with the e-book resellers to induce resellers to act collectively against Apple's competitor Amazon, *see Apple*, 791 F.3d at 318–19, Non-School Defendants are not alleged to have any motive to conspire with School Defendants to allocate specific applicants to specific School Defendants.  Nor would Non-School Defendants plausibly have such motivation.  Any conduct that would result in a diminution of students' demand to apply to college through their platforms, such as a restraint that would increase the price of matriculation at their member schools, would result in fewer applications and therefore fewer application fees paid to Common App or Scoir.

14

Second, Plaintiffs do not allege that Non-School Defendants acted contrary to their self-interests.  Providing application forms adopted by their members, transmitting applications to them, or providing them with a platform are actions entirely consistent with their organizational purposes and business models.  Third, Plaintiffs do not allege any traditional indicia of conspiracy, such as exchanges of assurances or coordinated adoption of a common plan by Non-School Defendants.

Allegations that certain School Defendants' administrators serve on Non-School Defendants' boards of directors (Doc. No. 1 ¶¶ 123–124) also do not support a reasonable inference that Non-School Defendants joined a conspiracy.  In *Processed Egg*, the court held that overlapping membership between trade associations was "not sufficient alone to plausibly suggest that [each individual association] as an entity participated in the conspiracy," explaining that a court will not "impute the activities of [an] organization's members to the organization itself absent [plausible] allegations that the entity participated in the conspiracy."  821 F. Supp. 2d at 753 (quoting *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 165 (D.D.C. 2004)).  So too here.

Similarly, Plaintiffs' allegations that COFHE "facilitates information sharing," is "highly secretive," and holds "productive in-person meetings" (Doc. No. 1 ¶¶ 1, 22, 118–19) do not constitute plausible plus factors.  Again, *Hansen* is instructive.  The *Hansen* court found that generic allegations about the university defendants' involvement with the College Board were "unspectacular and fail[ed] to move the needle."  2025 WL 2731378, at *9.  Plaintiffs' COFHE allegations are even less "spectacular," and amount to no more than the generalized references to meetings that were insufficient to save the complaint in *Hansen*.  And unlike the *Hansen* complaint, which at least identified the specific mechanism and result of the alleged agreement, Plaintiffs here do not identify any COFHE process, policy, vote, directive, or enforcement mechanism concerning Early Decision whatsoever.  *Cf. Evergreen Partnering Grp.*, 720 F.3d at 47–50 (finding sufficient

pleading to survive motion to dismiss only where the plaintiff alleged (i) when and where the agreement was formed (a specific trade association meeting); (ii) who advanced the policy; and (iii) post-meeting coordinated conduct including withdrawn deals, refusals to deal, the promotion of a 'sham competitor,' and dissemination of false information).  In fact, Plaintiffs do not allege that COFHE designs any Early Decision forms, runs any application workflow, or sets any rules for Early Decision application processes.  Courts have consistently held that such generalized trade-association allegations—membership, meetings, and opportunities to confer—are factually neutral and do not plausibly suggest an unlawful agreement without specifics identifying who agreed to what, when, where, and how.  *See Evergreen Partnering Grp.,* 720 F.3d at 46–49; *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193–98 (9th Cir. 2015) (affirming dismissal where trade-association activities and opportunity to conspire did not plausibly allege agreement); *Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 918–20 (N.D. Cal. 2019) (rejecting allegations based on trade-association meetings and "opportunity to collude" and noting that "data-gathering and information sharing are perfectly legitimate objectives of trade associations").

Because Plaintiffs have failed to allege any plus factors as to Non-School Defendants, their allegations at most describe conduct that is "merely consistent with" lawful behavior, and thus "stop[s] short of the line between possibility and plausibility of entitlement to relief."  *Twombly*, 550 U.S. at 557.  Plaintiffs' Section 1 claims against Non-School Defendants therefore cannot survive dismissal.

### 3.    Plaintiffs' Group Pleading Allegations Are Particularly Impermissible As to Non-School Defendants

The Complaint also impermissibly lumps Non-School Defendants together with all "Defendants" multiple times and relies on broad assertions that they collectively "facilitate" and "enforce" the alleged restraints.  (Doc. No. 1 ¶ 1.)  Such undifferentiated group pleading is subject

to dismissal. A pleading, "group or otherwise, must be sufficiently clear to put the defendants on notice as to 'who did what to whom, when, where and why.'" *Zond*, 990 F. Supp. 2d at 53 (quoting *Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 68 (1st Cir. 2004)); *see also In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389 (S.D.N.Y. 2019) ("Allegations about the defendants 'as a general collective bloc, or generalized claims of parallel conduct must . . . be set aside . . . as impermissible group pleading.'") (additional quotations omitted).

While this Court has held that Federal Rule of Civil Procedure 8(a)'s notice pleading requirement does not *prima facie* exclude group pleadings, it will dismiss them "where it is 'entirely implausible' or impossible for the grouped defendants to have acted as alleged." *Zond*, 990 F. Supp. 2d at 53 (additional quotation omitted). That is precisely the case here. The Complaint's allegation that "[e]ach Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing in this District" (Doc. No. 1 ¶ 66) *is* impossible as to Non-School Defendants. Common App, Scoir, and COFHE did not and could not recruit, accept, enroll, or charge high prices of college tuition, as they are not colleges and have no role in any college's admission decisions or tuition policies. So is the allegation that all Defendants agreed "to restrain competition for an agreed-upon group of students, in order to increase overall tuition levels and to increase financial aid." (Doc. No. 1 ¶ 14.) Again, application platforms and a trade association do not compete to enroll students, do not charge them tuition, and do not participate in the determination of their financial aid awards. These allegations are both implausible and impossible. "Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim." *Mexican Gov't Bonds.*, 412 F. Supp. 3d at 389 ("[E]ven if

Plaintiffs have alleged the plausible existence of an antitrust conspiracy . . . they have not alleged anything that would 'plausibly suggest that the particular defendants named in this suit were part of that conspiracy.'") (citation omitted).  Accordingly, the Court should dismiss the Complaint against Non-School Defendants.

### B.    Plaintiffs' Conclusory Allegations of Information-Sharing Are Not Circumstantial Evidence of an Unlawful Agreement.

Plaintiffs do not allege a standalone information-sharing scheme through their spare, generic reference to the practice.  (Doc. No. 1 ¶146.)  And their allegations that COFHE "facilitates" information sharing among its members (Doc. No. 1 ¶¶ 1, 22, 118-19) do not plead plausible circumstantial evidence to buttress their Section 1 claim.  In fact, the accusation that COFHE held meetings and assisted its members in sharing information alleges nothing more than the unremarkable fact that COFHE behaved like a lawful trade association.  The Supreme Court made clear a century ago that the Sherman Act permits this.  *See, e.g., Maple Flooring Mfrs. Ass'n v. U.S.*, 268 U.S. 563 (1925) (holding that a trade association that gathered and disseminated information amongst its members did not violate the Sherman Act in part because "[c]ompetition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge. . .").  Plaintiffs do not allege that COFHE distributed competitively sensitive Early Decision data, coordinated Early Decision policies, or enforced any Early Decision commitments whatsoever.  Their conclusory "information sharing" allegations do not buttress their Section 1 claim.  *See Evergreen Partnering Grp.,* 720 F.3d at 46–49; *Micron Tech.*, 400 F. Supp. 3d at 918–20 (rejecting allegations based on trade-association meetings and "opportunity to collude" and noting that "data-gathering and information sharing are perfectly legitimate objectives of trade associations").

They allege even less against the application platforms.  As to Scoir, Plaintiffs allege only that it provides an application platform (through the Coalition App), but they do not allege that Scoir collected or disseminated admissions data in any way—much less in a way that facilitated collusion among School Defendants.  And the Complaint does not allege that Common App itself exchanged information regarding Early Decision admission lists among School Defendants. Instead, Plaintiffs point only to the fact that Common App's "Early decision agreement" states that the "student acknowledges that the Early Decision admitting **school *may share*** applicants' name and early commitment with other institutions."  (Doc. No. 1 ¶ 83 (emphasis added).)  That language merely shows that there is a possibility that schools may share applicant information, but does not allege that Common App itself does or even "may" do so, nor that it facilitates the exchange of information sharing among School Defendants.

Accordingly, Plaintiffs fail to plead sufficient facts regarding the participation of any Non-School Defendants in the alleged information-sharing scheme.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' claims against Non-School Defendants should be dismissed with prejudice.

Dated: October 15, 2025                    Respectfully submitted,

/s/ Michael T. Gass
Michael T. Gass (BBO No. 546874)
Samuel N. Rudman (BBO No. 698018)
John C. Calhoun (BBO No. 694479)
Katherine Quezada (BBO No. 711550)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone:  617-248-5000
mgass@choate.com
srudman@choate.com
jcalhoun@choate.com
kquezada@choate.com

*Counsel for Defendant Consortium On Financing Higher Education*

/s/ Alexander M. Wolf
Alexander M. Wolf (BBO # 685374)
awolf@steptoe.com
STEPTOE LLP
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Telephone:  713-221-2300
Facsimile:  713-221-2320

Eric S. Berman (admitted *pro hac vice*)
Lee F. Berger (admitted *pro hac vice*)
Patrick F. Linehan (admitted *pro hac vice*)
Weisiyu Jiang (admitted *pro hac vice*)
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
eberman@steptoe.com
lberger@steptoe.com
plinehan@steptoe.com
wjiang@steptoe.com

*Counsel for Defendant The Common Application, Inc.*

/s/ Sarah F. Kirkpatrick
Sarah F. Kirkpatrick (BBO No. 667300)
Cole T. Wintheiser (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
Tel: 202-434-5000
skirkpatrick@wc.com
cwintheiser@wc.com

*Counsel for Defendant Scoir, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Non-School Defendants' Memorandum of Law in Support of Motion to Dismiss has been served on all counsel of record via the Court's ECF system on October 15, 2025.

*Alexander M. Wolf*
Alexander M. Wolf