# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>  v.<br><br>CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE,<br><br>            Defendants. | Case No. 25-cv-12221-AK |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 5

    I.       The College Admissions Landscape ............................................................ 5

    II.      Binding Early Decision ............................................................................... 6

    III.    Financial Effects of Early Decision ........................................................... 9

    IV.    The Challenged Agreement to Limit Competition ................................... 10

    V.      Legal and Historical Context: DOJ Antitrust Scrutiny of
           Higher Education Restraints ...................................................................... 13

DISCUSSION ................................................................................................................ 15

    I.       Plaintiffs' Allegations Must Be Accepted as True .................................... 15

    II.      This District Is the Appropriate Forum ..................................................... 16

           A.  Venue Is Proper Pursuant to Section 12 ............................................ 16

                1.    Defendants Distort the Modest "Transact Business"
                     Standard .................................................................................. 16

                2.    Defendants' Affidavits Confirm They Transact
                     Substantial Business in Massachusetts ................................... 18

                3.    Defendants' Authorities Are Misplaced ................................... 21

                4.    Defendants Transact Other Business in the
                     Commonwealth ....................................................................... 23

                  5.    Denying Venue Would Undermine Section 12's
                     Purpose and Generate Absurd Results ................................... 24

            B.  Jurisdiction Is Proper Pursuant to Rule 4 ......................................... 25

    III.    Plaintiffs State a Claim Under the Sherman Act ...................................... 27

           A.  Plaintiffs Plausibly Allege an Agreement ......................................... 28

                  1.    Direct Evidence: Written Agreements and Enforcement .......... 29

                  2.    Circumstantial Evidence: Parallel Conduct and "Plus"
                     Factors .................................................................................... 32

a) Parallel Conduct ................................................................... 32

b) "Plus" Factors ...................................................................... 37

    (1) Defendants Have a Motive to Conspire ........................ 38

    (2) Early Decision Runs Counter to Each School
        Defendant's Unilateral Self-Interest............................. 40

    (3) Defendants Share Confidential Information.................. 41

c) Plaintiffs Need Not Allege That the Non-School
   Defendants Are the "Hub" of the ED Conspiracy ................ 43

B. Plaintiffs Plausibly Allege an Antitrust Violation Regardless of
Whether It Is Evaluated *Per Se*, by Quick Look, or Under the
Full Rule of Reason............................................................................ 45

  1. The Court Need Not Decide Now What Framework
     Applies ...................................................................................... 45

  2. Plaintiffs State a *Per Se* Claim Under the Sherman Act ........... 49

  3. Alternatively, Plaintiffs State a Claim Under
     "Quick Look" ............................................................................ 51

  4. Alternatively, Plaintiffs State a Claim Under the
     Rule of Reason ......................................................................... 52

    a) Plaintiffs Plausibly Allege Direct Evidence of
       Anticompetitive Effects........................................................ 53

    b) Plaintiffs Plausibly Allege Indirect Evidence of
       Anticompetitive Effects........................................................ 55

        (1) Relevant Market ........................................................... 55

        (2) Market Power .............................................................. 58

C. Plaintiffs Plausibly Allege Antitrust Injury and Standing ................. 59

IV.    No Claim Is Barred by the Statute of Limitations ..................................... 63

CONCLUSION ................................................................................................ 65

ii

## TABLE OF AUTHORITIES

Page(s)

Cases

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) ......................................................................................................... 53

*Addamax Corp. v. Open Software Found.*,
    152 F.3d 48 (1st Cir. 1998) ........................................................................................................ 47

*Advanced Tech. Corp. v. Instron, Inc.*,
    925 F. Supp. 2d 170 (D. Mass. 2013) .................................................................................. 38, 39

*Ali v. Federal Bureau of Prisons*,
    552 U.S. 214 (2008) ................................................................................................................... 18

*Alianza Americas v. DeSantis*,
    727 F. Supp. 3d 9 (D. Mass. 2024) ............................................................................................ 26

*American Needle, Inc. v. NFL*,
    560 U.S. 183 (2010) ................................................................................................................... 52

*American Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental &
    Reinforcing Iron Workers*,
    815 F.3d 43 (1st Cir. 2016) ................................................................................................... 28, 51

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ................................................................................................... 54

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) ..................................................................................................... 29

*American Medicorp, Inc. v. Humana, Inc.*,
    445 F. Supp. 573 (E.D. Pa. 1977) ........................................................................................ 21, 22

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ...................................................................................................... 15

*Arizona v. Maricopa Cnty. Med. Soc.*,
    457 U.S. 332 (1982) ................................................................................................................... 50

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................................. 15, 16

*Bartholomew v. Virginia Chiropractors Ass'n*,
    612 F.2d 812 (4th Cir. 1979) ..................................................................................................... 22

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*,
  825 F.3d 28 (1st Cir. 2016) ...................................................................... 26, 27

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................ *passim*

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ........................................................................ 28

*Borozny v. Raytheon Techs. Corp.*,
  2023 WL 348323 (D. Conn. Jan. 20, 2023) .................................................. 46

*Brown v. City of Brockton*,
  2025 WL 2677231 (D. Mass. Sep. 18, 2025) ........................................... 35, 37

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ...................................................................................... 59

*Bryan v. Ascend Learning, LLC*,
  2025 WL 2239250 (D. Mass. Aug. 6, 2025) ................................................. 57

*Buckeye Assocs., Ltd. v. Fila Sports, Inc.*,
  616 F. Supp. 1484 (D. Mass. 1985) .......................................................... 17, 20

*Bunker Ramo Corp. v. United Bus. Forms, Inc.*,
  713 F.2d 1272 (7th Cir. 1983) ...................................................................... 49

*Burke v. Walsh*,
  2024 WL 3548759 (D. Mass. June 5, 2024) .................................................. 36

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ..................................................................... 38, 39

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ...................................................................... 28, 45, 46, 51

*Carbone v. Brown Univ.*,
  621 F. Supp. 3d 878 (N.D. Ill. 2022) ............................................................ 57

*CCBN.com, Inc. v. Thomson Fin., Inc.*,
  270 F. Supp. 2d 146 (D. Mass. 2003) ....................................................... 49, 58

*Choh v. Brown University*,
  753 F. Supp. 3d 117 (D. Conn. 2024) ................................................ 50, 56, 64

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
  92 F.4th 381 (2d Cir. 2024) .......................................................................... 30

iv

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
   79 F.3d 182 (1st Cir. 1996)........................................................................................ 58

*Cossart v. United Excel Corp.*,
   804 F.3d 13 (1st Cir. 2015)........................................................................... 25, 26, 27

*Daniel v. American Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005) ....................................................................................... 22

*Oto Analytics, LLC v. Benworth Cap. Partners PR, LLC*,
   2025 WL 989954 (D.P.R. Apr. 2, 2025) ................................................................... 36

*Deslandes v. McDonald's USA, LLC*,
   81 F.4th 699 (7th Cir. 2023) ...................................................................... 45, 47, 48, 49

*Donaldson v. Shapemix Music, LLC*,
   2013 WL 7121289 (Mass. Super. Ct. Dec. 11, 2013).............................................. 26

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................................................ 55, 57

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ..................................................................................... 52

*Euromodas, Inc. v. Zanella, Ltd.*,
   368 F.3d 11 (1st Cir. 2004)........................................................................................ 28

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013)...............................................................................*passim*

*Fishman Transducers, Inc. v. Paul*,
   684 F.3d 187 (1st Cir. 2012)...................................................................................... 54

*Flovac, Inc. v. Airvac, Inc.*,
   817 F.3d 849 (1st Cir. 2016)...................................................................................... 55

*FTC v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) .................................................................................................. 53

*FWK Holdings LLC v. Shire PLC*,
   2017 WL 11449668 (D. Mass. Oct. 10, 2017) ......................................................... 38

*García-Catalán v. United States*,
   734 F.3d 100 (1st Cir. 2013)...................................................................................... 15

*Geffner v. Coca-Cola Co.*,
   343 F. Supp. 3d 246 (S.D.N.Y. 2018)........................................................................ 61

*Gibson v. National Ass'n of Realtors*,
2024 WL 6821480 (W.D. Mo. Dec. 16, 2024) ............................................................... 19

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ....................................................................................... 54

*Goldfarb v. Virginia State Bar*,
421 U.S. 773 (1976) ..................................................................................................... 18

*Golf City, Inc. v. Wilson Sporting Goods, Inc.*,
555 F.2d 426 (5th Cir. 1977) ....................................................................................... 22

*Gonzales v. United States*,
520 U.S. 1 (1997) ......................................................................................................... 18

*Hahn v. Vermont Law School*,
698 F.2d 48 (1st Cir. 1983) .......................................................................................... 26

*Hansen v. Northwestern University*,
2025 WL 2731378 (N.D. Ill. Sept. 24, 2025) ........................................................ 22, 24

*In re Blue Cross Blue Shield Antitrust Litig.*,
225 F. Supp. 3d 1269 (N.D. Ala. 2016) .......................................................... 19, 20, 23

*In re Broiler Chicken Antitrust Litigation*,
2019 WL 1003111 (N.D. Ill. Feb. 28, 2019) ............................................... 35, 39, 40, 44

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ....................................................................... 46

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017) ........................................................................................ 39

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019) ......................................................................... 37

*In re Musical Instruments & Equipment Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ......................................................................... 33, 34, 43

*In re Nexium (Esomeprazole) Antitrust Litig.*,
42 F. Supp. 3d 231 (D. Mass. 2014) ............................................................................ 53

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) .......................................................................... 55

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) ..................................................................... 35, 44

*In re Pork Antitrust Litig.*,
  781 F. Supp. 3d 758 (D. Minn. 2025).................................................................................. 35

*In re Processed Egg Products Antitrust Litig.*,
  850 F. App'x 142 (3d Cir. 2021) ........................................................................................ 44

*In re Processed Egg Products Antitrust Litigation*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) ................................................................................. 44

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
  709 F. Supp. 3d 478 (M.D. Tenn. 2023)............................................................................ 54

*In re Relafen Antitrust Litig.*,
  286 F. Supp. 2d 56 (D. Mass. 2003)................................................................................... 63

*In re Vitamin C Antitrust Litig.*,
  2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012) .................................................................. 27

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ................................................................................................ 30, 33, 53

*Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp.*,
  46 F.2d 623 (1st Cir. 1931)................................................................................................. 23

*Jones v. Micron Techs., Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019)................................................................................ 43

*Kamakahi v. American Soc'y for Reprod. Med.*,
  2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) .................................................................. 46

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ........................................................................................................... 63

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
  725 F.3d 718 (7th Cir. 2013) ......................................................................................... 17, 18

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................................................................... 50

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
  415 F. Supp. 3d 703 (E.D. Va. 2019)............................................................................. 46, 48

*MJ's Mkt., Inc. v. Jushi Holdings, Inc.*,
  766 F. Supp. 3d 197 (D. Mass. 2025)......................................................................... 55, 56, 59

*MM Glob. Servs. Inc. v. Dow Chem. Co.*,
  404 F. Supp. 2d 425 (D. Conn. 2005)................................................................................. 20

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ....................................................................................... 29

*Morales-Villalobos v. Garcia-Llorens*,
    316 F.3d 51 (1st Cir. 2003) ........................................................................... 59

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
    2025 WL 2921807 (2d Cir. Oct. 15, 2025) .................................................... 34

*North American Soccer League, LLC v. U.S. Soccer Fed'n*,
    883 F.3d 32 (2d Cir. 2018) ............................................................................ 50

*Northern Pacific Railway Co. v. United States*,
    356 U.S. 1 (1958) ........................................................................................... 50

*NCAA v. Alston*,
    594 U.S. 69 (2021) ............................................................................. 46, 48, 50

*NCAA v. Board of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ............................................................................. 39, 45, 54

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985) ....................................................................................... 49

*Nova Biomed. Corp. v. Moller*,
    629 F.2d 190 (1st Cir. 1980) ......................................................................... 26

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ..................................................................... 52, 53, 54, 55

*Othart Dairy Farms, LLC v. Dairy Farmers of Am.*,
    720 F. Supp. 3d 1087 (D.N.M. 2024) ........................................................... 44

*OV Loop Inc. v. Mastercard Inc.*,
    2025 WL 1333546 (D. Mass. May 7, 2025) .................................................. 57

*OV Loop, Inc. v. Mastercard Inc.*,
    2024 WL 3834927 (D. Mass. Aug. 14, 2024) ............................................... 20

*Picone v. Shire PLC*,
    2017 WL 4873506 (D. Mass. Oct. 20, 2017) ................................................ 38

*Pietrantoni v. Corcept Therapeutics Inc.*,
    640 F. Supp. 3d 197 (D. Mass. 2022) ........................................................... 56

*PLS.com, LLC v. National Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ......................................................................... 51

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
769 F. Supp. 3d 1067 (N.D. Cal. 2025) ................................................................. 61

*Ross v. American Express Co.*,
35 F. Supp. 3d 407 (S.D.N.Y. 2014), *aff'd* 630 F. App'x 79 (2d Cir. 2015). ................................. 33

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ................................................................. 64

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ................................................................. 33, 34

*Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*,
782 F.3d 922 (7th Cir. 2015) ................................................................. 65

*Snow v. American Morgan Horse Ass'n, Inc.*,
1994 WL 287719 (D.N.H. June 28, 1994) ................................................................. 26

*State of Ga. v. Pa. R.R. Co.*,
324 U.S. 439 (1945) ................................................................. 29

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
373 F.3d 57 (1st Cir. 2004) ................................................................. 47

*Sullivan v. National Football League*,
34 F.3d 1091 (1st Cir. 1994) ................................................................. 62

*Sullivan v. Tagliabue*,
25 F.3d 43 (1st Cir. 1994) ................................................................. 59, 60

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
346 U.S. 537 (1954) ................................................................. 28

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ................................................................. 41, 42, 55, 59

*United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*,
960 F.2d 1080 (1st Cir. 1992) ................................................................. 25

*United States v. American Airlines Grp. Inc.*,
121 F.4th 209 (1st Cir. 2024) ................................................................. 48

*United States v. Apple Inc.*,
952 F. Supp. 2d 638 (S.D.N.Y. 2013) ................................................................. 38, 41

*United States v. Brown Univ.*,
805 F. Supp. 288 (E.D. Pa. 1992) ................................................................. 47

*United States v. Brown University*,
  5 F.3d 658 (3d Cir. 1993) ............................................................................*passim*

*United States v. Cadillac Overall Supply Co.*,
  568 F.2d 1078 (5th Cir. 1978) ............................................................................ 49

*United States v. Coop. Theaters of Ohio*,
  845 F.2d 1367 (6th Cir. 1988) ............................................................................ 49

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ............................................................................................ 55

*United States v. Get Eng'g Corp.*,
  2019 WL 4452968 (C.D. Cal. June 20, 2019)...................................................... 20

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ............................................................................................ 57

*United States v. Manahe*,
  2022 WL 3161781 (D. Me. Aug. 8, 2022) ..................................................... 46, 50

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ............................................................................................ 43

*United States v. Rabinowich*,
  238 U.S. 78 (1915) .............................................................................................. 42

*United States v. Scophony Corp.*,
  333 U.S. 795 (1948) ............................................................................... 17, 18, 24

*United States v. Socony Vacuum Oil Co.*,
  310 U.S. 150 (1940) ................................................................................ 18, 29, 42

*United States v. Topco Assocs.*,
  405 U.S. 596 (1972) ...................................................................................... 48, 49

*Urena v. Travelers Cas. & Sur. Co. of Am.*,
  714 F. Supp. 3d 31 (D.N.H. 2024) ............................................................... 64, 65

*Volkswagen Grp. Of Am., Inc. v. Smartcar, Inc.*,
  2024 WL 4312217 (N.D. Cal. Sep. 25, 2024)...................................................... 55

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
  55 F.4th 286 (1st Cir. 2022)............................................................................*passim*

*World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*,
  2024 WL 4893266 (S.D.N.Y. Nov. 26, 2024) ............................................... 20, 21

x

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971) ................................................................................................................ 63

*Zero Techs., LLC v. Clorox Co.*,
  713 F. Supp. 3d 40 (E.D. Pa. 2024) ...................................................................................... 19

**Statutes**

15 U.S.C. § 1 ............................................................................................................................ 27, 28

15 U.S.C. § 15b ............................................................................................................................. 63

15 U.S.C. § 22 ........................................................................................................................... 17, 24

28 U.S.C. § 1407 ............................................................................................................................ 24

Mass. Gen. Laws ch. 223A § 3(a)............................................................................................ 25, 26

Mass. Gen. Laws ch. 223A § 3(c)................................................................................................. 26

Mass. Gen. Laws ch. 223A § 3(d) ................................................................................................ 27

**Rules**

Fed. R. Civ. P. 4(k)(1)(A) ............................................................................................................. 25

Fed. R. Civ. P. 8(a)........................................................................................................................ 35

Fed. R. Evid. 201(b) ...................................................................................................................... 56

**Other Authorities**

5 Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004) ............ 32

Ruby Shellaway (née Afram), *Civil Rights, Antitrust, and Early Decision Programs*,
  115 Yale L.J. 880 (2006) ........................................................................................................ 1, 14

U.S. News Education Rankings, https://www.usnews.com/best-colleges/rankings (last accessed
  Nov. 21, 2025)............................................................................................................................. 5

**INTRODUCTION**

For decades, a group of the nation's wealthiest and most prestigious private colleges and universities has conspired to suppress competition in admissions. Rather than allow students to freely compare offers and negotiate the price of their education, these institutions have agreed to use the Early Decision ("ED") admissions pathway to lock applicants into one school and eliminate competitive bidding. In a competitive admissions market, colleges would vie for top applicants by offering greater financial aid, tuition discounts, or other inducements. But under ED, once a student is accepted early by one Defendant, the others step aside. The student is removed from the market, barred from applying elsewhere, and stripped of the leverage that competing offers provide. As the current General Counsel of Defendant Vanderbilt explained in the *Yale Law Journal* before taking that role, ED allows schools to "create[] monopolies on certain customers' business for themselves—an illegal customer allocation and horizontal restraint of trade." Ruby Shellaway (née Afram), *Civil Rights, Antitrust, and Early Decision Programs*, 115 Yale L.J. 880, 914 (2006).

Early Decision is not a neutral admissions policy. To guarantee they can fill large portions of their classes without facing price competition, the Defendant Schools coerce students into an unfair choice: accept a significantly lower chance of admission by applying Regular Decision, or apply ED and surrender the ability to compare financial aid offers. Doc No. 1 ¶¶ 2–9. To ensure that system works as they intend, Defendants have agreed to collectively misrepresent to students that ED is a legally "binding" commitment, and they have agreed not to present students with competing offers once they have been accepted ED by—*i.e.*, allocated to—one of their competitor schools. *Id.* ¶¶ 91, 126, 132. Defendants enforce those agreements by sharing lists of ED admits, enabling the schools to monitor their no-compete agreements and blackball any student that seeks competing offers. *Id.* ¶¶ 134, 147, 174. The conspiracy eliminates applicants' bargaining leverage and enables the schools to raise tuition list prices for all students by locking in and isolating a

higher percentage of price-insensitive students. The result is higher tuition, lower aid, and entrenched inequity in college access. *Id.* ¶¶ 1, 126–28.

The conspiracy is not limited to schools. It includes two application platforms—Common App and Coalition App—that have agreed to embed and enforce the ED restraints by requiring applicants to sign misleading "Early Decision Agreements" and by preventing applicants from applying ED to more than one school. Doc No. 1 ¶¶ 1, 21, 60–61, 80–83, 92–95, 101, 106–09, 122–24. It also includes the Consortium on Financing Higher Education ("COFHE"), a Massachusetts-based organization of highly selective colleges—including each of the School Defendants—that serves as a confidential forum for exchanging admissions data and maintaining commitments, including those underpinning the ED restraints. *Id.* ¶¶ 22, 81, 108, 118–19.

Although courts routinely recognize that direct evidence of an agreement to conspire is rare and not required, the Complaint provides it. The five Ivy League School Defendants openly admit they have agreed not to compete for students that have been allocated to another via ED. Doc No. 1 ¶ 116. And former admissions officers from Dartmouth and Amherst have explained that those concerted efforts extend beyond just the Ivies to "other highly selective colleges," numbering "about 30," which mirrors COFHE's membership. *Id.* ¶¶ 111–12. The application platforms further memorialize and enforce this agreement: both have agreed to prohibit applicants from applying ED to more than one school at a time, embedding the Defendants' no-poach pact directly into their software architecture. *Id.* ¶ 81.

As the Department of Justice observed when challenging other agreements among colleges and universities to pull their competitive punches in admissions, when a student is admitted to more than one school, "there is typically a competitive negotiation between the student and each college over the financial aid package," and in a properly functioning market, colleges would

"compete vigorously for students" by offering more aid or better terms. *See* Complaint, *United States v. Nat'l Ass'n for College Admissions Counseling*, No. 1:19-cv-03706 (D.D.C. Dec. 12, 2019), ECF No. 1, ¶¶ 14–15. Defendants' ED agreements exist to prevent exactly that competition.

Defendants' motions to dismiss distort both the Complaint and the law. Most egregiously, they attempt to recast Plaintiffs' allegations to suggest a benign picture: that the case concerns nothing more than individual schools choosing not to "waste resources" pursuing applicants who have made up their minds to go elsewhere. *See* Mem. of Law in Supp. of Defendants' Joint Mot. to Dismiss, Doc No. 220, at 13, 21 (hereinafter "Joint Mot."). But that mischaracterization ignores the Complaint's core allegation: Early Decision exists as a market-allocating mechanism only because Defendants have jointly agreed to make it so. The purported "binding" nature of ED, the prohibition on multiple ED applications, the collective enforcement mechanisms, and the mutual refusal to recruit each other's ED admits are not inherent or necessary features of early admissions. None would be required if the School Defendants were simply making individual decisions to conserve resources. Plaintiffs are not challenging non-binding Early *Action*, after all, which allows for early admission without imposing any of those anti-competitive restraints. Plaintiffs are challenging Early *Decision*, which exists to ensure that Defendants' agreement to divide the market sticks.

Defendants also seek to downplay their agreements by claiming that many schools use Early Decision. That argument ignores Plaintiffs' allegations and the relevant market in which Defendants operate. Plaintiffs challenge ED as used by this specific group of highly selective institutions—schools operating in a distinct market for top-tier applicants, where admissions rates hover in the single digits or low teens and demand far exceeds supply. In that environment, even a small boost in acceptance odds carries enormous weight, giving ED extraordinary power to lock

3

in students and suppress competition. These schools—who were all members of COFHE during the class period—occupy the highest tier of the admissions market. It is precisely because they are in greatest demand that they have the power and incentive to use ED collectively to avoid price competition. Whether lower-tier schools also use ED is irrelevant. Those schools are not parties to COFHE's information sharing agreements, do not seriously compete with Defendants for the same students, and their admissions practices do not influence those of the Defendants.

Defendants' remaining arguments likewise mischaracterize the Complaint and ignore its core allegations. In disputing the plausibility of a conspiracy, Defendants deny that Plaintiffs allege any parallel conduct or "plus factors," yet the Complaint is replete with such allegations, including the exchange of ED admit lists and the systematic denial of admission to otherwise deserving students on those lists—which obviously is the point (the only point) of exchanging those lists. Defendants claim that Plaintiffs allege no anticompetitive effects from ED. But here again, the Complaint specifically highlights the prototypical anticompetitive effects of Defendants' scheme: reduced choice for students and higher prices. Defendants attack Plaintiffs' proffered market definition of the "highest rated" and most "selective" schools even though they themselves use this distinction and even though similar arguments have already been considered and rejected by federal courts considering antitrust cases against elite institutions.

Several Defendants go so far as to deny transacting business in Massachusetts, despite the Complaint's allegations and their own affidavits confirming otherwise. Cambridge serves as the primary site for Defendants' in-person information exchanges, and they target Massachusetts applicants, deriving millions of dollars annually in tuition from students in the Commonwealth.

The non-School Defendants take a similar tack, arguing that it is implausible that they participated in the conspiracy because they do not enroll students and thus did not engage in the

4

same parallel conduct. But the case law recognizes what common sense dictates—that entities associated with horizontal competitors may be held liable for conspiracies they effectuate or facilitate, even though the nature of their involvement in the conspiracy differs.

Ultimately, Defendants seek to escape liability not by engaging with the substance of Plaintiffs' allegations but by distorting them. The Complaint brings to light an entrenched agreement among the nation's elite institutions to avoid the pressures of competition. It states a claim. The motions to dismiss should be denied.

## BACKGROUND

### I.    The College Admissions Landscape

For millions of high school seniors, these fall and winter months represent the crucible of college applications season. While there are thousands of colleges and universities in the United States—the Common Application alone claims 1,100 members (*see* Non-School Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Non-Schools Mot."), Doc No. 222, at 2)—only a small fraction is anywhere near as selective as the School Defendants in this case. Doc No. 1 ¶¶ 3, 62, 118. Most of the School Defendants report acceptance rates in the single digits or low teens, placing them among the most exclusive colleges and universities in the country. *See id.* ¶ 78; U.S. News Education Rankings, available at https://www.usnews.com/best-colleges/rankings.

Elite private colleges and universities—including the School Defendants and a few non-defendant schools that do not use ED and/or have not been COFHE members during the Class Period—command disproportionate demand, especially from the full-pay and high-pay families whom all colleges seek to attract for their tuition revenue. Unlike colleges that admit most applicants, these elite institutions operate in a tier that is not meaningfully constrained by broader market competition. Their selectivity and scarcity of seats, combined with consistently high tuition rates, reflect this market position. Doc No. 1 ¶ 9. Their sky-high rejection rates create an intensely

5

stressful environment for students hoping to gain admission to one of these institutions. *See id.* ¶¶ 135–37.

Nearly all applications to these schools are submitted through one of two centralized platforms: the Common App or the Coalition App. *Id.* ¶ 80. Most applications to U.S. schools are submitted via either "Early Action" or "Regular Decision." These two options generally differ only in timing: Early Action applications are submitted earlier and receive responses earlier than Regular Decision applications. But neither option limits how many schools a student may apply to nor demands a commitment to attend. *Id.* ¶¶ 69–71, 76, 90. Both Early Action and Regular Decision support a normal competitive process, allowing students to compare admissions and financial aid offers and decide where to enroll by the common national reply deadline of May 1.

Early Decision, by contrast, imposes a fundamental constraint: while it typically shares the same early timeline as EA, it purports to require—at the time the student clicks the button to submit her application—that the applicant commit to matriculating if accepted.

## II.    Binding Early Decision

Through a combination of concerted communications, misdirection, technological enforcement, and applicant blackballing, Defendants use Early Decision as a market allocation mechanism, enabling them to fill large portions of their incoming classes without engaging in meaningful price competition. What might otherwise resemble a mere timing preference is instead an agreement to suppress student choice and insulate Defendant Schools from competitive bidding.

To encourage students to give up their negotiating leverage in this way, Defendants emphasize that Regular Decision applicants face worse odds. *Id.* ¶¶ 3, 78, 137. The schools deliberately fill a large share of their incoming class with ED applicants and openly frame ED as the more strategic path to admission. *Id.* ¶¶ 2, 137. That messaging pressures students into applying early, not because it necessarily best fits their needs or preferences, but because they fear missing

6

out altogether. Defendants insist in their motions that ED is reserved for students' "first choice" school. But many students apply early not to the school they most hope to attend, but to the school where they believe they may not get in via Regular Decision but will via ED. The disparity in admit rates is not a neutral byproduct of applicant preferences, in other words, but a direct consequence of enrollment strategies designed to present ED as essential. By funneling students into ED, schools ensure more applicants enter the allocation scheme before competing offers can materialize.

To further lock in applicants, Defendants agree to mislead them into believing that ED constitutes a legally binding contract. Students are repeatedly told that if they apply ED, they *must* enroll at that school if accepted. *Id.* ¶¶ 2–3, 84. This message is formalized through the mandatory execution of an "Early Decision Agreement," presented to resemble a formal contract, which must be digitally signed before a student can submit an ED application. *Id.* ¶¶ 81, 92, Doc Nos. 1-1, 1-2 (Exs. A, B). The Coalition Application has agreed to require students to affirm that, if admitted ED, they "**must immediately withdraw the applications submitted to other colleges and make no additional applications to any other college in any country.**" Doc No. 1-2, Ex. B (emphasis in original). The Common App likewise has agreed to require students to confirm that, if admitted ED, they will "promptly withdraw the applications submitted to other colleges and universities and make no additional applications to any other university in any country." Doc No. 1-1, Ex. A. The Common App and Coalition App reinforce this point by preventing applicants from submitting multiple ED applications. Doc No. 1 ¶¶ 81, 108–09.

To support the misapprehension that ED is a legally binding agreement, Defendants require a parent or guardian and the student's high school counselor to sign the ED agreement, each attesting that they will ensure the student will enroll if admitted. *Id.* ¶ 82, Doc Nos. 1-1, 1-2 (Exs.

7

A, B). That process, with all the trappings of a binding contract, is designed to send the clear message to students that submitting an ED application irrevocably commits them to one school. Indeed, even the narrow withdrawal exception—based on inadequate financial aid—reinforces that perception, limiting release to only extraordinary cases of "documented financial hardship." Doc No. 1 ¶ 92.

All the while, Defendants know that Early Decision is not actually a legally binding contract. *See id.* ¶¶ 4, 100–01. They retain discretion to rescind offers of admission, modify programs of study, and change the costs of attendance without facing any legal consequences. *Id.* ¶ 4. Applicants do not have the same freedom, as Defendants threaten and impose extralegal discipline on students who attempt to withdraw from ED. *See id.* ¶¶ 109–12. To this day, the Common App requires students to acknowledge that the ED school "may share my name and my early commitment with other institutions." *Id.* ¶ 83. That acknowledgement alone—carrying the peril of blackballing—would operate as a stark disciplining mechanism even if the schools were not sharing lists. But they do share lists. A former administrator at several institutions, including some using Early Decision, confirmed direct knowledge of ED admit lists being shared among COFHE-member schools and other liberal arts colleges. *Id.* ¶ 109. Likewise, the New York Times has reported that Amherst's dean of admissions stated that Amherst and a COFHE-sized group of "about 30 others shared lists of students admitted through early decision." *Id.* ¶ 111.

Through these mechanisms, Defendants ensure that their market allocation scheme functions as intended. By jointly presenting ED as binding, enforcing exclusivity through application platforms, and blackballing students who seek to break ranks, they eliminate the risk that any one school might compete for another's ED admit. This mutual enforcement guarantees that once a student is accepted by one Defendant, that student is effectively removed from the

8

market—solidifying the allocation and insulating each school from price competition.

### III.    Financial Effects of Early Decision

The student allocation scheme challenged by this lawsuit increases the price of undergraduate education in two ways. First, by creating a substantial pool of captive students, the School Defendants can profitably increase their posted tuition prices—for students admitted through ED and Regular Decision alike—above the level that would be set by a free market without collusively enforced binding Early Decision. *Id.* ¶ 128. Those inflated rates, in turn, serve as a pricing umbrella under which even non-participating peer institutions raise their own tuition to within a few thousand dollars of the inflated price. *Id.* ¶ 127. The data reflect this effect: the rapid rise of ED in the early 1990s coincides with an unprecedented surge in tuition levels, outpacing both general inflation and the Higher Education Price Index, which measures institutional cost growth. *Id.* ¶ 129.

Second, from these artificially elevated sticker prices, Defendant Schools offer smaller discounts. *Id.* ¶¶ 130–31. Binding ED strips students of their most powerful source of price leverage: the ability to compare and negotiate financial aid packages. *Id.* ¶ 132. By locking students into one institution before offers are on the table, and by securing mutual no-poach commitments among competing schools, Defendants suppress the very competition that otherwise would produce more generous financial aid. As Ruby Shellaway argued in the Yale Law Journal, "competitor schools, who—under E[arly] A[ction] or regular decision—might have lured the student away with a better financial aid package, [instead] promise not to compete with the school to which the student has been admitted." *Id.* ¶ 8. Because of that collective blackballing, each school "is guaranteed a listed student's attendance, and a student can only negotiate financial aid with the school that admitted him." *Id.*

College officials themselves acknowledge that ED insulates them from having to offer

competitive aid. Charles Deacon, the longtime Dean of Admissions at Georgetown (which does not use ED), explained that "there is absolutely no need to compete on financial [aid] packages" for ED admits. He described ED as "a programmatic way of rationing your financial aid," explaining that "the ED applicant pool is more affluent, so you spend less money" on discounts from tuition to fill a class. Doc No. 1 ¶ 9. He then gave a concrete example:

> "I am dealing with a very attractive candidate right now, admitted in our nonbinding program, who is comparing our aid package with"—and here he named a famous East Coast school that has a binding early-decision plan. That school, he said, had just come up with an offer that was all grant, no loan. "If she had applied there early decision, they wouldn't have had to do that."

*Id.* ¶ 9. These inflated prices and suppressed discounts disproportionately burden students with limited financial means or insufficient guidance through the college admissions process. *Id.* ¶¶ 139–44. As a result, ED systematically reinforces inequities and perpetuates "a crisis of representation on America's most prestigious college campuses." *Id.* ¶ 143.

Each named Plaintiff in this case paid more for college as a direct result of the ED system. Alayna D'Amico and Bram Silbert both applied to Wesleyan University under its ED program and were told their acceptances were binding. *Id.* ¶¶ 17, 20. They each paid full, inflated tuition every semester, never having the chance to compare financial aid offers from other schools. *Id.* Bella "Jude" Robinson was admitted ED at Vassar and thus was likewise unable to press Vassar to improve its financial aid offer with offers from competing schools. *Id.* ¶ 19. Early Decision's effects are not limited to ED applicants: even students who do not apply ED pay higher tuition due to the upward pressure ED exerts on tuition rates. Max Miller, admitted Regular Decision to Washington University in St. Louis, received no financial aid, paying tuition each semester that was inflated by Defendants' agreements. *Id.* ¶ 18.

## IV.    The Challenged Agreement to Limit Competition

For years, the Defendant Schools have adhered to a mutual non-solicitation pact that

restricts competition for students admitted through ED. That agreement ensures that once a student is accepted by one Defendant, the others step aside, allowing schools to lock in a significant portion of their incoming classes without engaging in competitive bidding on price or aid.

The Ivy League Defendants (Brown, Columbia, Cornell, Dartmouth, and Penn) provide the most visible example of this restraint. Each is a signatory to the "Joint Statement for Candidates on Common Ivy Admission Procedure," which publicly affirms that every Ivy League school "will honor any required commitment to matriculate that has been made to another college under this [ED] plan." *Id.* ¶ 116. That language makes explicit what all Defendant Schools have agreed to do. The binding nature of ED is not intrinsic to the admissions format; it arises from the collective agreement not to poach. Without that mutual forbearance, Early Decision would be functionally indistinguishable from non-binding Early Action. *See id.* ¶ 90.

Although the other Defendant Schools have not issued similarly public pledges, their participation in the agreement is no less real. As a former director of admissions at Dartmouth College explained: "When Dartmouth finishes its final decisions for the early-decision applicants, it mails a list to the Ivies *and several other highly selective colleges*." *Id.* ¶ 112 (emphasis added). Such information sharing serves no purpose other than advancing the allocation agreement. As Vanderbilt University's General Counsel, Ruby Shellaway, explained (before joining Vanderbilt):

> Once a school admits a student under ED, it notifies the student, and also sends a list of the students it has admitted ED to all of its competitor schools. Those schools then check the list and take two steps. First, they may terminate any EA [("Early Action")] or Regular Decision application that an ED-admitted student has submitted. Second, if they discover that the student has applied ED to more than one school, they notify the first school—and all involved typically revoke the student's admission.

*Id.* ¶ 110.

Even institutions that have recognized the distortive effects of ED have chosen to maintain

11

the status quo. In 2001, Amherst's then-Dean of Admission, Tom Parker, candidly admitted: "The whole early-decision thing is so preposterous, transparent, and demeaning to the profession that it is bound to go bust." *Id.* ¶ 10. Yet more than two decades later, ED remains firmly entrenched, and Amherst itself continues to participate in the conspiracy. Similarly, when Harvard briefly considered abandoning the ED system in favor of free competition, one faculty committee member asked pointedly, "[Why] would we honor a system that stinks?" *Id.* ¶ 115. But Yale's Dean of Admissions, Richard Shaw, swiftly admonished Harvard not to break ranks. "Harvard has always respected and acknowledged the binding commitment of early decision programs," he wrote, stressing the importance of reaching "respectful consensus rather than tak[ing] unilateral action." *Id.* That exchange exemplifies how peer pressure and concerted behavior suppressed even modest challenges to the agreement.

Much of the School Defendants' collusive information sharing happens through, and is facilitated by, COFHE, a decades-old club of selective colleges and universities to which all Defendant Schools belong (or recently belonged), that meets privately for "productive in-person meetings and information-sharing" about admissions and financial aid. *Id.* ¶¶ 118–19. Although its existence is public, COFHE's specific activities are highly secretive—a person who once worked in the provost's office at a COFHE-member school noted that COFHE has a history of being "twitchy about being subject to antitrust investigations." *Id.* ¶ 119.

That the conspiracy extends to all Defendants also was confirmed by Amherst's Dean of Admissions, who explained that Amherst and "about 30 others" shared ED admit lists—a number that mirrors COFHE's membership. *Id.* ¶ 111. The Common App's requirement that students acknowledge that the ED school "may share my name and my early commitment with other institutions" indicates that the practice persists to this day. *Id.* ¶ 83.

12

The Common App and the Coalition App also function as the operational arms of the hands-off agreement. Both platforms have agreed to prevent any student from submitting more than one ED application at a time, an intentional restriction that facilitates the Defendant Schools' agreement not to compete for the same student. *Id.* ¶ 108. Each platform also requires every ED applicant (and their guardian and counselor) to certify that the student will withdraw all other applications if admitted early and to acknowledge being bound to matriculate to the ED school if accepted. *Id.* ¶ 82. The Platform Defendants thus provide the mechanical infrastructure of the conspiracy, ensuring that the restraint is forcefully imposed on every applicant.[1]

Keeping the Defendants marching in time with the hands-off agreement is facilitated by the multiple hats that many School Defendant leaders wear. In addition to all being members of COFHE, many of the same administrators who oversee admissions at one school sit on the boards of the Common App or the Coalition App. *See id.* ¶¶ 122–23. In that way, the network of schools, platforms, and associations all interlock to maintain the Early Decision arrangement—effectively denying students competing offers, suppressing competition among elite colleges, and raising prices as a result.

## V.    Legal and Historical Context: DOJ Antitrust Scrutiny of Higher Education Restraints

Elite universities and the organizations that support them have a well-documented history of working together to suppress competition for students in violation of the Sherman Act. One of the most prominent examples occurred in the early 1990s, when a group of elite private

---

[1] Scoir contends that the software integration of the Coalition App did not create an ownership interest in the app, and that the Coalition for College, rather than Scoir, owns the Coalition App. *See* Non-School Mot. 3. If discovery bears out that claim, Plaintiffs may seek leave to amend the Complaint to name the Coalition for College as a Defendant in place of, or in addition to, Scoir.

institutions—many of which are Defendants here—was caught participating in what became known as the "Ivy Overlap" agreement. Under that scheme, member schools would meet each Spring to coordinate financial aid offers to jointly admitted students, effectively fixing the net price of attendance. In *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), the Third Circuit described the arrangement as a "price-fixing mechanism impeding the ordinary functioning of the free market[.]" *Id.* at 674.

As that path was closing, the School Defendants turned to Early Decision to produce a similar outcome by different means: instead of agreeing on aid levels (*i.e.*, price fixing), participating schools agree that only one of them may even make an offer to a given student (*i.e.*, market/customer allocation). As Shellaway observed, "the ultimate effect on individual ED students looks much like the results achieved directly through Overlap"—namely, colleges need not compete on price for a subset of students. Shellaway, Civil Rights, Antitrust, and Early Decision Programs, 115 Yale L.J. 880, 915 (2006); *see also* Doc No. 1 ¶ 147.

More recently, the DOJ brought an enforcement action against the National Association for College Admission Counseling (NACAC), challenging mandatory "ethics" rules that restrained competition among colleges for prospective students. *See* Complaint, *United States v. Nat'l Ass'n for College Admissions Counseling*, No. 1:19-cv-03706 (D.D.C. Dec. 12, 2019), ECF No. 1. One of the challenged provisions—the "First-Year Undergraduate Recruiting Rule"—operated much like ED, barring colleges from "recruit[ing] or offer[ing] enrollment incentives to students who are already enrolled, registered, have declared their intent, or submitted contractual deposits to other institutions." Competitive Impact Statement, *id.*, ECF No. 5, at 5. The DOJ concluded that the rule "imposed significant restrictions on competition between colleges for first-year students" and that "[a]bsent these restrictions, colleges will be free to offer more aggressive

14

financial aid packages or other inducements to students to entice them to enroll." *Id*. at 6.

The DOJ also challenged NACAC's "Early Decision Incentives Rule," which prohibited schools from offering benefits—like special housing or priority course registration—to students applying ED. *Id*. at 4. It found that this prohibition—the product of a horizontal agreement among competitors—unlawfully suppressed competition by preventing schools from enhancing their offers to ED applicants. *Id*. at 7. The DOJ objected to the schools' *agreement* as anticompetitive; it did not opine on—or appear to consider—the legality of ED itself, let alone its concerted use by top-tier schools as a tool to suppress competition. Contrary to Defendants' assertion, Joint Mot. (Doc No. 220), at 19 n.4, it did not endorse ED as a "desirable" admissions practice. Instead, the DOJ condemned agreements among schools not to compete for students and, in challenging the Recruiting Rule, rejected the very rationale Defendants advance here: that once a student commits—whether through ED or by deposit—the ethical or efficient choice for other schools is simply to step aside. The DOJ recognized that justification as a pretext for a horizontal restraint that limits the ability of schools to improve offers, respond to market demand, and entice students with better terms.

## DISCUSSION

### I.    Plaintiffs' Allegations Must Be Accepted as True

At the pleading stage, a plaintiff need not show that they are likely to prevail, only that their allegations "suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *García-Catalán v. United States*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Evergreen Partnering Grp., Inc. v. Pactiv Corp*., 720 F.3d 33, 45 (1st Cir. 2013) (quoting *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 189

15

(2d Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. These principles apply with full force in antitrust cases, where the First Circuit has specifically criticized "[t]he slow influx of unreasonably high pleading requirements at the earliest stages of antitrust litigation[.]" *Evergreen*, 720 F.3d at 44.

## II.    This District Is the Appropriate Forum

A subset of Defendants contends that, because they are not headquartered in Massachusetts, they cannot be sued here under Section 12 of the Clayton Act or Rule 4. *See* Mem. in Supp. of Non-Massachusetts Defendants' Mot. to Dismiss ("Venue Mot."), Doc No. 218.[2] That argument misunderstands the law and disregards both Plaintiffs' allegations and Defendants' own sworn admissions. Each of those Defendants transacts substantial business in Massachusetts and directed conduct into the Commonwealth that forms part of the unlawful conspiracy. The venue motion should be denied.

### A.    Venue Is Proper Pursuant to Section 12

Venue plainly is proper in this District under Section 12 of the Clayton Act. Defendants' argument to the contrary misreads the text and purpose of Section 12, disregards established precedent, and ignores the substantial, continuous business they conduct in Massachusetts.

#### 1.    Defendants Distort the Modest "Transact Business" Standard

Section 12 provides: "Any suit, action, or proceeding under the antitrust laws against a

---

[2] The subset of Defendants moving to dismiss on venue grounds are Barnard, Bowdoin, Bryn Mawr, Carleton, Columbia, Duke, Emory, Haverford, Johns Hopkins, Macalester, Middlebury, Northwestern, Oberlin, Pomona, Swarthmore, University of Pennsylvania, Rochester, Vanderbilt, Vassar, Washington University in St. Louis, and Scoir. Defendants Common App and Wesleyan University did not join the motion despite not being headquartered in Massachusetts.

corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22. As courts have long recognized, "Section 12 provides for both personal jurisdiction and venue in the case of a corporate defendant." *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013). The statute's first clause—before the semicolon—governs venue: it determines *where* suit may be brought. The second clause—after the semicolon—authorizes nationwide service of process, "and therefore nationwide personal jurisdiction." *Id.*

Defendants do not suggest that Plaintiffs have failed to satisfy Section 12's personal jurisdiction clause. And rightly so. Due process requires only that the non-Massachusetts Defendants have sufficient minimum contacts with the United States, *see id.*, which they plainly do. The sole issue Defendants raise under Section 12 is venue. But even then, their argument is peculiar. They do not dispute that venue is proper *somewhere*, or that litigating these claims in this District is unfair or burdensome. Nor do they contest, for purposes of their motion, the factual allegations in Plaintiffs' Complaint. Plaintiffs allege, and the Court must accept, that Ms. D'Amico and numerous other class members were injured in Massachusetts by a conspiracy involving Massachusetts and non-Massachusetts entities. Instead, Defendants argue only that venue is improper in this District because they do not "transact business" in Massachusetts. They are wrong. Section 12's text, history, and purpose make clear that they do.

To "transact business" under Section 12, an out-of-state defendant need only conduct business "of *any* substantial character." *United States v. Scophony Corp.*, 333 U.S. 795, 807 (1948) (emphasis added); *Buckeye Assocs., Ltd. v. Fila Sports, Inc.*, 616 F. Supp. 1484, 1489 (D. Mass. 1985) (same); *see also KM Enterprises*, 725 F.3d at 731 (interpreting "transacts business" as "the

17

practical, everyday business or commercial concept of doing or carrying on business of any substantial character"). While isolated or sporadic contacts may fall short, the bar for venue is deliberately low. In passing the Clayton Act, Congress "gave the words 'transacts business' a much broader meaning for establishing venue" than under the Sherman Act, thereby "reliev[ing] persons injured through corporate violations of the antitrust laws from the often insuperable obstacle of resorting to distant forums for redress of wrongs done in the places of their business or residence." *Scophony*, 333 U.S. at 807–08; *see also KM Enterprises*, 725 F.3d at 730. Section 12's modest venue requirement effectuates Congress's aim to identify and remedy antitrust violations of all kinds, regardless of their magnitude. In an antitrust case, what matters is the character of the restraint, not the amount of commerce restrained. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 785 (1976); *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 221–23 (1940).[3]

### 2.    Defendants' Affidavits Confirm They Transact Substantial Business in Massachusetts

The non-Massachusetts Defendants' own affidavits leave no doubt that they "transact business" in this District. Each submitted a sworn declaration with their venue motion detailing the number of Massachusetts students they enroll. While the affidavits omit revenue figures, conservatively estimating that the non-Massachusetts Defendants charge their Massachusetts students an average of just $20,000 tuition annually shows that those schools collectively generate at least $122 million in tuition payments from Massachusetts residents *each year*—an average of

---

[3] Defendants also repeatedly misquote *Scophony*'s governing standard, omitting the critical word "any." *See, e.g.*, Venue Mot. (Doc No. 218), at 1, 4, 5. That omission is significant. In related interpretive contexts, the Supreme Court has emphasized that "any" is an expansive term. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008); *Gonzales v. United States*, 520 U.S. 1, 5 (1997). By rewriting *Scophony*'s standard, Defendants seek to improperly narrow Section 12's scope.

about $6 million per school.[4] The only school possibly deriving less than $1 million a year from Massachusetts is Pomona in California (about $800,000). Duke takes in over $5 million annually; Columbia earns approximately $21 million. Defendant Scoir's affidavit similarly confirms ongoing and substantial business in Massachusetts. Over the past year, Scoir—the only application platform to join the motion—reports that 350,000 students used its services, with roughly one-in-twenty residing in Massachusetts. Declaration of Kevin McCloskey, President of Scoir, Doc No. 218-16, at 3. That translates to Massachusetts residents submitting at least 16,800 applications via Scoir's Coalition App.

These figures comfortably satisfy Section 12's "transacts business" requirement. Sales in a district "are considered transactions of business for purposes of Section 12." *See In re Blue Cross Blue Shield Antitrust Litig.*, 225 F. Supp. 3d 1269, 1293 (N.D. Ala. 2016). And District courts across the country, applying *Scophony* and its progeny, routinely have upheld venue on far smaller revenue. *See, e.g.*, *Gibson v. Nat'l Ass'n of Realtors*, 2024 WL 6821480, at *3 (W.D. Mo. Dec. 16, 2024) (venue proper where out-of-state defendant "receive[d] … thousands of dollars in revenue" from entities in district); *Zero Techs., LLC v. Clorox Co.*, 713 F. Supp. 3d 40, 60 (E.D. Pa. 2024) (venue proper where out-of-state defendants were "selling their products in this

---

[4] At Defendant University of Pennsylvania, for instance, undergraduate tuition and fees for 2024–25 totaled $68,686, and approximately half of all students received no aid and paid the full price. Even if one generously assumed for hypothetical purposes that Penn awarded all aid-receiving students a full scholarship, the *average* student (including both aid-receiving and non-aid-receiving students) would still pay over $30,000 in tuition each year. *See* National Center for Education Statistics ("NCES"), University of Pennsylvania (last accessed Nov. 19, 2025), https://nces.ed.gov/collegenavigator/?q=university+of+pennsylvania&s=all&id=215062.
Average tuition paid by Massachusetts residents may differ from the average tuition paid by all students at any given institution, of course, but there is no reason to believe it is systematically or substantially lower.

District"); *Blue Cross Blue Shield*, 225 F. Supp. 3d at 1291, 1296–97 (venue proper where out-of-state defendants received approximately $100 in premiums from 1,900 subscribers); *World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, 2024 WL 4893266, at *17 (S.D.N.Y. Nov. 26, 2024) (indicating level of business in *Blue Cross Blue Shield* would satisfy Section 12); *MM Glob. Servs. Inc. v. Dow Chem. Co.*, 404 F. Supp. 2d 425, 433 (D. Conn. 2005) (venue proper where defendant made low-six-figure purchases within district and "marketing managers made trips" to district). In all, "it is well-established that the words 'transacts business' in federal venue statutes cover even minimal commercial activity." *United States v. Get Eng'g Corp.*, 2019 WL 4452968, at *2 (C.D. Cal. June 20, 2019). Given the "strong presumption in favor of plaintiff's choice of forum," *OV Loop, Inc. v. Mastercard Inc.*, 2024 WL 3834927, at *3 (D. Mass. Aug. 14, 2024), there can be no doubt that venue is proper here.

Doubling down on their failed venue argument, the moving Defendants suggest that they do not "transact business" in Massachusetts because only "a small percentage" of their total revenue originates in the state. *See* Venue Mot. (Doc No. 218), at 4–6. That position misstates the law and misreads the key case on which they rely. In *Buckeye Associates v. Fila Sports*, 616 F. Supp. 1484 (D. Mass. 1985), an out-of-state defendant similarly argued that venue was improper because less than two percent of its total business came from Massachusetts. *Id.* at 1490. The court rejected that argument, holding that "the fact that Fila USA's sales in Massachusetts constituted only a small percentage of the company's total business *is not dispositive*" under Section 12. *Id*. (emphasis added). Instead, the court emphasized that business of "any substantial character" must be assessed from the standpoint of an "average businessman," and noted that several courts have rightly rejected the idea that percentage of total revenue alone controls. *Id*. While the court ultimately found that the defendant's activity was not sufficiently continuous in that case, *Buckeye*

20

*Associates* confirms that regular and systematic business in a forum—regardless of relative scale—satisfies Section 12.

### 3. Defendants' Authorities Are Misplaced

The remainder of Defendants' authority fares no better. First, in *World Association of Icehockey Players Unions v. National Hockey League*, 2024 WL 4893266 (S.D.N.Y. Nov. 26, 2024), the court found Section 12 venue lacking because (1) plaintiffs did not allege that the out-of-state defendants engaged in *any* commercial activity in the district—"such as receiving substantial or regular payments from this District"; (2) they "point[ed] to no conduct—and no conduct in *this District* whatsoever—by the [out-of-state] Defendants that shows that they actually attempted to supervise or otherwise enforce those rules" alleged to be anticompetitive in the venue district; and (3) they "allege[d] in a conclusory fashion" activity in New York, but "*not* specifically show[ing] activities in *this [Southern] District*." *Id.* at *17–18. Those findings bear no resemblance to this case. Here, Defendants affirmatively admit to generating millions of dollars in annual revenue from Massachusetts residents—far exceeding the threshold *Icehockey* said would suffice. *See id*. at *17 (suggesting "hundreds of thousands of dollars" would constitute transacting business). And unlike in *Icehockey*, Plaintiffs here have alleged that Defendants repeatedly engaged in direct, in-person collaboration in this District in furtherance of the alleged conspiracy. *See, e.g.*, Doc No. 1 ¶¶ 118–19.

Defendants also cite *American Medicorp, Inc. v. Humana, Inc*., 445 F. Supp. 573 (E.D. Pa. 1977), but it undercuts their position. There, the court concluded that anticipated future conduct—specifically, a successful tender offer for a company headquartered in the district—could support venue under Section 12. *Id*. at 582. While Defendants quote *Medicorp* for the proposition that recruiting visits and meeting attendance may be insufficient to support venue, they overlook that

21

the plaintiffs in that case had already abandoned such a theory. *Id*. at 579–80. The court did not reject that theory; it simply did not have occasion to consider it. In contrast, the Complaint here alleges extensive and ongoing activity in Massachusetts—including in-person meetings in Cambridge to collaborate on admissions practices. *Medicorp* confirms that conduct undertaken to advance an antitrust conspiracy, whether current or anticipated, supports venue.

The closest the non-Massachusetts Defendants get to a supportive decision is *Hansen v. Northwestern University*, 2025 WL 2731378 (N.D. Ill. Sept. 24, 2025), an antitrust lawsuit against many of these same defendants. But even setting aside that *Hansen* is an out-of-circuit, non-binding decision, it rests on evident legal error that Defendants do not try to defend. The court there concluded that venue was lacking under Section 12 because the defendant universities functioned as "associations focused on professional advancement," and relied on trade association cases holding that a member's in-state activity does not mean the association itself transacts business in the forum. *Id*. at *11–12. But no defendant in *Hansen* claimed—and no Defendant here claims—to be a trade association. And for good reasons. The institutions in *Hansen*, like those here, operate as universities, not membership-based advocacy organizations. The trade association cases the *Hansen* court relied on—such as *Daniel*, *Bartholomew*, and *Golf City*—involved entities that derived little or no revenue from the forum and whose contacts were limited to occasional publications or indirect regulatory effects. *See Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 430 (2d Cir. 2005) (there was "an unspecified but apparently minimal amount of revenue" generated in the district); *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 816 (4th Cir. 1979) (there were "no sales" in the district "save of pamphlets, journals, and other educational and public relations materials generating very little revenue"); *Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d 426 at 437–38 (5th Cir. 1977) (not mentioning *any* revenue

22

generated from the district). Here, by contrast, the non-Massachusetts Defendants admit they generate substantial and continuous revenue from Massachusetts residents—estimated at over $122 million collectively each year—and regularly recruit students, solicit donations, and participate in in-person meetings in the District. They are not analogous to trade associations under any plausible reading of Section 12.

### 4.    Defendants Transact Other Business in the Commonwealth

Beyond the substantial revenue the moving Defendants derive from Massachusetts, the record further shows that they engage in numerous additional activities that independently satisfy Section 12's "transacts business" standard. Plaintiffs' allegations, which must be accepted as true, demonstrate that each non-Massachusetts school actively recruits and markets to Massachusetts students and high schools; solicits donations and alumni support within the Commonwealth; and participates—through Defendants Scoir and the Common Application—in a nationwide admissions network that operates seamlessly across state lines. *See, e.g.*, Doc No. 1 ¶¶ 17, 62–66. Courts have consistently held that such "regular and continuous" in-state contacts are sufficient to establish venue under Section 12. *See, e.g.*, *Blue Cross Blue Shield Antitrust Litig.*, 225 F. Supp. 3d 1269, 1293 (N.D. Ala. 2016); *see also Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp.*, 46 F.2d 623, 625 (1st Cir. 1931) ("[W]hile a single transaction of business may not be sufficient to establish a venue in a district, it does not require the maintenance of an office or place of business or the presence of agents soliciting or taking orders.").

Further, Plaintiffs have alleged that each non-Massachusetts Defendant regularly attends in-person meetings in this District—just across the river in Cambridge—that advance and facilitate the conspiracy. Doc No. 1 ¶ 119. Indeed, even in *Hansen*, on which these Defendants rely most heavily, many of the same institutions conceded that such in-person contacts would suffice to

establish Section 12 venue. *See Hansen v. Northwestern University*, No. 24-cv-9667 (N.D. Ill.), ECF No. 237, at 3 (contending plaintiffs' venue theory was improper in part because "Plaintiffs do not allege that any meetings among the alleged conspirators took place in the District").

> **5.    Denying Venue Would Undermine Section 12's Purpose and Generate Absurd Results**

Finding that the moving Defendants "transact business" in the Commonwealth follows both the text and purpose of the Clayton Act. Section 12 was enacted exactly for cases like this— multi-defendant, interstate conspiracies producing real effects in a district where each participant evidently "transacts business." 15 U.S.C. § 22. Congress designed Section 12 to expand, not restrict, the venues available to injured plaintiffs. As *Scophony* explains, Congress intended to ensure that an out-of-state defendant "no longer could come to a district, perpetrate there the injuries outlawed, and then … defeat or delay the retribution due." 333 U.S. at 808.

Through their motion, Defendants seek to resurrect the very jurisdictional barriers Congress dismantled more than a century ago. But Defendants never offer a good reason why. Nor do they suggest that litigating Plaintiffs' claims in this District (as opposed to another) would impose on them an unreasonable burden or cause them to suffer any significant inconvenience. And, even as they lean heavily on the case, Defendants steer clear of adopting *Hansen*'s ultimate suggestion that Plaintiffs may challenge wide-ranging conspiracies only by naming representatives from each Defendant's domicile or filing individual actions for later coordination through 28 U.S.C. § 1407. *See Hansen*, 2025 WL 2731378, at *7 n.5. Defendants' position would leave no federal district court able to hear these claims—an outcome courts have rightly rejected as incompatible with the Clayton Act's remedial purpose.

Ms. D'Amico and many other class members were injured in Massachusetts by a conspiracy involving both in-state and out-of-state institutions that directed substantial activity at

24

the Commonwealth and availed themselves of its students and resources. Each non-Massachusetts Defendant derives considerable, continuous, and growing revenue from Massachusetts, revenue that Plaintiffs allege increased in significant part due to the conspiracy at the heart of this case. That is exactly the scenario Section 12 was enacted to cover. Venue is proper in this District.

### B.    Jurisdiction Is Proper Pursuant to Rule 4

Jurisdiction over the non-Massachusetts Defendants is independently supported by Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Under that rule, service establishes personal jurisdiction over a defendant subject to jurisdiction in the courts of the forum state. Here, each Defendant is subject to personal jurisdiction under Massachusetts law—and thus in this Court.

Massachusetts's long-arm statute authorizes jurisdiction over out-of-state defendants whose conduct satisfies any of three provisions relevant here. First, Section 3(a) authorizes jurisdiction where the claim arises from a defendant "transacting any business in this commonwealth." Second, Section 3(c) applies when the defendant causes "tortious injury by an act or omission in this commonwealth." And third, Section 3(d) reaches a defendant who causes "tortious injury in this commonwealth by an act or omission outside this commonwealth," so long as the defendant also "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." *See* Mass. Gen. Laws ch. 223A § 3(a), (c), (d).

Jurisdiction is proper under each of these provisions. Courts construe Section 3(a) "in a generous manner," asking only whether the defendants' choice "to participate in the commonwealth's economic life" was a but-for cause of the plaintiff's injury. *Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015) (quoting *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992)). "This standard is not especially rigorous: 'an isolated and transitory contact with the forum … is all the statute

25

requires.'" *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 n.3 (1st Cir. 2016) (quoting *Nova Biomed. Corp. v. Moller*, 629 F.2d 190, 195 (1st Cir. 1980)). Section 3(a) does not even require that the injury occur in Massachusetts—only that it flows from the defendant's in-forum conduct. *Donaldson v. Shapemix Music, LLC*, 2013 WL 7121289, at *2–3 (Mass. Super. Ct. Dec. 11, 2013) (holding that jurisdiction was proper even though the injury was felt in New York).

Despite Defendants' preemptive attempt to distinguish it, *see* Venue Mot. (Doc No. 218), at 8–9, *Hahn v. Vermont Law School*, 698 F.2d 48 (1st Cir. 1983), illustrates Section 3(a)'s low threshold. There, the First Circuit held that Vermont Law School's limited recruitment efforts—mailing application information and an acceptance letter to a Massachusetts student—was alone sufficient to constitute "transacting business" under section 3(a). *Id*. at 51. The showing here is far stronger. The non-Massachusetts Defendants engaged in extensive commercial activity in Massachusetts: recruiting students, facilitating and restricting applications, collecting tuition and donations, and participating in repeated in-person meetings hosted by COFHE in Cambridge. Doc No. 1 ¶¶ 60–67, 118–19. These acts collectively establish that each Defendant purposefully availed itself of the Massachusetts market—and that Plaintiffs' injuries arose from that conduct. *Cossart*, 804 F.3d at 18.

Jurisdiction also is proper under Section 3(c), which requires only "some act" in Massachusetts that caused injury there. *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 37 (D. Mass. 2024). Plaintiffs allege that Defendants repeatedly traveled to Massachusetts to discuss admissions conduct and exchange competitively sensitive information through COFHE. Doc No. 1 ¶¶ 67, 118–19. Such acts constitute tortious conduct within the Commonwealth and caused harm to Massachusetts residents, including Plaintiff D'Amico. *Id*. ¶ 17; *see also Snow v. Am. Morgan*

26

*Horse Ass'n, Inc.*, 1994 WL 287719, at *5 (D.N.H. June 28, 1994) (explaining that antitrust violations are "characterized as tortious act[s] for purposes of personal jurisdiction"); *In re Vitamin C Antitrust Litig.*, 2012 WL 12355046, at *6 (E.D.N.Y. Aug. 8, 2012) (collecting cases standing for the same principle).

Finally, Section 3(d) provides an additional and independent basis for jurisdiction. Each Defendant derives substantial revenue from Massachusetts—collectively over $122 million annually—and Plaintiffs allege that this revenue was enhanced by the challenged conspiracy. That is precisely the type of persistent commercial relationship that, when coupled with tortious injury in Massachusetts, satisfies the requirements of Section 3(d).

Plaintiffs also satisfy the constitutional due process "minimum contacts" test, which requires that a claim (1) arise out of or relate to the defendant's forum contacts (2) demonstrating the defendant's purposeful availment of acting in the forum state such that (3) the exercise of jurisdiction over the defendant is reasonable. *Baskin-Robbins*, 825 F.3d at 35. For the reasons described above, the claims here arise out of (and relate to) Defendants' in-forum conduct. Defendants chose to work together through COFHE in Massachusetts and profited substantially from Massachusetts residents. Exercising jurisdiction in this forum is both foreseeable and reasonable—particularly as there is no other forum better situated to adjudicate this multi-defendant conspiracy. *See Cossart*, 804 F.3d at 22 (noting that reasonableness turns in part on whether the burden of appearing in one forum is greater than the burden of appearing in others).

The Court should deny the non-Massachusetts Defendants' motion. In the alternative, if the Court is inclined to grant the Motion, it should permit jurisdictional discovery.

## III.    Plaintiffs State a Claim Under the Sherman Act

Plaintiffs bring this action under Section 1 of the Sherman Act, which forbids "every contract, combination …, or conspiracy, in restraint of trade." 15 U.S.C. § 1. An agreement to

27

allocate or divide customers between competitors within the same horizontal market is one of the most pernicious types of agreement because it eliminates all forms of competition among the parties, not just price competition. *See, e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("It would be a strange interpretation of antitrust law that forbade competitors to agree on what price to charge, thus eliminating price competition among them, but allowed them to divide markets, thus eliminating all competition among them.").

To plead a Section 1 claim, Plaintiffs must allege facts showing (1) "concerted action" that (2) "involve[s] either restrictions that are per se illegal or restraints of trade that fail scrutiny under the rule of reason," *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004);[5] and (3) that Plaintiffs were harmed by the conspiracy in a way attributable to its anticompetitive nature, *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022).

### A.    Plaintiffs Plausibly Allege an Agreement

As to the first element—concerted action—"'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). Plaintiffs may plausibly plead an agreement through either direct or circumstantial evidence; they need not offer both. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013). The Complaint

---

[5] The second element also can be met if the restraints fail under the "quick look" doctrine, which applies to restraints that are not *per se* illegal but nonetheless "seem[] anticompetitive at first glance." *Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 61 (1st Cir. 2016). Quick look immediately "shifts to 'a defendant the burden to show empirical evidence of procompetitive effects.'" *Id.* (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999)).

offers both.

### 1.      Direct Evidence: Written Agreements and Enforcement

Direct evidence, such as communications between conspirators expressly agreeing to the restraints, constitutes the strongest proof of agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Evergreen*, 720 F.3d at 43. Here, five defendants—Brown, Columbia, Cornell, Dartmouth, and Penn—memorialized their participation in the ED conspiracy through the written "Joint Statement for Candidates on Common Ivy Admission Procedure." Doc No. 1 ¶ 116. That document explicitly provides that "[a]ll Ivy League institutions will honor any required commitment to matriculate that has been made to another college under this plan." *Id.* On its face, that language is an express promise by horizontal competitors not to recruit or admit students admitted Early Decision elsewhere—precisely the type of customer-allocation agreement condemned by the Sherman Act, and exactly the kind of "extremely rare" direct evidence that Defendants concede is indicative of concerted action. Joint Mot. (Doc No. 220), at 13 (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004)).

Defendants do not dispute the existence or accuracy of the Joint Statement. Nor do they deny that the quoted language reflects an agreement not to compete for ED admits. *See* Joint Mot 14. Instead, they propose a novel "mismatch" theory, contending that the Court should disregard the allegations because their agreement does not include all defendants and includes other schools that Plaintiffs did not sue. *Id.*; *see also* Non-School Mot. 10–11. That argument fails for two reasons.

*First*, the law is clear that "[i]n a suit to enjoin a conspiracy not all the conspirators are necessary parties." *State of Ga. v. Pa. R.R. Co.*, 324 U.S. 439, 463 (1945); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253–54 (1940). Plaintiffs therefore were entitled to sue

only those COFHE members that actively use and enforce Early Decision, regardless of whether others (such as Harvard, Yale, and MIT) aided or facilitated that conduct. *See* Doc No. 1 ¶¶ 114–17, 157. The conduct of those other schools, which the complaint labels as co-conspirators, strengthens Plaintiffs' allegations. After all, when Harvard tried to get out of the ED restraints—"a system that stinks," as Harvard put it—it was browbeaten into joining the "respectful consensus" and agreeing not to compete for applicants allocated via ED to the others. *Id*. ¶ 115.

*Second*, direct evidence that several Defendants executed such an agreement strongly supports the inference that the remaining defendants adhered to it or reached related agreements—whether written down or not. The Supreme Court recognized precisely this dynamic in *Interstate Circuit v. United States*, 306 U.S. 208 (1939). There, written communications and parallel conduct by some distributors justified inferring a single unlawful agreement among all. "It taxes credulity," the Court explained, "to believe that the several distributors would … have accepted and put into operation … such far-reaching changes … without some understanding that all were to join." *Id.* at 223. The same inference applies here: schools whose conduct mirrors the Joint Statement and who met in-person within COFHE—a confidential body dedicated to sharing admissions and financial-aid data among these Defendants, *see* Doc No. 1 ¶ 22—may plausibly be inferred to have joined the agreement or to be acting pursuant to a similar one. *Id*.

Defendants' repeated reliance on *Twombly* is therefore misplaced. The *Twombly* Court rejected a complaint resting solely on parallel conduct "and not on any independent allegation of actual agreement." 550 U.S. at 564. Far from being "on all fours with *Twombly*," Joint Mot. (Doc No. 220), at 18, this case is the opposite. Plaintiffs allege a written, explicit agreement among competitors—precisely the type of direct evidence that "can show [a conspiracy] exists without any inferences." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381,

391 (2d Cir. 2024). Had the *Twombly* plaintiffs alleged a document like the Joint Statement—an express pledge not to compete for one another's students during the ED window—the outcome would have been entirely different. Such an allegation would have defeated dismissal as to the signatories *and* stripped away the Court's central rationale that the alleged noncompetition reflected independent, lawful conduct. *Twombly*, 550 U.S. at 568. An express agreement between even a subset of defendants would necessarily "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. The same is true here. Where an anticompetitive agreement is memorialized in part, it is *plausible* in whole. Plaintiffs' allegations concerning the Ivy League's Joint Statement, standing alone, are therefore sufficient to sustain their pleadings as to agreement.

This inference is further supported by the fact that each School Defendant admits students through the Platform Defendants. There is no dispute that both platforms have agreed with the Defendants to implement practices intended to lock students into a single school. *See* Non-Schools Mot. (Doc No. 222), at 5–6. They have agreed to prevent students from applying Early Decision to multiple schools and to ensure the restraint works by telling students that if they apply ED, they must withdraw all other applications and attend if admitted. Doc No. 1 ¶¶ 1, 91–97, Doc Nos. 1-1, 1-2 (Exs. A, B). Those technical restraints and specifications operate just as the Ivy's Joint Statement does, ensuring that no school will—or even can—compete for students allocated to a different school via Early Decision.

Defendants' attempt to reframe the challenged conduct as a set of benign vertical agreements—between students and schools, or between schools and vendors—ignores these allegations. Plaintiffs do not challenge any standalone agreement between a student and a school, nor do they challenge schools' licensing of application platforms. What Plaintiffs challenge is a

31

horizontal agreement among rival schools to allocate customers. That this scheme is carried out in part by locking students into "binding" contracts and by agreeing with the platforms to enforce the restraint does not transform the schools' horizontal collusion into vertical conduct. Those arrangements are simply tools to ensure the horizontal market-allocation agreement works.

### 2.    Circumstantial Evidence: Parallel Conduct and "Plus" Factors

The written Joint Statement and the inferences it permits constitute direct evidence of an agreement. Plaintiffs have further pleaded extensive circumstantial evidence of concerted action, which is independently sufficient to survive a motion to dismiss. Under *Twombly* and *Evergreen*, circumstantial evidence supports an inference of agreement when it demonstrates parallel conduct plus "something more." *Twombly*, 550 U.S. at 555 (quoting 5 Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004)); *Evergreen*, 720 F.3d at 46.

### a)    Parallel Conduct

Parallel conduct among competitors can suggest collusion. *Twombly*, 550 U.S. at 553. Plaintiffs have alleged extensive parallel conduct. Specifically, Plaintiffs allege that ***each*** Defendant School:

- "employs Early Decision to accept a substantial portion of its incoming class each year," Doc No. 1 ¶ 2;

- "intentionally create[s] the impression that the agreement is legally binding," *id.* ¶ 99; while "benefit[ing] from the fact that Early Decision is not legally binding," *id.* ¶ 4;

- uses the application platforms that facilitate and enforce the conspiracy by falsely representing ED as "binding," and by prohibiting applicants from applying ED to more than one institution, *see id.* ¶¶ 91–95, 97 & Doc Nos. 1-1, 1-2 (Exs. A, B);

32

- uses identical or nearly identical ED language and forms, *id.* ¶¶ 60–61, 92–95;

- "essentially force[s] Early Decision admittees to be bound to the school that offered early admission by preventing students from receiving and comparing offers from other schools," *id.* ¶ 5;

- does not "compete for students offered admission at other schools through Early Decision," *id.* ¶ 6;

- "regularly share[s] lists of students admitted under Early Decision in order to coordinate their allocation of applicants," *id.* ¶ 109; and

- "routinely remove those students [admitted Early Decision elsewhere] from their own application processes," *id.* ¶ 113.

Notwithstanding this common behavior, Defendants claim there cannot be parallel conduct because Plaintiffs have not identified the precise moment each defendant joined the agreement. Joint Mot. (Doc No. 220), at 15. Supreme Court precedent rejects such a rigid approach: conspiracies need not be formed simultaneously, and parallel conduct need not be perfectly identical. *See, e.g.*, *Interstate Circuit*, 306 U.S. at 227 (holding that antitrust conspiracies "may be and often [are] formed without simultaneous action or agreement on the part of the conspirators"); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015).[6]

---

[6] This principle holds especially in non-price-fixing cases, where courts recognize that staggered adoption does not undermine a complaint's plausibility. *See, e.g.*, *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 439 (S.D.N.Y. 2014) ("Defendants contend that a four-and-a-half-year-long 'slow motion conspiracy' would defy both economic and common sense, as any benefit from collusive adoption of [arbitration] clauses is lost unless they are adopted close in time. But not all conspiracies require swift, simultaneous parallelism. … Unlike price fixing, which may quickly impose a negative toll on the first firm to raise its price unless others soon follow, an agreement to impose and maintain arbitration clauses would not require immediate, concerted action to be successful."), *aff'd* 630 F. App'x 79 (2d Cir. 2015).

The case Defendants misleadingly rely on—*In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015)—does not state otherwise. *Musical Instruments* explained that "competitors adopting similar policies around the same time" is an *example* of parallel conduct, not a requirement. *Compare id.* at 1193 ("[P]arallel conduct, *such as* competitors adopting similar policies around the same time … may constitute circumstantial evidence of anticompetitive behavior.") (emphasis added), *with* Joint Mot. (Doc No. 220), at 15 (omitting "such as" and asserting *Musical Instruments* held "[p]arallel conduct arises when 'competitors adopt similar policies around the same time in response to similar market conditions'" (citation modified)). Defendants mistake sufficiency for necessity. More recent appellate authority, moreover, confirms that parallel conduct exists when competitors act with general similarities in "substance, timing, *or* effect," and that plaintiffs need not allege identical actions or a precise timeline. *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 2025 WL 2921807, at *7–8 (2d Cir. Oct. 15, 2025) (emphasis added); *SD3*, 801 F.3d at 429.

Similarly, Defendants argue that because many colleges use Early Decision, their own use of the practice cannot support an inference of conspiracy. But that argument misunderstands the market Plaintiffs allege. Plaintiffs do not claim that Defendants are the only schools employing ED; they allege that these particular Defendants—all highly selective COFHE members—have agreed to use ED to restrain competition in the top-tier admissions market. Whether a less selective, non-defendant school uses ED is irrelevant, because that conduct does not constrain the prices or aid policies of the Defendants. It is Defendants' collective use of ED and their attendant restraints, in a market where marginal increases in admission odds drive high-stakes applicant decisions and tuition dollars, that gives rise to, at the very least, an inference of agreement.

As for the non-School Defendants, Plaintiffs need not show that co-conspirators who are

34

not horizontal competitors engaged in parallel conduct. For example, in *Evergreen Partnering Group v. Pactiv*, 720 F.3d 33 (1st Cir. 2013), the First Circuit held that Evergreen (a maker of food-grade recycled plastic products) plausibly alleged that a trade association, the American Chemistry Council, had unlawfully facilitated an antitrust conspiracy among four manufacturer defendants. *Id.* at 49 n.4. Evergreen alleged that all four manufacturer defendants had, in parallel, refused to work with Evergreen, despite customer requests that they do so. *Id*. at 48. The trade association defendant there did not engage in such conduct; indeed, it could not, as it did not manufacture or sell anything. Nonetheless, the First Circuit held that Evergreen had sufficiently alleged that the trade association participated in the conspiracy. *Id*. at 49 n.4.

Similarly, in *Broiler Chicken Antitrust Litigation*, 2019 WL 1003111 (N.D. Ill. Feb. 28, 2019), all but one defendant was "an industrial producer of chicken meat," while the other defendant, Agri Stats, "produce[d] subscription reports about the Broiler industry" for "producers that supply data to Agri Stats." *Id.* at *1. Plaintiffs alleged that the producer defendants conspired to fix prices above competitive levels. *Id*. Agri Stats, of course, did not sell chicken, and thus could not have engaged in parallel, supracompetitive pricing. Nevertheless, the court held that plaintiffs plausibly alleged that Agri Stats had facilitated the price-fixing conspiracy, in violation of the Sherman Act. *Id*. at *2–3; *see also In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 831-34 (D. Minn. 2025) (denying Agri Stats's motion for summary judgment); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 (N.D. Ill. 2011) (trade association plausibly alleged to have facilitated manufacturers' agreement to suppress supply and raise prices).

Relatedly, the non-School Defendants claim that the allegations against them constitute impermissible "group pleading." Non-Schools Mot. (Doc No. 222), at 16–18. They are wrong. Rule 8(a) requires only that a complaint give each defendant fair notice of the claims alleged. Fed.

R. Civ. P. 8(a). Under the rule, "'group pleadings' are not impermissible *per se*, and '[a]t the motion to dismiss stage, a complaint generally will only be dismissed where it is entirely implausible or impossible for the grouped defendants to have acted as alleged.'" *Brown v. City of Brockton*, 2025 WL 2677231, at *3 (D. Mass. Sep. 18, 2025) (alteration in original) (quoting *Burke v. Walsh*, 2024 WL 3548759, at *5 (D. Mass. June 5, 2024)). The Complaint satisfies that standard. It alleges, for instance, that the Platform Defendants facilitate and enforce the anticompetitive scheme by misrepresenting the "binding" nature of ED and by preventing applicants from applying ED to more than one institution. *See* Doc No. 1 ¶¶ 1, 91–95, 97 & Doc Nos. 1-1, 1-2 (Exs. A, B). It further alleges that these representations were made "in collaboration" with the Schools. *Id*. ¶ 97. As to COFHE, the Complaint alleges that it enabled the Schools to collaborate on admissions practices through regular in-person meetings and data sharing. *Id*. ¶¶ 1, 22, 67, 109–13, 118–19. These allegations put each non-School Defendant on notice of its alleged role in the conspiracy.

The non-School Defendants seize on two Complaint paragraphs—14 and 66—to argue that the claims against them are implausible. *See* Non-Schools Mot. (Doc No. 222), at 16–17. But their arguments distort the Complaint. Paragraph 14 states that the *conspiracy* involves an agreement among Defendants to restrain competition, which increased tuition and reduced financial aid. It does not allege that the non-School Defendants themselves charged tuition or enrolled students. Rather, it alleges their role in facilitating a scheme that enabled those outcomes.

Paragraph 66—contained in the jurisdiction section—obviously refers to each of the School Defendants when it states that "[e]ach Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District." Doc No. 1 ¶ 66. Despite the missing "School," that language is neither misleading nor confusing in context. Courts do not dismiss complaints over minor drafting errors—especially

where, as here, the allegation appears in a jurisdictional section and was not the basis for asserting jurisdiction over non-School Defendants. *See Oto Analytics, LLC v. Benworth Cap. Partners PR, LLC*, 2025 WL 989954, at \*10 (D.P.R. Apr. 2, 2025) (denying dismissal where "the Court cannot reasonably believe that Defendants could be so confused as to be unable to respond to the substance of the claims alleged"); *Brown*, 2025 WL 2677231, at \*3 (observing Rule 8 is a "low bar").[7]

### b) "Plus" Factors

In addition to alleging substantial parallel conduct among the School Defendants, Plaintiffs have alleged ample "something more" to support a plausible inference of agreement. *See Twombly*, 550 U.S. at 555; *Evergreen*, 720 F.3d at 46. While Plaintiffs do not need to allege "plus factors" at the pleading stage, *Evergreen*, 720 F.3d at 47, Plaintiffs nonetheless do so here. Defendants' concerted restrictions on student choice, their use of shared application platforms to implement and police their Early Decision restraints, their admissions of their mutual understanding, and their membership in organizations that codify those norms all reinforce the inference of agreement. At minimum, these allegations raise a reasonable expectation that discovery will reveal additional evidence of collusion. *Twombly*, 550 U.S. at 556.

Defendants' argument that Plaintiffs *must* plead "plus factors," or even specifically actions "against unilateral self-interest," *see* Non-Schools Mot. (Doc No. 222), at 9, 14; Joint Mot. (Doc No. 220), at 15, to allege circumstantial evidence of agreement misstates the law. As the First Circuit held in *Evergreen*:

We are thus wary of placing too much significance on the presence or absence of

---

[7] The *Mexican Government Bonds* case cited by Defendants does not help them because the plaintiffs there did not "allege[] anything that would 'plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy.'" *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389 (S.D.N.Y. 2019) (citation omitted).

"plus factors" at the pleadings stage. While they are certainly helpful in guiding a court in its assessment of the plausibility of agreement in a § 1 case, other, more general allegations informing the context of an agreement may be sufficient. This is particularly true given the increasing complexity and expert nature of "plus factor" evidence which would not likely be available at the beginning stages of litigation.

*Evergreen*, 720 F.3d at 47; *see also Picone v. Shire PLC*, 2017 WL 4873506, at *10 (D. Mass. Oct. 20, 2017) (same); *FWK Holdings LLC v. Shire PLC*, 2017 WL 11449668, at *7 (D. Mass. Oct. 10, 2017) (same). *Twombly* likewise requires only "some factual context suggesting agreement, as distinct from identical, independent action." 550 U.S. at 549.

In any event, Plaintiffs plead abundant facts establishing multiple plus factors here. Common plus factors "include: '(1) evidence that the defendant had a motive to enter into a[ ] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 178 (D. Mass. 2013) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011)). With respect to evidence implying a traditional conspiracy, courts include "a high level of interfirm communications" and "'facilitating practices' like information sharing." *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015) (citations omitted). Plaintiffs adequately allege all of these plus factors here.

### (1)    Defendants Have a Motive to Conspire

Defendants have a clear motive to conspire. ED is immensely profitable for the School Defendants, allowing them to increase top-line tuition revenue while reducing discounts from the list price given to aid-receiving students. *See* Doc No. 1 ¶¶ 6–9, 14, 126–33. Further, because the schools concede that ED "commitments" are not legally binding contracts, *see id.* ¶¶ 4, 91–104, they *must* agree not to compete for students holding ED offers from other schools to enforce those commitments and preserve the supra-competitive tuition they generate, *see id.* ¶¶ 5–6, 105–24.

38

The non-School Defendants contend that Plaintiffs "do not allege that Non-School Defendants had any motive to conspire with School Defendants to raise tuition or reduce financial aid." Non-Schools Mot. (Doc No. 222), at 14. As an initial matter, while motive is a plus factor that supports the plausibility of agreement allegations, *Advanced Tech. Corp.*, 925 F. Supp. 2d at 178 (citing *Burtch*, 662 F.3d at 227), it is not an element of an antitrust claim, *see NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984) ("good motives will not validate an otherwise anticompetitive practice"); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 263 (3d Cir. 2017) ("intent is not an element of an antitrust claim"); *Broiler Chicken*, 2019 WL 1003111, at *2 ("motive is not an element of a Sherman Act claim"). But COFHE and the application platforms—Common App and Scoir—had clear institutional and commercial incentives to support and entrench the Early Decision conspiracy.

As for COFHE, it is an "unincorporated, voluntary, institutionally-supported organization of highly selective, private liberal arts colleges and universities." Doc No. 1 ¶ 118. It is, in other words, controlled and funded by its member schools. And according to COFHE's website, seven of the eight members of COFHE's Board of Directors are employed by the School Defendants. COFHE's motives are thus identical to those of its member institutions. In addition, COFHE's mission is to foster inter-school collaboration on issues including admissions and financial aid. *Id*. The ED regime advances its members' shared objective of stabilizing enrollment and protecting tuition revenue. By facilitating information-sharing on Early Decision admits, applicant pools, and aid practices, COFHE allows its member schools to monitor compliance with their no-poach agreement and avoid competitive bidding wars. Acting as a trusted, confidential space for collaboration and enabling the maintenance of shared norms like binding ED is crucial to COFHE's continued existence. COFHE's role as a hub of data exchange and strategy-setting gave

39

it both the tools and the incentive to sustain the collusive framework.

The application platforms, for their part, derived commercial and strategic benefits from aligning with the ED system. By operationalizing ED restrictions—agreeing to limit users to a single ED application and agreeing to require uniform pledges—those platforms became indispensable enforcement arms of the conspiracy. Their compliance tools reduced friction for the School Defendants while embedding ED's anticompetitive structure into the technical architecture of the admissions process. In doing so, the Platform Defendants deepened their institutional relationships with the School Defendants. *See*, *e.g.*, *Broiler Chicken*, 2019 WL 1003111, at \*2 ("It is plausible to infer that Agri Stats is motivated to serve its clients' demands.").[8]

### (2)   Early Decision Runs Counter to Each School Defendant's Unilateral Self-Interest

Plaintiffs also plausibly allege that the Early Decision conspiracy is against the unilateral self-interest of any individual School Defendant, reinforcing the inference of collusion. No rational school acting alone would refuse to consider or admit an applicant simply because that student had been accepted ED at another institution—especially when ED admits are disproportionately full-pay, non-price-sensitive students. *See* Doc No. 1 ¶ 126. These applicants are among the most desirable from a revenue perspective. *Id.* ¶¶ 9, 133. A school that unilaterally blackballs such students would be rejecting valuable tuition dollars and strong candidates without any reciprocal

---

[8] The non-School Defendants argue that a conspiracy that increased tuition costs "would result in fewer applications and therefore fewer application fees paid to Common App or Scoir." Non-Schools Mot. (Doc No. 222), at 14–15. That argument assumes that the School Defendants would not abandon the Common App and Coalition App if they stopped agreeing to enforce the hands-off agreement. Any reduction in application volume due to increased tuition prices would pale in comparison to the reduction in application volume that would accompany a decision by Defendant Schools not to accept ED applications through the Platform Defendants or to leave them altogether.

benefit. It is only when all schools agree to respect one another's ED "claims" that the individual cost of boycotting is outweighed by the collective benefit of being shielded from competition for one's own ED admits. *Id.* ¶¶ 6, 69–77.

Defendants attempt to justify their parallel blackballing by asserting that it would be "remarkably wasteful" to devote resources to recruiting students who have ED offers elsewhere. Joint Mot. (Doc No. 220), at 17. That cynical explanation fails on multiple levels. First, it elides the substantial gap between active recruitment and simply offering admission to a desirable applicant—something that generally may require *fewer* resources than screening out other schools' ED admits. Second, Plaintiffs do not argue that schools must court students who have withdrawn their applications or declined offers; rather, they challenge the agreement to reject applicants based solely on another school's ED offer.

Defendants disingenuously claim that "even Plaintiffs describe [these students] as unethical," Joint Mot. (Doc No. 220), at 17–18, apparently to justify their separate claim that considering applications from such students would be "wasteful." The Complaint does no such thing. Rather, it makes clear that *Defendants* propagate the notion that ED creates an "honor-bound" ethical obligation (*i.e.*, a one-way contract that binds students but not schools), largely to justify the School Defendants' refusal to compete. Doc No. 1 ¶¶ 4, 81–82, 91–104.[9]

### (3)    Defendants Share Confidential Information

Plaintiffs also allege classic hallmarks of conspiracy, including "facilitating practices" such

---

[9] The Platform Defendants also forgo revenue they would otherwise collect by restricting students to a single ED application. No such limits apply to Early Action or Regular Decision applications. Doc No. 1 ¶ 81. The embedded ED constraints serve no independent commercial purpose but instead exist solely to facilitate the School Defendants' agreement not to compete.

41

as information sharing among competitors. *Apple Inc.*, 952 F. Supp. 2d at 690 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)). The complaint specifically details how Defendant Schools share lists of students admitted through Early Decision. Doc No. 1 ¶¶ 109–12. Defendants do not deny that this practice exists but claim it helps "minimize the risk of wasting limited and highly valued Early Decision admissions on applicants who may violate their commitments." Joint Mot. (Doc No. 220), at 21. That rationale is implausible on its face.

There is only one reason to circulate lists of ED admits to competitor institutions: to ensure those students are not admitted elsewhere. Absent such an understanding, sharing lists would serve no useful function—schools gain nothing from telling rivals whom they admitted unless they expect reciprocal restraint in response. That is not neutral or unilateral conduct. It is a textbook form of information exchange that supports, at the very least, an inference of a mutual commitment not to compete. *See, e.g.*, *Todd*, 275 F.3d at 198 ("Information exchange is an example of a facilitating practice that can help support an inference of a[n] … agreement."). Nor are these allegations stale. The Common App, *to this day*, warns applicants that schools may share their ED acceptance with other schools. The Platform Defendants' claim that they do not participate in the information-sharing aspect of Defendants' conspiracy is thus wrong. *See* Non-Schools Mot. (Doc No. 222), at 19.[10]

The alleged evidence indicates that COFHE is at the center of this information sharing network. Amherst's Dean of Admissions stated that Amherst shares the identities of ED admits

---

[10] Even if there *were* a basis to conclude that the Platform Defendants do not participate in unlawful information sharing, the law is clear that co-conspirators need not participate in all aspects of the conspiracy to be held liable. *See, e.g.*, *Socony-Vacuum*, 310 U.S. at 224 n.59 ("[I]t is well established that a person 'may be guilty of conspiring, although incapable of committing the objective offense.'") (quoting *United States v. Rabinowich*, 238 U.S. 78, 86 (1915)).

with roughly 30 other schools. Doc No. 1 ¶ 111. It is reasonable to infer that this group is not a random subset of schools but rather is COFHE,[11] as COFHE's stated purpose is "to facilitate information sharing among these institutions." *Id.* ¶¶ 1, 22, 109–13, 118.[12] By facilitating anticompetitive communications among the School Defendants, COFHE is a full member of the conspiracy.[13]

### c)    Plaintiffs Need Not Allege That the Non-School Defendants Are the "Hub" of the ED Conspiracy

The non-School Defendants contend that a non-competitor "facilitator" of a conspiracy among horizontal competitors cannot be held liable unless it served as a "hub" that "actively directed or orchestrated" the alleged anticompetitive scheme. *See* Non-Schools Mot. (Doc No. 222), at 11–13. That is not the law. While it is indeed one way in which non-competitors can be held liable for conspiracies among horizontal competitors, it is not the only one. Courts have

---

[11] As of January 1, 2016, 35 schools were members of COFHE. *See* https://web.archive.org/web/20160101150018/web.mit.edu/cofhe/.

[12] The out-of-circuit cases cited by non-School Defendants, *see* Non-Schools Mot. (Doc No. 222), at 16, for the proposition that trade associations and the opportunity to conspire, *standing alone*, do not plausibly suggest an anti-competitive agreement are inapposite. *Cf. In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1198 (9th Cir. 2015) ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *Jones v. Micron Techs., Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) (complaint alleged only that trade associations afforded "opportunities for social interaction or side conversations among members" but "[did] not describe any suspected or actual interactions between Defendants at these trade associations"). Here, Plaintiffs allege much more than trade association membership and an opportunity to conspire; they allege specific ways in which COFHE and the other non-School Defendants facilitated and enforced the School Defendants' anti-competitive agreements.

[13] Of course, even if COFHE had merely acquiesced in the conspiracy, "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948).

43

repeatedly held that non-competitors that *facilitate* horizontal agreements among competitors violate the Sherman Act, even where they do not "actively direct" or "orchestrate" the conspiracy. *See, e.g.*, *Evergreen*, 720 F.3d at 49 n.4 (allegations that a trade association defendant allowed a manufacturer defendant to publish a misleading article on the trade association's website and used the trade association's publication to promote a sham competitor were "sufficient to state a claim that, at a minimum, the [trade association] acquiesced to and/or aided and abetted a trade-restraining agreement actionable under [Sherman Act] § 1"); *Othart Dairy Farms, LLC v. Dairy Farmers of Am.*, 720 F. Supp. 3d 1087, 1109 (D.N.M. 2024) ("While GSA may not have the same motive as its co-defendants, Plaintiffs allege specific facts that, if true, plausibly allege GSA facilitated meetings between co-Defendants in furtherance of an anticompetitive conspiracy, making them similarly culpable."); *In re Broiler Chicken*, 2019 WL 1003111, at *2 ("[T]he mere *possibility* that Agri Stats's 'facilitation' of the alleged conspiracy was 'unwitting,' does not mean that the allegation that Agri Stats was a knowing co-conspirator is not *plausible*. … It is at least plausible (if not likely) that a person who facilitates a conspiracy knows about the conspiracy and engages in the facilitation knowing of its consequences."); *In re Plasma-Derivative Protein Therapies*, 764 F. Supp. 2d at 1003 ("The court must also accept as true the well pled allegations that PPTA helped defendants conceal the conspiracy by falsely denying the existence of supply shortages and over-reporting the actual supply to government officials. … Given this allegation, the court cannot see how it can avoid the conclusion that plaintiffs have adequately pled PPTA's participation in the conspiracy.").[14]

---

[14] *In re Processed Egg Products Antitrust Litigation*, 821 F. Supp. 2d 709 (E.D. Pa. 2011), does not help Defendants. There, the complaint named three trade associations, the United Egg Association ("UEA"), United Egg Producers ("UEP") and United States Egg Marketers ("USEM")

* * * * *

In short, Plaintiffs allege multiple, independent, and mutually reinforcing facts establishing an agreement among all Defendants. The Ivy League Joint Statement is direct evidence of an explicit non-solicitation agreement that alone demonstrates concerted action. That showing is reinforced by extensive circumstantial evidence—including parallel conduct, platform-based enforcement, sharing of Early Decision admit lists, and behavior contrary to unilateral self-interest. *Twombly*, *Evergreen*, and other controlling precedent confirm that these allegations, taken together, more than plausibly plead an unlawful agreement.

### B.    Plaintiffs Plausibly Allege an Antitrust Violation Regardless of Whether It Is Evaluated *Per Se*, by Quick Look, or Under the Full Rule of Reason

Defendants next claim that Plaintiffs' allegations must be evaluated under the Rule of Reason, and Plaintiffs fail to plausibly allege a restraint of trade under that framework. That argument fails for two reasons. First, the Court need not—indeed should not—decide at this stage which mode of analysis applies. Second, under each of the *per se*, quick look, or rule-of-reason frameworks, Plaintiffs have more than plausibly alleged an unlawful restraint that injures competition.

### 1.    The Court Need Not Decide Now What Framework Applies

In cases (like this one) where the "complaint alleges a horizontal restraint" constituting a "naked agreement[] among competitors," courts should not "jettison[] the *per se* rule too early."

---

who were alleged to have "facilitated" the egg producers' coordinated conduct. *Id*. at 715. The district court dismissed without prejudice allegations against UEA only because plaintiffs had not adequately alleged *that particular* association's role in the conspiracy. *Id*. at 755. But the claims against UEP, USEM, and one producer went all the way through trial, verdict, and appeal. *See In re Processed Egg Products Antitrust Litig.*, 850 F. App'x 142, 144–45 (3d Cir. 2021).

45

*Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (Easterbrook, J.). "[T]here is often no bright line separating per se from Rule of Reason analysis," *Bd. of Regents*, 468 U.S. 85 at 104 n.26, and the "categories of analysis of anticompetitive effect are less fixed than terms like *per se*, quick look, and rule of reason tend to make them appear," *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999) (quotation marks omitted); *see* Philip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1911a (last updated Sep. 2025) (*per se*, quick look, and rule of reason are "a scale that can vary continuously with the nature of the restraint and the evidence"). As the Supreme Court has explained, evaluating antitrust liability "necessarily depends on a careful analysis of market realities," which may shift as the parties develop the factual record. *NCAA v. Alston*, 594 U.S. 69, 93 (2021). So courts must examine "the circumstances, details, and logic of a restraint" to determine whether it gives rise to an intuitively obvious inference of anticompetitive effect (*per se* or quick look) or instead calls for more detailed treatment (full rule of reason). *Cal. Dental*, 526 U.S. at 780–81; *see* Areeda & Hovenkamp ¶ 305e ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery.").

For that reason, courts routinely decline to resolve the applicable framework on a motion to dismiss. *See, e.g.*, *Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 713–714 (E.D. Va. 2019); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 2013 WL 1768706, at *8 (N.D. Cal. Mar. 29, 2013). "[T]hat decision is more appropriate on a motion for summary judgment." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (collecting cases); *see also United States v. Manahe*, 2022 WL 3161781, at *9 (D. Me. Aug. 8, 2022) ("At the motion to dismiss stage, the Court rejects [a defendant's] proposed exception to the per se rule because the Defendants' alleged agreement to engage in horizontal price-fixing and market-

46

allocation falls within the category of restraints long condemned as inherently anticompetitive."); *Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323, at \*9 (D. Conn. Jan. 20, 2023) ("Whether plaintiffs will eventually be able to produce evidence to substantiate [a *per se*] claim at summary judgment or trial is a question for another day.").

Indeed, the First Circuit has cautioned against importing "unreasonably high pleading requirements at the earliest stages of antitrust litigation." *Evergreen*, 720 F.3d at 44. That caution underscores why *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57 (1st Cir. 2004), offers Defendants no support. There, the First Circuit noted that in *some* circumstances *per se* issues "can often be resolved" early. *Id.* at 61. But in the next sentence it identified "market allocation" as among "[t]he most important per se categories." *Id*. In fact, when the alleged anticompetitive agreement is one traditionally subject to *per se* condemnation—like the customer-market allocation agreement pleaded here—resolution of the *per se* claim's viability "requires discovery, economic analysis, and potentially a trial." *Deslandes*, 81 F.4th at 705; *see also Stop & Shop Supermarket*, 373 F.3d at 59–60, 69 (affirming district court's *per se* ruling at summary-judgment stage); *Addamax Corp. v. Open Software Found.*, 152 F.3d 48, 50–51, 55 (1st Cir. 1998) (affirming the district court's "thoughtful" summary-judgment decision after "[c]onsiderable discovery was conducted"). *Stop & Shop Supermarket* reinforces, rather than undermines, that determining *per se* applicability requires consideration of the factual record when the challenged restraint is one, as here, potentially subject to *per se* condemnation.

For similar reasons, the Third Circuit's decision in *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), does not aid Defendants. That case involved a challenge to the "Overlap" agreement, under which elite private universities—including several Defendants here—collectively determined financial aid awards for commonly admitted students. *Id.* at 662–63. While

47

the district court declined to apply the *per se* rule, it did so only "in the exercise of caution" and only after issuing extensive factual findings following a bench trial. *United States v. Brown Univ.*, 805 F. Supp. 288, 289, 301 (E.D. Pa. 1992). The court of appeals agreed that the defendants' "Agreement is a price fixing mechanism impeding the ordinary functioning of the free market," but remanded so that the district court could evaluate whether the schools could offer any procompetitive justifications to offset the scheme's anticompetitive effects. *See Brown Univ.*, 5 F.3d at 672–73, 679. *Brown University* thus stands for the proposition that conduct among university competitors to restrict price competition is subject to antitrust scrutiny—and it underscores that the *per se* versus rule of reason determination requires a fully developed evidentiary record.

Nothing in *Brown University* suggests that courts must conclusively default to rule-of-reason review at the pleading stage, nor does it bar application of the *per se* rule to educational markets where the restraint is a horizontal no-poach agreement. To the contrary, it emphasized that agreements among competitors to eliminate price or service competition—even in higher education—are not immune from traditional antitrust analysis. Moreover, recent authority—including decisions by the Supreme Court and other circuits—confirms that the analytical framework through which to evaluate a horizontal restraint should not be fixed until a factual record is developed. *See Alston*, 594 U.S. at 113–14; *Lumber Liquidators*, 415 F. Supp. 3d at 714; *Deslandes*, 81 F.4th at 703 (holding the appropriate analytical framework to be a question of fact).

At this stage, Plaintiffs have plausibly alleged a naked horizontal agreement not to compete for students—an archetypal *per se* violation. Because nothing in the Complaint forecloses *per se* condemnation (or quick look analysis), there is no basis for the Court to find at this time that a full rule of reason analysis will be required.

48

### 2.     Plaintiffs State a *Per Se* Claim Under the Sherman Act

Plaintiffs plausibly plead a *per se* violation of the Sherman Act. Horizontal agreements allocating markets among competitors have long been treated as *per se* illegal. *United States v. Am. Airlines Grp. Inc.*, 121 F.4th 209, 224 (1st Cir. 2024); *see also United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972) (explaining where it is "clear that the restraint … is a horizontal one," it constitutes a *per se* violation of §1). Such agreements are "naked restraints of trade," unlawful even if well-intentioned or designed to enhance competition, and they are conclusively presumed to be unreasonable because they "always or almost always tend to restrict competition and decrease output." *Topco*, 405 U.S. at 610; *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289–290 (1985).

Courts routinely apply *per se* treatment where collusion takes the form of competitors agreeing not to compete for one another's customers, including both existing and potential accounts. *See, e.g.*, *United States v. Coop. Theaters of Ohio*, 845 F.2d 1367, 1372 (6th Cir. 1988) (booking agents agreeing not to solicit each other's accounts); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1087–90 (5th Cir. 1978) (dealers' non-solicitation of each other's customers); *Deslandes*, 81 F.4th at 703 (no-poach agreements among franchisees).

The same principles apply here, where the Complaint plausibly alleges that Defendants "have mutually agreed not to compete for students accepted through Early Decision," Doc No. 1 ¶ 6, in a scheme that "restrain[s] competition for an agreed-upon group of students," *id.* ¶ 14. Far from being "unsubstantiated," Joint Mot. (Doc No. 220), at 23, extensive factual allegations support the existence of the *per se* unlawful horizontal customer-allocation conspiracy alleged.

Plaintiffs' factual allegations are nothing like the "conclusory," "on information and belief" assertions courts find insufficient to justify *per se* treatment. *CCBN.com, Inc. v. Thomson Fin.*,

49

*Inc.*, 270 F. Supp. 2d 146, 154 (D. Mass. 2003). Nor are Plaintiffs recasting as an antitrust violation conduct that ordinarily falls outside the Sherman Act's scope. *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983). Rather, the Complaint pleads a straightforward horizontal customer-allocation agreement—a quintessential *per se* antitrust violation.

Defendants argue that *per se* treatment is inappropriate here because it has not previously been employed against "educational institutions purporting to restrict competition for customers or labor." Joint Mot. (Doc No. 220), at 23. But, in assessing whether the judicial system has enough "experience" to determine the anticompetitive effects of an action, courts focus on the particular *practice* involved, rather than the *industry* in which the allegedly unlawful practice was used. "The argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable[.]'" *Arizona. v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351 (1982) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)); *see also Manahe*, 2022 WL 3161781, at *9 (citing *Maricopa* in allowing a no-poach conspiracy claim to proceed on a *per se* theory). And horizontal market allocation is a restraint with which courts have "amassed 'considerable experience.'" *Alston*, 594 U.S. at 89 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

Defendants' contrary authorities are unavailing. *Choh v. Brown University*, 753 F. Supp. 3d 117 (D. Conn. 2024), relied on rules specific to "[r]egulation of league sports" in rejecting *per se* analysis. *Id.* at 127 (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 41 (2d Cir. 2018)), *appeal docketed*, No. 24-2826 (2d Cir. Oct. 25, 2024). And for the reasons already

explained, the Third Circuit's decision in *Brown University*—based on a district court's detailed factual findings after a ten-day bench trial, *see* 5 F.3d at 664, 672—does not control the pleading-stage question of whether Plaintiffs have plausibly alleged a *per se* unlawful agreement.

### 3.    Alternatively, Plaintiffs State a Claim Under "Quick Look"

Even if the challenged agreement ultimately skirts *per se* condemnation, it remains a horizontal agreement not to compete for applicants. It thus is the paradigm of an agreement where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental*, 526 U.S. at 770. Accordingly, it is a plausible candidate for "quick look" analysis. *See Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 61 (1st Cir. 2016).

The functional difference between quick look analysis and *per se* condemnation is that defendants subject to the former may offer justifications for the challenged restraint and evidence that its procompetitive benefits outweigh the competitive harm, which quick look presumes. *See id.* at 60–61. But those efforts are part of a burden-shifting framework that is not susceptible to resolution prior to discovery. *See id.* at 61; *Cal. Dental*, 526 U.S. at 775 n.12.

Defendants here sketch out a pair of purportedly procompetitive rationales they hope will find evidentiary support: that Early Decision increases applicants' chance of admission at their top choice and facilitates early resolution of the application process. Joint Mot. (Doc No. 220), at 23. But each flies into the teeth of the Complaint's well-pleaded factual allegations that applicants "use Early Decision strategically" rather than in reference to their first-choice institution, Doc No. 1 ¶¶ 137–38, and that early resolution of the application process could be—and regularly is—achieved by Early Action, *id.* ¶ 90. Telling applicants they are less likely to be admitted regular

51

decision is not a benefit, but part of the scheme to encourage students to give up their leverage. In any event, these "factual question[s]" about "whether the alleged procompetitive benefits of [the challenged restraint] outweigh its alleged anticompetitive effects" cannot be "resolve[d] on the pleadings." *Vázquez-Ramos*, 55 F.4th at 299 (second alteration in original) (quoting *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839–40 (9th Cir. 2022)).[15] Plaintiffs have detailed how Defendants structured and enforced a customer allocation system that suppresses competition for students and raises the effective price of attendance. They need do no more at this stage to satisfy the unreasonableness element.

### 4. Alternatively, Plaintiffs State a Claim Under the Rule of Reason

Plaintiffs' allegations also independently support a claim under the full rule of reason. Under that framework, courts engage in a three-step, burden-shifting framework: the plaintiff must first "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Vázquez-Ramos*, 55 F.4th at 299 (quoting *Ohio v. Am. Express Co.* ("*AmEx*"), 585 U.S. 529, 541 (2018)). "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *AmEx*, 585 U.S.

---

[15] Defendants are not entitled to any presumption of procompetitive benefit merely because they operate in the education sector. The Supreme Court has held that horizontal restraints are presumed lawful only where the joint venture itself creates a new product that could not otherwise exist. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203 (2010). That is not the case here, where ED is just a mechanism, not the educational product the School Defendants are selling. Nor does *Brown University* suggest otherwise. That decision simply held that certain educational collaborations may warrant fuller scrutiny—not that collusion among schools to eliminate price competition should be presumed lawful. *See* 5 F.3d at 674.

52

at 541–542 (citations omitted). Where the challenged restraint has "significant anticompetitive effects but only minimal procompetitive benefits," courts typically "find the purported benefits pretextual at step two." *Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 994 (9th Cir. 2023).

Plaintiffs have alleged anticompetitive effects, both through direct effects on competition and through Defendants' exercise of market power, either of which would suffice independently. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

**a)      Plaintiffs Plausibly Allege Direct Evidence of Anticompetitive Effects**

Plaintiffs allege multiple forms of direct evidence showing the anticompetitive effects of the Early Decision conspiracy. Widespread adoption of Early Decision began in the early 1990s, eliminating the ability of students accepted via Early Decision to consider "competing offers from other colleges." Doc No. 1 ¶¶ 91, 129. This led to: (1) higher prices at all colleges and universities than would have existed absent the Conspiracy, *id.* ¶¶ 128–29; (2) tuition "thousands of dollars higher" at schools using Early Decision than at comparable schools that do not, *id*. ¶¶ 126–27; and (3) reduced financial aid for Early Decision admits, *id.* ¶¶ 130–33. These allegations constitute paradigmatic direct evidence of anticompetitive harm. *AmEx*, 585 U.S. at 542.

Defendants argue that Plaintiffs fail to allege "an actual anticompetitive change in prices after" the initial implementation of ED. Joint Mot. (Doc No. 220), at 24 (quoting *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021)). But specific before-and-after allegations are not required. Sherman Act conspiracies often form incrementally, as competitors gradually accept invitations to participate. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 254–55 (D. Mass. 2014) (citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939)). Here, the Complaint plausibly alleges anticompetitive effects as ED expanded, citing multiple sources showing schools' allocation of ED applicants. Doc No. 1 ¶¶ 109–111 (confidential sources,

53

law review article, and New York Times article); *id.* ¶ 116 (explaining codification of Ivy League collusion in joint statement); *see also id.* ¶¶ 22, 81, 83 (COFHE and Application Platforms facilitate information sharing and enforcement).

Defendants' argument that correlation of widespread adoption of ED with "skyrocketing tuition prices," *id.* ¶ 129, does not prove causation, Joint Mot. (Doc No. 220), at 25, is correct as far as it goes, but premature as a reason to reject the plausibility of the allegations of harm, as "[e]conomists … have means of moving from data indicating correlation to a fair inference of causation," *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 195 (1st Cir. 2012). Plaintiffs also allege that Early Decision isolates "price-insensitive" students, leading schools to charge full tuition rates thousands of dollars higher than comparable schools without Early Decision programs. Doc No. 1 ¶¶ 126–28. Unlike Defendants' cited cases, like *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478 (M.D. Tenn. 2023), Plaintiffs' allegations plausibly show a "supracompetitive increase" not explainable by normal market forces. *See id.* at 525.

Finally, Plaintiffs also have alleged direct evidence of anticompetitive conduct beyond price effects. Defendants' scheme "force[s] Early Decision admittees to be bound to the school that offered early admission by preventing students from receiving and comparing offers from other schools." Doc No. 1 ¶ 5; *see id.* ¶¶ 105–24. Such "[c]oercive activity that prevents its victims from making free choices between market alternatives" constitutes direct evidence of harm. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (quoting *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996)). Direct evidence of an antitrust violation may include "reduced output, increased prices, or decreased quality," *AmEx*, 585 U.S. at 542, or other forms of harm, including restriction of consumer choice, *see, e.g.*, *Bd. of Regents*, 468 U.S. at 107. These

allegations suffice to plausibly show that the Early Decision conspiracy has anticompetitive effects under the rule of reason.

### b)    Plaintiffs Plausibly Allege Indirect Evidence of Anticompetitive Effects

Plaintiffs also have alleged substantial indirect evidence of anticompetitive effects. To sustain an antitrust claim on indirect evidence, plaintiffs must show market power in a relevant market and that the restraints harmed competition in that market. *AmEx*, 585 U.S. at 542.

### (1)    Relevant Market

"The definition of the relevant market is ordinarily a question of fact." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Cir. 2016). Accordingly, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (alteration in original) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.)). A complaint is sufficient at this stage so long as it "alleges facts that plausibly delineate a relevant market." *Vázquez-Ramos*, 55 F.4th at 297; *see also MJ's Mkt., Inc. v. Jushi Holdings, Inc.*, 766 F. Supp. 3d 197, 215 (D. Mass. 2025) (explaining that a relevant market is sufficiently defined if it "suffers" no "fatal legal defect") (quoting *Volkswagen Grp. Of Am., Inc. v. Smartcar, Inc.*, 2024 WL 4312217, at *7 (N.D. Cal. Sep. 25, 2024)).

Here, Plaintiffs have pleaded a relevant market for "undergraduate education from selective private national universities and liberal arts colleges in the United States," including schools "consistently among the highest-rated schools on national rankings." Doc No. 1 ¶ 151. The Complaint explains that this market reflects "the universe of products that are considered 'reasonably interchangeable by consumers for the same purposes,'" *Flovac*, 817 F.3d at 854 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)), and the

"cross-elasticity of demand" between those products, *id*. (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 469 (1992)). *See* Doc No. 1 ¶ 153. Indeed, Defendants *themselves* essentially endorsed the contours of this distinct market by their membership in COFHE—an "unincorporated, voluntary, institutionally-supported organization of highly selective, private liberal arts colleges and universities." Doc No. 1 ¶ 118. Far more than "coherent" and plausible, this market definition "easily crosses the pleading threshold." *MJ's Mkt.*, 766 F. Supp. 3d at 215.

Defendants' counterarguments fail. Their contention that Plaintiffs have not "defined the contours of the market based on objectively identifiable characteristics," Joint Mot. (Doc No. 220), at 26, ignores Plaintiffs' allegations regarding national rankings, COFHE membership, and industry recognition as criteria defining the relevant market. Doc No. 1 ¶¶ 151–55. These pleaded criteria distinguish Plaintiffs' case from *Choh v. Brown University*, which rejected alternative market definitions that included "a few other schools" or a "small number of … academically selective universities," because the complaint did not identify factors that could be used to identify which schools fell within such parameters. 753 F. Supp. 3d at 132–33.

Defendants' argument that Plaintiffs' alleged market is "underinclusive on its face" because it excludes public universities, Joint Mot. (Doc No. 220), at 27–28, is both wrong and premature. Public colleges and universities draw from meaningfully different applicant pools and have significantly different tuition models—important differences in the relevant market analysis.[16] Indeed, the Northern District of Illinois squarely rejected this argument when it found

---

[16] For example, the undergraduate student body at the University of California-Berkeley is 78% in-state attendees, for whom the school's sticker price in 2024–25 was $16,347. *See* Nat'l Ctr. for Educ. Statistics, "University of California-Berkeley," *CollegeNavigator* (last accessed Nov. 19, 2025), available at https://nces.ed.gov/collegenavigator/?q=Berkeley&s=all&id=110635. By

it plausible that "public universities" are "sufficiently different from the [private] schools in the alleged market that they are not interchangeable." *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 890 (N.D. Ill. 2022). If anything, Plaintiffs' inclusion of highly ranked liberal arts colleges, Doc No. 1 ¶ 151, creates a more fulsomely defined relevant market than the one approved in *Carbone*. *See Carbone*, 621 F. Supp. 3d at 890 (finding plausible a market that included only national private universities and excluded top-ranked liberal arts colleges, which defendants had insisted were part of the market).

Defendants' argument is also premature because it is only after discovery that Plaintiffs can conduct the fact-intensive "inquiry into the 'commercial realities' faced by consumers" needed to precisely delineate the boundaries of the relevant market. *Eastman Kodak*, 504 U.S. at 482 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)). For this reason, courts at this stage routinely reject challenges to alleged relevant markets where factual questions remain regarding the market's scope. *See, e.g.*, *OV Loop Inc. v. Mastercard Inc.*, 2025 WL 1333546, at *3–4 (D. Mass. May 7, 2025) (rejecting challenge to market defined as "consumer-merchant mobile wallet contactless payments network processing services on behalf of banks" because whether the plaintiff's market "actually delineates the universe of reasonably interchangeable products is a question of fact").

---

contrast, at Defendant Columbia University—tied with Berkeley in the latest *US News & World Report* rankings—only 19% of students are in-state, and tuition is the same ($71,845) for in-state and out-of-state attendees. *See id.*, "Columbia University in the City of New York" (last accessed Nov. 19, 2025), available at https://nces.ed.gov/collegenavigator/?q=columbia+university &=s&id=190150. The court may take judicial notice of these facts because they are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 205 (D. Mass. 2022) (explaining that "material on government websites" is "generally subject to judicial notice").

Defendants' reference to *Bryan v. Ascend Learning, LLC*, 2025 WL 2239250 (D. Mass. Aug. 6, 2025), *appeal docketed*, No. 25-1858 (1st Cir. Sept. 12, 2025), only highlights the differences between this case and the "rare" complaint that can be "dismiss[ed] on the grounds of failing to plead market definition." *Id.* at *4. The complaint in *Bryan* made "no attempt to plead the parameters of the relevant market in accordance with the principles of reasonable interchangeability and cross-elasticity of demand" and contained internally inconsistent market definitions. *Id.* The Complaint here, by contrast, contains specific allegations regarding interchangeability and cross-elasticity of demand, Doc No. 1 ¶ 153, and a single, consistent market definition, *id.* ¶ 151. That definition is not only plausible, it aligns with the Defendants' own conduct within COFHE, a self-defined peer group. That is more than sufficient at this stage.

### (2)    Market Power

Defendants' challenge to Plaintiffs' market power allegations repeats a familiar misdirection: it dismisses detailed, well-supported allegations as conclusory, while improperly demanding facts that are not required at the pleading stage. *See* Joint Mot. (Doc No. 220), at 28–29. Courts have consistently recognized that market power—that is, the ability to raise prices above competitive levels—may be alleged and inferred through circumstantial evidence, including the ability to control prices or restrict output, the presence of high barriers to entry, and the existence of strong consumer brand preferences. *See CCBN.Com*, 270 F. Supp. 2d at 155. Here, Plaintiffs allege precisely such factors. They plead that Defendants wield "considerable market power" in the defined market for selective private undergraduate education and have used that power "to increase the net price of attendance." Doc No. 1 ¶ 156. Plaintiffs further allege that demand in this market is shaped by "extremely strong brand preferences among consumers" and that Defendants "limit the supply of available seats" to create artificial scarcity, *id.* ¶ 158—classic

indicators of market power. *See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 197 (1st Cir. 1996) ("Market power may be proved circumstantially by showing … that existing competitors lack the capacity to increase their output in the short run.").

Defendants incorrectly argue that Plaintiffs must plead market share figures to survive dismissal. *See* Joint Mot. (Doc No. 220), at 28–29. But market share is not a threshold pleading requirement, especially where—as here—its measurement depends on factual determinations about market scope. As the First Circuit has repeatedly held, antitrust complaints may proceed without numerical market share allegations if they otherwise plead facts supporting a plausible inference of market power. *Vázquez-Ramos*, for example, allowed plaintiffs' claims to proceed without allegations of market share percentage because that percentage depended on the market's scope—and that scope, "at the pleading threshold," "remain[ed] to be seen." 55 F.4th at 297–98; *see also Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003) (dismissal was premature where market share may be "nearly complete" or "a trivial percentage" depending on the circumstances). Indeed, proving market share is sometimes not necessary at all. "If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power. In fact, this arguably is more direct evidence of market power than calculations of elusive market share figures." *Todd*, 275 F.3d at 206.

By detailing the price effects, supply constraints, and exclusionary dynamics that result from Defendants' agreement, the Complaint more than supports the inference that Defendant Schools possess the power to raise prices and restrain aid competition without fear of losing students to non-market substitutes—*i.e.*, they plausibly allege market power.

### C.    Plaintiffs Plausibly Allege Antitrust Injury and Standing

To have antitrust standing, a plaintiff must have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "The Supreme Court established a six-factor test to determine whether a plaintiff has antitrust standing—and the Court must 'consider the balance of factors in each case.'" *MJ's Mkt.*, 766 F. Supp. 3d at 210 (citing *Sullivan v. Tagliabue*, 25 F.3d 43, 46 (1st Cir. 1994)). Those factors are: "(1) the causal connection between the alleged antitrust violation and harm to Plaintiff; (2) an improper motive; (3) the nature of Plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ('antitrust injury'); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages." *Id.*

Here, Plaintiffs allege that the ED conspiracy imposes direct and measurable harm on students by distorting the admissions process and suppressing competition at the most critical stage: when students are choosing where to apply and how to finance their education. In a competitive market, students can apply broadly, compare admissions offers, and negotiate for better financial aid. But under the ED system, Defendants have collectively removed those options. By agreeing not to accept students admitted ED by another Defendant, and by jointly presenting ED as a binding commitment through application platform restrictions and misleading pledges, Defendants deny students the opportunity to leverage one offer against another. That artificial restriction allocates students to institutions prematurely and reduces the information and bargaining power they would otherwise possess—hallmarks of an anticompetitive arrangement.

That conduct directly inflates the price of attendance. As the Complaint explains, schools using ED consistently charge higher tuition than comparable institutions that do not employ the practice. *See* Doc No. 1 ¶ 127. That disparity is not coincidental. By capturing students early, Defendants reduce the need to compete on price later. In addition to raising the cost of attending

60

an ED school, ED also creates an "umbrella" effect, allowing even non-ED schools to raise tuition under the cover of ED-driven market segmentation. *Id.* ¶ 128. That outcome is explained by basic economic theory: when sellers divide the market and lock in buyers before they can shop around, prices rise. *See* Areeda & Hovenkamp ¶ 2030a ("[H]orizontal market-division agreements enable the participants to reduce output in their assigned territorial, product, or customer area, thus raising the price above competitive levels.").

Defendants' alternative explanations for tuition growth—"industry-wide factors such as increases in demand and to the schools' costs," Joint Mot. (Doc No. 220), at 31–32—run counter to Plaintiffs' factual allegations, including a chart reproduced in the Complaint that demonstrates that tuition has risen substantially faster than Defendants' institutional costs. *See* Doc No. 1 ¶ 129. Even setting that aside, Defendants' alternative theories cannot undermine the sufficiency of Plaintiffs' allegations: that other factors also may have contributed to increased prices does not mean ED did not do so. *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp. 3d 1067, 1092 (N.D. Cal. 2025).[17] At the pleading stage, Plaintiffs need not disprove alternative theories; the question is whether their factual allegations make their claim plausible. *Evergreen*, 720 F.3d at 45.

The Early Decision conspiracy also suppresses the availability and generosity of financial aid. In a competitive system, schools use aid not only to promote access, but also as a recruitment tool. Early Decision disrupts that dynamic. As Plaintiffs allege, once a student applies ED, schools face little incentive to offer strong aid packages: the student cannot consider offers from elsewhere,

---

[17] Defendants' reliance on *Geffner v. Coca-Cola Co.*, 343 F. Supp. 3d 246 (S.D.N.Y. 2018), is misplaced. There, plaintiffs' injury relied on studies that cast doubt on the complaint's allegations. *Id.* at 254. Defendants identify no similar flaw here.

cannot negotiate, and often must accept the offer quickly or risk losing their seat. Doc No. 1 ¶¶ 7–9, 86-88, 130–32. The School Defendants know as much, and ED structures the entire market to take advantage of it—particularly for those students who feel compelled to apply early for a better shot at admission. In this way, ED exerts downward pressure on aid while lifting tuition ceilings.

These harms are not speculative or isolated. They flow directly from Defendants' agreements and affect a wide swath of applicants—especially full-pay and middle-income students who are forced to accept being locked out of the competitive process for aid if they want the best chance of admission. *See* Doc No. 1 ¶¶ 3, 78, 126, 137, 140. The antitrust injury here is clear: Plaintiffs paid more, and received less, because Defendants conspired to restrict the competitive forces that would otherwise govern tuition and aid decisions. That is precisely the kind of market injury the antitrust laws exist to redress.

Rather than grapple with these allegations, Defendants argue that the harm caused by "Early Decision itself"—in contrast, they say, to the harm caused by their agreements not to compete for students admitted ED elsewhere—does not count. Joint Mot. (Doc No. 220), at 6. But the distinction Defendants attempt to draw is a false and legally irrelevant one. Plaintiffs do not challenge ED as an abstract or independent admissions practice. Rather, the Complaint alleges a multi-defendant conspiracy in which ED functions as the mechanism for restraining competition. *See* Doc No. 1 ¶¶ 14, 21, 105–13, 118–24, 147, 173–75. The School Defendants do not merely happen to use ED in parallel. They have agreed—explicitly and through consistent, collusive conduct—to treat ED admissions as binding, to refrain from competing for each other's ED admits, to share lists identifying those students, and to use application platforms and COFHE to facilitate, monitor, and enforce that conduct. *Id*. ¶¶ 105–13, 116, 118–24. It is that combination of concerted practices that Plaintiffs challenge under the Sherman Act. Plaintiffs' injuries, in other words, do

62

not arise from an artificially isolated "Early Decision itself," *see* Joint Mot. (Doc No. 220), at 1, 30, but from Defendants' concerted agreement to structure and implement ED in ways that foreclose competition.

Defendants' voluntariness argument, *see* Joint Mot. (Doc No. 220), at 33, also fails and furthermore is inappropriate for resolution at the pleadings stage. To establish a "voluntariness" defense, a defendant must prove "that the plaintiff bears at least substantially equal responsibility for an anticompetitive restriction by creating, approving, maintaining, continually and actively supporting, relying upon, or otherwise utilizing and implementing, that restriction to his or her benefit." *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994). Defendants make no effort to establish those factors here. Plaintiffs were not co-conspirators; they were coerced participants in a market where ED functioned as the dominant route to selective colleges. Doc No. 1 ¶¶ 3, 5, 105–24, 137–38, 147–48. The very structure of ED—engineered and maintained by Defendants—pressures students into applying early, without bargaining leverage or meaningful competitive alternatives. That is not a freely chosen market condition; it is the injury.

## IV.     No Claim Is Barred by the Statute of Limitations

Defendants finally contend that Ms. D'Amico's and Mr. Silbert's claims are untimely.[18] Joint Mot. (Doc No. 220), at 33. They are not. The antitrust statute of limitations runs for four years "after the cause of action accrued." 15 U.S.C. § 15b. A cause of action *first* accrues when "a defendant commits an act that injures" a plaintiff. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *accord In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56, 61 (D. Mass. 2003).

---

[18] Defendants do not dispute that the claims of the remaining Plaintiffs are timely. Accordingly, even if the Court were to find D'Amico's and Silbert's claims untimely (and it should not), that determination would not dispose of the case.

But in the antitrust context, "each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks omitted). That rule governs here.

Defendants acknowledge that D'Amico's and Silbert's "injuries first arose when they enrolled and paid tuition[.]" Joint Mot. (Doc No. 220), at 33. But they insist that all subsequent tuition payments were not additional injuries. *Id*. at 34. That argument fails for two independent reasons.

*First*, the Complaint alleges not only a conspiracy to restrain competition in college admissions, but also that Plaintiffs "have been injured and *will continue to be injured* … by paying more for attendance at Defendant Schools than they would have paid but for the combination and conspiracy." Doc No. 1 ¶ 176 (emphasis added); *accord id.* ¶ 178 ("The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid and will pay to Defendant Schools flows directly from Defendants' restraints on competition and is the type of injury that the antitrust laws were designed to prevent."). Each time Ms. D'Amico and Mr. Silbert paid inflated tuition, they suffered a new and independent injury, triggering a fresh limitations period. Because they last paid inflated tuition no earlier than summer 2022, before their senior years began, the four-year limitations window runs at least through summer 2026.

Plaintiffs' claims are nothing like the claims in *Choh v. Brown University*, 753 F. Supp. 3d 117 (D. Conn. 2024). There, the court found that Brown's denial of an athletic scholarship to a student was the result of a *single* past decision to join an Ivy League Agreement prohibiting such aid, and it held that each subsequent denial was "simply a manifestation" of that initial act. *Id*. at 136–37. There, no new or independent conduct restarted the limitations clock. Here, by contrast, Plaintiffs allege an ongoing conspiracy implemented through repeated, collusive conduct:

64

Defendants apply the ED scheme to each incoming class, share ED commitments across schools each year, and meet regularly through COFHE. Those actions, in turn, enabled Wesleyan to set and collect supracompetitive tuition every semester that D'Amico and Silbert were enrolled. That is not a lingering effect of a one-time decision; it is a series of new overt acts that cause new overcharges. Unlike in *Choh*, each semester's artificially inflated tuition payment reflects a new injury—and restarts the statute of limitations.

*Second*, Defendants' statute-of-limitations argument is inappropriate for resolution at this stage anyway. It is an affirmative defense, and "a complaint need not anticipate or overcome affirmative defenses." *Urena v. Travelers Cas. & Sur. Co. of Am.*, 714 F. Supp. 3d 31, 39 (D.N.H. 2024) (quoting *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014)). Indeed, "courts have regularly held that even a facially untimely case should proceed if the allegations in the complaint leave open the possibility that an exception to the statute of limitations could apply." *Id.* at 39–40; *see also Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) ("As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial)."). Defendants have not shown that there is no "conceivable set of facts, consistent with the complaint," under which D'Amico and Silbert were injured by an overt act during the limitations period. *Sidney Hillman*, 782 F.3d at 928. They were, in fact, injured each time they paid more tuition than they would have paid but for the conspiracy.

## CONCLUSION

For these reasons, Defendants' motions to dismiss should be denied.

Dated: November 21, 2025

Respectfully Submitted:

By:     /s/ *Peter Leckman*

Edward Diver (admitted *pro hac vice*)
Peter Leckman (admitted *pro hac vice*)
Kevin Trainer (admitted *pro hac vice*)
**LANGER GROGAN & DIVER P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
ndiver@langergrogan.com
pleckman@langergrogan.com
ktrainer@langergrogan.com

Benjamin D. Brown (admitted *pro hac vice*)
Richard A. Koffman (admitted *pro hac vice*)
Daniel McCuaig (admitted *pro hac vice*)
Alex Bodaken (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, DC 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dmccuaig@cohenmilstein.com
abodaken@cohenmilstein.com

Daniel H. Silverman
Massachusetts Bar ID: 704387
**COHEN MILSTEIN SELLERS & TOLL PLLC**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

Emily Marcus (*pro hac vice* pending)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
emarcus@cohenmilstein.com

66

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiffs' Opposition to Defendants' Motions to Dismiss has been served on all counsel of record via the Court's ECF system on November 21, 2025.

*/s/ Peter Leckman*
Peter Leckman