UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


ALAYNA D'AMICO, et al.,          )
                                 )         Civil Action
                Plaintiffs,      )         No. 25-12221-AK
                                 )
v.                               )
                                 )
CONSORTIUM ON FINANCING          )
HIGHER EDUCATION, et al.,        )
                                 )
                Defendants.      )



BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE


MOTION HEARING


May 1, 2026


John J. Moakley United States Courthouse
Courtroom No. 7
One Courthouse Way
Boston, Massachusetts  02210



Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiffs:
Daniel McCuaig
Alex Bodaken
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
Suite 800
Washington, DC 20005
202-408-4600
abodaken@cohenmilstein.com

Peter Edwin Leckman
Langer Grogan & Diver, P.C.
1717 Arch Street
Suite 4020
Philadelphia, PA 19103
215-320-5660
pleckman@langergrogan.com

Counsel on behalf of Defendant Rice University and Dartmouth College:
Douglas Litvack
Jenner & Block LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
202-637-6357
dlitvack@jenner.com

Counsel on behalf of Defendant Duke University:
Christopher D. Dusseault
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7855
cdusseault@gibsondunn.com

Counsel on behalf of Columbia University:
Karen Mary Lent
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001-8602
212-735-3000
karen.lent@skadden.com

(Continued)

APPEARANCES:   (Continued)

Counsel on behalf of Defendant The Common Application, Inc.:
Weisiyu Jiang
Steptoe LLP
1330 Connecticut Avenue, NW
Washington DC, DC 20036
202-818-0919
wjiang@steptoe.com

Counsel on behalf of Defendants Barnard, Oberlin, Pamona, Trinity, Vassar:
Laura Christine Hurtado
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center
Ste 22nd Floor
San Francisco, CA 94111
415-983-1082
laura.hurtado@pillsburylaw.com

Counsel on behalf of Cornell University:
Melissa H. Maxman
Cohen & Gresser LLP
2001 Pennsylvania Ave., NW
Ste 300
Washington, DC 20006
202-851-2070
mmaxman@cohengresser.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Angel Kelley, United States District Judge for the District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 7, Boston, Massachusetts, on May 1, 2026.)

COURTROOM CLERK:  The Honorable Angel Kelley presiding.  Today's date is May 1.  We are on the record in the matter of D'Amico, et al v. Consortium On Financing Higher Education, et al, Civil Action 25-12221.

THE COURT:  Thank you.  Good morning, everyone.

ALL:  Good morning, Your Honor.

THE COURT:  That was a nice chorus.  All right.  So what I'm going to do, and I'm going to ask that we do it slowly so that I understand who everyone is, if you have clients who are present, please identify them.  If there are counsel on the case, because there are a lot signed in but are not at the front tables, also identify them, please.

All right.  And so I assume because you're at the table that you will be arguing the motion in some capacity.  I did request from the parties an outline of what the request was for time and who was giving what arguments.  I didn't receive anything.  I know that there was a question back, so I'm a little surprised by that.

MR. McCUAIG:  Dan McCuaig for the plaintiffs.  We and

defense counsel had a back and forth with courtroom staff on how much time we recommended for each of the three motions.  I believe where we came out was ten minutes a side on jurisdiction, followed by 25 minutes a side on the main motion to dismiss, followed by five minutes a side on the non-schools' motion to dismiss.  I did not see a further request for clarification as to who was arguing which pieces or any other --

THE COURT:  I didn't even receive that.  So there was some discussion between you about designating those amounts of time?  And did anyone communicate that with the court?

MR. McCUAIG:  We didn't file anything.  We had emails, which I don't have with me.  Do you have --

MR. LITVACK:  If I may, Your Honor, we were e-mailing with Ms. Simeone.

THE COURT:  Okay.  Was there a final email?

MR. LITVACK:  I believe so.

THE COURT:  Not a good start.  All right.  So would you do me a favor and repeat what you said.

MR. McCUAIG:  Yes, Your Honor.  And please correct me if I have this wrong, but I believe where we came out on the parties' recommendation was ten minutes per side on the jurisdictional motion, followed by 25 minutes per side on the main, all-defendant motion to dismiss, followed by five minutes per side on the non-schools' motion to dismiss.

THE COURT:  Okay.  So that looks like it's about an hour and 20 minutes.

MR. McCUAIG:  Correct, Your Honor.

THE COURT:  That is pretty impressive that I was able to do that math.

MR. McCUAIG:  With the caveat of course that we're happy to use more or less time as makes sense for the court.  I think we're all here just to answer the court's questions.

THE COURT:  Oh, you'll be doing more than that.  Okay.  Thank you.  Sorry, that email was just forwarded to me, and it looks like the parties proposed 80 minutes.

All right.  So that's helpful now that I have that before me.  And so let me find out who you all are, and we'll take it from there.  So you said Dan McCuaig.

MR. McCUAIG:  Dan McCuaig.

THE COURT:  For the plaintiffs.  Who else do you have with you?

MR. BODAKEN:  Good morning, Your Honor.  Alex Bodaken for the plaintiffs.

MR. LECKMAN:  And Peter Leckman, also for the plaintiffs.

THE COURT:  I'm not that formal, but I'm used to lawyers standing when they give their appearances.  And Peter, let me just make sure I have your name.  Any clients present?

MR. McCUAIG:  No clients are present today, Your

Honor.

THE COURT:  All right.  Very good.  Now let's go to the side of the case that has a lot of people, entities involved, and I'm going to try to check them off.  All right.

MS. LENT:  Good morning, Your Honor.  Karen Lent for Columbia University.

THE COURT:  Give me one second.  I found you.  Thank you.

MR. LITVACK:  Doug Litvack, Your Honor, for Dartmouth College and Rice University, and I do have two clients present.

THE COURT:  All right.  Just give me one second.  Slow down for me.  All right.  Your clients?

MR. LITVACK:  Josh Grubman from Dartmouth College.

THE COURT:  All right.  Thank you.  And Rice?

MS. TREDENNICK:  Lucy Tredennick from Rice University.

THE COURT:  Thank you.  Thank you for coming.  Yes.

MR. DUSSEAULT:  Good morning, Your Honor.  Chris Dusseault.  I'm counsel for Duke University.  Today I will be arguing the personal jurisdiction motion on behalf of the 21 non-Massachusetts defendants who brought that motion, and I do not have a client present.

THE COURT:  All right.  You also have someone in the back?

MR. JIANG:  Good morning, Your Honor.  I'm Weisiyu Jiang.  I represent Common App.  I'm here on behalf of the

non-school defendants, including Common App, Scior and COFHE, and I have the clients from Scior and COFHE here in the room.

THE COURT:  Where are they?  Maybe not.

MR. JIANG:  I apologize, Your Honor.  I saw them just now.

THE COURT:  Are they in the room or no?  Really not off to a good start.  You lost your clients, okay.  They may show up.  And I apologize in advance.  Ms. Simeone is filling in for my usual courtroom deputy, so it's just taking a little bit longer to get things set up.

All right.  So, very interesting case.  I think many people would agree that tuition at universities are very high and maybe too high.  You raise some interesting claims, theories.  I'm trying to understand how this all fits into the antitrust context.  And please don't interpret my questions, either side, as an impression of what my views of the case are. It's really more to understand the case.

So usually how I start is I always give plaintiffs an opportunity to sort of set the stage for the discussion, and so some of this is going to be fact-based.  And so why don't we start there because I do have questions with regards to the allegations with regards to facts, and so I'll give you that chance, and then I will give defendants an opportunity to add any additional facts.  All right, please.

MR. McCUAIG:  Thank you, Your Honor.  Dan McCuaig on

behalf of plaintiffs. The core of this action is our challenge to the agreement, the horizontal agreement among the elite private colleges and universities who are defendants in this case to stop competing for applicants as soon as the applicant receives an early decision offer from one of the other schools.

To be clear, we are not challenging the right of a school to set whatever application process or processes it wants so long as it does so unilaterally. What they can't do under the Sherman Act is get together with their rivals and say that they will respect the claims that one another make on students. That is a classic customer allocation agreement, and it has straightforward economic effects. Students who are admitted early decision receive less financial aid in economic terms, smaller discounts off the price than students who are not because the school that has admitted them knows it does not have to compete on price.

More broadly, by shuttling an ever-larger percentage of kids from well-off families in particular into the ED pool and then taking more and more of their class from that ED pool, the schools decrease the competitive pressure on top-line tuition that otherwise would hold that top-line tuition down. So it increases on all of their undergraduates.

THE COURT: I'm not following that part, but I do have a couple of questions before that. Why don't you just reinforce this point that you're making now, particularly when

started to do this, because that's where you lost me.

MR. McCUAIG:  Okay.  So in a normal market where the customers are not segregated in any way, the downward pricing pressure is based on the competition for all the customers in the market.  And in this market what early decision does is segregates those customers and creates a pool of customers who are not particularly price-sensitive, so there's less downward pricing pressure on that pool.

THE COURT:  So let me ask you this question.  The early decision versus regular decision process, are you not taking issue with that at all?  It's the way in which you've alleged that they've conspired with each other and that they are withdrawing or requiring that the student withdraw their applications from other schools that is the problem?

MR. McCUAIG:  That's correct, Your Honor.  We're not challenging anything about regular decision.  Our challenge is focused on the coordination of the defendants to step off the competitive field as soon as an applicant receives an early decision offer from someone else.

THE COURT:  Okay.  So just to make sure I get an answer to both parts of my question regarding the early decision, so you don't take issue with an early decision process in and of itself?

MR. McCUAIG:  That's kind of a loaded term, "early decision," right?

THE COURT: Rolling admission?

MR. McCUAIG: Okay. I think of rolling as something else entirely. Actually, you could conceivably merge the two together. We're not --

THE COURT: You've got the people who apply early and you've got the people who apply later, I think it's different times of the year, fall versus winter that they apply, and you sort of outline when those decisions are made. So if there was not these platforms in which they allegedly share information, would you not take issue with these two different application pools?

MR. McCUAIG: So the way I would put it is early action, nonbinding early action, right, which is basically like regular decision, it just happens earlier, totally fine.

THE COURT: Okay. That was one of my questions that I had is between early decision and early application. So it's your position that early action is not a violation of the antitrust laws?

MR. McCUAIG: Correct.

THE COURT: Okay.

MR. McCUAIG: In early action there is not the hands-off agreement that we challenge here.

THE COURT: Okay.

MR. McCUAIG: Right. The schools don't tell those kids, Hey, it's us and only us, and they don't tell their

colleagues, Okay, fine.  You've got that one.  Our hands are off.

THE COURT:  All right.  Understood.  Let me just go back to two things.  One is this group of schools versus the universe of schools and the schools that may be a part of certain coalitions or using these platforms, where are they; why aren't they here, too?

MR. McCUAIG:  The answer is we have the best evidence against this group of schools.  Once we're into discovery, is it possible that there are other schools who have actually joined this agreement instead of just following the leader?  Sure, it's possible, and we could always amend our complaint at that point in time.  But right now what we know -- well, we know a number of things.  We know that there is absolutely an agreement not to go after each other's early decision admits.  We know that because there's a literal written Joint Ivy League Statement that says we won't go after each other's early decision admits.

THE COURT:  Let me not derail you too much from your argument, and I want to sort of stay focused on my questions, and then I will let you go back to it.  I have one more.  You said discounts off of price, and this was another question.  Is tuition one number for everyone, and the financial aid which you're describing is that discount off, or are we talking about tuition that varies student to student?

MR. McCUAIG:  There is a tuition price that all full-pay students pay, and then there are discounts from that price that some students receive in the form of either need-based financial aid or merit-based financial aid.  So the prices that those students, the one who received the discounts pay, those can vary student to student.

THE COURT:  Understood.  All right.  Thank you.  So why don't you pick up from where you left off.

MR. McCUAIG:  The effects that we allege here, both the smaller discounts and the higher top-line price, are quintessential antitrust harm when they result from an agreement to reduce competition like the hands-off agreement that we've challenged here.  And that's why we've brought this action, to put a stop to that agreement.

THE COURT:  Okay.

MR. McCUAIG:  You had asked if there was a way to do early decision that we wouldn't have a problem with, and I think that's a really useful question because --

THE COURT:  Sounds like that's the end of where you want to be, right?  You want there to be some agreement that the schools are going to cooperate and not do the things that you're complaining about.

MR. McCUAIG:  Well, I want there to be an injunction that the schools have to follow as opposed to an agreement among the schools.

So the way that early decision works now, right, and the reason why I was pushing back a little bit on the question do I have a problem with early decision, because it's a loaded term. "Early decision" as it's thrown around these days includes this idea that nobody else is going to take you if you've gotten an offer from one of these schools.

THE COURT: I accept that in the context of this litigation, but my question was not including that aspect.

MR. McCUAIG: Right. So there's another way that you could have kind of an early-decision-like pathway that we think wouldn't violate the antitrust laws, right? You could have an option on the Common App that says, This is the school that I love the best, right? I'm applying to Columbia. I love Columbia best. And that application goes to Columbia, and then, because I'm a 17-year-old kid, two weeks later I change my mind and decide, Actually, I love Dartmouth the best. The way that the system currently works is I'm out of luck. Columbia, through the Common App, has actually blocked me from saying, I love Dartmouth the best.

But it doesn't have to work that way, right? I could have the option of submitting, Dartmouth, I love you the best, and the Common App conveys to Columbia, Hey, guess what? That kid who loved you the best's heart has changed. And Columbia could do with that information whatever it wanted, right? Columbia could move that kid into the regular pile, not the

loves-me-best pile, or it could try to win them back, right? It could compete.  But what it couldn't do is block Dartmouth from ruing away a student who used to love Columbia the best.

THE COURT:  And thank you for raising that because I couldn't understand how a student ended up at a school that was not their preferred school as you recite in the complaint, so at least that helps me understand it.  You have young people with fickle minds and they change which school they like, but the initial thought is that when they submit that one application for early decision, it is for their preferred school.

MR. McCUAIG:  That's the way the schools present it publicly facing, but that's not the way that it actually plays out in the real world, right?  These kids are told, Hey, if you want a shot at getting into one of these highly selective colleges or universities, you need to spend your early decision bullet on that one.  And so the way that they spend their early decision bullet isn't necessarily on the school that they truly love the best.  It's often, and this is an allegation that we make in our complaint, it's often a tactical decision to apply early to the school where they think it's most likely to tip the balance between not getting in and getting in.  They're doing that with very imperfect information.

THE COURT:  Why would that be the fault of the defendants versus a miscalculation by the student?

MR. McCUAIG:  The student didn't put the system in place.  If the world were a world where every school continues to compete for every student throughout the application and matriculation process, as it is in every other respect, except for this little piece of ED, then the students would have the incentive to apply to all the schools where they thought they might like to go and ultimately choose the one where they want to go.  You would have optimal matchmaking from the perspective of the students at least.

THE COURT:  I suspect you might like this question or suggestion, and, defendants, feel free when I turn to you to respond to any of the questions that I've asked.  But what about a process where there is early decision?  Because it's competitive.  That makes applying to a school competitive.  You can apply early and increase your chances or you can apply later.  Rolling admission you said is a different system, but it's basically my chances are better if I apply early, but it's still valid later.

What if the platforms in the schools did not require that there only be that one early decision application, that they could apply to as many schools as they want in that early decision process?  That's part A.  Part B is that one of two things happen.  By a certain date all schools in that early decision process have to make their offer to the student, offer of acceptance.  And so at that time the student would know I've

applied to ten, but five have offered me the opportunity at early decision to attend there.  Then there's the other scenario, which would be that it's not a set deadline but that you can still apply to more than one, but it's sort of trickled in, the offers trickle in at different times.  Would that be a better system that would not have any competitive concerns that you're raising?

MR. McCUAIG:  Yes, Your Honor.  The first scenario that you laid out is basically an early action system.

THE COURT:  Okay.

MR. McCUAIG:  Where students apply earlier and they get their responses earlier, but they can apply to whatever schools they want, and they haven't promised anybody, yes, if you take me, I'll come to you.

THE COURT:  So are any of these defendants involved in early action process?

MR. McCUAIG:  I believe, I would have to be doing this on the fly.

THE COURT:  Okay.  Well, you've got co-counsel.  They'll think about it as you are arguing.  Also -- go ahead.  I'll let you go.

MR. McCUAIG:  So when I said that you could combine rolling and early decision, that's actually something that's happened within the last couple of years at one school in particular, not a defendant in this case.  Wake Forest

University now doesn't have the same apply-by and we'll-let-you-know-by deadlines that all the defendant schools have.  Wake has an early rolling decision process where you apply to Wake and you say, I love you best, you're my first choice, whenever you want to, and Wake gets back to you quickly and lets you know if it's a match or if it's not.  If you apply early in the process, you can essentially get a second bite at the apple if the answer from Wake is no, right?  You're still before the early decision deadlines for the other schools.

That's a strong competitive move by Wake Forest, right?  That increases the likelihood that it will get more early decision applicants because they're giving up less to apply to Wake than they are to apply to another school because if the answer is no, they still have this one shot.  It's the type of move that in a free competitive market where there's not an agreement in the background, you would expect to be mimicked by other schools or you'd expect to be countered with other kind of similar plays.

All these schools say they compete fiercely for early decision applicants, and we have no reason not to believe that.  It's just that the competition stops as soon as the kid gets an offer from one of the schools.  If there weren't the agreement that the competition stop with the offer being extended, then you would expect to see more moves like Wake where you really could have kind of a matching process, right?  I mean, if

everybody did that, the student has the opportunity to kind of work down their list. You know, it's August 1, where I really want to go is Columbia, and so my application goes in to Columbia, and Columbia says, Sorry, it's just not going to work. But it's only August 20. And my second choice is Dartmouth, so I tell Dartmouth, All right, if you take me, I'm there. And if Dartmouth says, No, sorry, it's just not going to work, then you're on to Swarthmore or Rochester or whoever comes next. And that's an actual matching process as opposed to the process that we have now, which is an exercise in game theory where the kid gets one shot and is encouraged to take that shot where they think it will make the biggest difference, having very imperfect information and ultimately mostly being told, no, right, from public data -- this is not in our complaint, but it is public data about these defendant schools in the last year that is all available, their collective acceptance rate in Early Decision 1 was about 20 percent. So about 68,000 of their 83,000 applicants got bad news when their early decision came back.

Now, of course that's not what it looks like for these kids because they're all on social media, and the only things that pop on social media are their peers and classmates who are getting accepted, right? So the shot that they take with the rejection is compounded by seeing the acceptances.

THE COURT: That's going to happen anyway, right?

Some students are going to apply to schools and not get in, and so they're going to be disappointed, you know, when their friend got into Columbia and they didn't.

But one area that was -- and it was a question for the defense, but I'll pose it to you is, the withdrawal of the applications elsewhere while they wait for the negotiations, I think you called it slight negotiations for financial aid and getting a decision on that and then making a determination whether or not they can financially afford it or not, if there's a financial hardship to the family and they decide, I can't, we just can't send our child to this school, even though they applied early decision, based on the package, I don't know exactly at what point in time that happens in the process, whether that's January or whether that's more in the fall or if that's later in the winter, but that student would be disadvantaged, it seems, because they're now later in the process trying to get into those other schools.

So either they've applied early to other schools and had to withdraw, or now that there is no application pending with those schools they're trying to get back into the track of admission.  So that was going to be a question for the defense, but you can weigh in on it if you want.

MR. McCUAIG:  Yeah, I think it's a complicated question.  I think the way --

THE COURT:  That's why I'm struggling with it.

MR. McCUAIG:  I think the way that the situation is typically presented to the students is, if you get in, you have to come, and only in documented financial hardship can you get out.  And there is often a lag between receiving an early decision offer and receiving the financial aid offer that comes with it.  And the way that that conveys is, I've gotten into a school like all the defendants here who promised to meet my full financial need, so this caveat of not being able to afford it isn't going to apply to me, so now I need to withdraw from these other schools and not submit any more applications.

As a practical matter, it's kind of up to the student whether and how they do that, right?  We're not alleging that these withdrawals are enforced by the schools or by the platforms or by COFHE.

THE COURT:  Okay.  When does the competition begin?  Is it with the application or is it with the offer, or the competition stops?

MR. McCUAIG:  The competition begins when these kids are in ninth grade and they show up with an older sibling at an open house.  In every circumstance, except for early decision, competition continues up to and sometimes through matriculation at other schools.

THE COURT:  Okay.  But in this case, these defendants.

MR. McCUAIG:  But in this case, competition stops when the student receives an early decision offer from some other

school.

THE COURT: Okay. Thank you. All right. Let me just take a look and see my other questions.

This Joint Statement For Candidates on Common Ivy Admission Procedure, when was that issued?

MR. McCUAIG: 2002. So there's a chronology here that's outlined in our complaint that I think really highlights the agreement and the underlying fulsome agreement, not just the Ivy League agreement. You know, we allege that, well, we quote a Dartmouth admissions officer saying that once Dartmouth makes its early decision decisions, it mails out a list of its early decision admits to the Ivies and a number of other selective institutions.

And defense, in the defendants' papers they say it doesn't really count. That's from 1997. And, okay, yes, it is from 1997, and it tells us that no later than 1997 this hands-off agreement existed, right? Because Dartmouth, there's only one reason to send out that list of here are the kids that we admitted. And it's not Dartmouth saying to its competitors, Hey, these kids are so great we admitted them early. You should really take a look. It's saying, These are ours, hands off.

In 2002, Harvard says, You know what? This early decision process stinks. And Yale and the other Ivy League institutions lean on Harvard and say, You've got to respect it,

you need to follow respectful consensus, not take unilateral action.  All right.  That is a pithy statement of exactly what the Sherman Act says is unlawful.

THE COURT:  And there's evidence of that?

MR. McCUAIG:  That's a direct quote from --

THE COURT:  You don't have to spend time looking for that if it's in the complaint.

MR. McCUAIG:  Yes, we quote that in our complaint.

THE COURT:  Okay.

MR. McCUAIG:  And they win, right?  Harvard caves and comes back in and signs the Ivy League Joint Statement that was put into place so they wouldn't have to deal with defections from the agreement going forward.

THE COURT:  Forgive me for jumping around because I just want to get some foundational facts, understanding of them, before I allow the parties to jump into their argument.

Page 6, and some of this may be premature, page 6 of the complaint you talk about to compensate class members for their financial harm.  How do you ultimately do that?  How do you determine that amount and how do you determine what they would have paid otherwise?

MR. McCUAIG:  You go through the but-for world analysis, right?  And this will be the subject of expert testimony, expert discovery, but it's fundamental economic analysis that says, Okay, we have one price, the real-world

price.  This is what actually happened.  And then we model what the world would have looked like if we didn't have in place the constraint that is alleged to be unlawful, and we have what's known as the but-for world or the but-for price.

THE COURT:  So is your expert going to be predicting what other schools would have offered in financial aid and what they would have paid there and whether or not the student would have accepted that versus where they did go, or another scenario, your expert predicting, even at that school where the student did attend, what they would have paid if they were able to have more competition with other schools and be able to negotiate and say, Well, but Dartmouth offered me this, so, Columbia, you should come down on what you're charging me and offer me more.  That seems like a whole lot of if's.

MR. McCUAIG:  There's a lot of modeling involved in any antitrust case when you're attempting to determine what the but-for price looks like, right?  Because you don't have the but-for world.  The but-for world is simply a modeled world.  But you do have standard economic tools that allow the economists to model with a relatively high degree of accuracy, and this is another point about antitrust damages, they don't have to be perfect, right?  They have to be reasonable.

And part of the reason for that is because it's not the plaintiff's fault that they don't have this but-for world.  The defendants are the one who created the actual world, and so

it's not a way for them to escape liability to say, Look, your model isn't perfect.  Well, of course it's not perfect because we didn't have that world.  So the experts do the best they can to model what in this case both top-line tuition prices would have looked like had there been additional competition and then, secondly, what the discounts would have looked like had there been competition.  And it will be hotly disputed, and defense experts will say different things than our experts will say, and ultimately it's a question for the jury.

THE COURT:  All right.  On page 7, you make reference to any semester, but isn't the relevant period that initial offer?  So why are we looking at any semester that the student attended?  And wouldn't the student have the option to transfer to another school or to further negotiate financial aid if that's not their preferred school so they don't lose all of their agency?

MR. McCUAIG:  Let me break that question into a couple of parts.  For the top-line tuition, that's set each year by each of these schools, and it's increased each year by each of these schools, and we allege it's artificially inflated each year because of the conspiracy that we challenge.

THE COURT:  Do all these schools have higher tuition than -- probably -- than other schools that don't participate in this?

MR. McCUAIG:  We haven't made that allegation.

THE COURT:  Okay.

MR. McCUAIG:  We do make the allegation that the -- let me frame this -- let me read this because I don't want to misstate it.  This is paragraph 127 of our complaint.  "The elite colleges and universities with standard early decision programs impose full tuition rates that are, on average, thousands of dollars higher than those charged by comparable schools without such early decision programs."

THE COURT:  I did note that it said "thousands of dollars" and not "tens of thousands of dollars," but okay.

MR. McCUAIG:  That is correct.  And thousands of dollars ultimately is sufficient to show anticompetitive harm.

THE COURT:  But what about the other semesters?  So that makes sense, or at least I'm following you, for that initial fall semester that they're offered or that first year, but why the semesters after that?  Why is that relevant?

MR. McCUAIG:  So it's easier to think about in terms of years rather than semesters because tuition is set once a year.

THE COURT:  I said "semesters" because it says "any semesters" on page 7.

MR. McCUAIG:  They've paid an inflated price every semester, but when you think about why it matters, it matters on a year-by-year basis because each year there's a new price.

THE COURT:  I see.

MR. McCUAIG:  And that new price is higher than it otherwise would have been.

THE COURT:  All right.  Understood.

MR. McCUAIG:  It's, as Your Honor suggested, it's a somewhat more complicated analysis with respect to financial aid, and I don't even want to try to get ahead of the experts on modeling how that might change from year to year.

THE COURT:  Talk to me about plaintiff Miller.  Why is he in this litigation?  He was a regular admission student and wasn't in need of financial aid.

MR. McCUAIG:  Because he does not receive any financial aid.  He pays the full tuition rate.  And we allege that the full tuition rate is inflated, because of the way that the defendants have segregated their application pools, created a substantial pool that is less price-sensitive and therefore less constraining of tuition levels and raised overall tuition that then applies not just to the early decision admits but to all of their undergrads.

THE COURT:  All right.  Let me just turn to page 8.  So with regards to the apps that were identified through your defendants, maybe this relates to my earlier question about aren't there other universities that use them, but your position is you have the best evidence with these defendants and that's why you've selected them, but not that the others could not be added later?

MR. McCUAIG:  That's correct, Your Honor.  Well, yes, there are other -- and I think this is an allegation in our complaint.  There are many, many other universities that use the application platforms.  We're not challenging the use of the application platform.  We're challenging the agreement to stop competing for --

THE COURT:  That's a part of the platforms, right?

MR. McCUAIG:  Not necessarily.  I would say that the platforms, the way that we know the platforms knew that this agreement was in place and intentionally facilitated it, was they built the structure, they both built the structure that allows Columbia to block Dartmouth, right?  Columbia and Dartmouth are both customers of the application platform.  And in normal circumstances, a platform won't allow one customer to block the business of another customer because that other customer will squeal, unless you know that Columbia and Dartmouth have agreed that that's fine.

So the fact of the platform's architecture tells us what we need to know about the knowledge and acquiescence of the platforms, but it doesn't tell us that every school using those platforms have joined this agreement, not even every school using these platforms with early decision and not even every school with these platforms using early decision that also don't recruit kids who they know have offers elsewhere.

And that's why we -- that's one reason why we didn't

include schools outside of COFHE in this complaint, right? Because we don't know now without discovery whether Ithaca College joined this agreement on the one hand or just wants to look like Cornell on the other hand.  And we see follow-the-leader behavior in antitrust cases all the time. The Sherman Act doesn't reach it.

THE COURT:  Anything else before I turn to the defendants, factually?  All right.  Thank you.

MR. McCUAIG:  Thank you, Your Honor.

THE COURT:  Anything you want to add?

MR. LITVACK:  We might just have a slightly different view on the facts, Your Honor.  Your Honor, Doug Litvack.  Let me start with the general premise at a high level that competition for these students is vigorous, and it happens on many dimensions, as you heard from plaintiffs' counsel.

Here, I think what the difficulty is, and I was struggling listening to plaintiffs on what the agreement that they're challenging is, and so let me just start with the first principle of the question of is there some agreement among these 32 schools to adopt or utilize early decision.  And the answer to that --

THE COURT:  It sounds like you're getting into your legal argument, and I don't want you to do that yet.  I just want you to help me understand the facts.

MR. LITVACK:  Sure.

THE COURT:  And the process.

MR. LITVACK:  Well, let's start with the facts about early decision.  So we agree with plaintiffs there's no restriction on competition for students to apply early decision, no restriction at all.  On factually, we believe early decision enhances student choice.  It gives them a unique admission option that's totally voluntary.

THE COURT:  I think they agree with you on that.  It's the other part of it, the process, which is, Well, now you can't compete and you have to withdraw, that now it's just me.  So they agree that the early decision process -- I don't want to keep using the same terms, but the early decision mechanism they don't have an issue with.

MR. LITVACK:  Right, Your Honor.  So early decision is a commitment or a promise from the student to the school saying I promise to attend if you admit me, and I receive, if I'm applying for financial aid, a financial aid package that makes attendance feasible.  That's the relationship going on between the student and the school.  There is no factual agreement among any schools not to compete for students after they are admitted early decision.

And to your question, Your Honor, earlier just about how the admissions process works, and this is in Exhibit A of plaintiffs' complaint because they attach the application platforms, a student doesn't need to -- there are two types of

students.  There's a student who is applying for financial aid and a student who is not.

So the application platform -- this is in Tab A.  It says that the student who is not applying for financial aid, once they're admitted, should withdraw their application.  But if a student who is applying for financial aid -- and these are applications to other schools' regular decision.  So a student who is applying for --

THE COURT:  Say that part again about the regular decision.

MR. LITVACK:  Sorry, let me back up.  So students have one --

THE COURT:  One shot.

MR. LITVACK:  -- one shot at early decision, and I can explain why that is factually.  Students also at the same time apply regular decision.

THE COURT:  Okay.

MR. LITVACK:  So they have both.

THE COURT:  That was one of my questions.  All right.  Thank you.

MR. LITVACK:  They have multiple options at that point.  Okay.  So a student who does not need financial aid who is admitted early decision, at that point if they're going to live to their promise, they would withdraw their applications from the other schools they applied regular decision.  A

student who applies for financial aid, they need not withdraw their applications, those admitted need not withdraw their applications --

THE COURT:  Until there's some agreement on the amount.

MR. LITVACK:  Exactly, between the schools.

THE COURT:  Financially.

MR. LITVACK:  Right, exactly.  So that student doesn't have to, again as a promise, does not need to attend the school it applies to early decision.

THE COURT:  So that window remains open a little bit longer until there's an actual agreement.

MR. LITVACK:  Exactly.  And they have those regular decision admissions, the regular decision applications out there, too.

THE COURT:  Right, but the early decision timeframe is what, November?  I think someone said August.  Is it even starting that early?

MR. LITVACK:  It depends, Your Honor.  There are many different variations of early decision.  There's Early Decision 1, Early Decision 2.  They typically wrap up, you know, January, like the beginning of the --

THE COURT:  That's when regular decision is just starting the process, right?

MR. LITVACK:  Correct, Your Honor.  That is when

regular decision start in their process, and those decisions usually go out in the spring.  But the student and the school -- so the student has the financial aid award, which it will receive in close proximity in time to being accepted to the university in which it applied early decision.

THE COURT:  Let's say November.

MR. LITVACK:  Let's say November.

THE COURT:  They won't hear regular decision until sometime in the following year.

MR. LITVACK:  Right, that's right.

THE COURT:  All right.  I'm following you.

MR. LITVACK:  Okay, you're following.  You won't be able to compare your regular decision financial aid offers with your early decision, but you will be able to, as the student, look at your financial aid and see does this make attendance feasible.  And, again, it's just a promise to attend.  And if you decide not to attend, you break the promise, and you pursue your regular applications, which are already on file, and you'll get your notifications in March.

And to bring this back full circle, this is entirely voluntary.  So a student who really just wants to preserve their flexibility entirely can just decide to apply regular decision or early action.  There's a wide range of options.  So this is really a unique option.

THE COURT:  And early action is not limited to one

application.

MR. LITVACK:  Right.  The way I think about early action is it's just early notification.  It's an earlier way to get a decision from a school, but it doesn't have the benefit --

THE COURT:  Same timelines?

MR. LITVACK:  Roughly, Your Honor.

THE COURT:  Go ahead.

MR. LITVACK:  But it doesn't have the benefit that comes, which is pled in the complaint, it doesn't have the benefit that comes with early decision.

THE COURT:  To who?

MR. LITVACK:  The student.  There's benefits both ways, factually.

THE COURT:  What's the benefit to the student?

MR. LITVACK:  The benefit is you get a higher chance of getting into your top choice because you're telling that school, I really like you, I want to go here, and the school in exchange is getting two things.  One, it's getting, based on the promise --

THE COURT:  It knows you're going to take a particular spot in their class.

MR. LITVACK:  Right.  And the seats in these classes, the demand for the seats in these classes far exceeds the number of seats available.  Anyone I think going through the

college admissions process knows that.  And so this option provides this unique choice to the student where they can improve their chance to get one of those scarce seats at their preferred school because they're telling the school, I want to go here, you are my first choice, I promise that if you admit me, I will attend, with the condition of, if you need financial aid, that you get a financial aid package that meets it. That's the arrangement that works, Your Honor.  That's how it works.

THE COURT:  Okay.  Anything else?

MR. LITVACK:  Yes, Your Honor.  So I wanted to go back to your point of, like, when competition begins and starts.

THE COURT:  Yeah.  Well, let's get to stops.

MR. LITVACK:  Okay.  When competition stops?  It doesn't stop until the student is ready to graduate.  Because, Your Honor picked this up, there's always an idea that you can transfer.  Maybe I took that a little too far.  At some point the transfer window will close, but competition continues for these students because at any moment any student can transfer schools.  So there's competition going on constantly, and none of that is allegedly restrained by the conduct at issue in this case.

And just when this begins, it begins when the student decides to make an application to a school, maybe even before that when the school actually -- sorry, Your Honor -- even

before that when the schools and students start going through the process of thinking about where do I want to attend and giving the student information about the schools. I mean, the process is highly competitive.

And just to harp on the point, we have here a unique different admissions option that is available to the student because of the promise. And if you take away the promise, this is just early notification. And the student loses the benefit of the higher probability of getting into a school that it might not have gotten into.

THE COURT: Okay. What about my question about the withdrawal, the requirement that they withdraw their applications with the other schools, the regular decision schools, early action? If they do that -- let's see. They have to do that upon acceptance of the offer that includes the financial aid, right? Or do they have to do that upon the offer of admission without the offer of financial aid if it's needed? At what point in time do they need to withdraw?

MR. LITVACK: So, first, for a student who needs financial aid, they do not need to withdraw their application, per Exhibit A in the complaint, until they've received their financial aid package and determined that that makes attendance feasible from their perspective, that they got the need that they need to attend the school.

So to answer Your Honor's question, the application

doesn't need to be withdrawn once they're accepted. It doesn't need to be withdrawn once they immediately get the financial aid offer. It's after they've received the financial aid offer, looked at the financial aid offer and made a determination that that makes the attendance feasible.

THE COURT: Okay. So their applications that they've submitted are still out there.

MR. LITVACK: Correct, Your Honor.

THE COURT: Okay. All right. Go ahead.

MR. LITVACK: I want to go to the Joint Statement.

THE COURT: Yes.

MR. LITVACK: Plaintiffs make a large fuss about the Joint Statement among Ivy League schools, which is incorporated in the complaint and is a statement among not only schools that have early decision but also three schools that do not have early decision. They have early action.

And so the idea that the Joint Statement proves any agreement not to compete for early decision students doesn't really make sense based on the plaintiffs' characterization because there is no give/get on the early action. They're not getting anything in exchange for that bargain because they don't have early decision in the first place. There is no -- counsel describes this as, you know, hands off my students and I'll keep my hands off your students, because the early action schools, they don't have early decision. So that's factually

point one, that the agreement includes schools that --

THE COURT:  I'm not really seeing the advantage of early decision over early action because they could be at the same time occurring.  And what is the turnaround time for the expectation of acceptance of the school's offer for admission?

MR. LITVACK:  They can be at the same time, but the advantage of early decision is that higher probability of getting in because it comes with the promise, where early action does not come with the promise.  It's just, early action, the way to think about it is just an earlier decision or earlier resolution of the admissions process.

THE COURT:  Okay.  So there's no requirement that you've committed to me, and, if anything, you put down a deposit, you change your mind, you lose your deposit.  Is that the way that works?

MR. LITVACK:  That's right.  There's no promise to attend.  There's no promise to attend.  Just about that, again, going back to the Ivy League statement, that statement is made in the context and also includes statements about various collaborative efforts among the Ivy League.  They have an athletic conference.  They have collaborations beyond athletics and academics, and that statement talks about athletic -- in the same statement talks about athletic collaborations, talks about academic collaborations, so that statement has nothing to do with the 27 non-Ivy schools in this case.  I wanted to make

that really clear from a factual perspective.

THE COURT:  All right.  Why don't we jump into legal arguments.  Were you going to go first, or who is going to go first?

MR. DUSSEAULT:  Your Honor, I think we had proposed taking jurisdiction first.

THE COURT:  All right.

MR. DUSSEAULT:  Your Honor, Chris Dusseault, counsel for Duke University, but I'm arguing on behalf of all 21 of the non-Massachusetts defendants.

Your Honor, the court should dismiss plaintiffs' claims against the 21 non-Massachusetts defendants.  Plaintiffs have sued 21 defendants in the District of Massachusetts, although they come from 13 states other than Massachusetts.  To be clear, the 21 is 20 schools and then one platform, Scoir.  Those are the non-Massachusetts defendants who are moving based on personal jurisdiction.

Now, because this is an antitrust case, plaintiffs have the burden of proving personal jurisdiction as they do in any case, but they can do it in one of two ways.  They can do it under Section 12 of the Clayton Act, which is an antitrust specific law, or they can do it under Rule 4 of the Federal Rules of Civil Procedure, which coordinates the Massachusetts Long-Arm Statute.

What the declarations and the arguments in this case

show is that they cannot satisfy either avenue, and, therefore, this court doesn't have personal jurisdiction and should dismiss as to those 21 defendants.

Plaintiffs' position is that because universities, understandably and I think desirably, would like to have students from all 50 states, that they're therefore doing business in all 50 states and are subject to being sued in all 50 states.  No court has so held.  You would be the first so far as I'm aware.

THE COURT:  All right.  That's what I was wondering.

MR. DUSSEAULT:  We have not found one.

THE COURT:  Not the First Circuit and not the Supreme Court, right?

MR. DUSSEAULT:  Right, right.  And one thing that I think is particularly helpful here is there is another court in the Northern District of Illinois in the *Hansen* case that dealt with exactly the same argument brought by many of the same schools, not the exact same schools because the defendants here -- there's not complete overlap, many of the same schools who submitted similar declarations, and the court in *Hansen* said no personal jurisdiction under either approach.

Our position is the *Hansen* court got it exactly right. I think if you read the *Hansen* decision, they got it right. There's an effort in the opposition to distinguish it and suggest that somehow there's an error by analogizing this case

to trade associations.  But what the court said was, particularly as to Section 12 of the Clayton Act, this is where she was addressing it, she said, I haven't seen cases that deal with this specifically with universities, but I find it analogous to cases that talk about whether trade association is doing this.  I think it was an appropriate analogy, but it also wasn't the entire basis for the decision.

I would also say, Your Honor, that not only have the courts not taken this position.  It would be a terrible outcome in numerous respects.  One is a university should not be subjecting itself to being dragged into lawsuits all over the country at the same time simply because it has the laudable goal of having students from various states.

But secondly, businesses or nonprofits have to make decisions every day about whether to transact business in particular states, and there may be reasons that they don't want to, either they've heard about the laws in the state or jury makeup in the state or whatever it might be.  The last thing anyone would want is a school saying I'm not going to admit students from these five states because I don't want to be subject to personal jurisdiction.

And it's not limited to schools, Your Honor.  So picture something like a hospital, right?  Suppose you have a hospital in Minnesota that is so highly regarded that people who have a particular illness want to go to that hospital from

all over the country.  The idea that by taking patients from all over the country they're subjecting themselves to being sued all over the country would almost certainly deter that hospital from accepting patients, and that's a bad outcome for the patients and for the hospital.  And, again, there's no cases that have so held.

THE COURT:  So it's your position, if they want to sue you, sue you in North Carolina?

MR. DUSSEAULT:  We would be subject to personal jurisdiction in North Carolina, certainly.  To be clear, it's not necessarily our view that we would only be subject in North Carolina.  There might be other states where we actually do transactional business, but Massachusetts is not one of them.

So starting with the Clayton Act, I think the most -- and I can be brief on this.  I think the briefing was short and fairly clear on these points.

THE COURT:  I appreciate it.

MR. DUSSEAULT:  The most important thing to keep in mind about the Clayton Act is that it has two clauses, and you have to satisfy both to take advantage of either.  So I think plaintiffs try to characterize our argument as a venue argument rather than a personal jurisdiction argument.  That is wrong for this reason.  If you don't meet the venue requirement under Section 12, you cannot take advantage of the personal jurisdiction language which is more lenient under the Sherman

Act.  And the Seventh Circuit has definitively held that.  The District of Massachusetts has cited to that case in reaching the same conclusion.  And so they have to establish proper venue, and essentially, the plaintiffs' argument is venue is proper here because --

THE COURT:  The D. Mass case, just remind me what year that was and what judge.

MR. DUSSEAULT:  Yes, let me just check.

THE COURT:  Let me not derail you.

MR. DUSSEAULT:  No.  It's okay.

THE COURT:  You're on a time limit.

MR. DUSSEAULT:  Okay.  We've cited both in our briefs, Your Honor.  It's a Seventh Circuit case and there's a District of Mass case.

THE COURT:  Okay.

MR. DUSSEAULT:  So their argument is, because you recruit or admit or invoice students in Massachusetts, you're transacting business.  As I say, no court has so held, but in the *Buckeye* case, the court articulates seven factors that are considered to decide whether there's business of a substantial character with some degree of continuity.  Those factors are a place to do business, people to carry on the business, tangible property, subjection to state regulation, business operations, manifestation of doing business, and goodwill activity.

Plaintiffs make no effort to show that those factors

are satisfied.  We make an effort through the 21 declarations submitted to show that they are not.  That's how a court decides if there's business of a substantial character, and it isn't established.

So the *Hansen* court accepted this argument and said there's no personal jurisdiction under Section 12 for that reason.  The court said there is no law suggesting that simply having students is enough, and there's really no other allegation or evidence before the court.  That was the correct result, and we think the facts are essentially the same here.

And, again, plaintiffs will point to the fact that they have COFHE as a defendant and that there were COFHE meetings, but there's no case that I'm aware of that has said that just attending an association meeting is business.  So there's separate questions under the separate standards, Your Honor, and the question here is are you transacting business.  And even if you were to allege, which they haven't, that each of the 21 schools attended a meeting, that would not be deemed to be transacting business of a substantial character and a continuous nature.

So with that said, I can turn to the federal rules and the Long-Arm Statute, and there's a key issue here, Your Honor, that is really important and that plaintiffs don't address in their briefing, and that's, when you pivot to this question, the only plaintiff that is relevant are the named plaintiffs

because there's been no class certified yet.  The question is is there Massachusetts conduct that caused an injury in Massachusetts to one of the named plaintiffs.  It's a much narrower inquiry than the transacting business of a plaintiff.

Here there is only one named plaintiff, Ms. D'Amico, who is from Massachusetts, but there is no allegation anywhere in the complaint that she interacted in any way with any of these 21 schools.  They didn't go to one of these 21 schools.  So if one of these 21 schools is somehow responsible for engaging in conduct that led to an overcharge, she's not saying that any of their conduct in Massachusetts harmed her.  She may say, Well, I think you did that to other Massachusetts students, but that's not sufficient when you turn to the Rule 4 analysis.  So here we think it's equally clear but for somewhat different reasons that Ms. D'Amico has not sufficiently alleged that she specifically was harmed.

And, again, this is the same analysis that the *Hansen* court undertook.  The *Hansen* court said, Look, now that we're pivoting to the federal rules, we're looking only at the named plaintiffs.  Now, in *Hansen* there wasn't a named plaintiff.  Here there's one.  But that one went to a school that isn't moving for lack of personal jurisdiction, and she's not claiming anything.

I think, final point, I will anticipate plaintiffs are going to say, Well, we think that because you went to COFHE

meetings and maybe you entered into an agreement at a COFHE meeting, that's enough.  If you look at the allegations that' they point to to support that, it's paragraphs 118 and 119 of their complaint, they don't allege, they don't mention the 21 schools.  They don't say that the 21 schools went to meetings of any kind.  They just say, Oh, look at the COFHE website, there's a reference to meetings, and they do say that all of the defendants were or are members.  There's no allegation that these schools even attended a meeting, let alone that it was at such a meeting that the conduct that harmed Ms. D'Amico, who didn't go to their schools, was undertaken.  So the allegations of the complaint are inadequate to establish that.

So unless Your Honor has further questions, I can stop there.

THE COURT:  Thank you.  Perfect timing.  Counsel, or whoever is going to handle this.

MR. McCUAIG:  With apologies, Your Honor, I'm afraid it's going to be me all day.  Dan McCuaig on behalf of plaintiffs.

THE COURT:  Well, you're doing fine.

MR. McCUAIG:  Thank you, Your Honor.  The question that the court asked about whether we should have sued Duke and North Carolina I think was spot on.  And if you look at footnote five of *Hansen*, you can see why that case is such an outlier.  Footnote five says Section 12 doesn't really exist,

and if you want to challenge a conspiracy of universities, there are a couple of ways you can do it.  One, you can sue them all in their home states and then move to consolidate or coordinate under the MDL statute, which gets you through pretrial, right?  But then it all goes back to all these different courts for trial.  Or you can come up with named plaintiffs in a single jurisdiction for each of the defendants you would like to sue.

And why I say that reads Section 12 out of existence is because that's not what Section 12 requires.  Rule 4 is limited to named plaintiffs.  Section 12 looks at the class.  Section 12 is meant to expand venue and jurisdiction.  It's not meant to contract it.  And it's not a constriction if *Hansen* were to become the law of the land that would fall just on private litigants, right?  The US DOJ Antitrust Division also regularly relies on Section 12 to sue cartels in a single district.  The fact is, if venue is proper anywhere in the United States in a single district to litigate and try this case, it's proper here.  This is the best venue.  A forum non conveniens motion would be frivolous.

Defense is absolutely correct that if the defendants all came to Cambridge for COFHE meetings and engaged in information-sharing in support of the hands-off agreement we allege, that's sufficient to establish jurisdiction under either Rule 4 or Section 12.  It's advancing the conspiracy.

They say we haven't quite alleged that, and we haven't quite alleged that, but we're entitled to reasonable inferences at this stage in the case.  And if the court is not willing to go there on reasonable inferences, a small amount of jurisdictional discovery would establish it.

Jurisdiction discovery is not necessary here, though, because Section 12 is not nearly as demanding as *Hansen* or defendants in this case suggests.  The case in the First Circuit that defendants anticipated in their initial motion, we would point the court to *Hahn*, we are absolutely going to point the court to.

In that case, the First Circuit held, and I'm quoting this, "The purposeful actions of VLS in mailing to *Hahn* in Massachusetts application information and an acceptance letter were sufficient without more to constitute transacting business under the broadly construed Massachusetts Long-Arm Statute."

They say *Hahn* addresses only Rule 4.  It's not relevant to Section 12.  *Hahn* is much more than just a rule about Rule 4.  It shows us how the First Circuit thinks about broadly construed transacting business elements.  Maybe the broadly construed transacting business prong of Section 12 is more demanding than the broadly construed transacting business prong of the Massachusetts Long-Arm Statute, but it's not 40 times more demanding.  And I'm not pulling that number out of a hat.  We know from the defendants' declarations that Washington

University enrolls 447 Massachusetts residents.  Pamona College enrolls the fewest number of Massachusetts residents at 39.

Those enrolled Massachusetts residents represent sales made in Massachusetts.  Those are the transactions that matter. It doesn't matter where the education at the end of this process is offered.  We're not challenging the education. We're not saying that students at Pamona are getting a lesser education than they're getting.  We're saying they paid too much, and they paid too much in Massachusetts.

These schools all sent applications, recruited, sent acceptance letters, sent bills, accepted from Massachusetts tuition payments and application fee deposits.  By the time these kids get to campus, the education is bought and paid for. The transactions that mattered happened in Massachusetts.  And the little bit of kind of simplistic and extremely conservative math that we offer in our opposition suggests that Pamona makes annual revenues from Massachusetts approaching a million dollars, and everybody else makes a heck of a lot more.

It was interesting to hear the example of a hospital because we would point the court to an insurance case in considering whether those revenues, revenues of 800,000 plus, are sufficient to show transacting business in Massachusetts of any substantial nature.  *In re Blue Cross Blue Shield of Alabama*, where the court said, quote, "Frankly, it is incredible for Blue Cross Blue Shield of Mississippi to assert

that its collection of approximately $190,000 in premiums per year from approximately 1900 subscribers in this district constitutes de minimus business.  That in itself would be enough for the court to conclude that Blue Cross Blue Shield of Mississippi engages in substantial business in this district."

That's the same analysis that applies here.  The defense points to *Buckeye* and lists out a set of seven factors that, if the court reviews that decision, you'll see that *Buckeye* lists those factors in a boilerplate at the beginning and then never returns to them, right?

The analysis that *Buckeye* actually goes through is the standard *Schiavone* analysis of whether a practical business person would understand that this is business of any substantial nature directed at the forum district.  And in this case, absolutely it is.  *Hahn* is instructive in another respect as well.  There the court said, sufficient for the school to be held into court in Massachusetts because it sent application materials and an acceptance letter.

However, there was a second defendant in *Hahn*.  There was a professor, and the First Circuit said as to the professor, Well, he just taught a class in Vermont.  He didn't recruit or do business in Massachusetts, so, no, there's no personal jurisdiction over the professor.  In the replies, the defendants basically say we're the professor, but they're obviously not the professor.  They're the schools.  They're the

schools who, in each case, have 39 times up to 447 times the number of Massachusetts residents who are sufficient to establish jurisdiction in *Hahn*.

One other case that we would point the court's attention to on the same notion of whether doing business in a district can be quantified in dollars and cents, *Zero Technologies v. Clorox*.  The defendant there was Brita and Brita, quote, "does not dispute that they're selling their products in this district.  Therefore there is no question in this case that Brita satisfies the first clause of Section 12 of the Clayton Act for purposes of venue by transacting business here."

Even *Buckeye* in footnote seven confirms that venue is proper, quote, "if a defendant makes substantial sales on a continuous basis within a forum district."  That's exactly what all of these schools have done.

THE COURT:  Anything further, counsel?  Can we move on?

MR. McCUAIG:  I would just note that *Hansen* is the outlier here, right?  The Sherman Act offers plaintiffs treble damages to encourage private enforcement of antitrust actions.  The Clayton Act lowered the venue and personal jurisdiction bars for the same reason.  *Hansen* would wipe that out and send the world back to the pre-Clayton Act days where there were meaningful procedural barriers to substantive justice that

Congress fixed with the Clayton Act and that the other courts, even in the Northern District of Illinois have recognized, right?

In *Corzo*, the 568 case, you have colleges from all over the country properly defendants in that case.  I don't believe this particular argument was raised there.  It's not raised in cases traditionally because it's a little wild.  Thank you.

THE COURT:  Thank you.

MR. DUSSEAULT:  Your Honor, may I rebut briefly?

THE COURT:  Yeah, briefly.  And can anyone explain why not all the non-Massachusetts defendants joined this motion?

MR. DUSSEAULT:  I can, with the caveat that I'm not arguing on their behalf, but I think it's a great sign.  I think that each of the schools did a good faith inquiry into whether they are conducting business of a substantial nature in the state, and the answer is not going to be the same for all schools.  There may be schools who are outside of Massachusetts who say yes, we do this, that, and the other thing, and subject to jurisdiction.

THE COURT:  Okay, fair enough.

MR. DUSSEAULT:  The first thing I want to do is give you the answer I couldn't give you before, which was when the Baymont case was decided, and it was September of 2025.  So it's a very recent decision.

The idea that our position reads Rule 12 out of existence and that the *Hansen* judge somehow read it out of existence is frankly a bit crazy because there is language in Rule 12 that says you have to conduct business in the state. Now, plaintiffs say, Well, I don't really care about that as much, but you don't just get to sue in all 50 states. It's limited to where you transact business of a substantial and ongoing nature. It is the plaintiffs who want to read that language and the many cases that have required that out of existence and say, Oh, this should be a very liberal standard.

Next point, they ask for jurisdictional discovery, which they ask for in a sentence at the very end of their section, was the only mention of it, just, if you don't agree with us, please give us jurisdictional discovery, that's been waived. They didn't take a position that there were particular facts which, if established, would prove jurisdiction.

And that's under *United States v. Swiss American Bank*, 274 F.3d 610, 626, which said that plaintiff, quote, "must be diligent in preserving his rights to be entitled to jurisdictional discovery. This includes the obligation to present facts to the court which show why jurisdiction would be found if discovery was permitted." And there was nothing beyond just a throwaway sentence at the end saying if you don't buy our current arguments, let us take some discovery and look for a better argument.

The *Hahn* case, the reason the *Hahn* case is distinguishable even beyond the fact that it's interpreting a different statute, so similar language but a different statute, is that *Hahn* would be as if you had Ms. D'Amico just suing the school she went to.  *Hahn* was a breach of contract case.  So what they said is, Hey, if you are doing business in the sense that you sent an application and you entered into this admissions relationship with this student who then went to your school and is saying that you breached that contract, that is sufficient when you're doing the narrow Rule 4 question of did you cause that individual plaintiff's injury.  That has nothing to do with how you interpret the much broader question of are you transacting substantial business.  And it isn't of help to plaintiffs in the Rule 4 context because Ms. D'Amico did not enter into a contract or anything with any of the schools.

The insurance case, I know they emphasize that in the brief.  Again, it's a little puzzling to me.  It is not particularly surprising that a court might say that if I'm paying premiums to insure me while I live in Massachusetts that that's doing business with someone in Massachusetts.  If the insurance company said, Hey, you know, I hear you want to come to California and go through this training session with us, you can do that, come to California.  That would not be transacting business in Massachusetts.

Here what I think plaintiffs just don't want to

acknowledge is that the business is transacted in the state where the school exists, and they label the revenues as Massachusetts revenues but they're not.  They're revenues that are paid for a service that's being provided in one of these numerous other states.

And then, lastly, on the *Buckeye* case, I don't think the *Buckeye* case was just spinning its wheels to state the factors.  I think they were trying to guide as to what the factors were.  But it is important to note in the *Buckeye* case that they found a lack of personal jurisdiction even though the evidence showed that one of the two defendants was actually selling product in Massachusetts through a sales representative and the sales representative was putting these products into Massachusetts stores, and those sales were being made.  And the *Buckeye* case said even that is not enough to satisfy personal jurisdiction.  Thank you, Your Honor.

THE COURT:  All right.  What would you like to turn to next, the main motion?

MR. LITVACK:  Yeah, the main motion, Your Honor.  Before we do, Your Honor, Doug Litvack.  I'll speak to the no-agreement issue and why the per se rule does not apply, and my colleague, Ms. Lent, she will speak to why there's no anticompetitive effects under the rule of reason antitrust standing and why plaintiffs Silbert and D'Amico's claims are time barred.  That's the allocation so you have it.

THE COURT:  Thank you.

MR. LITVACK:  Plaintiffs have not alleged an agreement to adopt or utilize early decision, nor could they.  It's a voluntary admissions option offered by over 500 colleges and universities across the country.  And the complaint makes clear that each school had an independent reason to adopt early decision.  Plaintiffs also do not dispute that students compete for early decision applicants and that early decision benefits both students and schools, yet they claim that the 32 of the many schools that offer early decision have conspired not to compete for students after they're admitted early decision.  And that is the definition of an implausible agreement under *Twombly*.  And plaintiffs do not have antitrust standing because the alleged harms of higher tuition prices and lower financial aid all flow from early decision itself, a clear mismatch from the alleged anticompetitive agreement, which is essentially a noncompetition agreement for students admitted early decision.

So turning to the agreement element first, Your Honor, so the first thing that the plaintiffs need to show is they need to plausibly allege an agreement among competitors.  And here it's an agreement among the 32 defendant schools, and you can do that in two ways.  You can plead direct evidence of the agreement, or you can do it through circumstantial evidence, which is an inference.  And there's a specific way you do that.  It's through parallel conduct and plus factors, or the

"something more," as the First Circuit calls it.

It's important you need both because if you just have parallel conduct -- and this is what was the issue in *Twombly*. If you just have parallel conduct, you need something else to tell you that parallel conduct was the product of an agreement rather than independent action.  So that's the framework for how we analyze the agreement issue under the Sherman Act.

And here plaintiffs cannot identify when these 32 schools reached agreement, who agreed, what the terms were or why these 32 conspired and many other schools with early decision did not.

So if I may just start with the direct evidence points first, direct evidence of an agreement under antitrust law is explicit and just by definition requires no inferences.  We talked earlier about the Joint Ivy League Statement. Plaintiffs contend that the Joint Ivy League Statement is direct evidence of the alleged agreement here.  But it simply cannot be, and plaintiffs admit this on page 30 of their brief. They ask for an inference because it doesn't involve the 27 non-Ivy schools.  So we're done with direct evidence because we're in the inference category.

Unless Your Honor has questions about that, I'm going to move to the next point.

THE COURT:  I don't.

MR. LITVACK:  Okay.  So now we're in the

circumstantial evidence category, and we need parallel conduct and the something more.  And just to start with, *Evergreen* makes really clear that a plaintiff needs to identify the general contours of when any alleged agreement was made, and that's *Evergreen*, 720 F.3d at 46.  They don't do that here.  And starting with the parallel conduct, there's no parallel conduct actually pled in the complaint.  There's no factual allegations about what any particular defendant did, when they did it, how they did it.  I'll explain that in a second, Your Honor.

Here all we have is generalized allegations that all the schools have early decision policies and don't compete for students after they're admitted.  And it's not even specific to these 32 defendants.  We don't even know the full boundary of the alleged agreement.  So to take one step back, when we're thinking about parallel conduct in an antitrust case, it's most easiest to talk about, I think first, to think about price fixing cases.

So typical parallel conduct you'll see is a few different companies, and you see them in parallel start raising their prices, and they do this somewhat in close proximity, maybe within two weeks, maybe three weeks, but they start raising their prices, and it raises the suspicion of why are these prices going up.  At that point you have parallel conduct because prices are going up in parallel.

And then you would go to the next factors of looking at the something more to understand is it plausible that it was done to agreement, or is something else going on, like COVID, for example, shortage of supply and prices are going up.

THE COURT:  But isn't that what their chart pertains to, that around the time that this early decision starts to take off, page 23, that they're showing that the tuition prices are increasing, and it's not just due to inflation?

MR. LITVACK:  But that conduct is not specific to any of the defendants at all, the defendant schools.  So typically in a parallel conduct case, the plaintiffs are required, this is the *SD3* case, to specifically allege how each defendant or at least the majority of defendants acted in parallel.  Here, it's just, it's a chart of all schools, and it just shows tuition going up.  And so from that chart, we can't understand who is acting in parallel.  Is it these 32 schools?  What are they doing?  We don't have any of that information.

And here it's important, too, to bring this back, we have to remember what the agreement -- we have to look at what the agreement is.  I believe the agreement here is an agreement not to compete for these students after they're admitted through the early decision process.

THE COURT:  That's my understanding now, yeah.

MR. LITVACK:  So the type of parallel conduct we've been looking for in the complaint that isn't in there is a

change in the policies of these schools.  Like, at some point this agreement must have not existed.  And so when did schools change their business behavior?  That's the normal parallel conduct we see.  *Evergreen* illustrates this well, the First Circuit case because there --

THE COURT:  So is it your position that they would need to have this at this stage of the litigation?

MR. LITVACK:  They would need to have some facts. They don't need to have all the facts, but they need to have some factual basis that the defendants engaged in parallel behavior, and there just isn't.  It's just conclusory generalized allegations that aren't even specific to these 32 defendants, and that's what we need to keep in mind.  It needs to be specific to these 32 defendant schools.

The other thing that's important, too, Your Honor, on parallel conduct, again, we're trying to understand whether something was done in parallel, and the temporal component is important, too, to think about because we're trying to draw an inference of whether the conduct at issue is done pursuant to an agreement or not.  And I would think common sense might tell you that if it's done really close in time to each other, that might suggest an agreement more than very disparate behavior.

And here, the only factual allegation about the adoption of early decision is that there was widespread adoption in the 1990s.  There's no other allegation anywhere

about the temporal component of this.  So, again, there's nothing in the complaint from a factual basis.

THE COURT:  But their theory is that -- and I don't think it would take place in the same way that a price-fixing case would occur where, you know, it happens a lot closer in time.  Their theory is that schools start to inflate their prices, and then other schools follow along, and so then the price of tuition is increasing.  So that's going to take place year to year.  That's not going to take place in a period of days or months.

MR. LITVACK:  That's a fair observation.  But they don't have any temporal boundary on when this took place.  And we're not looking at parallel pricing behavior here.  What we're looking at is -- because they're claiming that there was this unnatural effort to not compete for students that you otherwise would if there was allegedly no agreement.

And so just like in *Evergreen*, it wasn't a price-fixing case, *Evergreen*.  *Evergreen* is about a refusal to deal.  Just like in *Evergreen*, what you have in *Evergreen* is a 2006 specific moment in time, you all of sudden have defendant manufacturers, they all of a sudden start doing the same business behavior in parallel.  You have them start to now refuse to deal with the plastics manufacturer.  None of that is in this complaint, and that's why, from our perspective, it's deficient on the parallel conduct allegations.

THE COURT:  Okay.

MR. LITVACK:  Moving to the "something more," so you understand our view that there's no parallel conduct, but take that as now if we're in the second step of the something more. *Twombly* tells us that just conscious parallels and parallel conduct alone isn't enough.  And while the First Circuit in *Evergreen* says you don't need to plead rigid plus factors that many courts around the country do, you still need something else to put whatever the parallel conduct is in a context that makes it plausible it was done pursuant to an agreement, and that's lacking here.

First, and most critically, their contention of the something more I think all fails.  So first, they point to membership in COFHE of these 32 schools, which these are 32 of 35 members as being suggestive of an agreement.  But participation in a trade association absent more is not enough.

And then they have some generalized allegations that through the trade association information is shared, but we don't know what that information is, who shared it.  There's no details about it.  And of course a trade association, just like any trade association, shares some information with each other. So these allegations are just unremarkable and don't nudge their complaint any closer.

THE COURT:  You don't always find the smoking gun.

MR. LITVACK:  Sorry, what?

THE COURT:  You don't always find the smoking gun at this stage.

MR. LITVACK:  You're right, Your Honor.  And that's why we have the inference standard, and that's why most plaintiffs proceed at the pleading stage under the inference standard because we don't have the smoking gun, and we definitely don't have it here.  But this case, we don't have any of the inference factors either.  So just to go to the next point that they make is about the application platforms and the use of the application platforms.  They again say that suggests an agreement, and it doesn't, because the use of the application platforms is done by -- is used by hundreds of schools, not limited to these 32 and not limited to schools that even have early decision.  It's schools that have early action use them, too.  So, again, you can't infer anything from that.

THE COURT:  According to plaintiff, they might be in the case, too, later.

MR. LITVACK:  The plaintiff contends that the application platforms, and you'll hear from my colleague on this point, they contend that it was an enforcement mechanism.  Meaning that, if you assumed that there was an alleged agreement that the conspiring schools in that assumption enforced and monitored that agreement through the application platforms, like that's their contention, which is completely

false because, again, the application platforms -- we're at the point where we're trying to understand have they pled the agreement among the 32 schools.  There's no inference that can be drawn, even reasonable inferences all in their favor, from just the use of the application platform because so many schools other than these 32 schools and schools that do not even have early decision --

THE COURT:  So what's your position on the sharing, the platform-sharing information or that they may share information?

MR. LITVACK:  So the platforms are not alleged to have shared information.  It's alleged that in the platform agreement it says that -- it notifies the student that information may be shared with other schools.  It's in Exhibit A.  I'm paraphrasing.

THE COURT:  Yeah.

MR. LITVACK:  But there's no allegation, there's no allegation that the platforms themselves share any information.  So we're now down to the list-sharing allegations that counsel refer to that are in paragraphs 109 and then I believe 111 to 113.  And those allegations, just back to my earlier point, are generalized, vague, nonspecific, to the defendant schools in this case.

And if you go to them, 109 talks about -- I'll let you get there, Your Honor.  Okay.  109 says, "In accordance with

the provision in the Common App early decision document, colleges and universities," again, general statement, then it says, "including the defendants," again, general statement, not specific to any defendant school, "regularly share lists of students admitted under early decision in order to coordinate their allocation of applicants."

Respectfully, that's a legal conclusion, and that's not entitled to its presumption of truth on this because it's just a conclusion. It also tells us nothing because it has no detail about what any specific defendant did. I'll take you then to 111, which is the --

THE COURT: 110, there's a reference to Vanderbilt general counsel who writes in the Yale Law Review -- excuse me -- Law Journal that they also send a list of the students it has admitted.

MR. LITVACK: That allegation, Your Honor, is based on a student note long before the Vanderbilt GC became the Vanderbilt GC. She had no personal knowledge, and the contention in her law review article isn't specific to any of these 32 defendants. It's a piece on the policy of early decision. So, again, it just doesn't help them out here. It's not specific.

If I may, if you go to 111, you get the same issue. It's a thirdhand account from the New York Times. It talks about in 2016 the Amherst dean of admissions told U.S. News

that the college and about 30 others shared lists of students admitted through early decision and that she would also be open to sharing the names of students who chose not to attend and for what reasons.  But we don't know who those 30 schools are that shared lists, and I know plaintiffs speculate that it was COFHE members, but there's no basis in their complaint to even draw that inference.  Actually, the opposite inference, because COFHE had 35 members.

So just to wrap this up, unless Your Honor has more questions, these are just not specific enough allegations to even infer that there's the something more here in terms of making -- if there was parallel conduct, which there isn't, there isn't the something more to suggest that there's any agreement among the 32 schools.

THE COURT:  Is there a difference between a post-admission agreement not to compete for students and a pre-admission decision to offer early decision?

MR. LITVACK:  Yes, there is a difference.  They're two different -- those are two different types of agreements, assuming they are agreements, which again, my contention here is they are not.

The first, if I understand your question, the first is an upfront agreement to just stop competition outright, meaning there is an agreement among schools that you just won't compete for each other's applicants at the front end.

The second is more of what is in the complaint, which is, there's an agreement after they're admitted -- they're free of choice, they can apply anywhere, but there's an agreement after they're admitted to not compete for those students, and there's a difference because the first instance is just a naked market allocation agreement. The first instance -- this is all hypothetical -- is a naked market allocation agreement absent any justification or collaboration around it.

The second instance, there might be reasonable expectation -- there might be unilateral behavior for why there isn't -- for why schools aren't competing for those students after the fact. And there might be benefits associated with after the fact why competition for those students aren't good because -- again, this is all in a hypothetical, but I would say, too, that the promise, the commitment, that's important for the bargain that we're getting here in terms of the student being able to get a higher chance of getting into its first choice school. That's what makes it different.

THE COURT: Okay. Let me turn to plaintiffs' counsel. I'll come back to you.

MR. McCUAIG: Thank you, Your Honor.

THE COURT: But I want to be mindful of the time because I have a sentencing that was scheduled for 12:00 that I've pushed back a little, but go ahead.

MR. McCUAIG: I'll try to be brief, and I actually

think this is a pretty easy one for the court, so hopefully I can be brief.

I do want to point out that we do dispute whether there is any benefit to the students from the conspiracy that we challenge in this case.  The defendants say they get two benefits, they get to know early, and they know at the same time under early action.  So knowing early is not tied at all to the agreement that we've challenged to have hands off each other's ED admits.  And they say the student gets a better shot at admission to one particular school.  We don't dispute that.

We do dispute that that's a benefit because, as we allege in the complaint, these students are not applying to their first choice schools.  They're applying to schools where they think they have the best chance to move the needle.  And they're often giving up applications to their first choice schools in order to make these early, early applications, and as defense would have it, early, early commitments.

THE COURT:  But that goes back to my question before.  Doesn't that just come down to poor calculation on the part of the student, that they made a mistake in judgment in taking that approach rather than saving that one shot for the school that they really want to attend?  I think we all had schools that we really wanted to attend.

MR. McCUAIG:  So that's kind of a flavor of the voluntariness argument that defendants make.  And voluntariness

in the antitrust context means more than you just made the decision to enter this agreement, right?  If that's all it meant, you would never have customer antitrust cases. Customers always make the decision to do business with the defendants that they've sued for antitrust violations. Voluntariness means that the plaintiff is at least much at fault, right?  That's *Sullivan v. NFL*, which defendants just ignore.

And so from an antitrust perspective, no, that's not a get-out-of-jail-free card because plaintiffs had nothing to do with this system.  This system was created entirely by the universities and is great for the universities' bottom line, right, that's the pro-competitive benefit that they claim on the university side of the equation, but that's not a cognizable pro-competitive benefit when what it is really is antitrust harm, right?  They're saying we make more money because of the system, so it's good, but they make more money from the system because they've suppressed competition, so it's not good.  It's bad.

THE COURT:  Okay.

MR. McCUAIG:  Turning to agreement, we have the best direct evidence of agreement that we could have in an antitrust case.  We have an actual written agreement among several of the defendants to do exactly what we claim they've agreed to do.

THE COURT:  The written agreement, you're talking

about Exhibit A?

MR. McCUAIG:  No.  I'm talking about the Ivy League Joint Statement, yes.

THE COURT:  Some are in and some are not.

MR. McCUAIG:  So that's two separate questions, right?

THE COURT:  Let me keep you on track because you told me it was going to be short.

MR. McCUAIG:  It's going to be so quick, and persuasive.  The question of whether there's an agreement is antecedent to the question who joined the agreement.  And when we try this case, if you look at the model jury instructions, ABA Model Jury Instructions, one, under the Sherman Act I'm pretty sure says plaintiff has to show two things.  They have to show an agreement exists, and they have to show defendant joined it.

The question whether an agreement exists is definitively answered by the Ivy League Joint Statement.  The agreement exists.  Separate question, who joined it?  Okay.  Here we have other evidence that the defendants we've sued joined that agreement, right?  It starts before the Ivy League agreement.  It starts in 1997 with Dartmouth saying once we come up with our ED admit list, we mail it out to the Ivy League and a bunch of other schools.

Then roll the clock, 2002, Harvard says, This stinks.  The rest of the Ivy League drags them back in.  They don't want

defections again going forward.  So now we have this written agreement that we can point to as a smoking gun, right?  Plaintiffs never had this.  We have it.

THE COURT:  How come Harvard is not in this case?

MR. McCUAIG:  So Harvard, we allege in our complaint, is an unnamed co-conspirator.  They have agreed not to go after other schools' ED admits.  Based on what we know right now, and this of course may change over the course of discovery, we assess them to be less culpable, and we didn't sue them.  We don't have to.  We don't have to join all the conspirators in a complaint.  You keep rolling the clock to the 2016 Amherst statement where Amherst says, Yeah, we share our ED admit lists with about 30 other schools.

THE COURT:  Paragraph 111.

MR. McCUAIG:  Correct.  Defendants say, Well, she said about 30, she didn't say exactly 34, so why do we think this is COFHE?  Well, it's a reasonable inference that it's COFHE because who else is it going to be?  COFHE is an organization that the schools created, they opted into, and it's meant to be an institution to bring together peer institutions.  These schools looked around and said, These are our peer schools, we're going to exchange admissions and financial aid data with them.  Those are exactly the schools who, you know, you would want to stay away from your ED admits.  They are each other's closest competitors, and they all recognized it, and they all

recognized it when they formed COFHE.  At the very least, that's a plausible inference, and there are no other inferences certainly within the four corners of the complaint to suggest that this is some random collection of 30 schools, 31 if you count Amherst.

So we think we get there on direct evidence and we don't need to look at whether there's indirect evidence of agreement also.  We can prove it either way.  The direct evidence here is as clear as could be with respect to both the agreement existing among the Ivy League schools, those five schools joining the agreement.  And the agreement itself, the existence of the agreement tells you that an agreement is necessary, right?  It tells you that this isn't something that can happen absent an agreement because these folks felt the need to write it down when Harvard said I'm not going to do it anymore.

The question is what does Harvard get out of it, well, as defense counsel pointed out, there are lots of other parts of that agreement, and we don't know now what horse-trading happened on athletics or anything else in the joint statement, but we know what these defendants agreed to because it's written in black and white.  They agreed hands off each other's ED admits.

THE COURT:  Thank you.

MR. McCUAIG:  If we have to go into -- if the court is

convinced on direct evidence, I'll sit down.

THE COURT:  I'm not, but you don't have to go there. Can I turn to Attorney Lent.

MR. McCUAIG:  Of course, Your Honor.

THE COURT:  Thank you.

MS. LENT:  Your Honor, Mr. Litvack is first going to address whether the per se rule applies, which will be extremely quick, and then I will take over.

THE COURT:  All right.

MS. LENT:  Okay.

MR. LITVACK:  I'll be very quick.  The per se rule only applies if the conduct at issue is just so obviously anticompetitive it requires no consideration.  That's not the case here.  Three reasons:  First, no judicial experience with all the complex issues that we've just been talking about for almost two hours, so that's point one.  And the courts are reluctant to apply a per se rule in the higher education context, *Allston*, *Board of Regents*, just a litany of cases that refuse to do that.

Second, this isn't a market allocation agreement for the reasons we were talking about earlier.  It's not -- there's competition going on for these students.  Market allocation is I won't compete for schools in the East, you don't compete for schools in the West, like you divide the market.  That's not what's going on here.  There's upfront competition.

And the third point is the benefits point.  If there's any hint of a benefit, you just can't condemn it per se because you need to do the full reasonableness test.

And I'll just conclude with, when you do the reasonable test here, and you'll hear this from Ms. Lent, it completely flunk -- it's entirely reasonable, the conduct at issue here.  Your Honor, unless you have any other questions, I'll sit down.

THE COURT:  I don't.  Thank you.

MR. McCUAIG:  May I respond previously on the per se?

THE COURT:  One minute.

MR. McCUAIG:  The courts have plenty of experience in allocation agreements which are different from the -- also per se the market allocation agreements is a misdirection. Customer allocation agreements, we point the court to three Court of Appeals cases holding them per se.  Defendants just ignore them.

The question of whether a customer allocation agreement can be per se is probably most learnedly addressed by a case that defendants actually cite in their reply brief on a different point, the *In re Antitrust Brokerage* case in the Third Circuit.  In that case, the plaintiffs explicitly foreswore a rule of reason case.  They said we're proceeding only under per se or quick look so that we don't have to define a market, we don't have to deal with market power.  The

District Court dismissed all of their claims.

The Third Circuit mostly affirmed, but as to what it termed the Marsh-centered incumbent protection conspiracy, it said that the plaintiffs sufficiently alleged a customer allocation conspiracy to proceed to discovery despite notwithstanding or despite not having a rule of reason case in their complaint. And the incumbent protection conspiracy there looks exactly like the case that we have alleged, except with insureds instead of college applicants.

THE COURT: Thank you.

MS. LENT: Thank you, Your Honor. Karen Lent. I'm going to first start by talking about the rule of reason. And I think Your Honor had the question exactly right when you started this hearing, to say how does this all fit in the antitrust context, right? Like, I understand that you're claiming that tuition has gone up, but why is this an antitrust violation?

Well, let's start with the plaintiffs' requirement under the rule of reason that they have to show that the challenged agreement had a substantial adverse effect on competition across a relevant antitrust market. They haven't done that here.

Now, they've said they've done it through both direct evidence and indirect evidence, but they have neither. On direct evidence, right, the alleged harms here are higher

tuition prices and lower financial aid.  So with respect to higher tuition prices, all they've offered is this graph, which Your Honor pointed to earlier, it's at paragraph 129 of the complaint.  This graph may be of schools that have early decision.  Maybe it includes the defendant schools.  Maybe it includes all schools.  We have no idea what this graph is purporting to show other than some collection of schools and the rise in tuition, right?

There's nothing linking that at all to the alleged agreement not to compete for candidates after they've been accepted early decision.  This just shows tuition has gone up at schools in the past few decades.

And, you know, they might be upset that the early decision process itself causes schools to get price-insensitive customers, applicants to commit early, and that might not be great for higher ed overall, but that's not an antitrust violation.  There's no direct evidence of a substantial anticompetitive effect of the agreement they've alleged in the relevant market.  So that's tuition prices.

And then it's even worse, Your Honor, with respect to financial aid because they just have a conclusory assertion that financial aid is lower for folks who have committed to a school in early decision.  There are no facts, no facts alleged.  It's just a conclusory allegation that financial aid is lower.  That is not enough to plausibly allege direct

effects of harm.  It's just not enough.  They're assertions, not facts.

Now, in their opposition the plaintiffs claim that early decision prevents plaintiffs from making free choices between market alternatives, and that's direct evidence of an anticompetitive effect.  But that's not true.  As you've heard already today, the option of early decision increases choice for students.  They can apply regular decision.  They can apply early action, or they can apply early decision, right?

And if they choose to apply early decision, they are saying to a school, Accept me, I am more likely to come.  But that's their choice, and they still have other choices to make.  So this is actually the opposite of preventing free market choice.  It's offering another choice to students and one that might provide them some benefits.

THE COURT:  What's the other choice for someone who doesn't need financial aid, who didn't apply for financial aid?  Once they apply and say, I don't need financial aid and an offer is extended to them, aren't they then bound, honor-bound to this agreement to accept?

MS. LENT:  They are, Your Honor, but they've already made the choice.  They had a choice to say, I'm going to apply to this school regular decision, I'm going to apply to a school early action, or I'm going to choose the school that I want to use my early decision application for.  They've already made

the choice.  Having early decision gave them that choice.

THE COURT:  Understood.  Let me just also ask, so I understand it's your position that the defendants, they had good reasons for the process, you know.  And it's competitive. It was business smart, and there are good justifications for it.  But isn't it -- or is it possible that these well-intentioned acts are determined to have an anticompetitive effect?

MS. LENT:  Well, it's possible, but the question for you today, Your Honor, is are there facts pled in the complaint making it plausible, and that's the burden that plaintiffs have.  It's not to allege something that's possible.  It's to nudge it over the line to plausible, which is what *Twombly* tells us.  And all courts on an antitrust motion to dismiss tell us that they have to plead facts, not legal conclusions. So I'm telling you, the facts aren't here to show harm, anticompetitive effects, right?  That's what they fail to do on the direct effects side.

THE COURT:  Let me hear from counsel.  We're interrupting her argument, so I am coming back to her, so don't use up all her time.

MS. LENT:  Thank you.

MR. McCUAIG:  Wouldn't dream of it, Your Honor.  I would like to touch on *Twombly*.

THE COURT:  Yeah, that's why I came to you.

MR. McCUAIG:  Fantastic.  So if *Twombly* had had something like the Ivy League Statement, right, an agreement just between SBC and Bell South that says we'll stay out of each other's territory, those two are definitely moving on.

Also, it undercuts the notion underlying the rest of *Twombly* that an agreement is not necessary.  So not just Bell South and SBC are moving on, all of the regional Bell operating companies are moving on in *Twombly* if there's a fact pattern like the one that we have here, right?

The Supreme Court leans hard on the notion that they don't really need an agreement to get this done, but the existence of an agreement between any two of those regional Bell operating companies, or maybe they call them ILECs there, shows that, yes, you do need an agreement.

The rule of reason we get to only if the court finds at this stage in the case that we haven't plausibly pled a per se violation or an agreement that should be evaluated under quick look.  We obviously think that's not the case.  The notion that courts don't have extensive experience with customer allocations is simply not correct, and customer allocations like this one where there are no complicating factors, where it's a straight hands-off, of course is plausibly per se.

I mean, if the court had to decide today which mode of analysis to engage in, per se is the right answer.  The court

doesn't need to decide that today and most courts don't, right? It's a decision that's guided by facts, and we don't have a lot of facts yet.  We do have enough plausibly to say these defendants engaged in a straight customer allocation hands-off agreement potentially liable under per se.  But if we are in rule of reason, you know, the defendants say in their briefs and they said it again here, the only allegation we make about increased prices is the graph in 129.

THE COURT:  Give me your best argument, succinctly. And let me just mention to my attorneys on the criminal matter, as you can see, I'm running over, but I'll try to get to you by 12:30.

MR. McCUAIG:  Paragraphs 126 to 128 can't be ignored, and there we say the defendants don't touch --

THE COURT:  You said 126 and 128?

MR. McCUAIG:  126 to 128.

THE COURT:  I had a couple of question marks next to 127.  I don't understand, so if you can help me with that one.

MR. McCUAIG:  Sure.  So 127 is a standard yardstick allegation where we say there's a group of defendants who use early decision, and we compare them to their closest -- as best we can tell, and again, we're lawyers, not economists -- but as best we can tell, we compare them to their closest competitors who don't use early decision, and we see thousands of dollars' difference in their top-line tuition prices.  That's a factual

allegation.  It can't just be ignored.

Also, what can't just be ignored is the Econ 101, if you have less competition, you have higher prices.  You couple that set of allegations from 126 to 128.  And when you look at 129, you see this huge chasm that's opened up between prices and costs, right?  And the question for the court for this stage of this case is is it plausible that some of that chasm has opened up because these defendants are not competing for each other's ED admits, right?

The question is not do the defense have their own theories about why that chasm is opened up.  The question is whether the plaintiffs' theory is plausible.  And it's more plausible because the chasm is so big.  That's the point of the graph in 129.

THE COURT:  All right.  Thank you, counsel.

MS. LENT:  Thank you.  I just want to very quickly reply to a few points that were off-topic.

Most courts do decide the per se rule versus rule of reason at motion to dismiss.  There are lots of cases dismissed because there's not a rule of reason violation pled when the plaintiffs also said, Hey, this is a per se violation.  It happens all the time.

With respect to --

THE COURT:  Is there a case in particular you want to direct me to with regards to that?

MR. CRUZ: Sure. I can direct you to *Choh v. Brown*, which was just recently affirmed by the Second Circuit.

With respect to paragraph 127 and the argument that this is a sufficient factual allegation of direct evidence of injury, tuitions are public, right? There's a set of schools, a set of defendant schools that the plaintiffs have said are engaged in the alleged conspiracy, and a general allegation that tuition at schools that offer early decision, not schools that agreed not to compete for students once they are accepted, but schools that offer early decision are thousands of dollars higher, but that's not fact. That's an allegation. That's a conclusion.

Where are the numbers that are public to say that these schools that participated in the alleged conspiracy, not just early decision, are charging more? It's just not there. There's no direct evidence. So I'd like to turn to indirect evidence, which requires defining a relevant market.

THE COURT: What's the relevant market?

MS. LENT: So their relevant market, they say in paragraph 151, is selective private national universities and liberal arts colleges in the United States that are consistently among the highest rated schools on national rankings such as those published by U.S. News and World Report.

This is not a cognizable antitrust market. It's unclear what U.S. News and World Report rankings they're

referring to because none of them, none of the ranking lists align with this alleged market.  There's no mention of what other national rankings they're referring to because they do say, "Such as those published by U.S. World News and Reports." And there aren't any parameters to define what schools are selective or highly rated.  We literally have no idea what schools are in this relevant market.

This is in stark contrast to *Carbone* or *Corzo*, depending on the name of the plaintiff at the time of the decision.  There, the plaintiffs define the relevant market for undergraduate education at private national universities with an average ranking of 25 or higher in U.S. News and World Report from 2003 to 2021.  It was an objectively knowable list of schools, and that's not what we have here, right?

*Choh*, which I mentioned, is directly on point.  In that case the Second Circuit affirmed dismissal of an alleged Ivy League plus market because, and this is a quote, "Plaintiffs put forth no accounting of which universities or colleges comprise the relevant market, nor do they make clear the boundaries of the market."  We have no idea what the boundary of this market is.

We said a number of other things on this in our briefing, Your Honor, which I'm going to leave because I know you have to get to another matter.  And I'll just say that plaintiffs try to say that the market is somehow related to

COFHE.  You've heard that brought up several times today. COFHE is the Consortium On Financing Higher Education.  It is a consortium about financial aid.  Why COFHE would be the parameters of a market for an alleged agreement about early decision admits is not clear.  But certainly there's nothing in the complaint to allege why this set of schools are the ones that compete with each other and the only ones that compete with each other.  Clearly they're not.  There are many other schools that offer early decision, 500 other schools that offer early decision, and there's just no reason not to be thinking about them when you're defining what the relevant market is.

So it's unclear that there's a relevant market alleged here, but then in addition to a relevant market you need to allege power in a relevant market.  And all plaintiffs have done is say that the defendants have a substantial market share, or, you know, that they have a dominant market power. That's not enough.  That's a conclusion.  That's not a fact. And it's not surprising that they're left to just allege that conclusion because if we don't know who is in the market, we don't know the share of the defendants in that market.

Going back to *Carbone*, in that case, the court found that there was a well-defined market, and that complaint included an allegation that there was a 74 percent share by defendants of that relevant market.  That was enough to defeat the motion to dismiss on this point.  We have nothing like that

in this complaint.  We just have conclusory assertions.

And it's also not enough to just say there are high barriers to entry or there's, you know, preference for these colleges.  You need to allege a relevant market with a high market share, and that is in the *Coastal Fuels* decision from the First Circuit in 1996.  You need both, and plaintiffs have neither.  So that's on substantial anticompetitive effects in a relevant market.

I'd like to move on to antitrust standing, if that's okay.

THE COURT:  Yes.

MS. LENT:  Okay.  Here I think there's just an absolute mismatch with what has been alleged to be the anticompetitive agreement and the harm that plaintiffs allege is being suffered.  So antitrust standing is a threshold legal doctrine.  It requires the private plaintiffs to plead antitrust injury, right, which is harm that flows from that which is alleged to be unlawful, and then there's also a causation requirement to antitrust standing.

Let's talk about antitrust injury first.  Plaintiffs don't allege that their injury flows from this alleged agreement not to compete on the back end of the early decision process.  When you look at the facts as alleged in the complaint, they are alleging that the harm flows from early decision itself.

They say things like, "Early decision attracts price-insensitive students who don't care about the costs of education because they can afford to pay it, and it allows schools to raise the price."  That has nothing to do with the back end of not competing for folks that are admitted and everything to do with the fact of early decision itself.

And as I said before, Your Honor, we might not like that as a policy decision, but that is not an antitrust violation.  That's just a dislike of an early decision itself.  And that's in fact what nearly every statement from a college administrator that they have in the complaint, that's literally all they're saying.  We don't like this.  They're not saying, We conspired.  They're saying, We don't like this, we think it could be better.  Not an antitrust violation.

THE COURT:  I think there was one that may have suggested that there was an antitrust violation.  I can't remember which one.

MS. LENT:  The gentleman from Georgetown said something about financial aid, not having to compete on the back end for financial aid.  Georgetown doesn't have early decision.  Georgetown is not a defendant in this case.  Of course, Georgetown is going to say we prefer not early decision, but that's not evidence pled that the injury claimed flows from the agreement not to compete on the back end.  It literally is all about whether we like early decision or not.

With respect to causation, I'd like to talk about these named plaintiffs. And as Your Honor already pointed out, one of them, Mr. Miller, didn't even apply for early decision, right? So we don't know what he's doing here and how he's been harmed by this alleged agreement. Neither he nor plaintiffs D'Amico or Silbert even applied for financial aid, right? They're these price-insensitive students that applied early decision, got in, accepted the bargain.

THE COURT: Those are the two that already graduated as well?

MS. LENT: They are the two that already graduated as well. So they have multiple problems as plaintiffs, but the only thing that they can claim that harmed them is somehow tuition prices overall are higher because these schools decided not to compete on the back end for applicants who were accepted early decision.

As I mentioned with respect to the absence of direct evidence of substantial anticompetitive effects, all they have there is that chart which shows tuition went up, who knows why, and their allegation that schools that have early decision charge thousands of dollars more. Again, these are just conclusions. They're possibilities. They're not plausibilities. So these folks have not suffered antitrust injury, an injury that was caused by what was alleged to be the violation.

THE COURT:  Just so that you know, I'm going to allow the parties to submit additional briefing, maybe five pages or so.  So don't feel like you have to say everything at this moment.

MS. LENT:  Okay.  I appreciate that.  Then why don't I just switch, finally, I just want to give you a very, very brief argument on the plaintiffs, which you just mentioned, D'Amico and Silbert, who have not satisfied the statute of limitations.  They matriculated in the fall of 2019, which means their claims expired in the fall of 2023 because there's a four-year statute of limitations for antitrust violations.

The plaintiffs have said you should not decide this now.  This is affirmative defense.  This requires facts.  Not the case, right?  Statute of limitations may be an affirmative defense, but in the cases where it's not decided on a motion to dismiss, it's based on allegations like fraudulent concealment or when did someone find out about this violation.  That's not the argument that's being made here by the plaintiffs.  The plaintiffs are saying that there's a continuing violation rule.  This is a rule of law, continuing violation, that they should be able to recover for each year that they paid tuition, but that's not the law.

The law, and we've cited the *Government of Puerto Rico* case but also the *Choh* case, which is again directly on point, involves colleges, that say that the overt act is the initial

act of setting the tuition for the person who comes in or the financial aid.  Everything else is just a manifestation of that.

So in *Choh*, the argument, the allegation was, well, you don't provide athletic scholarships through agreement, and so I've been harmed every year I don't get that athletic scholarship.  And the court said that's not true, you're only harmed in that first year.  After that is just a reaffirmation of that initial overt act.

So for that reason, among with the others we've discussed, plaintiffs Silbert and D'Amico, their claims are time barred, and they should not be able to serve as named plaintiffs.  So I will address anything else that we might have missed in that briefing, Your Honor.

THE COURT:  Thank you.  Counsel?

MR. McCUAIG:  I understand I have to be brief.

THE COURT:  Yes.  And don't forget, Attorney Jiang wants to be heard.  She might have to wait until after my sentencing if he's here.  Is he here?  Do we know?  Ms. Simeone, do you know?

COURTROOM CLERK:  He's being brought up at 12:30.

THE COURT:  All right.  So I'm having the defendant brought in at 12:30, so I will need to break at that point in time, but I'll give you a few minutes after, unless you just want to rest on the papers, but go ahead.  You have six

minutes.  Don't take them all.

MR. McCUAIG:  *Choh* is a sports case, and it's a price-fixing case.  And both of those factors are absent here, right?  Sports cases are pragmatic cases where some degree of coordination is necessary in order to make the sport happen.  We don't have that.  The university price-fixing cases generally are looking at things like financial aid calculations that can be complicated and so are evaluated under either quick look or rule of reason.

In *Corzo*, which counsel mentioned, the court did not take per se off the table at motion to dismiss, did not take quick look off the table, even at motion for summary judgment.  He said it still remains to be seen who bears the initial burden, the universities or the students.  That's saying I haven't decided yet whether we're going to do full rule of reason or quick look, even at trial.  These are fact-bound determinations that in some cases have complicating factors that we don't have here.

If you have a price-fixing case that said, We're going to charge every student $50,000 tuition, just a straight clear-as-it-comes price-fixing case, that's per se.  It's certainly not per se is off the table at motion to dismiss.  That's what we have in the customer allocation context, just a straight we're not competing for those kids, garden variety, there's no complication.  There's no reason on the face of the

complaint that this can't be a per se violation or at least a rule of reason case.

Sticking with *Choh*, it's also a different circumstance where you're looking at the decision to offer or not offer an athletic scholarship, okay?  That's a one-shot deal.  But here, we have new fixed tuition prices every year, so that's a new harm every year.  That's different than *Choh*.

The question in paragraph 127 of whether we're particular enough as to the schools involved, we say the elite colleges and universities with standard early decision programs, those are by definition schools within our relevant market.  This isn't a random set of schools.

THE COURT:  So are there schools that are not involved in COFHE that are sufficiently competitive?

MR. McCUAIG:  Probably, probably.  We don't know yet and we might not know for quite some time.  I mean, another fact about *Corzo*, right, at summary judgment the court looked at the set of universities that the plaintiffs said were in the relevant market based on a number of economic studies that we can't do yet but we will do at some point, looking at pricing and how far students are willing to travel to go to different schools and the sorts of things that indicate which schools are really competing with which other schools.  And the court said, you know, the jury might find that a few of these schools on this list shouldn't be on this list and a few on the outside

should be in, but it's directionally correct, and these are questions of fact, and the jury can sort it out.

THE COURT:  How do you draw the line for the relevant market?

MR. McCUAIG:  Right.  So in *Choh* they did it wrong because they said, These are the schools that are in the relevant market and here we'll draw the line around them.  We haven't done that.  We've done it the way you're supposed to do it, which is to say there is a functional market for elite private colleges and universities, and we will evaluate using economic tools and standard indicia of markets, Brown Shoe factors basically who is in that market.

What we know now, the best proxy for who is in that market is the self-selected group of COFHE schools.  We know those schools selected themselves as each other's closest competitors when they formed COFHE, and as we allege, economists and other academics have used COFHE as the best proxy they could find for the market that we allege, the elite private colleges and universities market.

THE COURT:  Counsel, I'll give you that same opportunity, five pages to supplement, and I'd like if the parties can do that by Monday morning, or sooner would be great.

MR. McCUAIG:  Thank you.

THE COURT:  But question for you, and I haven't

decided this, but let's say I decide to deny the motions. What's the next step?  If I deny the motions as to some but allow it to others, what's the next step?  Have the parties thought about that?

Probation and the parties are starting to arrive for my 12:30.

MS. LENT:  If you deny the motion, the next step would be we'd head into discovery, Your Honor.  And whether -- if you deny it as to -- grant it as to some defendants, they would no longer -- sorry -- plaintiffs, they would no longer be class representatives, but we would engage in discovery.  But I think what's critical here is that, you know, the *Twombly* court said you have to have plausible allegations to get into discovery because it's so expensive in these cases.  You've heard about all the experts that are going to do all this analysis.  It needs to be more than just possible.  It needs to be plausible. And then you get into that expensive exercise that you're talking about, what happens next.

THE COURT:  Do you take a position on Ms. Jiang's client?  So let's say I were to allow her motion.  What would your position on that be?

MS. LENT:  You would allow her clients to be dismissed but the rest of us not?

THE COURT:  Yeah.

MS. LENT:  I mean, it would be the same thing.  They'd

end up being third parties then.  If the plaintiffs wanted evidence from them, they'd have to use Rule 45.

MR. McCUAIG:  We agree.

THE COURT:  Okay.  So are we ready for Mr. Castro?  Is he there?

U.S. MARSHAL:  Yes.

THE COURT:  Okay.  So you have an option.  You can take a break while I try to handle Mr. Castro and his matter and then come back for -- very brief because I think you only asked for five minutes -- Ms. Jiang's motion, or you can just submit on the papers.  What would you like to do?

MR. JIANG:  We would like to rest on the papers, Your Honor.

THE COURT:  All right.

MR. McCUAIG:  That's fine with us, Your Honor.  Is there any guidance the court would like to provide as far as which issues in particular the court would like to hear about in our five pages?

THE COURT:  No.  Whatever you think that you didn't have a full opportunity to address.  I've limited it to five pages.  Don't go to like size font eight, single space, you know.  Just get straight to the point and give me a key case.  I don't need the string cites.

MR. DUSSEAULT:  Thank you, Your Honor.  For clarification, is that only the Rule 12(b)(6) motion?  You

don't need supplemental briefing on the jurisdiction issue?

THE COURT:  Well, do you feel like you need to say something else?

MR. DUSSEAULT:  I don't.

THE COURT:  All right then.  I don't need more paper. I've got plenty of paper.  All right.  Thank you.

(Adjourned, 12:29 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this  2nd day of May, 2026.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter