**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE,<br><br>     Defendants. | Case No. 25-cv-12221-AK |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................2

*Choh v. Brown University*,
  753 F. Supp. 3d 117 (D. Conn. 2024)........................................................................5

*Corzo v. Brown Univ.*,
  2026 WL 91424 (N.D. Ill. Jan. 12, 2026)..............................................................3, 5

*Deslandes v. McDonald's USA, LLC*,
  81 F.4th 699 (7th Cir. 2023) .....................................................................................2

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013).......................................................................................1

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ..................................................................................................4

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012).....................................................................3

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ......................................................................................2

*InterVest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003) ......................................................................................1

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ..................................................................................................3

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2005)........................................................................................2

*United States v. Cadillac Overall Supply Co.*,
  568 F.2d 1078 (5th Cir. 1978)...................................................................................3

*United States v. Coop. Theatres of Ohio*,
  845 F.2d 1367 (6th Cir. 1988)...................................................................................2

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
  55 F.4th 286 (1st Cir. 2022) ......................................................................................4

**Other Authorities**

ABA Model Jury Instructions in Civil Antitrust Cases § 2(A)(1) (2016).......................................1

Plaintiffs respectfully submit this supplemental brief, as instructed at oral argument.

*Agreement.* Plaintiffs do not challenge early applications, early notifications, unilateral admissions policies, or any independent vertical arrangements. What Plaintiffs challenge is Defendants' horizontal agreement to allocate applicants by ending all competition for any claimed by another school with an ED offer. Early Decision is not an "additional choice" for applicants, it's what 29 of the 32 School Defendants offer instead of non-binding Early Action (3 offer both ED and EA). That regime does not expand student choice; it takes choice away by requiring students to commit before comparing offers and ensuring that no rival will compete with a better price or better aid or even offering the student a better fit. The question at this stage is whether the Complaint plausibly suggests a "conscious commitment" to that scheme. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (citation omitted). It does.

The Joint Statement for Candidates on Common Ivy Admission Procedure, Doc No. 1 ¶ 116, expressly provides that Ivy institutions will "honor any required commitment to matriculate" made via ED to another college. That is direct evidence—a "smoking gun," *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)—that a hands-off agreement exists. Defendants' attempt to minimize that allegation, Doc No. 220 at 13–14, conflates two distinct questions: whether an agreement exists (it does) and who joined it. *See* ABA Model Jury Instructions in Civil Antitrust Cases § 2(A)(1) (2016). The Complaint plausibly alleges that non-Ivy Defendants joined the hands-off agreement. Dartmouth admitted sharing ED-admit lists with "the Ivies and several other highly selective colleges." Doc No. 1 ¶ 112. Amherst admitted sharing lists with "about 30 others." *Id.* ¶ 111. The most plausible inference is that those schools were Amherst's closest competitors, *i.e.*, the schools that comprise COFHE, an organization created by peer institutions to share information. *Id.* ¶¶ 118–19. Those allegations describe exactly how a

1

hands-off agreement would be carried out. At minimum, they "tend to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

The Ivy Statement also defeats Defendants' innocent explanations for blackballing applicants with ED offers. If schools independently treated those students as off-limits, there would have been no need to write down a reciprocal hands-off rule. And unilateral conduct would not require the enforcement mechanisms alleged here: ED admit list-sharing, cross-school platform exclusivity, and parallel (mis)representations that ED is "binding." Doc No. 1 ¶¶ 80–83, 92–113.

***Unreasonable Restraint.*** Because the challenged agreement is plausibly subject to *per se* or quick-look review, Plaintiffs have pleaded an unreasonable restraint of trade. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 336–48 (3d Cir. 2010). The Court need not decide now which framework will govern at trial. *Stop & Shop* does not require, or even counsel, otherwise. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2005). Defendants' argument that it does rests on excising the words "or for summary judgment" from the sentence they (mis)quote. *Compare* Doc No. 231 at 10, *with Stop & Shop*, 373 F.3d at 61. The Court should not "jettison[] the *per se* rule too early" where plaintiffs allege a "naked agreement[] among competitors." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023).

Straightforward customer-allocation agreements like the one alleged here regularly are subject to *per se*, or at least quick-look, review. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 336–48 (alleged incumbent-protection agreement survives dismissal despite plaintiffs forswearing rule of reason theory); *United States v. Coop. Theatres of Ohio*, 845 F.2d 1367, 1372 (6th Cir. 1988) (a "horizontal agreement between two competitor[]" movie theater booking agents "to refrain from seeking business from each other's existing accounts" is a *per se* restraint); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1087–90 (5th Cir. 1978) (dealerships' "non-

solicitation of each other's customers" was subject to *per se* treatment); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1121–22 (N.D. Cal. 2012) (employee no-poach allegations plead a *per se* violation); *see also Corzo v. Brown Univ.*, 2026 WL 91424, at *9 (N.D. Ill. Jan. 12, 2026) (explaining that, at summary judgment in a complicated pricing case, "the Court need not resolve whether the students or the universities bear the initial burden of showing how the agreement affects competition"—that is, whether quick look or rule of reason applies). Defendants offer no cases suggesting customer-allocation schemes must be evaluated under the rule of reason.

If the Court nonetheless finds a full rule of reason analysis necessary, Plaintiffs plead a plausible claim under that framework too. The first step under that burden-shifting framework is to show that the challenged restraint has anticompetitive effects. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Here, the hands-off agreement has led to both higher topline tuition prices for all undergraduates and reduced financial aid for ED admits. Doc No. 1 ¶¶ 125–133. Those are factual allegations of increased prices, a paradigmatic form of anticompetitive harm.

Those higher prices flow from basic economics. It is common sense (and well-recognized) that schools offer reduced financial aid to ED applicants who cannot compare aid offers. *Id.* ¶¶ 130–33. The hands-off agreement's contribution to increasing Defendant Schools' topline prices, *id.* ¶¶ 126–29, also follows textbook economics. In a competitive market, college tuition rates are constrained by the risk that students will choose a rival school offering a lower price. But the current ED regime leaves fewer and fewer seats exposed to the ordinary competitive process, as schools fill more and more of their classes with students willing and able to commit without seeing competing offers (or even the ED school's final price tag). So when a school sets its sticker price, it does so knowing that a large portion of the class will be filled by students committed to attend price-unseen and who cannot be wooed away by a peer school offering a better deal. Once

3

enough students are locked in that way, fewer seats remain subject to real price competition, and schools set tuition rates with a more secure, less price-sensitive revenue base in mind.

Defendants have offered no reason to believe that ordinary economic forces do not apply here, and they cannot defeat this theory by recasting Plaintiffs' harms as flowing from "Early Decision itself" rather than the challenged hands-off agreement. Doc No. 220 at 30. The "binding" feature of the current form of "Early Decision itself" exists only because it "is enforced by mutual agreement between would-be competitors not to compete." Doc No. 1 ¶ 6; *see id.* ¶¶ 105–24. Only Defendants' agreement to treat each other's ED admits as off-limits prevents rival schools from trying to win away these desirable students by lowering prices. That *agreement* is what makes the ED pool safe to rely on when setting tuition: each school can protect its own large block of committed, high-value admits because it affords the same protection to its rivals. Plaintiffs' well-pleaded allegations of increased prices flowing from the alleged hands-off agreement are thus more than plausible and cannot be defeated by assuming away the challenged restraint.

Direct evidence of higher prices, *id.* ¶¶ 126–29, makes analysis of market definition and market power unnecessary, even under the rule of reason. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986). But Plaintiffs have nonetheless adequately pleaded both. Plaintiffs' burden at this stage is only to allege "facts that plausibly delineate a relevant market." *See Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 297 (1st Cir. 2022). The Complaint defines the relevant market by objective characteristics: national rankings, selectivity, cross-elasticity of demand, industry and academic recognition, and self-identification. Doc No. 1 ¶¶ 151–55. The last factor is especially probative at this stage because, prior to discovery, no one knows better than the schools who their rivals are. By choosing to include some schools in COFHE and to exclude the rest, Defendant Schools created a group of "most," *i.e.*, a market-power-holding share, "of the

institutions widely identified as the 'elite' colleges and universities in the United States." *Id.* ¶ 154. That is not a conclusory label; it is the schools' own practical recognition of the market in which they operate. And if "a few additional schools belong in the market and/or…a few schools in the market do not belong," *Corzo*, 2026 WL 91424 at *15, that is for a jury to decide—it does not defeat market definition, even at summary judgment. Nor must the market and the conspiracy be coextensive. The market is the arena of competition; the conspiracy is the group restraining competition within it.

*Harm and Antitrust Standing.* The same increased prices that establish anticompetitive effects also establish harm and antitrust standing. Because Defendants cannot dispute that paying a supracompetitive price is textbook antitrust injury, they instead recast Plaintiffs' injuries as flowing only from "the decision to offer Early Decision." Doc No. 231 at 13. But the Complaint does not allege harm from early applications or early notification. It alleges harm from Defendants' horizontal agreement not to compete: ED students lose financial-aid competition, and all students are subject to higher sticker prices. That is why Miller has standing even though he applied Regular Decision. He paid the same artificially inflated posted price charged to all full-pay students—a price Plaintiffs allege was sustained by Defendants' collusion.

*Statute of Limitations.* D'Amico's and Silbert's claims are timely because their injuries do not flow from a single decision with lingering effects. Unlike *Choh v. Brown University*, 753 F. Supp. 3d 117, 135–37 (D. Conn. 2024), which involved a single denial of an athletic scholarship, this case involves annual tuition overcharges. Defendants continue to conform to the hands-off agreement, and they set new artificially inflated tuition rates each year. Each new, collusion-enhanced tuition-setting decision and each resulting payment within the limitations period is a new overt act causing new injury.

5

Dated: May 4, 2026

Respectfully Submitted:

By: */s/ Daniel McCuaig*

Edward Diver (admitted *pro hac vice*)
Peter Leckman (admitted *pro hac vice*)
Kevin Trainer (admitted *pro hac vice*)
**LANGER GROGAN & DIVER P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
ndiver@langergrogan.com
pleckman@langergrogan.com
ktrainer@langergrogan.com

Benjamin D. Brown (admitted *pro hac vice*)
Richard A. Koffman (admitted *pro hac vice*)
Daniel McCuaig (admitted *pro hac vice*)
Alex Bodaken (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, DC 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dmccuaig@cohenmilstein.com
abodaken@cohenmilstein.com

Daniel H. Silverman
Massachusetts Bar ID: 704387
**COHEN MILSTEIN SELLERS & TOLL PLLC**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

Emily Marcus (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
emarcus@cohenmilstein.com

6

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Dismiss For Failure to State a Claim has been served on all counsel of record via the Court's ECF system on May 4, 2026.

/s/ Daniel McCuaig
Daniel McCuaig