**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, THE TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, WILLIAM MARSH RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 25-CV-12221-AK |

1

## MEMORANDUM AND ORDER ON NON-MASSACHUSETTS DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

**ANGEL KELLEY, D.J.**

Plaintiffs Alayna D'Amico, Max Miller, Bella Robinson, and Bram Silbert, on behalf of themselves and all other similarly situated, bring this putative class action alleging a single cause of action under Section 1 of the Sherman Antitrust Act (the "Sherman Act") against 32 private universities, two college application platforms, and the Consortium on Financing Higher Education ("COFHE"). They allege that Defendants, by agreeing not to compete for students admitted through the Early Decision admissions process, conspired to restrain competition for certain students "in order to increase overall tuition levels and to decrease financial aid, thereby increasing the net price of attending these institutions." [Dkt. 1 ¶ 14]. In total, Defendants filed three Motions to Dismiss. [Dkts. 217; 219; 221]. Relevant here, a portion of the non-Massachusetts Defendants (for purposes of this Motion, "Defendants")—including Barnard College, Bowdoin College, Bryn Mawr College, Carleton College, Columbia University, Duke University, Emory University, Haverford College, Johns Hopkins University, Macalester College, Middlebury College, Northwestern University, Oberlin College, Pomona College, Scoir, Inc. ("Scoir"), Swarthmore College, University of Pennsylvania, University of Rochester, Vanderbilt University, Vassar College, and Washington University in St. Louis—filed a Motion to Dismiss for Lack of Personal Jurisdiction.[1] [Dkt. 217]. Plaintiffs oppose the Motion [Dkt. 225] and Defendants filed a Reply [Dkt. 230]. For the reasons stated below, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED**.

---

[1] Seven non-Massachusetts Defendants—Brown University, Cornell University, Dartmouth College, Rice University, Trinity College, University of Chicago, and Wesleyan University—did not join the Motion.

I.    BACKGROUND

The following facts are drawn from the Complaint and assumed as true for purposes of this Motion.  The college application process in the United States is broadly categorized under two systems, regular decision, and early decision.  Under the standard process, called "Regular Decision," prospective students apply by a set deadline, typically around the beginning of a year, and receive admissions decisions in the spring.  In addition to the standard Regular Decision college application process, many universities have adopted Early Decision ("ED"), which "is marketed to potential student applicants as an opportunity to increase their likelihood of acceptance at prestigious schools that have lower acceptance rates."  However, each applicant is only allowed to submit one ED application, which is due at the beginning or middle of November.  Nearly all students submit ED applications using the Common Application ("Common App") and the Coalition Application ("Coalition App") (together "Application Platforms").  The Common App and Coalition App are centralized online platforms for students to consolidate their applications to apply to colleges and universities.  The Application Platforms allow students to submit only a single ED application on their platforms.

The Application Platforms, at the direction of participating schools, require students to sign an agreement "resembl[ing] a contract" in which they agree to accept admission "received through Early Decision, to withdraw any other pending applications, and to make no further applications to other schools."  The agreement also allows schools that admit a student through ED to share the student's name and commitment with other institutions.  Students who apply ED while also requesting financial aid sign the same agreement but with the express caveat that "the student need not withdraw other applications until the student has received notification about financial aid from the admitting early decision institution." [Id. ¶ 92].  The student may be

released from the ED agreement "only in cases of documented financial hardship." [Id.].

To enforce the agreement, schools share a list of students admitted through ED, resulting in other schools removing those students from their admission pools.  In addition to sharing information about ED admissions, many universities are or have been members of COFHE.  Formed in the 1970s, COFHE is an unincorporated organization of private liberal arts schools that facilitates the sharing of information regarding financing attendance, such as financial aid.  Through COFHE, member schools can compare their respective tuition levels and financial aid offers to prospective students.

Under the current system, where students may apply ED to only one school, they cannot compare or use competing financial aid offers to negotiate better packages.  This restriction reduces their bargaining power and generally leads to lower aid overall.  ED benefits colleges and universities by enabling them to accept students who can pay full tuition and are committed to attending if accepted.  By targeting applicants who are less sensitive to price and who forgo consideration of competing offers, schools can fill large portions of their classes with students willing to pay higher tuition.  These students accept elevated costs in exchange for a perceived higher chance of admission to a single institution, which allows the school to maintain or increase full tuition rates.

Further, Plaintiffs allege that the coordinated practices of sharing applicant information, dividing prospective students among schools, and collectively honoring these exclusive commitments effectively enforce ED agreements.  And by assigning students to a single institution without competition, these policies foster a collaborative arrangement among competing schools that unlawfully suppresses price competition to the detriment of applicants.

Plaintiffs bring this action on behalf of a purported class composed of all individuals who

enrolled in a full-time undergraduate program at a Defendant School within the four years prior to the filing of this Complaint, through the period in which the effects of Defendants' conduct continue (the "Class"). The Class includes students who paid for some or all of their education and excludes students who received financial aid grants that met the full cost of attendance. Class members fall into one of the following two categories: (i) students admitted through the ED process who received financial aid grants for at least one semester, or (ii) students admitted through any decision process who did not receive financial aid grants for any semester. On August 8, 2025, Plaintiffs filed a class action Complaint asserting a claim under Section 1 of the Sherman Act seeking declaratory judgment, injunctive relief, and damages. Defendants filed three motions to dismiss [Dkts. 217, 219, and 221]. On May 1, 2026, the Court heard oral arguments. Plaintiffs bring this lawsuit to compensate Class members for the financial harm of Defendants' purported conspiratorial conduct and to prevent future injuries from the alleged ongoing conspiracy.

## II.    LEGAL STANDARD

When personal jurisdiction is contested, the plaintiff has the "ultimate burden of showing by a preponderance of the evidence that jurisdiction exists." Vapotherm, Inc. v. Santiago, 38 F.4th 252, 257 (1st Cir. 2022) (quoting Adams v. Adams, 601 F.3d 1, 4 (1st Cir. 2010)). When the court assesses its jurisdiction without an evidentiary hearing, the *prima facie* standard applies. See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002). Under this standard, the plaintiff should "proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016). The court reviews the pleadings, supplemental filings in the record, and undisputed facts provided by the defendant, "giving

credence to plaintiff's version of genuinely contested facts." Id.  While the plaintiff's burden of proof is "light," reliance on "mere allegations" alone will not suffice. Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 8 (1st Cir. 2002) (citing Daynard, 290 F.3d at 51).  Instead, a plaintiff "must point to specific facts in the record that support" their claims. Id.  The defendant may also offer evidence, but the evidentiary proffers of the defendant "become part of the mix only to the extent that they are uncontradicted." Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007) (citing Mass. Sch. of L. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)); see Baskin-Robbins, 825 F.3d at 34.

## III.    DISCUSSION

Defendants move to dismiss for lack of personal jurisdiction, contending that Plaintiffs are unable to establish personal jurisdiction under either Section 12 of the Clayton Act, 15 U.S.C. § 22, or the Federal Rules of Civil Procedure Rule 4 and Massachusetts' long-arm statute. As explained below, the Court concludes that the Plaintiffs have established personal jurisdiction under Section 12.  Therefore, it is unnecessary to address Rule 4 or the analysis under the Massachusetts' long-arm statute, though the Court also finds that those requirements are met.

### A.    Section 12 of the Clayton Act

The Clayton Act of 1914 is a foundational antitrust law that, among other things, expanded the reach of personal jurisdiction for antitrust suits beyond preexisting statutes and caselaw.  In relevant part, Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

6

15 U.S.C. § 22. "Section 12 consists of two parts,[2] one before the semicolon, which addresses venue . . . and another after the semicolon, which provides for worldwide service of process and, therefore, the exercise of personal jurisdiction in such cases." <u>Mun. of Bayamón v. Exxon Mobil Corp.</u>, No. 22-CV-1550, 2025 WL 2630671, at *20 (D.P.R. Sep. 11, 2025) (internal quotation marks omitted). "[T]he plain language of Section 12 indicates that its service of process provision applies (and, therefore, establishes personal jurisdiction) only in cases in which its venue provision is satisfied." <u>Daniel v. Am. Bd. of Emergency Med.</u>, 428 F.3d 408, 423 (2d Cir. 2005).

**B.    Venue[3]**

Under Section 12, a district can satisfy the venue provisions when: (1) the corporation is an inhabitant and thus incorporated in that state; (2) the corporation is 'found' in the state, and thus is considered to be doing business in that state; or (3) the corporation is transacting business in the state which has fewer requirements than when a corporation is 'found' in that state. <u>In Re Auto. Refinishing Paint Antitrust Litig.</u>, 358 F.3d 288, n. 6 (3d Cir. 2004) (internal citations omitted). "[O]nly the last and most expansive of these tests [transacting business] is relevant here." <u>KM Enters.</u>, 725 F.3d at 731. Thus, the Court addresses whether the Defendants transact

---

[2] While not disputed by the parties and not yet addressed by the First Circuit, this Court agrees with the majority approach taken by the Second, Seventh, and D.C. Circuits, as well as another court in this circuit, that the two clauses in Section 12 should be read in conjunction, known as the integrated approach. <u>See</u> <u>KM Enters., Inc. v. Glob. Traffic Techs., Inc.</u>, 725 F.3d 718, 730 (7th Cir. 2013); <u>Daniel.</u>, 428 F.3d at 423; <u>GTE New Media Servs., Inc. v. BellSouth Corp.</u>, 199 F.3d 1343, 1351 (D.C. Cir. 2000); <u>Bayamón</u>, 2025 WL 2630671, at *19-20; <u>see also</u> <u>In re Blue Cross Blue Shield Antitrust Litig.</u>, 225 F. Supp. 3d 1269, 1292 (N.D. Ala. 2016).

[3] "The court may consider 'the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record,' including a defendant's offerings." <u>Groma, LLC v. BuildRE, LLC</u>, 668 F. Supp. 3d 40, 45 (D. Mass. 2023) (internal citation omitted). "We then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." <u>Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 34 (1st Cir. 1998). The facts in Defendants affidavits are uncontradicted and the Court assesses them.

business in Massachusetts in a manner sufficient to justify venue in the District.

The Supreme Court interprets the phrase "transacts business" as "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." Id. (quoting United States v. Scophony Corp. of Am., 333 U.S. 795, 807 (1948)); Daniel, 428 F.3d at 429; Bayamón, 2025 WL 2630671, at *20; Hansen v. Nw. Univ., No. 24-CV-9667, 2025 WL 2731378, at *5 (N.D. Ill. Sep. 24, 2025). For a transaction of business to be of "substantial character," there must be "some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district." World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League, No. 24-CV-01066, 2024 WL 4893266, at *16 (S.D.N.Y. Nov. 26, 2024) (quoting Dennis v. JPMorgan Chase & Co., 343 F. Supp. 3d 122, 199 (S.D.N.Y. 2018)). Thus, "isolated and sporadic contacts with the forum state are not sufficient to constitute transacting business . . . . [I]t must have some degree of continuity.'" Buckeye Assocs., Ltd. v. Fila Sports, Inc., 616 F. Supp. 1484, 1489 (D. Mass. 1985) (quoting Grappone, Inc. v. Subaru of Am., Inc., 403 F. Supp. 123, 130 (D.N.H. 1975)). With that said, as far back as 1931, the First Circuit has held that a business is not required to have an office or presence within the state. Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp., 46 F.2d 623, 625 (1st Cir. 1931) ("[W]hile a single transaction of business may not be sufficient to establish a venue in a district, it does not require the maintenance of an office or place of business or the presence of agents soliciting or taking orders").

Notably, courts have interpreted "transacts business" broadly considering Section 12's congressional purpose and legislative history. Prior to Section 12's enactment, venue for an antitrust action was proper only in the district in which a corporate defendant was incorporated, headquartered, had its principal place of business, or was found. By adding the words "transacts

8

business," Congress expanded venue beyond "the concept of carrying on business denoted by 'found' under the preexisting statute and decisions." Scophony, 333 U.S. at 807.  This venue expansion allows injured individuals to bring causes of action in their own district and prevent corporations from avoiding lawsuits being filed only where they were headquartered.  See id. (internal quotation marks omitted).  "Undoubtedly, Congress viewed Section 12's 'main contribution to be its expansion of the bounds of venue.'" Daniel, 428 F.3d at 425 (quoting Go-Video, Inc. v. Akai Elec. Co., 885 F.2d 1406, 1410 (9th Cir. 1989)).

When considering the purpose of Section 12 and Defendants' contacts with Massachusetts, this Court has little doubt that Defendants transact business with such substantial character to justify proper venue in this District.  Several other district courts have found that "receiving substantial or regular payments from [a district] or maintaining clubs or facilities in [a district]" are sufficient to establish contacts. World Ass'n of Icehockey Players Unions N. Am. Div., 2024 WL 4893266, at *17.  Here, in affidavit after affidavit, each moving Defendant attests that they receive substantial, regular payments from students who reside in Massachusetts, and that the payments continue year after year.  To illustrate the point, the Court will focus on several of the smaller moving Defendants that claim to have the most minor contacts with this District.

First are out-of-state schools with allegedly few students who are Massachusetts residents.  Pomona College in California, for example, avers that in Fall 2025, it had approximately 1,690 total students, of which only 2.3% of students were Massachusetts residents—a percentage that is generally consistent from year to year.  Schools like Swarthmore College and Bryn Mawr College in Pennsylvania, which are of a similar size and closer to Massachusetts, report similar numbers. [See Dkts. 218-2 ¶ 9 (reporting a total undergraduate size for Bryn Mawr of 1,375 students, of which approximately 8.5% reside in Massachusetts); 218-17

¶ 8 (showing similar numbers for Swarthmore)].  According to Plaintiffs' conservative estimates, Pomona is the "only school possibly deriving less than $1 million a year from Massachusetts," but still receives annual payments of about $800,000. [Dkt. 225 at 19].  At nearly $1 million, the Court readily finds that these schools transact business of a sufficient magnitude to establish venue in this District.

Several other courts have found similar, regular payments to be of such a substantial character to justify venue.  For example, receipt of premiums and administrative fees from health plan subscribers in amounts of $190,000, $235,000, $600,000, and $900,000, respectively, sufficiently justified venue.  In re Blue Cross Blue Shield Antitrust Litig., 225 F. Supp. 3d at 1296.  Similarly, courts found venue was proper for organizations with nearly $1,000,000 in invoices across almost two years, MM Glob. Servs. Inc. v. Dow Chem. Co., 404 F. Supp. 2d 425, 433 (D. Conn. 2005), nearly $300,000 in purchases across three years, McCrory Corp. v. Cloth World, Inc., 378 F. Supp. 322, 324 (S.D.N.Y. 1974), and $2,000,000 in purchases over several years, U.S. v. Burlington Indust. Inc., 247 F. Supp. 185, 187 (S.D.N.Y. 1965).  Here, because each Defendant receives similar total payments from Massachusetts-based students in a single year, year after year, the Court finds that their contacts are sufficiently substantial to establish venue.

Second, Defendant Scoir, is an education technology company that offers a centralized platform for college planning, including the Coalition App.  It is the one non-University Defendant to join the Motion and is another Defendant with ostensibly minimal contacts with Massachusetts.  Scoir asserts that "[a]pproximately 350,000 students entering college in the fall of 2024 utilized Scoir's various services," of which 4.8% were Massachusetts residents, a percentage that is generally consistent from year to year. [Dkt. 218-16 ¶ 6].  However, as

Plaintiffs allege, "[t]hat translates to Massachusetts residents submitting at least 16,800 applications via Scoir's Coalition App." [Dkt. 225 at 19].  The Court finds this is sufficiently numerous, regular, and repeated contact with residents of the District to justify venue.  More broadly, because the remaining moving Defendants each have more significant contacts with Massachusetts than these two categories of Defendants, the Court concludes that venue is proper for all Defendants.

Notably, a recent case in another circuit but with substantially similar facts, Hansen v. Northwestern in the Northern District of Illinois, came to a different conclusion. 2025 WL 2731378.  In Hansen, the court found:

> While a small percentage of Illinois residents attend the Non-Illinois [School] Defendants . . . without more detail about the Non-Illinois Defendants' activities, the fact that the Non-Illinois Defendants recruit students from Illinois, draw some part of their student body from Illinois, and receive tuition payments from Illinois residents does not provide a basis to conclude that the Non-Illinois Defendants conduct business "of any substantial character" in this District.

Id. at *6.

The Court declines to follow Hansen for two reasons.  First, in contrast to the scant declarations provided in Hansen, the level of detail in the Defendants' affidavits, in conjunction with Plaintiffs' analysis, provide sufficient information as to Defendants' activities in the District to enable the Court to make an appropriate determination.  Second, and more importantly, the Court finds that the total volume of business in a forum, rather than the proportion of business in a forum, is the appropriate measure for determining proper venue.

Some courts, particularly those in the Seventh Circuit where the Hansen court sits, consider the percentage of sales, purchases, or business as an important factor. See e.g., KM Enters.,725 F.3d at 731, Sanderson v. Spectrum Labs, Inc., 227 F. Supp. 2d 1001, 1006 (N.D. Ind.), aff'd, 248 F.3d 1159 (7th Cir. 2000); Indus. Models, Inc. v. SNF, Inc., 14-C-8340, 2015

WL 2399089, at *2 (N.D. Ill. May 18, 2015).

However, courts have found that "it is not the percentage of a corporation's business in the district one looks to in resolving the venue question . . . The defendant's volume of business must be evaluated from this point of view of the average businessman, not the corporate giant." King v. Johnson Wax Assocs., Inc., 565 F. Supp. 711,716 (D. Md. 1983) (citation omitted). Further, in this District, courts have found that "whether a defendant corporation's activities are of a 'substantial character' within the meaning of Section 12 is generally based on the point of view of the 'average businessman,'" and have "rejected the view that 'substantiality' should be tested by looking to the percentage of the defendant's business conducted within the forum district." Buckeye, 616 F. Supp. at 1490; see also Sunbury Wire Rope Mfg. Co. v. U.S. Steel Corp., 129 F. Supp. 425, 427 (E.D. Pa. 1955) ("The important thing is whether or not the sales would appear to be substantial from the average businessman's point of view.").

Using percentages, as opposed to total value, "does not comport with the basic principles behind Section 12's transacts-business test." In re Blue Cross Blue Shield Antitrust Litig., 225 F. Supp. 3d at 1295. Percentages are the incorrect metric for several reasons. First, "[t]he percentage of revenue approach adds a technical factor that an antitrust plaintiff would be required to consider in determining whether a particular district is an appropriate venue under Section 12," which ignores the Supreme Court's finding "that the transacts-business prong of Section 12 'sloughed off the highly technical distinctions . . . glossed upon' the Sherman Act's venue provision in favor of a 'practical and broader business conception of engaging in any substantial business operations.'" Id. (quoting Scophony, 333 U.S. at 807).

Second, "such an approach favors large corporations over small corporations because, in marginal cases, a large corporation could make an identical amount of sales as a small business

12

in a particular district but avoid jurisdiction under Section 12 based on its larger pool of total sales." Id. (citation omitted); Green v. U.S. Chewing Gum Mfg. Co., 224 F.2d 369, 372 (5th Cir. 1955). What is important is whether the sales would appear substantial from the perspective of the average businessman. See Sunbury Wire Rope Mfg. Co., 129 F. Supp. at 427.

Finally, Section 12's transacts-business prong was specifically meant to relieve "antitrust plaintiffs of the burden of filing antitrust suits in far-flung districts." In re Blue Cross Blue Shield Antitrust Litig., 225 F. Supp. 3d at 1295 (citing Scophony, 333 U.S. at 808); see also MM Glob. Servs. Inc., 404 F. Supp. 2d at 432-33.

Under the percentage-of-revenue approach, a large corporation can—whether intentionally or not—shift the burden onto a plaintiff by requiring them to file lawsuits in far-off districts. In re Blue Cross Blue Shield Antitrust Litig., 225 F. Supp. 3d at 1295. In a conspiracy case, this may even force the plaintiff to divide their claims across multiple districts, despite the corporation generating tens or even hundreds of thousands of dollars in sales within the district in question. Id.; see also King, 565 F. Supp. at 716. This Court cannot endorse such a subversion of Section 12's purpose.

Thus, when considering the volume of payments received from Massachusetts residents, an average businessman would certainly consider Pomona College's receipt of approximately $800,000 in tuition payments, the smallest estimated total of the moving non-Massachusetts University Defendants, substantial as compared to his own business. See Sunbury Wire Rope Mfg. Co., 129 F. Supp. at 427 ("In my opinion, almost $600,000 worth of business in less than two years, viewed absolutely and without reference to the sales volume of any particular corporation, would appear to be quite substantial to the average businessman as compared to the sales figures of his own business."). The same is true for the approximately 16,800 applicants,

13

representing 16,800 customers, who submitted via Scoir's Coalition App.

The Court finds that the regularity, continuity, and volume of payments received[4] by the moving non-Massachusetts Defendants are of such a substantial character to justify venue in the District of Massachusetts.

### C.        Nationwide Service of Process

The second part of Section 12 of the Clayton Act provides for nationwide service of process, and thus nationwide personal jurisdiction. 15 U.S.C. § 22; see also Hansen, 2025 WL 2731378, at *5 (citing KM Enters., 725 F.3d at 731).  Nationwide personal jurisdiction under Section 12 requires only that Defendants have sufficient minimum contacts with the United States. Hansen, 2025 WL 2731378, at *5.  Defendants plainly have sufficient contacts with the United States because they are incorporated and headquartered here, and nothing is unreasonable about requiring Defendants to submit to the authority of the federal courts.  Accordingly, because the Court concludes that venue is proper in the District of Massachusetts, Plaintiffs have established that the Court has personal jurisdiction over Defendants. KM Enters., 725 F.3d at 730 ("To avail oneself of the privilege of nationwide service of process, a plaintiff must satisfy the venue provisions of Section 12's first clause.").

---

[4] Moreover, while the volume and continuity of payments received from the District are sufficient on its own, other factors also weigh in favor of finding venue appropriate.  Although in a different context, when reviewing Massachusetts's long-arm statute, the First Circuit found that the mailing of "application information and an acceptance letter were sufficient, without more, to constitute transacting business under the broadly construed Massachusetts long-arm statute," as was undoubtedly the case for the Massachusetts domiciled students attending each of the moving non-Massachusetts University Defendants. See Hahn v. Vt. L. Sch., 698 F.2d 48, 51 (1st Cir. 1983).  Additionally, as Plaintiffs claim, "each non-Massachusetts Defendant regularly attends in-person meetings in this District—just across the river in Cambridge—that advance and facilitate the conspiracy." [Dkt. 225 at 23]; see also World Ass'n of Icehockey Players Unions N. Am. Div., 2024 WL 4893266, at *17 (finding that court should consider if a corporation "maintain[s] clubs or facilities in this District.).  These additional factors further support that venue is proper.

14

**IV.    Rule 4 and Massachusetts Long-Arm Statute**

Fed. R. Civ. P. 4(k)(1)(A) provides that service of process establishes personal jurisdiction over a defendant when the defendant is subject to the jurisdiction of the courts of the state where the federal court is located.  Under the Massachusetts long-arm statute, "[a] court may exercise personal jurisdiction over a person . . . as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth." Reagent Fund II, LP v. Lotus Gunworks of S. Fla., LLC, 687 F. Supp. 3d 169, 174 (D. Mass. 2023).  To establish jurisdiction under this statute, the facts must show that: "(1) the defendant transacted business in Massachusetts, and (2) the plaintiff's claim arose from that transaction." Id.

Here, the Court has already determined that personal jurisdiction is proper under Section 12 of the Clayton Act, as discussed *supra* in Section III. B., because the Defendants have transacted business in Massachusetts, and Plaintiff's claim arose from that transaction.  For the same reasons, the Court concludes that the Defendants' conduct also satisfies the requirements of the Massachusetts long-arm statute.

**V.    CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [Dkt. 217] is **DENIED**.

**SO ORDERED.**

Dated: August 7, 2026                    /s/ Angel Kelley
                                         Hon. Angel Kelley
                                         United States District Judge

15