**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ALAYNA D'AMICO, MAX MILLER, BELLA ROBINSON, and BRAM SILBERT, representing themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONSORTIUM ON FINANCING HIGHER EDUCATION, THE COMMON APPLICATION INC., SCOIR INC., AMHERST COLLEGE, BARNARD COLLEGE, BOWDOIN COLLEGE, BROWN UNIVERSITY, BRYN MAWR COLLEGE, CARLETON COLLEGE, COLUMBIA UNIVERSITY, CORNELL UNIVERSITY, THE TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, HAVERFORD COLLEGE, JOHNS HOPKINS UNIVERSITY, MACALESTER COLLEGE, MIDDLEBURY COLLEGE, MOUNT HOLYOKE COLLEGE, NORTHWESTERN UNIVERSITY, OBERLIN COLLEGE, POMONA COLLEGE, WILLIAM MARSH RICE UNIVERSITY, SMITH COLLEGE, SWARTHMORE COLLEGE, TRINITY COLLEGE, UNIVERSITY OF CHICAGO, UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, VANDERBILT UNIVERSITY, VASSAR COLLEGE, WASHINGTON UNIVERSITY IN ST. LOUIS, WELLESLEY COLLEGE, WESLEYAN UNIVERSITY, and WILLIAMS COLLEGE,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 25-CV-12221-AK |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

**ANGEL KELLEY, D.J.**

Plaintiffs Alayna D'Amico, Max Miller, Bella Robinson, and Bram Silbert, on behalf of themselves and all others similarly situated, bring this putative class action alleging a single cause of action under Section 1 of the Sherman Antitrust Act (the "Sherman Act") against thirty-two private universities, two college application platforms, and the Consortium on Financing Higher Education. They allege the school defendants, by agreeing not to compete for students admitted through the Early Decision admissions process, conspired to restrain competition for an agreed-upon group of students "in order to increase overall tuition levels and to decrease financial aid, thereby increasing the net price of attending these institutions." [Dkt. 1 ¶ 14].

In total, Defendants filed three Motions to Dismiss. [Dkts. 217, 219, 221]. Relevant here are two: the joint Motion to Dismiss [Dkt. 219] filed by Defendants Amherst College, Barnard College, Bowdoin College, Brown University, Bryn Mawr College, Carleton College, Columbia University, Cornell University, the Trustees of Dartmouth College, Duke University, Emory University, Haverford College, Johns Hopkins University, Macalester College, Middlebury College, Mount Holyoke College, Northwestern University, Oberlin College, Pomona College, William Marsh Rice University, Smith College, Swarthmore College, Trinity College, University of Chicago, University of Pennsylvania, University of Rochester, Vanderbilt University, Vassar College, Washington University in St. Louis, Wellesley College, Wesleyan University, Williams College (the "School Defendants"), and the Consortium on Financing Higher Education ("COFHE"), the Common Application Inc. ("Common App"), and Scoir Inc. ("Scoir") (the "Non-School Defendants") (together with the School Defendants, "Defendants"), and the Motion to Dismiss [Dkt. 221] filed by the Non-School Defendants COFHE, the Common App, and Scoir.

Plaintiffs opposed the Motions to Dismiss [Dkt. 225], the moving Non-School Defendants filed a Reply [Dkt. 229], and all Defendants filed a joint Reply [Dkt. 231].  For the reasons stated below, the Defendants' Motion to Dismiss [Dkt. 219] is **DENIED** and the Non-School Defendants' Motion to Dismiss [Dkt. 221] is **GRANTED**.

## I.    BACKGROUND

All facts taken from the Complaint are accepted as true for purposes of a motion to dismiss.  The Early Decision admission process ("ED") is a binding application pathway that schools widely adopted in the early 1990s.  Under ED, a student may apply to only one school and is bound to attend that school if admitted from the ED applicant pool.  By making this binding commitment, the student signals heightened interest in one institution; she also has a few months' notice prior to regular decision students to learn whether she has been admitted.  If that student's application is deferred to the Regular Decision pool, she is free to decide to go to another school.

In contrast to ED, Restricted Early Action and Early Action ("EA") are admissions pathways that involve many of the same benefits as ED.  Under EA, the applicant applies for early admission, but it is nonbinding.  Under Restricted Early Action, an applicant applies early to only *one* school, allowing her to signal a heightened interest in that particular school.  Under both EA and Restricted EA, applicants receive a decision early in the process.  And under either EA pathway, the application is not binding; a student is free to apply to other schools in the Regular Decision process and choose from competing schools at any stage in the process.

These agreements between the students and the schools are memorialized in the form of agreements through the Common App or Scoir's Coalition Application ("Coalition App") during the application process.  The Common App is a nonprofit organization founded in 1975 with

membership of fifteen colleges to streamline the admission process for students.  Scoir is a software service platform that provides students, parents, high school counselors, and colleges with a suite of tools to accomplish its three goals: (1) simplifying the college application process, (2) expanding collegiate access, and (3) improving student outcomes.

Through the Common App or the Coalition App, students applying ED sign an agreement promising to attend that school if admitted through ED.  While the Early Decision agreement is presented in a form that resembles a contract, an applicant's commitment is not actually legally binding.  The Common App's ED Agreement expressly requires the student to acknowledge that the school "may share [their] name and [their] early commitment with other institutions." [Dkt. 1 ¶ 83].

According to Plaintiffs, the School Defendants enforce these binding ED agreements by colluding with competitor schools, rather than relying only on student applicants to abide by the terms.  Thus, Plaintiffs allege, these schools—institutions that vigorously compete for the best students in the country—agree not to compete for a specific pool: students who are admitted ED. For example, certain Ivy League schools have joined the Ivy League Joint Statement ("Joint Statement"), under which the member schools—including those that do not offer ED, like Harvard and Yale—agree to refrain from competing for students accepted through other Ivy League schools' ED programs.  Beyond the Joint Statement, each School Defendant is or has been a member of COFHE.  COFHE is an unincorporated association of selective colleges and universities headquartered in Cambridge, Massachusetts.  COFHE describes itself as an "organization of highly selective, private liberal arts colleges and universities," whose stated purpose is to facilitate information sharing among ostensibly competing elite education institutions "as they relate to undergraduate education, admissions, financial aid, and the

financing of higher education." [Dkt. 1 ¶ 22].  Past and present COFHE members allegedly share lists of students admitted through ED to enforce the hands-off agreement.

According to Plaintiffs, this scheme has significant anti-competitive effects on students' financial outcomes.  When a student applies through the binding ED process, she commits to paying the tuition and fees the school demands of her, provided her family can afford the price of attendance after factoring in the school's offered financial aid package.  Thus, for students who do not need financial aid, signaling heightened interest via ED also signals the willingness to pay any price the school asks.  And for students receiving a financial aid package, signaling heightened interest via ED indicates the willingness to accept the types of aid awarded[1], without the ability to meaningfully negotiate the composition of grants versus loans.  Thus, students who apply for ED are financially worse off while schools reap the benefit of both higher tuition and lower financial aid awards or packages.

The effect is particularly pronounced for the School Defendants, who operate in a distinct market for top-tier applicants.  For these elite schools, admissions rates hover in single digits or low teens, and the demand far exceeds the supply.  In the context of high demand and limited seats, these schools have more leverage to artificially raise prices by admitting price-insensitive customers—that is, students who are not concerned about tuition prices and can afford to pay full tuition and have also indicated via ED that they will not consider competing offers from other schools.  Thus, Plaintiffs allege, the ED scheme results in artificially inflated prices for all applicants, including ED applicants, Regular Decision applicants, full-price families, and financial aid families.

---

[1] All students are charged the same standard tuition price.  However, some students receive discounts through either need-based or merit-based financial aid.  As a result, the actual tuition paid by students who receive these discounts can vary from one student to another.

In 2018, Plaintiffs Alayna D'Amico and Bram Silbert applied to Wesleyan University through its ED program, were accepted, and enrolled in 2019. Likewise, in 2021, Plaintiff Bella "Jude" Robinson applied to Vassar College through its ED program, was accepted, and enrolled in 2022. Additionally, Plaintiff Max Miller applied to Washington University in St. Louis through its Regular Decision process, was accepted, and enrolled in 2022. D'Amico, Silbert, and Miller paid the full cost of attendance, while Robinson received partial financial aid in the form of grants, loans, and work-study.

Plaintiffs bring this action on behalf of a purported class composed of all individuals who enrolled in a full-time undergraduate program at a Defendant School within the four years prior to the filing of this Complaint, through the period in which the effects of Defendants' conduct continue (the "Class"). The Class includes students who paid for some or all their education and excludes students who received financial aid grants that met the full cost of attendance. Class members fall into one of the following two categories: (i) students admitted through the ED process who received financial aid grants for at least one semester, or (ii) students admitted through any decision process who did not receive financial aid grants for any semester.

On August 8, 2025, Plaintiffs filed this class action Complaint asserting a claim under Section 1 of the Sherman Act seeking declaratory judgment, injunctive relief, and damages. Defendants filed three Motions to Dismiss [Dkts. 217, 219, and 221]. On May 1, 2026, the Court heard oral arguments. Plaintiffs bring this lawsuit to compensate Class members for the financial harm of Defendants' purported conspiratorial conduct and to prevent future injuries from the alleged ongoing conspiracy.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

6

complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Reading the complaint "as a whole," the court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. Id.  Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id.  A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Second, the court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559).  As explained by the First Circuit:

> The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.  Assuming that [plaintiff] can adduce sufficient evidence to support its factual allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder. . . . Pleading requirements are thus starkly distinguished from what would be required at later litigation stages, or at trial.

Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 45-46 (1st Cir. 2013) (quoting Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 189-90 (2d Cir. 2012)).

## III.     DISCUSSION

Plaintiffs claim that the Defendant Schools' agreement not to compete for students accepted to another school via ED is an unlawful restraint of trade in violation of Section 1 of the Sherman Act.  Specifically, once a student is accepted to a competitor school through ED, the

School Defendants stop competing for that student and remove them from their applicant pools. This conduct allegedly inflates the cost of college for all because price-insensitive students[2] admitted through ED are forced to pay full tuition and fees.  Defendants have moved to dismiss on several grounds: (1) Plaintiffs do not have standing under the Sherman Act; (2) Plaintiffs D'Amico and Silbert's claims are barred by the statute of limitations, and (3) Plaintiffs fail to state a claim under Section 1 of the Sherman Act.  The Court addresses each argument in turn.

A.      Antitrust Standing

Defendants argue that Plaintiffs do not have antitrust standing.  The Court disagrees. Antitrust standing is a judicial doctrine that determines whether plaintiffs have standing to sue under federal antitrust laws, including the Sherman Act.  Courts have held that "[a]ntitrust standing is not jurisdictional, and, accordingly, the proper basis for dismissing a claim for lack of antitrust standing is Rule 12(b)(6)." Golden v. Intel Corp., No. 2023-1257, 2023 WL 3262948, at *1, n.2 (Fed. Cir. May 5, 2023); see Gerlinger v. Amazon.com Inc., Borders Group, Inc., 526 F.3d 1253, 1256 (9th Cir. 2008) ("Lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court.").

In order to have antitrust standing, "a plaintiff must have 'suffered an injury of the kind antitrust laws were intended to prevent, such that Plaintiff is a proper party to bring a federal antitrust suit.'" EmblemHealth, Inc. v. Alexion Pharms., Inc., 813 F. Supp. 3d 205, 217-18 (D. Mass. 2025) (quoting United Food & Com. Workers Union & Emps. Midwest Health Benefits Fund v. Novartis Pharm. Corp., 902 F.3d 1, 5 (1st Cir. 2018)).  The Supreme Court has established a six-factor test to determine whether a plaintiff has antitrust standing, and the Court

---

[2] Plaintiffs define price-insensitive students as those who are willing to accept artificially inflated tuition in the absence of competition in exchange for the apparent possibility of an increased likelihood of acceptance to a single school.

must "consider the balance of factors in each case." <u>Sullivan v. Tagliabue</u>, 25 F.3d 43, 46 (1st

Cir. 1994).  These factors are:

> (1) the causal connection between the alleged antitrust violation and harm to Plaintiff;
> (2) an improper motive;
> (3) the nature of Plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury");
> (4) the directness with which the alleged market restraint caused the asserted injury;
> (5) the speculative nature of the damages; and
> (6) the risk of duplicative recovery or complex apportionment of damages.

<u>Id.</u> (citing <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S.

519, 537-45 (1983)).

Here, the first four of the six factors plainly show that Plaintiffs have antitrust standing.

<u>See</u> <u>Sullivan</u>, 25 F.3d at 46 (quoting <u>L. A. Mem'l Coliseum v. Nat'l Football League</u>, 791 F.2d

1356, 1363 (9th Cir.1986)) ("Most cases will find some factors tending in favor of

standing . . ., and some against . . ., and a court may find standing if the balance of factors so

instructs.").  Plaintiffs have sufficiently established the first four factors; thus, the Court finds

that they have antitrust standing.

First, Plaintiffs plead a causal connection by alleging that the ED conspiracy has directly

resulted in systemic tuition inflation and a reduction in financial aid to students.  Second,

Plaintiffs plead improper motive by alleging that the School Defendants are financially

incentivized to increase overall tuition levels and decrease both need-based and merit-based

financial aid.  Third, Plaintiffs also allege that because of the market restraint, students are

deprived of any negotiating leverage because of the ED conspiracy.  And, in a normal

competitive market, students use multi-school acceptances to negotiate better aid packages.

Under the ED conspiracy, once a student is admitted, they lose all bargaining power because

they cannot make a credible threat to go elsewhere, since the schools have agreed not to entertain

9

offers from ED-admitted students.  Thus, Plaintiffs allege that this restraint directly causes the asserted injury, in that the ED conspiracy inflates tuition and eliminates the bargaining power of students who would benefit from negotiating financial aid packages from multiple institutions to receive the most affordable option.

As for the fourth factor, Plaintiffs have pleaded an antitrust injury.  To plead an antitrust injury, a plaintiff must show (1) injury to competition, i.e., "a reduction in output and an increase in prices in the relevant market," and (2) the defendant's actions caused their injury. See Sterling Merch., Inc. v. Nestle, S.A., 656 F.3d 112, 121 (1st Cir. 2011) (quoting Sullivan v. Nt'l Football League, 34 F.3d 1091, 1097 (1st Cir. 1994)).  Plaintiffs bear the burden of alleging facts from which an antitrust injury can be inferred. Id. (citation omitted); Growers 1-7 v. Ocean Spray Cranberries, Inc., No. 12-CV-12016, 2014 WL 1764533, at *6 (D. Mass. May 2, 2014) (citation omitted).  Plaintiffs have adequately pleaded both elements of antitrust injury.

Plaintiffs allege that after the adoption of ED in the 1990s, tuition began "skyrocketing" and that it has "significantly outstripped both overall inflation" and "Higher Education Price Index . . . which tracks costs incurred by colleges and universities." [Dkt. 1 ¶ 129].  This constitutes an injury to competition through a disproportionately rapid increase in tuition prices. Plaintiffs also allege that the injury was directly caused by Defendants' actions.  Consequently, Plaintiffs adequately pleaded an antitrust injury.  Accordingly, because Plaintiffs have pleaded four of the six factors, the Court finds they have antitrust standing.  The Court next addresses Defendants statute of limitations argument.

### B.    Statute of Limitations

Defendants argue that "Plaintiffs D'Amico and Silbert assert untimely claims that should be dismissed." [Dkt. 220 at 33].  As the Supreme Court stated, "[t]he basic rule is that damages

are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued,' plus any additional number of years during which the statute of limitations was tolled.  Generally, a cause of action accrues, and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine Rsch., Inc., 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b).

Alayna D'Amico applied to Wesleyan in the fall of 2018 through its Early Decision program.  Bram Silbert applied to Wesleyan in the fall of 2018 through its Early Decision program.  Neither D'Amico nor Silbert dispute that they enrolled at Wesleyan more than four years before this action was filed in 2025.  Rather, they both argue that their claims are timely under the continuing violation doctrine.

Plaintiffs contend that each semester's artificially inflated tuition payment represents a series of new overcharges, each of which restarts the statute of limitations.  Antitrust law recognizes that in the context of a continuing violation—such as a price-fixing conspiracy generating a series of unlawfully high-priced sales over time—"each overt act that is part of the violation and that injures the plaintiff," for example, each sale, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) (internal citation omitted).  However, the occurrence of a new overt act does not generally allow the plaintiff to recover for injuries caused by earlier acts that fall outside the limitations period. Id.

The Court agrees with D'Amico and Silbert that each time they paid inflated tuition, they suffered a new and independent injury, triggering a fresh limitations period.  D'Amico and Silbert posit that because they last paid inflated tuition in the summer of 2022, the four-year limitations window runs at least through summer 2026.  They argue that the Defendants apply

11

the ED scheme to each incoming class, share ED commitments across schools each year, and meet regularly through COFHE. Those actions, in turn, enabled Wesleyan to set and collect inflated tuition every semester that D'Amico and Silbert were enrolled.

The Court finds that D'Amico and Silbert first felt the adverse impact of their agreement with Wesleyan in 2018. The claims accrued at that point, and the statute of limitations began running. Yet, each semester, they suffered a new and independent injury, triggering a fresh limitations period.

Defendants disagree, and rely on Choh v. Brown University, 753 F. Supp. 3d 117 (D. Conn. 2024), aff'd, No. 24-2826, 2026 WL 905018 (2d Cir. Apr. 2, 2026), and aff'd, No. 24-2826, 2026 WL 1210124 (2d Cir. May 1, 2026), for the proposition that there was no continuing violation and thus these claims are time barred. However, Defendants' reliance on Choh is misplaced. In Choh, the court held that there was no continuing violation and thus the claims were untimely. 753 F. Supp. 3d at 136. There, the court reasoned that Brown University took overt action when it declined to award plaintiff an athletic scholarship. Id. The court stated that the plaintiff's lack of a scholarship for the rest of his time at Brown was simply "a manifestation of [that] overt act." Id. Here, however, Plaintiffs' purported injury is not from a one-time decision but rather the result of an artificially inflated tuition payment each semester. The injury is not from the failure to award an athletic scholarship, like in Choh, but rather from the inflated tuition paid each semester directly stemming from the ED conspiracy. Therefore, each semester where the School Defendants collect tuition and fees at inflated prices, a new antitrust injury occurs.

For the foregoing reasons, the Court concludes that Plaintiffs D'Amico and Silbert have plausibly alleged a continuing violation sufficient to restart the four-year statute of limitations

12

under the Sherman Act.  Accordingly, Defendants' Motion to Dismiss D'Amico and Silbert's claims as untimely is denied.

### C.    Section 1 of the Sherman Act

As the Supreme Court has explained, "[t]he Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.  It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958).  To bring a claim under Section 1 of the Sherman Act the plaintiff must prove "(1) the existence of an agreement, and (2) that the agreement was [an] unreasonable restraint of trade." Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1178 (9th Cir. 2016) (quoting Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 189-90 (2010)).

### 1.    Existence of an Agreement

To establish an agreement under Section 1 of the Sherman Act, a plaintiff must show that there is "direct or circumstantial evidence that reasonably tends to prove a . . . conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984).  Conspirators need not have identical motives for entering into the agreement. See, e.g., Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc., 295 F. Supp. 2d 75, 92 (D.D.C. 2003), dismissed, 2004 WL 1249736 (D.C. Cir. 2004). Section 1 of the Sherman Act does not prohibit all unreasonable restraints of trade, but "only restraints effected by a contract, combination or conspiracy." Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 43 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 553).  Further, "acquiescence in [a common] illegal scheme is as much a violation of the Sherman Act as the

13

creation and promotion of one." United States v. Paramount Pictures, Inc., 334 U.S. 131, 161 (1948).

At the pleading stage, plaintiffs need not offer definitive, or even probable, proof of a conspiracy. In the antitrust context, the Rule 12(b)(6) plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Evergreen, 720 F.3d at 45 (citing Twombly, 550 U.S. at 556). Thus, "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." Id. To sufficiently plead an agreement under Section 1, a plaintiff may use either direct or indirect evidence. See id. at 43.

### a.    Direct Evidence of Agreement

Plaintiffs pleaded direct evidence of an agreement to restrain trade with the Joint Statement. Direct evidence of a Section 1 violation might include "a recorded phone call in which two competitors agreed to fix prices, or documents or conversations explicitly manifesting the existence of the agreement in question. However, direct evidence need not be a 'smoking gun' that conclusively establishes the existence of a conspiracy." In re LIBOR-Based Fin. Instruments Antitrust Litig., 801 F. Supp. 3d 330, 376 (S.D.N.Y. 2025) (internal quotations omitted).

Here, the Joint Statement requires that each member school—including those without an ED option, like Harvard and Yale—agree not to compete for students accepted through other Ivy League schools' ED programs. The Statement provides, in relevant part: "[a]ll Ivy League institutions will honor any required commitment to matriculate that has been made to another college under this plan." [Dkt. 1 ¶ 116]. However, as Plaintiffs themselves acknowledge, only

14

five defendants—Brown, Columbia, Cornell, Dartmouth, and Penn—are parties to the Joint Statement.

Yet the absence of some Defendants as parties to the Joint Statement is immaterial at this stage.  Plaintiffs need not show that all necessary parties are part of the conspiracy at the pleading stage.  H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1012 (2d Cir. 1989) (quoting Schwimmer v. Sony Corp. of Am., 677 F.2d 946, 953 (2d Cir. 1982)) ("[A]ntitrust conspiracies 'are rarely evidenced by explicit agreements, but must almost always be proven by 'inferences that may be fairly drawn from the behavior of the alleged conspirators.'").  Direct evidence that some Defendants entered into the agreement, combined with the fact that the remaining Defendants engaged in conduct closely conforming to that of those who had joined, supports the inference that all Defendants were parties to the agreement. See Interstate Cir. v. United States, 306 U.S. 208, 221 (1939) (observing that direct evidence of an agreement is rare and that "in order to establish agreement [the government] is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators").

Here, Plaintiffs have identified direct evidence of an agreement: the Joint Statement. They also allege that the remaining schools' own conduct mirrors the conduct proscribed in the Joint Statement despite not being parties to the Joint Statement.  Schools like Harvard University, who were not parties to the Joint Agreement and did not have ED, ultimately chose to honor it anyway.  For example, in 2002, Harvard University complained about the program and, in response, Yale's Dean of Undergraduate Admissions and Financial Aid stated "Harvard has always respected and acknowledged the binding commitment of early decision programs . . . I assume they will continue to do so . . . ."  [Dkt. 1 ¶115].  Afterwards, Harvard honored the ED agreement and agreed not to compete for students admitted via ED.  This is only

15

one example—Plaintiffs allege other COFHE-member schools, like MIT who also does not have ED and is not a party to the Joint Statement, also enforce other schools' ED agreements.

Taken together with the Joint Statement, and the evidence of indistinguishable conduct by the COFHE-member schools, Plaintiffs have pleaded direct evidence of an agreement among the School Defendants and "inferences that may be fairly drawn from the behavior of the alleged conspirators." H.L. Hayden Co. of N.Y., 879 F.2d at 1012 (quoting Schwimmer, 677 F.2d at 953). Thus, Plaintiffs pleaded sufficient facts to show direct evidence of an agreement among the School Defendants and have raised a reasonable expectation that discovery will reveal the full contours of an agreement for the remaining School Defendants.

### b.      Circumstantial Evidence of Agreement

While Plaintiffs have pleaded direct evidence of an agreement, they have also identified circumstantial evidence of an agreement among the remaining Schools. To plead an agreement based on circumstantial evidence, Plaintiffs must plausibly allege parallel conduct and "something more." Twombly, 550 U.S. at 560. Parallel conduct, also known as "conscious parallelism," occurs when competitors independently adopt similar practices in reaction to market conditions without any agreement or collusion, and it "is not in itself unlawful." In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 56 (1st Cir. 2016) (quoting Twombly, 550 U.S. at 553-54). Plaintiffs often prove circumstantial evidence of an agreement by showing both parallel conduct and "plus factors," which are indicia that the alleged parallel conduct resulted from conspiracy rather than independent action. Id. at 58.

As the First Circuit explained in Evergreen Partnering Grp. v. Pactiv Corp., "[p]laintiffs must establish that it is plausible that defendants are engaged in more than mere conscious parallelism, by pleading and later producing evidence pointing toward conspiracy, sometimes

16

referred to as 'plus factors.'" 720 F.3d 33, 47 (1st Cir. 2013) (quoting White v. R.M. Packer Co., 635 F.3d 571, 577 (1st Cir. 2011)).  However, there is a key "distinction between pleading a plausible § 1 claim and the much later requirement of producing 'plus factor' evidence pointing towards conspiracy," and courts are "wary of placing too much significance on the presence or absence of 'plus factors' at the pleadings stage." Id.  While plus factors "are certainly helpful in guiding a court in its assessment of the plausibility of agreement in a § 1 case, other, more general allegations informing the context of an agreement may be sufficient," particularly given that "the increasing complexity and expert nature of 'plus factor' evidence . . . would not likely be available at the beginning stages of litigation." Id.  Parallel conduct allegations, standing alone, do not state a claim under Section 1, and plaintiffs relying on such evidence "must allege additional facts tending to exclude . . . the possibility of independent action." Twombly, 550 U.S. 544, 554 (2007).  These types of facts are known as "parallel plus" or "plus factors," Evergreen, 720 F.3d at 45, and plaintiffs must show that the parallel behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." Twombly, 550 U.S. at n.4.

Here, Plaintiffs sufficiently allege parallel conduct, contending that the School Defendants have all enacted identical ED admission processes and offer the same binding agreement through either the Common App or Coalition App.  Each School Defendant simultaneously maintains a Regular Decision admissions pathway alongside an ED pathway that dictates uniform constraints: a mandatory single application due in November, a strict requirement to withdraw all other applications upon acceptance, and a mandate to enroll students accepted via ED.  These identical actions demonstrate parallel conduct among the School Defendants.  Having found that the School Defendants engaged in parallel conduct, the Court

17

turns to the second step in the circumstantial evidence analysis—whether the School Defendants demonstrated any "plus factors."

Plaintiffs have sufficiently pleaded several plus factors that make the existence of an agreement plausible through circumstantial evidence.  Although there is not an "exhaustive" list of plus factors, "commonly cited factors include: '(1) evidence that the defendant had a motive to enter into a [] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.'" Advanced Tech. Corp. v. Instron, Inc., 925 F. Supp. 2d 170, 178 (D. Mass. 2013) (quoting Burtch v. Milberg Factors, Inc., 662 F.3d 212, 227 (3d Cir. 2011)).  Plaintiffs have alleged all three.

First, Plaintiffs allege that the School Defendants have a financial motive to engage in the conduct based on the profitability of price-insensitive ED applicants.  According to Plaintiffs, (a) students who are admitted ED pay more in tuition on average than those who are not, (b) tuition is higher in schools with ED programs, and (c) tuition would be lower if the School Defendants did not engage in the conspiracy.  These allegations establish a financial incentive to participate in the conspiracy.  Plaintiffs allege that students who are admitted via ED pay more in tuition on average than those who are not. [See Dkt. 1 ¶ 127 (schools charge "full tuition rates that are, on average, thousands of dollars higher than those charged by comparable schools without such [ED] programs"); id. (and that "[b]ut for their participation in the Early Decision Conspiracy described herein, full tuition rates at the defendant colleges and universities would be lower.")].  Through the ED conspiracy, schools lose their incentive to compete on price for students admitted through ED and thus drive up the total tuition and costs for all students.

Furthermore, Plaintiffs allege that individual schools face a legitimate fear of competitive disadvantage if they unilaterally abandon the conspiracy, arguing that if they do so, they lose

18

desirable applicants to peers and miss out on the inflated revenue built into the system.  Plaintiffs allege this is against the School Defendants' interests.  Plaintiffs allege that no School Defendant acting alone would refuse to consider or admit an applicant simply because that student had been accepted ED at another institution, when ED admits are disproportionately full-pay, price-insensitive students.  Thus, Plaintiffs have identified clear motives for the School Defendants to conspire: the financial benefit to schools in the ability to charge higher tuition and fees to students admitted via ED and the fear of losing desirable applicants who may go to a competitor school.  Accordingly, the motive "plus factor" is present.

Second, Plaintiffs allege that the School Defendants act contrary to their own interests.  Under the conspiracy, as alleged, School Defendants voluntarily remove highly qualified ED candidates from their applicant pool once accepted to another school.  In doing so, School Defendants also reject candidates that are more likely to pay full tuition.  It is reasonable to infer that a school acting in its own interest has no rational, self-contained reason to walk away from highly qualified students who happen to be admitted to another school.  Thus, Plaintiffs sufficiently allege that the School Defendants acted contrary to their self-interest because of the alleged ED conspiracy.

Finally, the Complaint alleges facts implying a traditional conspiracy.  "[E]vidence implying a traditional conspiracy, consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island, 311 F. Supp. 3d 468, 494 (D.R.I. 2018) (citation modified).  For example, the Complaint cites an instance where Yale College's Dean of

19

Admissions directly pressured Harvard against taking "unilateral action" to compete for ED admits, successfully demanding a "respectful consensus" to honor the non-compete agreement. [Dkt. 1 ¶ 115].

Plaintiffs further allege that while only some schools are parties to the Ivy League Joint Statement, the School Defendants all act in accordance with its terms. Additionally, they allege that all School Defendants use information from the Common App or the Coalition App to implement and police these identical restrictions. And according to Plaintiffs, the School Defendants explicitly exchange lists of students admitted under ED to coordinate the systematic allocation of applicants and cross-check for duplicate applications. Upon receiving these shared lists, competitor schools act in concert to terminate any pending Regular Decision or Early Action applications submitted by those same students. The Complaint also offers specific examples of the School Defendants' admitting to this conduct, such as Dartmouth College admitting to mailing lists of ED admits to the Ivy League Schools, and Amherst College's Dean confirming they shared ED admit lists with roughly thirty colleges. Thus, Plaintiffs have pleaded a traditional conspiracy in that there was an actual, manifest agreement not to compete even though no meetings, conversations, or exchanged documents are shown. See Steward Health Care Sys., LLC, 311 F. Supp. 3d at 494.

Consequently, Plaintiffs have pleaded both parallel conduct and plus factors, thus establishing circumstantial evidence of an agreement among the School Defendants. Having established that the School Defendants entered into an agreement, the Court's next step is to determine whether that agreement was an unreasonable restraint of trade.

### 2. Unreasonable Restraint of Trade

Section 1 does not outlaw all restraints of trade, instead prohibits only "unreasonable

restraints of trade or commerce through contracts, combinations, or conspiracies." Am. Steel

Erectors v. Loc. Union No. 7, 815 F.3d 43, 60 (1st Cir. 2016). In evaluating a Section 1 claim,

"one of the first considerations a court faces is determining the appropriate framework for its

review: *per se*, 'quick look' or rule of reason." Id. As the First Circuit explained, this inquiry

"requires putting the cart before the horse to some extent, since the court must engage with the

functional and factual contents of the claim in order to decide how it will proceed to evaluate that

claim." Id.

Here, the parties disagree about the appropriate framework to apply. Plaintiffs argue that

the Court should conduct a *per se* analysis, or, in the alternative, a quick look analysis.

Defendants argue that the Court should conduct a rule of reason analysis. Yet, at this stage, the

Court cannot and need not "determine with certainty the nature of the restraint[s], and by

extension, the level of analysis to apply." United States v. eBay, Inc., 968 F. Supp. 2d 1030,

1040 (N.D. Cal. 2013) (refusing to apply *per se* standard or rule of reason at motion to dismiss

stage). Determining which framework applies is a better question for summary judgment. As

other courts have commented in declining to decide whether *per se* or rule of reason applied at

the motion to dismiss, "[i]ndeed, that decision is more appropriate on a motion for summary

judgment." In re High-Tech Emp. Antitrust Litig., 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012).

To survive the instant motion, Plaintiffs only need to allege sufficient facts to show an

unreasonable restraint of trade under one of the frameworks. The Plaintiffs have done so by

plausibly alleging the purported agreement is an unreasonable restraint of trade under a quick

look analysis.[3] Under the quick look analysis, the Supreme Court explained some agreements

---

[3] The Court thus does not address *per se* or rule of reason. PBTM LLC v. Football Nw., LLC,
511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021) ("A Section 1 plaintiff must sufficiently plead a
restraint of trade that falls under one of three rules of analysis: rule of reason, per se, or quick

may be rejected after a "quick look" that suggest an "intuitively obvious inference of an anticompetitive effect."  See Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 89 (2021). In doing so, the courts can presume competitive harm without extensive market analysis when the anticompetitive effects are obvious. Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 832 (3d Cir. 2010).  If an agreement seems anticompetitive to "an observer with even a mere rudimentary understanding of economics" but falls short of *per se* liability, a district court may apply quick-look scrutiny as a prelude to full rule-of-reason review.  In such cases, the burden shifts to the defendant to demonstrate empirical procompetitive effects. Am. Steel Erectors, 815 F.3d at 61 (internal citations omitted).  This typically requires careful evaluation of the parties' horizontal and vertical relationships, as horizontal restraints are agreements among competitors at the same market level, while vertical restraints involve parties at different market levels such as manufacturers and distributors. Id. at 61–62.  "Significantly, this 'quick look' analysis has primarily been applied to horizontal agreements among competitors, the anticompetitive effects of which were obvious to the Court." New England Carpenters Health Benefits Fund, 573 F. Supp. 2d at 435.

Here, Plaintiffs plead a horizontal agreement not to compete for applicants once admitted via ED; thus, the burden then shifts to Defendants to offer some procompetitive benefit.  First, Plaintiffs have pleaded anticompetitive effects which are obvious to the Court.  Plaintiffs argue that Defendants structured and enforced a customer allocation system which raised the price of tuition.  Namely, Plaintiffs have alleged that ED has raised tuition and fees by allowing the School Defendants to identify price insensitive applicants to fill a substantial portion of their

---

look.  While courts typically need not decide which standard to apply at the pleading stage, they must still determine whether the complaint has alleged sufficient facts to state a claim under at least one of these three rules.")

classes.  Plaintiffs allege that the School Defendants use ED to impose full tuition which is significantly higher than schools without ED programs and that, but for the participation in ED programs, the tuition and fees for college would be lower.  Plaintiffs also allege that the use of ED creates an upward pressure on college tuition.  Further, Plaintiffs allege that since the adoption of ED in the 1990s, the tuition and fees have increased, far outpacing inflation.  Taking Plaintiffs allegations as true, which the Court must, Plaintiffs have pleaded anticompetitive effects, thus shifting the burden to the School Defendants to offer some procompetitive benefit.

Defendants argue that ED has facially apparent procompetitive virtues including promoting competition for Early Decision applicants and protecting the integrity of each college's admissions process.  Defendants also argue that ED is a vertical agreement between non-competitors (e.g., student and school).  Defendants state that ED itself does not require any agreement between or among School Defendants.  However, Defendants also ignore Plaintiffs' allegations, which distinguishes between the ED admissions pathway and the ED conspiracy itself.  Plaintiffs do not allege that ED itself is a horizontal agreement but rather that the School Defendants have a horizontal agreement among themselves not to compete for applicants once a student is admitted via ED.  And it is through this ED conspiracy that applicants lose any potential leverage to negotiate for discounted tuition.

Defendants further argue that "students receive obvious procompetitive benefits from Early Decision—e.g., potentially higher chances of admission to their top choice school and early resolution of the application process." [Dkt. 220 at 23].  Yet, Plaintiffs allege that students are compelled to use ED primarily as a strategic tool to enhance their chances of admission, rather than to apply to their genuine top-choice school.  Plaintiffs further contend that students often pursue ED with the understanding that it improves their likelihood of acceptance, rather

than as an expression of preference for their first-choice institution.  Consequently, the Court

finds that there is a dispute as to the procompetitive effects of ED.  This diminishes any "facially

apparent virtues" and instead raises an issue of fact as to any procompetitive benefits of the

challenged conduct, which is inappropriate to resolve at the pleading stage.  See Vázquez-Ramos

v. Triple-S Salud, Inc., 55 F.4th 286, 299 (1st Cir. 2022).

Therefore, the Court concludes that Plaintiffs have adequately alleged a horizontal

agreement among the School Defendants to refrain from competing for students admitted via

ED, thereby justifying application of a quick-look analysis at the pleadings stage.  While the

School Defendants point to purported procompetitive justifications for the ED conspiracy,

Plaintiffs' well-pleaded allegations—taken as true—raise a plausible inference that such

justifications are undermined by the horizontal agreement alleged.  Thus, any balancing of

anticompetitive and procompetitive effects is premature and unwarranted at the pleading stage.

Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 460 (7th Cir. 2020).  Accordingly, the Court will

allow Plaintiffs' claims to proceed under a quick-look theory, saving for another day which

evidentiary standard ultimately applies.

### D.  Non-School Defendants Motion

#### 1. Common App and Scoir

Having found that Plaintiffs have standing and that their claims are not barred by the

statute of limitations as noted *supra*, the Court now addresses the Non-School Defendants

Motion to Dismiss.  The Non-School Defendants (COFHE, the Common App, and Scoir) argue

that Plaintiffs must demonstrate that they entered an unlawful agreement with any other

Defendant.  As stated by a sister court in this District, "[i]n assessing the adequacy of the

complaint, this court must follow 'the accepted rule that a complaint should not be dismissed for

24

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' This generous rule will not, however, rescue an anti-trust complaint 'containing vague pleadings lacking the requisite factual allegations of an antitrust claim . . .'" Wojcieszek v. New England Tel. & Tel. Co., 977 F. Supp. 527, 531 (D. Mass. 1997) (internal citations omitted). Plaintiffs do not allege that the Common App or Scoir joined any ED conspiracy. This dooms their claims.

Plaintiffs allege that the Common Application and Scoir are "jointly and severally liable for the acts of all members of the Early Decision Conspiracy." [Dkt. 1 ¶¶ 23-24]. Plaintiffs also allege that the Common App and Scoir's Coalition App "provide common application products that facilitate and enforce the anticompetitive restraints of the conspiracy." [Id. ¶ 1]. However, these are the only allegations in Plaintiffs' Complaint pointing to any conspiracy involving the Common App or Scoir. This is far from enough to plausibly allege that the Common App or Scoir joined any conspiracy or how they facilitated one. There is no allegation of parallel conduct or any plus factors evident here.

Plaintiffs argue that "Courts have repeatedly held that non-competitors that *facilitate* horizontal agreements among competitors violate the Sherman Act, even where they do not 'actively direct' or 'orchestrate' the conspiracy." [Dkt. 225 at 43-44]. Courts recognize that a noncompetitor can be *per se* liable under the Sherman Act if it organizes horizontal competitors in a price-fixing or bid-rigging scheme, even when its own relationship with those competitors is vertical. See Wilson v. Eagle Nat'l Bank, No. CV TDC-20-1344, 2021 WL 1238576, at *4 (D. Md. Apr. 2, 2021) (collecting cases); see also United States v. Apple, Inc., 791 F.3d 290, 325 (2d Cir. 2015); United States v. Green, 592 F.3d 1057, 1069 (9th Cir. 2010); United States v. MMR Corp., 907 F.2d 489, 498 (5th Cir. 1990); cf. Dickson v. Microsoft Corp., 309 F.3d 193, 204 (4th

25

Cir. 2002).  Horizontal restraints are "agreements between competitors at the same level of market structure," while vertical restraints are "combinations of persons at different levels of market structure such as manufacturers and distributors." Am. Steel Erectors, 815 F.3d at 62 (quoting M&H Tire Co. v. Hoosier Racing Tire Corp., 773 F.2d 973, 978 (1st Cir. 1984)).

Here, however the Common App and Scoir are technology platforms that support all college application processes.  There is no indication that they joined the conspiracy, nor is there any pleading that they have any financial motive to support the alleged ED conspiracy.  Plaintiffs have not alleged how the Common Application or Scoir facilitate the alleged conspiracy beyond threadbare conclusory allegations.  Accordingly, because Plaintiffs have not alleged any direct or indirect evidence of an agreement to enter a conspiracy by the Common Application and Scoir, the claims against them are dismissed. A.G. by & through Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013) ("When allegations, though disguised as factual, are so threadbare that they omit any meaningful factual content, we will treat them as what they are: naked conclusions.").

### 2. COFHE

As for COFHE[4], Plaintiffs allege that each Defendant School uses this organization as an intermediary hub to facilitate collusion.  Plaintiffs allege COFHE's "stated purpose is to facilitate information sharing among ostensibly competing elite education institutions 'as they relate to undergraduate education, admissions, financial aid, and the financing of higher education.'" [Dkt. 1 ¶ 22].  Plaintiffs allege that COFHE facilitated information sharing among its member schools regarding financial aid and admissions decisions, and that individual member schools

---

[4] Consortium on Financing Higher Education is an "organization of highly selective, private liberal arts colleges and universities," whose stated purpose is to facilitate information sharing among ostensibly competing elite education institutions "as they relate to undergraduate education, admissions, financial aid, and the financing of higher education." [Dkt. 1 ¶ 22].

and their administrators enforced the alleged ED agreement not to compete.  Neither allegation is sufficient to establish that COFHE itself joined the conspiracy.  Facilitating or participating in information exchange, without more, does not constitute parallel conduct or otherwise provide the "plus factors" necessary to infer a conspiracy.  See In re Processed Egg Prods. Antitrust Litig., 821 F. Supp. 2d 709, 753 (E.D. Pa. 2011) (noting organization is not liable for its members' conduct absent allegations of entity's own participation).  Likewise, the mere membership of schools or their administrators in COFHE does not impute alleged conduct to the organization itself.

Here, the Complaint lacks any allegation that COFHE shared lists of ED applicants' or ED-admitted applicants' information or otherwise acted to facilitate the ED conspiracy.  The single assertion that a former school administrator had knowledge of COFHE-member schools exchanging Early Decision admit lists does not bridge the gap to show that COFHE joined the conspiracy.  The remaining allegations simply note that School Defendants are members of COFHE or that COFHE-affiliated administrators also serve on other boards, but they do not demonstrate that COFHE, as an organization, engaged in conspiratorial conduct.  Absent concrete allegations of COFHE's own actions, the Court declines to impute the alleged conduct of its members to COFHE.  The School Defendants' mere membership in COFHE does not support the inference that COFHE is a party to a conspiracy to restrain trade.  There are no such allegations here.  Thus, on this record the claims against COFHE must also be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Dkt. 219] is **DENIED** and the Non-School Defendants' Motion to Dismiss [Dkt. 221] is **GRANTED**.

**SO ORDERED.**

27

Dated: August 7, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge